UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

Docket No. 6:06-cr-237-Orl-31DAB

```
UNITED STATES OF AMERICA     :
                             :
         Plaintiff           :     Orlando, Florida
            v.               :     December 21, 2006
                             :     11:05 a.m.
WILLIAM IREY                 :
                             :
         Defendant           :
```

FILED 2007 FEB 21 PM 2:32 CLERK, US DISTRICT COURT MIDDLE DISTRICT FLORIDA ORLANDO, FL

TRANSCRIPT OF DETENTION HEARING

BEFORE THE HONORABLE DAVID A. BAKER

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:     Cynthia Hawkins

For the Defendant:     John Woodard

Proceedings recorded by tape-recording, transcript produced by computer-aided transcription.

ORIGINAL

P R O C E E D I N G S

THE DEPUTY CLERK: Case number 6:06-cr-237-Orl-31DAB. United States of America v. William Irey.

Counsel, please state your appearances for the record.

MS. HAWKINS: Cynthia Hawkins for the United States.

MR. HANKS: Larry Hanks in the courtroom for Mr. Woodard who I understand is appearing by telephone.

THE COURT: Mr. Woodard, are you there?

MR. WOODARD: Yes, Your Honor. John Woodard appearing by phone, Your Honor.

THE COURT: All right. And the defendant is here.

All right. We had a hearing yesterday to consider the proposal from the defendant to be released to a 24-hour facility with electronic monitoring. Matter was continued to get some more details on both the technical and treatment aspects of that. Let me -- who wants to speak to that, Mr. Woodard, Mr. Hanks or maybe --

MS. HAWKINS: Maybe I could. Also Pretrial Services officer did some work on this.

I spoke yesterday with Dwayne Zimmerman who is the hospital administrator and executive vice president of

1  Life Stream.  He told me that this is a psychiatric
2  hospital and that it is in fact a Baker Act receiving
3  facility.  It is a lock down facility.  That it has -- it
4  is -- they're bonded.  They're monitored by the state
5  Court.  For that reason, because they're a Baker Act
6  receiving facility, that they have two sets of double
7  locked doors.  That the defendant, if ordered into their
8  facility, would not be able to check himself out and would
9  not be able to leave.  He would in effect is kind of what
10 was -- I thought was yesterday and I verified it -- a
11 functional equivalent of a jail setting in a sense,
12 however with rehab treatment options.  But in terms of his
13 ability to come and go, he would not be able leave without
14 a court order.  Mr. Zimmerman told me that it was -- this
15 facility is (inaudible) alternative here in town.  So
16 that's -- I also have literature they sent me and also
17 some information I acquired on my own to verify who
18 Mr. Zimmerman was and also who Dr. Valente was.  And I
19 have been able to verify that they are who they say they
20 are.  And I know the Pretrial Services officer has also
21 spoken with Dr. Valente and confirmed this information
22 with him.  That's what she tells me this morning.  It
23 seems to me that under the circumstances that this being a
24 lock down facility that electronic monitoring probably
25 isn't necessary, probably isn't something we could do

1   anyway because I guess the Pretrial Services officer told
2   me that the defendant would not have his own room and so
3   it would be difficult for him to be able to go throughout
4   the hospital.
5           THE COURT: That's what I was worried about.
6           MS. HAWKINS: The range of it, it's just not
7   practical. But as far as I'm concerned this is a lock
8   down facility. It really wouldn't be -- I think we would
9   meet the terms of Adam Walsh Act and wouldn't be --
10          THE COURT: It's a more restrictive environment
11  than simply EM.
12          MS. HAWKINS: Yes, sir.
13          THE COURT: Officer Rios?
14          THE PRETRIAL OFFICER: Yes, sir, Your Honor. I
15  did speak with the drug and alcohol treatment specialist.
16  He did confirm we actually had a contract with Life
17  Stream. So it is a facility that we're aware of and that
18  has been approved by our agency.
19      The second thing is I did speak with Dr. Valente and
20  he expressed that his facility has supervised inmates who
21  are currently serving prison sentences. So they have the
22  capability and the staff to supervise and impose any
23  conditions that are mandated by the Court. So they can
24  restrict the defendant whereabouts as strictly as the
25  Court imposes or as least restrictive as imposed.

1          As far as electronic monitoring, we contacted the
2    facility and they confirmed that if there's a designated
3    line, EM can be installed.  However, our concern is, one,
4    the way Dr. Valente described the facility, there's a
5    control unit in the outside and then around the control
6    area are the dormitories.  The dormitories are set up two
7    beds per room.  So he would not have his own room and the
8    phone would not be in his room.  The phone would be in
9    control area that I guess is in the middle of the
10   dormitory area.  So our concern would too many people
11   would have access to the equipment and it would be
12   damaged.  It could be tampered with.  There is just too
13   many people that would have access to it.  And the other
14   part of it would be the range with EM.  There's a certain
15   range that a defendant would be limited to in the hospital
16   or the facility.  It is larger than that range.  So that
17   any time he needed to go to a treatment on the other side
18   of the wing, it would cause problems.  And if there's any
19   type of radioactive type of equipment at the facility,
20   that would also cause concerns.
21         But as counsel stated, Dr. Valente did state that if
22   ordered by Court they can restrict him to just the
23   dormitory area.  They would not have to allow him to any
24   of the recreational areas, any of the -- visitation is
25   restricted to treatment purposes only and he would not

1  have access to the areas of the hospital where there's
2  children. So -- and he would definitely put a note on the
3  defendant's file that this patient or this defendant would
4  not have access to any children in the facility.
5      THE COURT: Do we have any sense that the
6  proposed treatment program would have a prospect of
7  providing some benefits during the pretrial period?
8      MR. WOODARD: Are you talking to me?
9      THE COURT: I'm throwing it out there. Officer
10  Rios is going to respond first and then --
11      THE PRETRIAL OFFICER: I did mention that to him
12  because he said essentially the defendant would have to be
13  evaluated first. And they (inaudible that's type of --
14      THE COURT: All the doctors say that.
15      THE PRETRIAL OFFICER: And I did mention what
16  about the treatment within a month or two, what would our
17  options be. He said that again he would have to evaluate
18  the defendant, but in his experience the type of
19  information that has been provided to him it would be his
20  professional judgment that this would be an indefinite
21  type of --
22      THE COURT: That's my anticipation, not being a
23  doctor, but having seen some of these cases before and
24  I -- it doesn't necessarily affect how we're going to deal
25  with this, but I just have a notion that the treatment

1  plans here tend to be much longer term than our pretrial
2  release periods tend to be.  But that doesn't mean he
3  can't get some benefit from it if that's how he wants to
4  proceed.
5      Mr. Woodard, do you want to speak to that?
6      MR. WOODARD: Yes, Your Honor.  And we
7  understand that we're subject to this Court's pretrial
8  order as well as the Court's (inaudible) abide by those
9  regardless of the level of treatment he's in.
10     I note that notwithstanding a disposition of
11 potential incarceration in this case, a treatment plan is
12 something that, as I saw the other day in a case in the
13 Middle District of Florida with Judge Fawsett, there's
14 something that she can recommend that the district court
15 can recommend and I think we have the groundwork
16 established that wherever he might go, if that is the
17 case, that we have a background, that we have the
18 groundwork laid so that a treating facility could pick up
19 from there.
20     You know, as the Court is well aware, has seen many
21 times in this case as well as the government, there are
22 many side effects of this type of charge.  This charge
23 being one, I would say, that is very steep in
24 psychological issues with depression, severe depression,
25 anxiety.  There was our early concern of self-destructive

1  tendencies, suicidal ideation, and what have you.  And I
2  think this continues to help treat the client especially
3  while on working with him to understand certain things
4  especially that are going on in the court process.
5      Your Honor, I have had a forensic psychiatrist
6  evaluate my client, and without going totally into that
7  evaluation, he will be looking at reports overseeing
8  (inaudible) that's Dr. Danzinger (phonetic) with this
9  clinic to keep me abreast on issues of -- I'm not going to
10 say that he is at this time, according to Dr. Danzinger,
11 competent to proceed, but make sure that he's monitored
12 and continued to be monitored with the continued treatment
13 and that he understands what is going on.  And I think
14 that will help him.
15      THE COURT:  Let me summarize.  It's the
16 defendant's application that he be released from the
17 Marshal's custody to be placed in this mental healthcare
18 facility under lock down conditions, to be evaluated and
19 get a treatment plan during the pendency of the pretrial
20 supervision period and that under the conditions as
21 described, both Pretrial Services and the United States is
22 satisfied that such a placement for the time being would
23 be appropriate under the Adam Walsh amendments to the Bail
24 Reform Act and would be appropriate under the
25 circumstances of the case.  Is that accurate?

1   MS. HAWKINS: Yes, Your Honor. And I also note
2 that the defendant has agreed to bear the cost of secured
3 escort from the Seminole County Jail to the facility and
4 (inaudible) to produce him for court hearing. I would
5 think that would be part of the order or agreement, and we
6 agree with that.
7   THE COURT: All right. I will approve this
8 along with my usual conditions of release even though some
9 of them are actually -- will be moot. But I'll recite
10 them and impose them nonetheless.
11   The defendant while he's on release is not to commit
12 any offense in violation of federal, state or local law.
13 He needs to -- obviously he will be in a lock down
14 facility, but the requirement is that he keep Pretrial
15 Services, his attorney and the United States attorney
16 advised as to his address and telephone number. He needs
17 to appear back in this courthouse for further proceedings,
18 and as described by Mr. Woodard yesterday, and reiterated
19 by Miss Hawkins this morning, he will at his own expense
20 provide security transportation to and from this mental
21 health facility from the Marshal's custody initially and
22 then back to the courthouse for further proceedings as
23 required. I am going to require the defendant sign a bond
24 in the amount of $50,000 which would be subject to
25 forfeiture if he would fail to appear. Obviously he's not

1  going to be employed so I'm not going to impose that
2  condition here.  He will be subject to restriction in his
3  placement to the facility that we have been talking about
4  under lock down conditions with no visitation except for
5  therapeutic purposes and legal consultations.  And I want
6  as soon as the doctors and whoever they're consulting
7  with, Dr. Danzinger, whoever else they need to consult
8  with, come up with a treatment plan, that that be
9  communicated to Pretrial Services so they're aware of what
10 that plan is in case they have any questions about it.
11        The defendant will be subject to monitoring by
12 Pretrial Services in the sense they'll be keeping track of
13 him and his situation and followed up with the facility
14 about that.
15        Defendant's obviously to refrain from possession of
16 any firearm, destructive device or any other dangerous
17 weapon, any use of alcohol or use of or possession of any
18 narcotic drugs or other controlled substance.
19        What happened with the defendant's passport?  Has
20 that been --
21             MR. WOODARD:  That has been surrendered to the
22 Department of Homeland Security, Your Honor.
23             THE COURT:  All right.  He's not to obtain a new
24 passport.
25             Officer Rios, any other specific conditions that will

1  be useful to you in terms of interacting with the facility
2  or otherwise?
3          THE PRETRIAL OFFICER: Your Honor, we will have
4  a release form signed by the defendant.
5          MR. WOODARD: Your Honor?
6          THE COURT: Yes, sir.
7          MR. WOODARD: If I may, two things. If the
8  Court would direct on transportation, I have provided that
9  through a licensed bonded investigative agency that works
10 for my office. That is Mike Andrews who's licensed and
11 bonded in the State of Florida, and he is willing to
12 undertake that and will pick up the subject from the
13 Seminole County Jail and deliver him to the program in
14 Leesburg. We will also do that for all four appearances
15 as needed.
16         THE COURT: All right.
17         MR. WOODARD: And secondly, Your Honor, I saw
18 that even though there is a Court imposed no visitation,
19 we had that question about the direct family as long as it
20 was part of the policy of the psychiatric link and under
21 their closed -- I don't want to say this -- they're
22 custodial care. In other words, he would have through a
23 window at the Seminole County Jail. If they have
24 custodial visitation where he is basically in a lock down
25 format would that be approved by the Court so that his

```
 1  wife, son and brother could see him?
 2          THE COURT:  So long as it's approved by the
 3  staff at the facility.
 4          MR. WOODARD:  Yes, sir.  I'm sorry, Your Honor.
 5  That would be in a custodial setting while it is ongoing
 6  so that there would be -- no one might consider lobby or
 7  gameroom visitation.
 8          THE COURT:  Right.
 9          THE PRETRIAL OFFICER:  I do think a condition
10  just so the facility could abide by it is that he not have
11  any contact with minors at that facility.
12          THE COURT:  I'm pretty confident they would
13  impose that but, yes.
14          MR. WOODARD:  Yes, sir.
15          THE COURT:  You couldn't hear Ms. Rios.  He is
16  not to have any contact with minors whatsoever.
17          MR. WOODARD:  That's correct.
18          THE COURT:  Anything else, Miss Hawkins?
19          MS. HAWKINS:  No, Your Honor.  No.
20          THE COURT:  All right.  Mr. Hanks, thanks for
21  being here, being available in person.
22       Mr. Woodard, we'll see you in the future.
23          MR. WOODARD:  Yes, sir.
24          THE COURT:  And we're in recess.
25
```

```
 1                      C E R T I F I C A T E
 2         I certify that the foregoing is a correct
 3  transcript from the record of proceedings in the
 4  above-entitled matter.
 5
 6
 7
 8
 9  _____      2/21/07
10  Sandra K. Tremel
```