1            IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF FLORIDA
2                     ORLANDO DIVISION

3            Case no.:  6:06-cr-237-Orl-31DAB

4  UNITED STATES OF AMERICA,        )    Orlando, Florida
                                     )    January 29, 2008
5                  Plaintiff,        )    1:00 p.m.
                                     )
6                      v.            )
                                     )
7  WILLIAM IREY,                     )
                                     )
8                  Defendant.        )
   _____ )

9

10

11

             Transcript of an excerpt of a sentencing

12

             before the Honorable Gregory A. Presnell

13

                 United States District Judge

14

15

16

   Appearances:
17
   Counsel for Plaintiff:    Cynthia Hawkins
18

19  Counsel for Defendant:    Kirk Kirconnell

20
   Court Reporter:           Diane C. Peede, RMR, CRR
21                            United States Courthouse
                              401 West Central Blvd., #4600
22                            Orlando, Florida  32801
                              (321) 537-2130
23
    Proceedings recorded by mechanical stenography, transcript
24  produced by computer.

25

Index of Transcript

                                                        Page

Ted Shaw
Direct by Mr. Kirkconnell                                 11
Cross by Ms. Hawkins                                      21


Jim Irey
Direct by Mr. Kirkconnell                                 31


John Sebring
Direct by Mr. Kirkconnell                                 34


Benjamin Sandrock
Direct by Mr. Kirkconnell                                 36


Glenn Irey
Direct by Mr. Kirkconnell                                 39


William Irey
Direct by Mr. Kirkconnell                                 45

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Call the case, Anita.

 3            THE COURTROOM DEPUTY:  This is in the matter of the

 4    United States of America versus William Irey, case number

 5    6:06-criminal-237-Orlando-31DAB.

 6            THE COURT:  Okay.  And appearance for the

 7    government?

 8            MS. HAWKINS:  Cynthia Hawkins for the United

 9    States, Your Honor.

10            THE COURT:  Okay.  And for the defendant?

11            MR. KIRKCONNELL:  Good afternoon, your Honor.  Kirk

12    Kirkconnell and William Ponall for the defense.  And with me

13    is Mr. Irey, the defendant.

14            THE COURT:  Okay.  Thank y'all.  We're here today

15    for the sentencing in this matter pursuant to notice.  Mr.

16    Irey pled guilty to Count One of the Indictment in this case

17    on July 2nd of last year, and that count charged him with

18    production of child pornography, in violation of 18, United

19    States Code, Section 2251(c).

20            I have -- in connection with the sentencing, I have

21    received and have reviewed the presentence report dated

22    November 26, 2007.  There's an addendum to that reflecting

23    some objections, which we'll deal with.

24            I also have received and have reviewed the

25    defendant's sentencing memorandum at document number 57 and
```

1    the government's sentencing memorandum at document number 50.

2              I have Dr. Shaw's curriculum vitae and his report,

3    Psycho-Sexual Evaluation report, dated December 3rd, which I

4    have also reviewed.  I think that's the extent of the written

5    documentation that I've looked at.  And the report of Dr.

6    Shaw was forwarded to me by Probation under cover date of

7    January 7, 2008.

8              Is there anything I've missed in terms of matters

9    that I should have reviewed?

10             MR. KIRKCONNELL:  Your Honor, there's a couple of

11   additional letters, which I thought I handed them to Anita

12   just a moment ago.  Maybe I didn't.  I've provided copies of

13   these to the government.  These are more letters of support.

14   I thought I had already provided those.  I've provided the

15   government copies of those.

16             THE COURT:  Well, I've reviewed several letters

17   written on behalf of Mr. Irey.

18             MR. KIRKCONNELL:  Your Honor, as you might recall,

19   we asked for a portion of this hearing to be in camera; and I

20   spoke with -- and you granted the motion, unopposed.  We

21   spoke with Anita.  And probably logistically the best way to

22   do that is to do that first.  It will require some live

23   testimony.

24             THE COURT:  All right.  Well, tell me again what

25   the purpose of the in camera is as opposed -- I mean, I

 1    granted it, but I still need to know what's going on and why.

 2                MR. KIRKCONNELL:   Your Honor --

 3                THE COURT:   Why don't you go up to the podium, Mr.

 4    Kirkconnell, so we can hear you better.

 5                MR. KIRKCONNELL:   Your Honor, from the beginning of

 6    this case, Mr. Irey has been attempting to do substantial

 7    assistance.   Because he has been in custody, he has been

 8    doing it with the assistance of his brother, Robert Irey, who

 9    is here presently.

10                This is an ongoing investigation.   I have talked to

11    Ms. Hawkins about it, and she has talked to the agent.   They

12    do not feel -- and she has told me she is not willing, based

13    on what we have, to file a regular 5(k)1 substantial

14    assistance.   But we ask you, Judge, to let us tell you a

15    little bit about what has been going on so you can make a

16    decision under all the facts and circumstances, character of

17    the defendant and so forth, about some efforts he's made.

18                The reason this is in camera is because it involves

19    the death of two United States' citizens in Iraq and the

20    theft or loss of over $20 million.   Mr. Irey and his brother

21    have been attempting to assist the F.B.I. in bringing this

22    person to justice and recovering this money.

23                It is -- I see your eyes rolling there, Your Honor;

24    but it's something which, if names are mentioned or places

25    are mentioned, it could jeopardize the investigation.

1          THE COURT:  I don't question that.  I'm just

2   wondering -- absent the government's motion, which is

3   entirely within their discretion, I'm just wondering whether

4   this type of information is even something that's pertinent

5   as a 3553(a) factor for me to consider.

6          MR. KIRKCONNELL:  Well, Your Honor, again, the

7   Court is much more familiar with the law than I, but my

8   understanding is that that would allow us to -- that that

9   section of the statute allows us to present any factor that

10  you could consider, even whether or not the government feels

11  it's substantial assistance, character and circumstances of

12  the defendant.

13         THE COURT:  I can consider anything that's

14  pertinent.  That's my question.  I have never before had --

15  well, you know, I'll hear it out; but I'm just giving you

16  some skepticism as to how much this is going to help me in

17  terms of fashioning a sentence.  I mean, I can assume he's

18  trying to help the government, and I can assume he's

19  attempting to do so in a matter of great importance; and Ms.

20  Hawkins may even agree to that.  So I don't know if I need to

21  know the details, I guess, is what I'm saying.  I'll listen

22  to them.

23         Ms. Hawkins.

24         MS. HAWKINS:  Actually, I think that the Court's

25  probably cut to the chase from where we're coming from.  I've

1  spoken with the agent involved out of Washington.  The case

2  agent here today has spoken with that agent.  We're talking

3  about a meeting with an agent by the brother, the defendant's

4  brother, in which he gave information that the agents said

5  they could not use and are not pursuing.  There is not an

6  ongoing investigation into this matter.  I mean, it was an

7  effort of sorts on behalf of the defendant.  I'll accept that

8  representation, but I am told that there is nothing ongoing.

9          I think the Court has the authority to listen to

10  this, for what it's worth; but, again, I don't think it's

11  pertinent; but I did agree that if it's certainly something

12  if they want to bring up, they can.

13          MR. KIRKCONNELL:  Your Honor, we'll keep it

14  relatively brief, but I would ask you to indulge us, if you

15  would, and hear this.

16          THE COURT:  All right.  Well, who am I going to

17  have to remove from the courtroom to do this?

18          MR. KIRKCONNELL:  Well, I've told the probation

19  officer.  That's fine.  The court personnel are fine.

20          I don't know who this gentleman is.  Court

21  personnel.  Okay.

22          Just the court personnel.  I just didn't want any

23  other civilians in here.

24          MS. HAWKINS:  The only other person is a federal

25  agent.

1        MR. KIRKCONNELL:  That's fine, Your Honor.

2        THE COURT:  All right.  Well, then unless somebody

3  enters the courtroom during the process of this, we'll just

4  go ahead and proceed then.

5  *****

6        (Per Judge Presnell's instructions, the in

7  camera portion of this hearing is omitted from the

8  transcript.)

9        MR. KIRKCONNELL:  Your Honor, we can now go into

10  the rest of the hearing, if you want to.  I'd like to call

11  Dr. Shaw as our next witness.

12        THE COURT:  Let the record show we're no longer in

13  an in camera mode.  We are open to the public.

14        Thank you, sir.  You can step down.

15        MR. KIRKCONNELL:  The Court has his report and his

16  C.V., Dr. Shaw's.

17        THE COURT:  Yeah.  But before you do that, let's

18  deal with these -- any objections you've got to the P.S.R.,

19  Mr. Kirkconnell.

20        MR. KIRKCONNELL:  I believe those objections have

21  been addressed in the P.S.R., Your Honor.  What's the date of

22  the objections that you have?

23        THE COURT:  September 17.

24        MR. KIRKCONNELL:  Yeah.  There have been two

25  amended P.S.R.s since then.  I think those have all been

1    addressed.

2              THE COURT:  Well, I don't happen to have copies of

3    the amended ones.  What you're telling me is there are no

4    factual objections?

5              MR. KIRKCONNELL:  Correct.

6              THE COURT:  All right.  The scoring in this matter

7    is -- I guess you could say it's simple.  It maxes out at a

8    43/I, and there's a 15-year mandatory minimum and a maximum

9    of 360 months.  Is there any objection to that scoring?

10             MR. KIRKCONNELL:  No, Your Honor.

11             THE COURT:  All right.  The Court then adopts the

12   factual statements contained in the presentence report as the

13   findings of the Court inasmuch as there's no objection

14   thereto, and determines that the advisory guideline score is

15   43/I, which would call for a term of imprisonment of 360

16   months; supervised release of between five years and life; a

17   fine of between 25,000 and $250,000; and a $100 special

18   assessment.  So that's the score we're dealing with.

19             So we're now at the point where you want to present

20   some mitigating evidence?

21             MR. KIRKCONNELL:  Yes, Your Honor.

22             THE COURT:  All right.  And you want to call Dr.

23   Shaw?

24             MR. KIRKCONNELL:  Yes, Your Honor.

25             THE COURT:  All right.

1           THE COURTROOM DEPUTY:  Please step forward and be

2    sworn.  Please raise your right hand.

3                           TED SHAW,

4    having been first duly sworn, was examined and testified as

5    follows:

6           THE COURTROOM DEPUTY:  Please state your name for

7    the record.

8           THE WITNESS:  Ted Shaw, S-h-a-w.

9           THE COURTROOM DEPUTY:  Have a seat, sir.

10          MR. KIRKCONNELL:  Your Honor, if we could, we -- I

11   think that the government and the defense are prepared to

12   stipulate to Dr. Shaw's expertise.  I believe the Court is

13   actually familiar with Dr. Shaw from other cases, too.

14          THE COURT:  Yes, I am.  If there's no objection,

15   I'll certainly recognize him as an expert in the field.

16          THE WITNESS:  Thank you, Your Honor.

17          MR. KIRKCONNELL:  Your Honor, the Court is in

18   possession of Dr. Shaw's C.V. and also his Psychosexual

19   Evaluation report; and rather than have him go through the

20   entire report -- I know the Court has read it -- I just would

21   like to have him, if he could, summarize it.  I'm going to

22   ask him a couple of questions and see if the government or

23   the state has any questions.

24                     DIRECT EXAMINATION

25   BY MR. KIRKCONNELL:

1   Q.    Would you tell Judge Presnell, if you would, after your

2   time and testing of Mr. William Irey, what your findings were

3   and what your recommendations are, and if you could also

4   comment on the treatment he's been getting and Dr. Berlin's

5   report, which you utilized?

6   A.    Certainly.  Well, as I summarized in my report, Mr. Irey

7   has a -- a long-standing problem with sexual obsession.  He

8   has a fairly recently identified problem of either depression

9   or an adjustment disorder with depressed features.  Dr.

10  Danziger made note of that.  But oftentimes people engage in

11  compulsive sexual behavior as a self-treatment for

12  depression.  It may be that Mr. Irey suffered much longer

13  from that, and has been treated in the Lake County facility

14  for depression in addition to being treated with an

15  addictions model.

16            Now, in lay terms, Mr. Irey suffers from

17  something like sexual addiction; and like many addictions, it

18  starts out limited, somewhat limited, and then it gets --

19  spreads.  It gets worse.

20            Using the DSM-IV TR obsessive-compulsive type

21  disorder, not the full-blown disorder, but with the sexual

22  behavior being the most prominent feature would be more the

23  way it would be described there.

24            This started out as the use of prostitution

25  and --

1    Q.    Doctor, all that is contained in the report.  What I

2    want you to do is summarize -- the Court has read the report.

3              MR. KIRKCONNELL:  Right, Your Honor?

4              THE COURT:  Yes, several times.

5              THE WITNESS:  Sorry.

6    BY MR. KIRKCONNELL:

7    Q.    Summarize the report.  The Court is aware of that.  So

8    if you could talk perhaps about his amenable to treatment,

9    your recommendations.

10   A.    Okay.  I don't usually talk about it without the

11   introduction.  So I apologize.

12             THE COURT:  No problem.

13   A.    Well, first of all, I did clearly find -- I found Mr.

14   Irey amenable for treatment; and I'm not surprised, in

15   reviewing Mr. Spears' notes, after eleven therapy sessions

16   that in fact he has made observable progress in the areas

17   that have been addressed in treatment.  Mr. Spears, who's a

18   clinical partner of mine and has worked with me for many

19   years, focused on relapse prevention and cognitive

20   restructuring.  These are two standard and important

21   components of sexual treatment that would translate into any

22   other program that he would attend afterwards to give him a

23   jump start.  And Mr. Spears found, as I suspected he would,

24   that he was open to confrontation and to looking at his

25   behaviors and his thinking and urges critically and has

1    already become, I think, more sensitive to the global impact

2    of his behavior as well as the specific impacts on victims

3    that his behavior caused.

4              I didn't find any evidence or sufficient

5    evidence to make a diagnosis of any personality disorder,

6    neither did the other doctors, Dr. Berlin or the other doctor

7    who evaluated him, and that's important because personality

8    disorders interfere with treatment progress and they often

9    later interfere with compliance and supervision when a person

10   returns to the community.

11             THE COURT:  Is that the Axis II diagnosis?

12             THE WITNESS:  Yes, Your Honor.

13   A.   So I did leave it deferred because it's possible that a

14   later intensive treatment might find a compulsive disorder.

15   But perhaps not surprisingly, compulsive disorders are the

16   one disorder that improves compliance with supervision.

17   People -- a lot of people who are compulsively into something

18   bad, once they've been rehabilitated, then they become as

19   dedicated to doing things right.  That's often true with

20   pedophiles, who actually tend to do very well in the

21   community under supervision.

22             He does accept responsibility for his behavior.

23   As I said, he was open to facilitation and confrontation.

24             The other really important aspect of Mr. Irey's

25   background is that he has overall in his life been a social

1    individual, a person with much responsibility, both with

2    family and in business, and has comported himself, from all

3    reports, honorably and responsibly with credit and

4    maintaining his family.  He has this sort of encapsulated

5    problem that grew and became worse.

6           In general, when individuals have that kind of a

7    problem, it makes them more treatable.  The other parts of

8    them are healthy, and they're able to get those resources and

9    marshal them to work on their problem.  For me, I think the

10   one other -- so that's amenability.

11          I also summarized my opinions in terms of his

12   recidivism risk.  May I speak about that?

13   Q.   (Nods head affirmatively.)

14   A.   Now, I used empirically validated actuarials.  They do

15   not apply to people who have committed only the crime of

16   viewing or sharing child porn; but because there were acts of

17   Mr. Irey's that were part of the porn and part of his

18   problem, I thought it was appropriate to consider them.  He's

19   essentially in the medium low to medium or moderate risk

20   categories, which is -- which is below a threshold of likely.

21   In my opinion, it would make him unlikely to be seriously

22   considered for civil commitment under -- in terms of my

23   understanding of the Adam Walsh Act and how it's playing out

24   in terms of the concept of likely to re-offend.

25          He also has -- he's very low in psychopathy,

1    which is the essential elements of criminality.  Again, he

2    has this encapsulated area where he was cheating, where he

3    was lying, where he was violating laws; but outside of that,

4    he was -- appears to be -- to have been a law-abiding

5    citizen.

6             Now, he does have the opportunity while

7    incarcerated in the federal prison system to participate in

8    residential treatment.  I have every reason to believe he

9    will volunteer, as he has for just about every treatment that

10   has come along; and, of course, he will be provided with

11   informed probation supervision.  As I'm sure you've noted, I

12   have a number of contracts with U.S. Probation to provide

13   treatment for them, and their level of professionalism is

14   very high and clients supervised by them are getting very,

15   very clear sex offender specific supervision.

16            Dr. Berlin suggested that Mr. Irey's risk could

17   be further reduced by the use of antiantigens; but I hesitate

18   to recommend to the Court that that be put into any form of

19   court order because antiantigens come with a number of side

20   effects, including depression, and they're not always useful.

21   They are sometimes useful; but Mr. Irey is going to be older,

22   obviously, when he is released, when and if he's released,

23   and he's going to have experienced a reduction naturally in

24   testosterone and a reduction in sex drive.  So he's going

25   to -- the use of antiantigens might or might not be

1   necessary.

2            I have recommended and continue to recommend

3   that it be considered, that it be an option, and perhaps even

4   ordered to be considered at the time of release because it

5   can be helpful; but the state of Florida has some laws that

6   require it under certain conditions, and no clinicians have

7   agreed with that way of using antiantigens.

8            THE COURT:  I can assure you I'm not going to make

9   that decision.

10            THE WITNESS:  Thank you, Your Honor.

11   A.   So overall, I find him to be, as I said, a moderate

12   risk, a low-moderate risk, low in psychopathy.  He does

13   have -- has deviant interests.  Those interests, he himself

14   has been working on reducing and are likely somewhat reduced

15   already.  They are fueled by obsessive thinking and

16   masturbating and by the sex acts themselves.

17            So I made just three very simple recommendations

18   at the end of my report, that he be -- I hope that he's

19   provided with an opportunity to participate in treatment

20   within the U.S. Bureau of Prisons; and that I don't think he

21   will be a candidate for Adam Walsh, a reasonable candidate;

22   and that he should be provided with extended probation and be

23   required to participate in treatment when he's released.

24   Q.   Thank you, Dr. Shaw.

25            MR. KIRKCONNELL:  Does the Court or counsel have

1    questions?

2             THE COURT:  Let me -- before you begin, Ms.

3    Hawkins, let me just -- the term "pedophilia," that is a

4    recognized condition or disorder, that is, it's recognized in

5    the medical community as such?

6             THE WITNESS:  Yes, Your Honor.

7             THE COURT:  I mean, is it an illness?  I mean, how

8    would you describe that as a mental health professional?

9             THE WITNESS:  First of all, I would like to say if

10   you have Dr. Berlin's report, he was part of the subcommittee

11   that wrote the definitions of pedophilia in the DSM-IV TR,

12   and I thought he did an eloquent job at describing it.

13            I'll take my shot at it.  It is a disorder of

14   sexual interest and behavior, and you can have the diagnosis

15   with only the interest.  So you could be fascinated, sexually

16   attracted to children and never act on it, and -- but if it

17   troubled you or caused any problems for you, you would still

18   be diagnosable with that disorder, and that is being

19   attracted to or engaging in behaviors, sexual behaviors, with

20   prepubescent children.

21            So it is clearly a well-recognized disorder, and I

22   thought that Dr. Berlin did a good job of saying that it's

23   not a disorder that someone chooses.  It's something that is

24   within you and you have some tendency towards it.

25            And frankly and quite sadly, I think the

1    availability of child images, particularly on the Internet,

2    has fueled an epidemic of pedophilia that was kind of

3    probably in the background, people might not have even known

4    that they suffered from it, and then come across these

5    images.  But nonetheless, it is a treatable disorder.  So

6    it's a disorder that has different origins.

7         And Mr. Irey talks about how the disorder

8    manifested itself for him in his being provided with a very

9    young -- or very young prostitutes without asking for them

10   initially; but then he found himself first repelled but then

11   attracted to them, and that's that sort of natural biological

12   disorder part of it that's different from the moral and

13   ethical issues.

14        So for another person, if they had been in the same

15   situation, they may have been repulsed and stayed repulsed by

16   it and, you know, not -- just said, "Don't ever do that again

17   and I'm not interested;" but that led him into a spiral of

18   interest in children sexually.  So that's the way that it's

19   manifested itself here.

20        THE COURT:  I guess what I'm trying to get at is

21   that -- I mean, I unfortunately -- unfortunately, we see more

22   and more of these cases here; and they're very troubling, for

23   obvious reasons.  And I've heard various comments from

24   Probation that it's not treatable.  I've heard comments from

25   people, when I suggest that it's both an illness and can be

1    carried forward into criminal conduct, people accuse me of

2    not knowing what I'm talking about when I say it's an

3    illness, and maybe I don't.  That's why I'm asking you.

4           And I guess the question is, from a standpoint of

5    criminology, is a person who acts out as a result of this

6    condition acting totally of rational free will or is that

7    person acting out as a result of something that is in essence

8    an illness that he at that point has no control over?  Do you

9    understand what I'm saying?

10          THE WITNESS:  I do, Your Honor.  I think that the

11   fact that pedophilia is not an underlying element for

12   competency or sanity -- it is an Axis I, treatable disorder.

13   Those of us who have been in the field -- I've been in the

14   sex offender field actually since 1976; and there were

15   pioneers in the field before me, long before me.  We have

16   been treating pedophilia for decades.

17          It is -- I think that the problem that a lot of lay

18   people have is in distinguishing between people who are

19   disordered, seriously disordered, and curability versus

20   treatability.  Pedophilia is very treatable, and there are

21   many pedophiles in the community who are doing just fine and

22   managing their behavior.

23          As I'm sure you know, probationers, U.S.

24   probationers, are now subjected to an annual polygraph about

25   whether they are following the rules of their probationer or

1   whether they are re-offending.  Pedophiles are capable of not

2   re-offending, even if they have an urge, in the same way that

3   compulsive dessert eaters can choose to not eat dessert.

4            They have different levels of struggling, and there

5   are aids to that:  Good supervision, good treatment,

6   replacing those needs with healthy needs.  A lot of treatment

7   is helping people understand the origin of their disorder and

8   then teaching them to, first of all, be aware of the danger

9   signs, the risks to relapsing, but at the same time replacing

10  the way that they were meeting the needs met with the

11  disordered behavior, meet them in healthy ways; and that's

12  something people can be taught.  People like Mr. Irey, who's

13  bright, who has been successful in business, he can certainly

14  learn the techniques that we teach to prevent -- be

15  responsible himself for preventing a reoffense.

16           It's -- I think because we like to say, "You can't

17  be cured" -- in other words, the best long-term treatment is

18  to be alert to the problem and to -- that's not a cure.

19  Cures, you can forget about it.  Just go be around kids again

20  and don't worry about it.  That, we can't do.

21           But there are, you know, thousands of pedophiles

22  and child molesters, different, out there, in my belief, who

23  aren't re-offending, who are in recovery and doing just fine.

24  The new treatments that we use are, I think, very effective.

25           THE COURT:  Okay.  Thank you.

1          Ms. Hawkins?

2                    CROSS-EXAMINATION

3    BY MS. HAWKINS:

4    Q.    I'm going to follow up on a question the Judge asked in

5    terms of the definition of a pedophile.  Pedophilia is

6    defined, is it not, by the age of the child that the

7    defendant would be attracted to?

8    A.    Well, in there, it does say "approximate age."

9    Q.    The degree of --

10   A.    Thirteen.

11   Q.    Or prepubescent?

12   A.    Yes, but because puberty has been -- kids are getting --

13   reaching puberty younger and younger, that's -- that's a

14   little complicated; but, yes, certainly partly by the age.

15   Q.    In this case, the defendant was diagnosed as a pedophile

16   with a sexual interest in children younger than 13,

17   prepubescent children?

18   A.    That's correct.

19   Q.    Now, in terms of the risk assessment, the Static 99 and

20   the MNSOST-R, in those tests, were just pedophiles used as a

21   control group?

22   A.    No.  There were individuals in the study who were

23   rapists as well.

24   Q.    Okay.

25   A.    Child molesters, some of them were pedophiles and

1  rapists.

2  Q.    Exactly.  So there were some adult sex offenders --

3  victims that were adults, some that had victims that were

4  teenagers, and then some that had victims that were

5  prepubescent?

6  A.    Yes.

7  Q.    Now, you did say that you didn't make a mental health

8  diagnosis, a personality disorder diagnosis, correct?

9  A.    Right.  I did make a diagnosis of depressive disorder

10  and OS.

11  Q.    And you would agree with me that being an alcoholic or

12  being depressed does not cause one to be a pedophile,

13  correct?

14  A.    Absolutely correct.

15  Q.    And isn't it true that people that are characterized as

16  sex addicts or characterize themselves as sex addicts often

17  are not pedophiles; is that correct?

18  A.    Yes, ma'am.

19  Q.    Did you look at any of the photographs of the

20  defendant's victims?

21  A.    Not in this case, no.

22  Q.    Did you know how many victims he had?

23  A.    In terms of the pictures, ma'am?

24  Q.    No.  In terms of the individual young children.

25  A.    I'm not sure whether I was given a -- any total count.

1   Q.    Would it make a difference to you to know that the

2   defendant committed sexual molestation of over 50 children?

3   A.    It actually wouldn't surprise me, and I knew that the

4   problem had been going on for some time, and he did admit

5   that he had become more and more obsessed and was returning

6   to Asia more and more often for the purpose of engaging in

7   these behaviors.

8   Q.    Did the defendant admit to you that he used different

9   items to penetrate children?

10  A.    He didn't describe those to me, but I did read them in

11  the file; and I -- as I'm sure you know, it's not easier to

12  talk about it.  I wasn't there to do therapy with him but

13  really just to make an assessment.  So that would come out

14  as -- in fact, he is talking much more about what he's done

15  in therapy now than when I first interviewed him.

16  Q.    That has more to do with therapy as opposed to your

17  assessment?

18  A.    Yeah.  I mean, I assume people are going to minimize and

19  leave some of the worst things out.  As part of survival as a

20  human being, we don't -- it's hard to face the worst things

21  that we've done.  So we let it out little by little.

22  Q.    Did you discuss with the defendant that he had

23  distributed images of himself molesting prepubescent children

24  over the Internet so that they are freely available to any

25  number of people throughout the world?

1   A.   Yes, ma'am, we did discuss that.

2            MS. HAWKINS:  I have no other questions.

3            MR. KIRKCONNELL:  I have no further questions, Your

4   Honor, unless the Court has some.

5            THE COURT:  No, I don't.

6            Doctor, I appreciate you being here.

7            THE WITNESS:  Thank you, Your Honor.

8            MR. KIRKCONNELL:  May Dr. Shaw be excused?

9            THE COURT:  He may.

10           MR. KIRKCONNELL:  Thank you.  Your Honor, at this

11  point I would ask the Court's permission -- I've provided the

12  clerk with a couple of very short videos by family members.

13  I would ask the Court to allow me to play those at this

14  point.

15           THE COURT:  Okay.

16           (Video played in open court as follows.)

17           A VOICE:  "It's called the clubhouse.  Bang, bang,

18  bang" --

19           MR. KIRKCONNELL:  Stop it a second, Anita.

20           Your Honor, first of all, let me identify this

21  young man.  This is Mr. Irey's youngest son who is speaking

22  in this video.

23           THE COURT:  Okay.

24           MR. KIRKCONNELL:  Okay, Anita.

25           (Video played in open court as follows.)

1          A VOICE:  "At my house about three years ago" --

2          THE COURTROOM DEPUTY:  Let me rewind it.

3          (Video played in open court as follows.)

4          A VOICE:  "This is a story that I wrote last year

5  for a project.  It's called The Clubhouse.  Bang, bang, bang.

6  At my house about three years ago, my dad and I built a

7  clubhouse.  First, my dad and I had to go get a lot of

8  supplies at Home Depot.  We got hundreds of planks of wood

9  and lots of nails, an electric saw and a hammer and lots of

10  other stuff.

11          "When we got home, my dad drew out what it would

12  look like.  It looked awesome.

13          "Next, my dad and I started to saw the lengths of

14  wood into a perfect size.  Then my dad and I started to build

15  a fantastic clubhouse.  My dad showed me where to hammer, and

16  I nailed the nails into the wood.  It took us about three to

17  four weeks to sand -- to build the clubhouse and an extra one

18  week to sand it down and put the swings on.

19          "Then when my dad and I were done, it looked

20  superb.  Not a board was crooked or out of place, not a nail

21  was loose.  The swings were perfect and the inside was big

22  and nice.  The clubhouse was the nicest clubhouse I've ever

23  seen.  I owe it all to my dad.  'Thanks, dad,' I said.

24          "The best part of building the clubhouse was

25  building it with my dad.

1          "We also had a fun time in the Boy Scouts, Indian

2     Guides, and throwing the football around the yard.  I

3     couldn't believe it when he built me a dirt bike track.  It

4     is so much fun.  I miss doing all that stuff with him.  I

5     love my dad.  I need my dad.

6               "A MALE VOICE:  That was a real good job."

7               (On the video appears a motocross rider riding his

8     dirt bike.)

9               MR. KIRKCONNELL:  Anita, you can skip that.

10              THE COURTROOM DEPUTY:  Is it right after this?

11              MR. KIRKCONNELL:  Your Honor, this is Mr. Irey's

12    daughter.  She's 16.

13              (Video playing in open court as follows.)

14              "BARBARA IREY:  There are millions of words that I

15    could use to describe my father, but by far the best one

16    would be 'loving.'  I can't thank my father enough for

17    everything he has done and everything he has shown me in

18    life.  My father has taught me how to be strong, respectful,

19    honorable, loyal, and the list can go on and on.  My father

20    has also taught me that nothing is impossible and that

21    nothing important comes without hard work.

22              "I have learned that it's okay to mess up, but you

23    just have to pick up -- pick yourself up and you'll end up

24    being stronger.

25              "And I've made a slide show showing the father that

1    he can be."

2             MR, KIRKCONNELL:  That's all for this video.  The

3    next one would be Defendant's Exhibit Number 2, Your Honor.

4             Anita, can you --

5             THE COURTROOM DEPUTY:  Yeah, it's reading it.

6             (Video played in open court as follows.)

7             "CANDY IREY:  My name is Candy Irey.  I'm Bill's

8    wife.  We've been married for 25 and a half years.  I wanted

9    to do this tape in lieu of being up on the stand because I

10   didn't feel I'd be able to get out what I needed to get out

11   the day of the trial.

12            "Bill is one of the most amazing people I've ever

13   known.  He's a loving and wonderful husband and father.  When

14   the children would ask Bill to help them or play with them,

15   he would always stop what he was doing and go to them.

16            "Whenever they would make mistakes, he would talk

17   it over with them and show them what they did wrong and how

18   to make sure it wouldn't happen again.  He would get the

19   point across in a way that would not belittle them.

20            "They always felt comfortable coming to him for

21   advice.  Bill made sure the kids knew that they were

22   important to him, and also whatever they were involved in was

23   also important to them, too.

24            "When the kids were involved in clubs or sports,

25   Bill would always volunteer to help out.  Bill was the club

1   master and leader for the Boy Scouts when Glenn was in the

2   Boy Scouts.  He would always have campouts with the troops.

3   Bill would always have the parents come with the kids so it

4   made it a family campout and not just the Scouts.

5        "Bill was also mindful of other people's feeling.

6   One time sticks out in mind when he was leader for our group.

7   One of the families could not afford a uniform for their son.

8   Bill told them not to worry, that the troop had extras.  The

9   real truth was that Bill paid for the uniform himself but did

10  not tell the family so that they kept their dignity.  This is

11  the typical side of Bill.  He would always help out but never

12  wanted the recognition.  Just seeing the result was enough

13  for him.  He always taught our children that it didn't matter

14  who got the credit.  What matters was that whatever needed to

15  be done was done.

16       "Another time one of our workers was bleeding in

17  his brain.  He had to be hospitalized and had tubes drilled

18  in his head to drain the blood.  They eventually had to drill

19  into both sides of his skull.  When he was released, he was

20  no longer able to perform his job because he was never able

21  to concentrate like he used to.  Bill created a new position

22  for him so he could remain on the payroll and also still have

23  his medical insurance.  He kept him employed for one and a

24  half years after his surgery, and then we had to close due to

25  Bill's being arrested.  Again, Bill never asked for anything

1    in return.

2           "I could go on and on about the different times

3    Bill could help people.  We just don't have enough time.

4           "Bill was always looking for ways to give back to

5    the community.  He was involved in the Rotary Club, he was a

6    32nd degree Mason, and he served on the boards of the United

7    Way, Dr. Phillips YMCA, and the Mount Dora Icehouse Theater.

8    He also donated his time and money doing various projects for

9    Give Kids the World and also the Shriners.

10          "Bill even helped out the local fire department.

11   One of the volunteers had called him to help him find a boy

12   that was missing and they thought might have drowned in the

13   river.  Bill was a scuba diver at the time.  He helped them

14   search the river, and Bill was the one who found him.  He

15   brought him to shore, but he was already dead.  This had such

16   an affect on Bill that he wasn't able to scuba dive again.

17          "It was probably about 15 years later when our son

18   Jim was going for his open water dive and Jim was able to

19   talk his dad into coming with him.

20          "During Hurricane Andrew in Miami, Bill had donated

21   our camper to the church so they could use it for the

22   families who had lost their homes.  This camper was passed on

23   from family to family as their houses were being fixed.

24          "Bill not only helped people, but he also helped

25   animals, too.  One time our neighbor's two dogs were

1   attacking another animal.  Bill went out to save the animal,

2   and he found it was another dog.  He rescued it from the two

3   dogs and brought it into the house.  After putting up fliers

4   and posting ads in the paper, no one claimed the dog.  The

5   dog, which is now known as Fox, has been part of our family

6   for four years now.

7              "Bill has been in LifeStream Medical Hospital for a

8   year now.  During his stay, he found ways to help others.

9   There is one patient in particular that sticks out.  His name

10  is Eric.  He was admitted into the detox facility.  Bill

11  talked to him about the problems -- about his problems and

12  even talked to him into going into the Baptist ministry

13  program.  Eric later came back as a visitor to see Bill and

14  he told him that he was now getting married and moved to

15  Tennessee.  Even in the worst of times, Bill sees to helping

16  others in need.

17             "I'm very blessed to have been part of Bill's life

18  for so many years.  He's taught me so many things.

19             "When we were married and gave our vows, part of

20  those was for better or worse, in sickness and in health.

21  These vows still hold true in my heart, and I will be there

22  for Bill until he is well enough again and he can come back

23  home to his family."

24             MR. KIRKCONNELL:  I'm not going to play the video.

25  I think you kind of get an idea of the family support, Your

1    Honor.

2              THE COURT:  I do.

3              MR. KIRKCONNELL:  The other video consists of

4    family photographs.  It's available, if the Court would like

5    to see it; but I think you get the flavor of the family here.

6              THE COURT:  I understand that Mr. Irey has been a

7    good family man and has family support.

8              MR. KIRKCONNELL:  Okay.  The next witness, Your

9    Honor, we'd ask the Court to consider is Jim Irey.

10             THE COURT:  Okay.

11             THE COURTROOM DEPUTY:  Please step forward to be

12   sworn.  If you will, stop and raise your right hand.

13                         JIM IREY,

14   having been first duly sworn, was examined and testified as

15   follows:

16                    DIRECT EXAMINATION

17             THE COURTROOM DEPUTY:  Please state your name for

18   the record.

19             THE WITNESS:  James Irey.

20                    DIRECT EXAMINATION

21   BY MR. KIRKCONNELL:

22   Q.   Good afternoon.  Would you tell the Judge and counsel

23   your relationship to the defendant, Bill Irey.

24   A.   Bill's my father and I'm his oldest son.

25   Q.   Do you have some thoughts you want to share with Judge

1   Presnell regarding your dad?

2   A.    Yeah.   I've prepared a list of thoughts that I had, just

3   stuff throughout the -- my years; but I also prepared a

4   statement, too, a list of thoughts, just twelve out of the

5   many, that's something that I can hand to you; but this

6   statement is something that I was wanted to read, if that

7   would be all right.

8   Q.    Go ahead.

9   A.    All right.   I want to tell you about a man I call "My

10  hero."

11  Q.    Can you get closer to the microphone, please.   We can't

12  can hear you.

13  A.    I want to tell but a man I call "My hero."   Ever since I

14  was a little kid, I've been absorbing every day and every

15  challenge like a sponge.   I have been taught the most

16  valuable of life's lessons, and can say that I've grown to be

17  a man that everyone can respect and be proud of.

18          Watching my hero and learning from my hero has

19  given me the courage, the strength and the faith to

20  accomplish so much in my short life.   Without his guidance

21  and persistence, I would not have followed in his footsteps

22  and become a respected community leader of Dr. Phillips,

23  through the Rotary Club of Bay Hill.   I joined Rotary when I

24  was 19 years old; and after three years of earning (sic) our

25  community's biggest event and fund raiser, which my hero

1   helped in every step of the way, I was placed on the board of

2   directors where I was able to do more good.  I am still

3   involved in it and now have become a Paul Harris Fellow, just

4   like he is.

5           My younger years is when I learned a little hard

6   work can go a long way for someone in need of a helping hand.

7   After helping my hero volunteer at Give Kids the World by

8   laying pavers and watching him build, I decided to stick

9   around and help every other week for a number of years.  I

10   have now brought that feeling back into my life by chairing a

11   monthly event for Give Kids the World through our Rotary Club

12   family.

13           Whether it be by his involvement in my Boy

14   Scouts, by coaching me in sports or just being there for

15   others, he has taught me so much about life and love.  Even

16   with all his accomplishments in life, his job is still not

17   done for he has two more sons and a daughter that need to be

18   taught these valuable life lessons.  What better person than

19   the one who taught me, my hero, my star, our father.

20   Q.    Thank you.

21           MR. KIRKCONNELL:  Questions?

22           MS. HAWKINS:  No.

23           MR. KIRKCONNELL:  Thank you.

24           THE COURT:  Thank you, sir.

25           MR. KIRKCONNELL:  Your Honor, we'd call John

1    Sebring at this time.

2              THE COURTROOM DEPUTY:  Please raise your right

3    hand, sir.

4                           JOHN SEBRING,

5    having been first duly sworn, was examined and testified as

6    follows:

7              THE WITNESS:  Some water, Your Honor.

8              THE COURT:  There should be some in there.

9              THE COURTROOM DEPUTY:  There is.

10             THE COURT:  If not, we'll give you some.

11             THE COURTROOM DEPUTY:  There's some in there.  Just

12   twist the top a little bit.

13                         DIRECT EXAMINATION

14   BY MR. KIRKCONNELL:

15   Q.   Mr. Sebring, would you explain to the Judge and counsel

16   who you are and how you know William Irey.

17   A.   My name is John Sebring.  I served with Billy's father

18   in Korea; and when I returned home -- I'm from New York -- we

19   visited the Ireys many times and basically saw Billy grow up.

20   Q.   Can you speak a little closer to the microphone.

21   A.   Better?

22   Q.   Yes, sir.  Thank you.

23   A.   I basically saw Billy grow up on and off; and when Billy

24   moved to Florida, I came down with my family and I called

25   Billy up and asked him, "What do I do about Disney tickets?"

1   And he told me to meet him at a location; and when I met him,

2   he had purchased the tickets for my family.

3             When I visited them in Florida many times, Billy

4   and Candy, and I saw him interact with his children.  I saw

5   him as a loving father who cares deeply for his family.

6             On a personal note, when my wife had a

7   problem -- my wife is Chinese -- when she had a problem --

8   her family had a problem in China, Billy used his contacts in

9   China to help her family out.

10            I -- when I moved to Florida in '03, Billy

11  called me and asked me if I was interested in a supervisory

12  position at Disney World, which I declined.

13            But I would like to say that I don't see any

14  advantage in putting this man in prison.  I did 32 years in

15  law enforcement in New York City.  I saw a lot of bad people,

16  and Billy Irey is not one of these people.  Thank you.

17            MR. KIRKCONNELL:  Thank you, sir.

18            Your Honor, we'd next like to call Ben Sandrock.

19            Ben, stop and let the clerk swear you in.

20                     BENJAMIN SANDROCK,

21  having been first duly sworn, was examined and testified as

22  follows:

23            THE COURTROOM DEPUTY:  Please state and spell your

24  last name for the court reporter.

25            THE WITNESS:  Benjamin Sandrock, B-e-n-j-a-m-i-n

1    S-a-n-d-r-o-c-k.

2                        DIRECT EXAMINATION

3    BY MR. KIRKCONNELL:

4    Q.    Ben, would you please tell the Judge and counsel what

5    your relationship is to the defendant, William Irey?

6    A.    He's my Uncle Bill.

7    Q.    And how?  Is he your dad's brother, your mom's brother?

8    A.    My mom's brother.

9    Q.    Okay.  Did you have some thoughts you wanted to share

10   with Judge Presnell before he sentences your uncle?

11   A.    Yes.

12   Q.    First of all, how old are you and what do you?

13   A.    I'm 23 and I'm a grad student at Tiffany University in

14   Ohio.

15   Q.    What are you studying?

16   A.    Sports management.

17             MR. KIRKCONNELL:  If I may, Your Honor.

18   BY MR. KIRKCONNELL:

19   Q.    Go ahead.

20   A.    To be honest, when I was asked about speaking on behalf

21   of my uncle, one thought and one thought only popped into my

22   head:  It would be my honor.

23             In my short 23 years that God has given me, I've

24   never met somebody like my Uncle Bill.  Not only is he the

25   most spirited and the most giving person, but he overall is

1    just one of a kind.  I like to think that when God created

2    Uncle Bill, He took a step back and He said, "I'm really

3    going to like this one."

4              In our family, we have an action we refer to as

5    "the Uncle Bill."  "The Uncle Bill" means pulling over and

6    helping someone that has pulled off to the side of the road.

7    I guess as a whole, we really haven't done a good job of

8    labeling "the Uncle Bill," because that would refer to

9    helping anybody in need at any moment.  Actually, that would

10   refer to having an impact and helping every person that you

11   come in contact with.

12             When I was in middle school, my dad was in and

13   out of work because of cancer and health-related issues.  My

14   family was not able to go on vacations, but my Uncle Bill was

15   always sure to bring me on his.  And at any time I wanted to

16   come and visit, it was only a phone call away.

17             Things did not change as I went to college.  I

18   was unable to buy a computer before my freshman year, but my

19   Uncle Bill once again came to the rescue and got me one.

20             I was a kicker for the football teams through

21   high school and college, and every summer I would practice

22   kicking footballs on our homemade uprights at our place at

23   the river.  Nobody ever really wanted the job of fetching the

24   footballs and bringing them back to me; but, sure enough,

25   every time my Uncle Bill came into town, he would stay out

1   there for hours upon hours.

2   　　　　Overall, Uncle Bill not only gave his effort,

3   his work and his love and his care, but he gave something

4   that most people in this world believed they have run out of:

5   Time.  Uncle Bill always made sure that he gave you his time.

6   I can't begin to describe to you how many hours I spent

7   talking to him about my dreams and aspirations for the

8   future.  Although at that time my dreams probably would have

9   brought laughter from others, my uncle not only listened, but

10  he gave advice and motivation for going after my dreams.

11  　　　　Uncle Bill really had a way of touching people's

12  lives in a way that I've never seen before.  People around me

13  must really enjoy my company after I've just been around

14  Uncle Bill and his family.  I've found that I look to help

15  people instead of people reaching out to me for help.  You

16  see, it's a mind set that everyone should look for.  Uncle

17  Bill taught me that helping someone is a gift that can be

18  given in an instant and a gift that never runs out.

19  　　　　The easy way to see your character is to look at

20  the people you are surrounded by.  Uncle Bill surrounds

21  himself with an unbelievable wife.  His four children are the

22  best people that I've ever met.  Their family is loving and

23  giving, and this is a true reflection of my Uncle Bill's

24  character.  He brings out the best in every single person

25  that he meets.

1          You can't look at my uncle -- you can't look at

2     my Uncle Bill and say, "That man's glass is half empty or

3     half full," because my Uncle Bill is pouring his into the

4     thirsty person's glass next to him.

5          MR. KIRKCONNELL:  Questions from the Court or

6     counsel?

7          MS. HAWKINS:  No.

8          MR. KIRKCONNELL:  Your Honor, my next-to-the-last

9     witness would be Glenn Irey.

10         THE COURTROOM DEPUTY:  Please stop and raise your

11    right hand.

12                      GLENN IREY,

13    having been first duly sworn, was examined and testified as

14    follows:

15         THE COURTROOM DEPUTY:  You can have a seat.

16                   DIRECT EXAMINATION

17    BY MR. KIRKCONNELL:

18    Q.   Mr. Irey, would you tell the Court and counsel what your

19    relationship is to the defendant, William Irey, and what --

20    your age and what you're currently doing now.

21    A.   My name is Glenn Irey.  I'm William Irey's second son.

22    I'm currently 20 years old.  I'm a student at the University

23    of Florida, studying economics.

24    Q.   Do you have some thoughts that you wanted to share with

25    Judge Presnell before he sentences your dad?

1   A.   Yes, I would.   When I was trying to think of what to say

2   here today, I realized I would be speaking in front of a lot

3   of people I don't know as well as the people that mean the

4   most to me; but this is really just about one person.

5           Dad, there are a lot of things that I've always

6   wanted to tell you but never got around to or maybe just not

7   saying it enough.   First of all, dad, I would like to say

8   thanks for almost 21 years stock full of some of the best

9   moments of my life.

10          I've been listening to what you say, I've been

11   watching what you do, and it's taught me more than you could

12   ever imagine and more than I could ever express on a pen some

13   silly sheets of paper.

14          Do you remember the day that you decided I was

15   going to learn how to ride a bike?   You sat me down on Jim's

16   bike and you grabbed the back of the seat and you said, "Are

17   you ready?"

18          I said, "Dad, I have no idea what to do."

19          And you said, "Sure, you do.   Just keep the

20   handlebars straight and pedal, and I'll be right here with

21   you just in case anything happens."

22          So off we went.   I got a couple of feet before I

23   freaked out and put my foot down.   I looked back and I saw

24   you back at the starting point clapping with Jim.   I was

25   furious.   I said, "Dad, you know, what if I fell," to which

1  you replied, "Then I would have picked you back up and tried

2  again."

3          I learned that day that sometimes you do fall.

4  No biggy.  You're never down forever.  That also taught me to

5  believe in myself.

6          At that same time we lived down the street from

7  a classmate of mine named Jonathan Scott Slater.  He would

8  call a couple of times a week to play, and a couple of times

9  a week I would come up with some excuse as to why I couldn't.

10  You see, he just kind of seemed a little weird.

11          One day my dad sat me down and said, "Son, why

12  don't you give this boy a chance?  An hour out of day won't

13  kill you, but it might make the world -- it might mean the

14  world to him.  If you were in his shoes, how would you want

15  to be treated?"

16          You made me go that day, and yet he was a little

17  weird, but he soon became one of my good friends and

18  eventually joined the Boy Scouts with me.

19          You've taught me to stick up for the little guy

20  because a lot of times nobody else will and, heck, it's

21  always nice have someone in your corner.  You've taught me

22  not to be ashamed to cry, that caring about something that

23  much is really something to be proud of.

24          I wanted to thank you for making me feel like I

25  was always the most important part of your life.  I always

1   enjoyed coming home from college and talking with you on the

2   pool swing about everything from politics to history to

3   whatever was on my mind.  Those talks captivated me for hours

4   and stimulated my mind more than anything that ever happened

5   in class.

6          I think it's incredible that you gave your mom

7   flowers on your birthday.  A day that most people spend

8   thinking only of themselves, you take the time to thank the

9   woman that made it happen.

10          I want to thank you for choosing the woman that

11  made me happen.  Mom is amazing, and I hope that one day I

12  can find love like you and mom share.

13          You're so full of love and joy.  You're

14  giddiness toward each other and every day is contagious.

15  Just being around you, dad, gives me such a brighter outlook

16  on life; and I'm jealous that you're more youthful than I am,

17  despite being over twice my age.

18          I apologize for the disorganization in my

19  testimony.  It's a work in progress.

20          I got involved in Mount Dora's Community Theater

21  when I was ten years old, and for six years you drove me an

22  hour there and an hour back at least four days a week.  You

23  even became a member of the board and donated a much-needed

24  concrete patio.

25          You allowed me to move to California for six

1   months when I got the opportunity to perform for Ray Bradbury

2   in Burbank.  You went above and beyond what you had to.  You

3   also taught me about commitment when I was fed up and ready

4   to quit halfway through a show's run.

5          You always gave me a summer job working for the

6   company.  I worked with Danny when we got the job at All

7   Stars Resort.  And one day he really got upset at Disney's

8   on-site management.  He said he had turned down a higher-

9   paying job that didn't deal with Disney because he enjoyed

10   working for you.  He said you always treated everyone with

11   respect, regardless of their job title; and to him, that

12   meant more than money.

13          My senior year of high school, you gave the

14   school a $40,000 kiosk so that my classmate and I could start

15   up a bookstore on campus.  The bookstore didn't quite work

16   out, but it meant the world to me that you believed in me and

17   offered your support.

18          I'm amazed at how you deal with adversity.  This

19   past year has been tough.  I can't imagine what it's been

20   like for you.  But much the same as you always have done,

21   you've looked for the positives and found the light in the

22   darkness.  You've made us various figurines and dream

23   catchers to remind us of you.  You always have a cheery

24   disposition, even when I'm ready to break down and cry.

25          You're 1500 pages into a brilliant series of

1    novels that you've written yourself, and you aren't bitter

2    toward anybody.  In fact, you've almost become an honorary

3    member of the LifeStream staff by heading AA and NA meetings,

4    participating in church services, and monitoring -- or

5    mentoring patients.  You're the first person that the nurses

6    call when a patient gets out of hand, and it was only two

7    days ago that you saved a woman's life after she had just had

8    a stroke and the field service technicians only wanted to

9    just -- they were just in a rush to get going.

10         One night right before Christmas I came to visit

11    and was surprised to see that I wasn't the only one that

12    night.  A man who had been in LifeStream with you had come

13    back to visit.  He told me "There's just something about your

14    dad.  I don't know what it was, but there is some sort of

15    connection there.  He helped me out a lot."  I know what he

16    means.  You somehow seem to know just what to say just when I

17    need to hear it the most.

18         Through the years many people have told me about

19    what an extraordinary person my dad is, but he would be the

20    first to tell you he's just a regular guy.

21         But, you see, dad, what makes you seem so

22    extraordinary to people is that you do the things that the

23    vast majority of us are either too selfish, too stone hearted

24    or too scared to do ourselves to make this world what we all

25    envision it could be.

1     When I was born, you gave me your middle name.

2 I view this as an honor, sir, and will do my best to pick up

3 the slack until you can come back home to us.

4 Q. Thank you.

5     MR. KIRKCONNELL:  Questions from the Court or

6 counsel?

7     THE COURT:  No.  Thank you.

8     MR. KIRKCONNELL:  The last short witness, Bob Irey,

9 on a different subject.

10     THE COURT:  Okay.

11     THE COURTROOM DEPUTY:  You've already been sworn.

12          BOB IREY,

13 having been previously duly sworn, was examined and testified

14 as follows:

15     MR. KIRKCONNELL:  Your Honor, you've already met

16 Mr. Irey.  He's already under oath.  I've asked him just to

17 share a single vignette of his childhood with his brother

18 with the Court.

19     THE COURT:  Okay.

20        DIRECT EXAMINATION

21 BY MR. KIRKCONNELL:

22 Q. Bob.

23 A. Got it.

24     Your Honor, the year was 1976.

25 Q. Bob, speak closer to the microphone, please.

A.   Your Honor, the year was 1976.  My brother was a senior

in high school, and I believe I was in the seventh grade.  I

was big for a seventh grader, about the size I am now.

Bill had a really cool leather sports coat, soft

leather, and I took a fancy to it.  Without his knowledge, I

wore it to school fairly regularly.  One day I came home from

school and saw his leather jacket laying on the table and it

was just covered with blood.  I said, "Man."  My knee jerk

reaction was, "What happened to Bill?"  And what happened to

Bill was on his way home from school, he came upon an

accident where a woman was pretty seriously hurt, and in

Bill's style, he immediately took off his jacket, put it

around her because she was shivering bad.  Without a thought,

take off the jacket and comfort the lady.

I remember my reaction to it:  "Why did you do

that?  You ruined your jacket."  Typical Bill, she needed it.

She needed it.

Q.   Take a minute.  Take a drink of water.

THE COURT:  I tell you what, we're going to have to

take a recess before we conclude, so why don't we go ahead

and take about ten minutes.

MR. KIRKCONNELL:  Okay.

(A recess was taken.)

THE WITNESS:  Your Honor, I'm sorry about that.

THE COURT:  That's all right.

A.   To get to the point of the story, Bill's comeback to the
use of the jacket:  "She needed it; I didn't."  It was
probably the first time that I recall in my life where it
really just sunk in, Bill's random acts of kindness, helping
others without concern as to what it's going to cost.  What's
the cost?  It doesn't matter.  If somebody is in need, you
can count on Uncle Bill.  He was going to be there.

         Those types of random acts of kindness have been
shared by many within the family.  My children have learned
it.  It's been instilled in them, and it's come directly
from, you know, the displays of ongoing acts of kindness that
Bill has displayed through his life.  And I could go on and
on.  I have a list them here, but I think you've got the
picture of who Bill Irey is, the type man he is, the goodness
of his heart, the goodness of his soul.  Thank you.

Q.   Thank you.

         MR. KIRKCONNELL:  Any questions from the Court or
counsel?

         THE COURT:  Ms. Hawkins, any?

         MS. HAWKINS:  No.

         THE COURT:  Thank you, sir.

         MR. KIRKCONNELL:  Your Honor, I have no more
witnesses, but there are two other items I would like the
Court to consider.  One is a letter from Mr. Irey, which I
presented to the Court today and which I presented to Ms.

1   Hawkins.

2        I also would like -- I believe we can stipulate

3   with Ms. Hawkins for the government and the agent that Mr.

4   Irey attempted to do substantial assistance on the actual

5   charge that he was on by helping -- attempting to help them

6   identify people, where all this stuff happened and all that

7   kind of stuff; and even though it did not rise to the level

8   of substantial assistance where they would file a Rule 5(k)1,

9   I believe under the cases of United States versus Doe, 398

10  Federal 3d. 1254, and United States versus Davis at --

11       THE COURT:  Doe is a Tenth Circuit case, which has

12  a different procedure than the Eleventh Circuit, where you

13  have to give notice of an intention to depart.  Apparently

14  there was a notice of intention to depart upward in Doe; and

15  while the court in that case felt it may not be appropriate

16  to consider proposed assistance for downward departure,

17  there's nothing that precluded it in consideration when

18  looking at an upward departure, which is totally inapplicable

19  here.

20       MR. KIRKCONNELL:  There's another case attached to

21  that, Your Honor.

22       THE COURT:  I saw that, a Tennessee case.

23       MR. KIRKCONNELL:  Your Honor, I just wanted the

24  Court to consider the letter from Mr. Irey, and we do have

25  some argument after you've looked at that.

1           THE COURT:  All right.  I've read the letter, which

2    is Exhibit 4.

3           MR. KIRKCONNELL:  Your Honor, do you wish us to

4    argue first or the state -- the government?

5           THE COURT:  Yeah.  Is there anything else you wish

6    to say in mitigation?  Obviously, I'll be happy to hear from

7    Mr. Irey as well.

8           MR. KIRKCONNELL:  Okay.  Your Honor, we would ask

9    the Court to consider -- as the Court correctly stated

10   initially, the options open to the Court here, because of the

11   statute, are a minimum of 15, a maximum of 30.  We are aware

12   of the recommended sentence by the guidelines, but as the

13   Court is well aware, those are not mandatory guidelines.

14   They are only one factor to be considered.

15           As U.S. Code -- 18, U.S. Code, 3553(a)(1) provides

16   that the Court can consider the nature and circumstances of

17   the offense and the history and characteristics of the

18   defendant, and that the sentence shall be sufficient but not

19   greater than necessary, we submit, Your Honor, that a

20   360-month sentence here is greater than necessary for Mr.

21   Irey in light of the mitigation that's been presented.

22           There is no way to minimize, and we would certainly

23   not try to minimize, the gravity of the acts with which Mr.

24   Irey is charged.  You've heard the mental health

25   professionals tell you that this is a compartmentalized area

1   of his whole being that is a result of his pedophilia, which

2   is a diagnostic criteria for psychiatric care.

3          What I gathered from Dr. Shaw's testimony and the

4   best I could from Dr. Berlin's report is that the behavior of

5   a pedophile is not totally volitional, that is, it is

6   dictated in some degree by the disease itself.  This is

7   contained in Dr. Berlin's report and was testified to by Dr.

8   Shaw.

9          The Court certainly has the legal authority to

10  impose a sentence in this case below the 360-month maximum;

11  and there are three cases which this Court, I'm sure, is very

12  well aware of and they are mentioned in our memorandum of

13  law, the most recent of which is the McBride case, decided in

14  December of '07, which I believe is from this court, which is

15  remarkably similar to Mr. Irey's case.  There's differences

16  in facts in every case, but it's remarkably similar.  In some

17  ways, Mr. McBride was perhaps more culpable even than Mr.

18  Irey in that he had a prior sex case.  He had also admitted

19  apparently to doing some things in a polygraph that were

20  pretty extensive child molestation, involved multiple

21  children, many images, and he, too, was diagnosed as a

22  pedophile.

23         In that case, according to the reported case, the

24  recommended sentence was 151 to 188 months; and this court, I

25  believe, sentenced Mr. McBride to 84 months and that was

1    upheld on appeal.

2           Another case is the Gray case, which is cited in

3    our memorandum.  Mr. Gray was 64 years of age at the time of

4    his sentencing for a similar crime; and in addition to

5    everything else, Mr. Gray failed to appear for sentencing.

6    In that case, there were many images.  There was an

7    aggravator of distribution.  In that case, as in Mr. Irey's

8    case, Mr. Gray cooperated and accepted responsibility.  The

9    sentence in that case was approximately one half of what the

10   recommended guideline sentence was.

11          The third case mentioned in the memoranda is the

12   White case.  Mr. White, like Mr. Irey, in fact exactly like

13   Mr. Irey, was 51 years of age at the time of his conviction

14   and sentencing, as is Mr. Irey today.  The Court considered

15   the defendant's age, lack of record, medical condition, and

16   followed the Gray case in sentencing him to a much reduced --

17   much less than the maximum which could be considered.

18          I think what you've heard today is a some of what a

19   snapshot of a much bigger part of Bill Irey's life than the

20   crimes he committed in terms not only of time but of effort.

21   He has lived, other than this disease and this addiction, an

22   exemplary life in terms of his taking care of his family,

23   taking care of his community, setting an example, and doing

24   what one of the witnesses has referred to as random acts of

25   kindness.

1          Mr. Irey is not going to go home from this

2    courtroom today.  He's going to go to the Bureau of Prisons.

3    He understands that.  He understands he needs to be punished.

4    He understands he will be punished, but he asks the Court to

5    give him some consideration for the rest of his life,

6    separate and apart from the crime he has committed.

7          If he were to be sentenced to 360 months and serve

8    that entire time, he would be approximately 81 years old, if

9    he survived that long.

10         As you can see, he has strong family support.  He

11   has young family members who care about him, in addition to

12   his contemporaries.  We would ask the Court to impose, as

13   U.S. Code 3553 requires, a sentence which is sufficient but

14   not greater than necessary, and we would submit something

15   between 15 and 20 years here with up to lifetime supervised

16   release.

17         You've heard that he's treatable.  You've heard

18   that he's a low risk of recidivism.  That would make him 66

19   or 71 when he got out, if he served the entire sentence.  He

20   would be an old man.  We ask you to consider a sentence less

21   than the guideline's recommended sentence.

22         THE COURT:  Thank you, Mr. Kirkconnell.  Does your

23   client wish to say anything?

24         MR. KIRKCONNELL:  Let me see, Your Honor.

25         I think he would like to briefly apologize, Your

1   Honor, if that's okay.

2                THE COURT:  Whatever.

3                MR. KIRKCONNELL:  From the witness stand?

4                THE COURT:  No.  Wherever he's comfortable.

5                THE DEFENDANT:  Your Honor, I would like to first

6   apologize to the government agents that have had to get

7   involved in my horrible deeds, the federal attorney's office,

8   and I would like to apologize to this Court.

9                I'd like to apologize, although they're not here,

10  to the children that I have harmed over the last several

11  years of going to Cambodia.

12               I would like to apologize to my family for what I

13  have put them through.  I love them.  I will be always there

14  for them in spirit, by telephone.  My friends and family, I

15  would like to thank them for their support.

16               I would like to apologize to my employees, that

17  I've pretty much hurt them.  I've hurt a lot of people and I

18  can't undo that, but I can learn from that and I'm willing to

19  learn.  Thank you, Your Honor.

20               THE COURT:  Thank you, sir.

21               Ms. Hawkins.

22               MS. HAWKINS:  Your Honor, it's pretty hard to

23  square what we've heard here today with what we know about

24  this case.  Let me start by saying that the defendant is not

25  being prosecuted for being a pedophile; he's being prosecuted

1    for the acts that he committed.  He did not have to go to

2    Cambodia.  As an alcoholic doesn't have to drive a car, a

3    pedophile doesn't have to put themselves in a brothel in

4    Cambodia, which this defendant did for years and years and

5    years, Your Honor.

6           I would ask the Court to go back to the PSR.  I

7    would not like to embarrass the people here by -- and I'm not

8    going to read the descriptions, a selected few of these

9    photographs that the defendant took, that the defendant

10   performed in; but on pages four and five of the PSR, the

11   descriptions of writing filth on children's bodies, inserting

12   objects into them, binding them up and tying them up,

13   treating them -- posing them as trophies, and having several

14   of them engaging in acts with him and with other children at

15   the same time, this is not run-of-the-mill child pornography,

16   by God, if there is such a thing.  This is not a possession

17   case, like the McBride case.

18           This is a production case, and the defendant

19   clearly had two different parts of his life going on; but in

20   this one, he was the star, the writer, the director and, at

21   the end, a person who ruined, just absolutely and forever

22   ruined over 50 children's lives.

23           And I would like to ask the Court -- these are not

24   -- this is not pornography.  These are pictures of about 50

25   of these children.  I would like the Court to -- I've shown

1    this to the defense -- to look at these babies' faces.

2             THE COURT:  Okay.

3             MS. HAWKINS:  As the Court can see, some of these

4    children are four or five, six years old.  They're babies,

5    Your Honor.  Their pictures will forever be out there online.

6    They will be victimized over and over again, and they know

7    that those pictures are out there.  Their lives can never be

8    the same.

9             When this case was uncovered, the National Center

10   For Missing and Exploited Children called the agents and

11   called us and said, "Oh, my God, you've found the person who

12   produced the 'pink wall' series."  If you look at these

13   pictures, in many of them there's a pink wall.  That's the

14   location for the abuse that this defendant perpetrated on

15   these very young children.  It was infamous on the Internet,

16   and it's turning up even in cases now, that we're finding

17   more and more of the pink wall series of these young

18   children.

19            Your Honor, in some of the -- in some of the

20   photographs, the defendant is smiling as he perpetrates this

21   abuse.  How can we square this with the stories we've heard

22   today?  How can you treat a dog better than you treat a human

23   being, a defenseless baby?  It makes no sense other than

24   there's something really, really bad about the defendant.

25   I've heard good things that he's done, but there's some

1   really very bad stuff inside and it has to be punished, Your

2   Honor.

3          The offense has to be considered.  The

4   victimization has to be considered.  The message we send to

5   people who would do this has to be considered.  And as the

6   defendant himself has admitted, it's not even just child rape

7   and child molestation, but dealing with prostitutes, lying

8   when he doesn't have to.  I believe he admitted in his

9   statement to stealing.  There's a person who does -- who lies

10  and steals and hurts other people that's been living here

11  among us as well, Your Honor, although he kept it hidden.

12         But when you look at these images of torture, and

13  there's really no better word for it, of these small children

14  and recalling that this was a huge collection of child

15  pornography, there were over 1200 images, Your Honor, of some

16  of the most egregious images that the agents have ever seen,

17  and that this defendant was going to these brothels and going

18  on these trips for many years, not just one time, not just

19  once in one year, but many years, many times and was paying

20  up to $1500 for the rights to particular children so that

21  they would be available to him so that he could make use of

22  them, whatever use he cared to make, Your Honor, given the

23  viciousness of these crimes, the United States is asking for

24  the 30-year sentence -- that is the most this Court can

25  impose -- and justice for these children who cannot plead on

1    their own behalf.  Thank you, Your Honor.

2              THE COURT:  Thank you, Ms. Hawkins.

3              Anything further from the defendant?

4              MR. KIRKCONNELL:  No, Your Honor.

5              THE COURT:  Well, as I've often said and will say

6    again, sentencing is not an easy task.  It's the hardest

7    thing I have to do in my job, and it's particularly difficult

8    in cases like this.

9              As you know, I'm dealing with a statutory minimum

10   of 15 years.  So that's the floor, and the ceiling is 360

11   months, and the ceiling also happens to be the guideline

12   score.

13             With respect to the way we sentence people today

14   post-Booker, Kimbrough, is I take into account the guideline

15   score and consider that as a benchmark in terms of imposing

16   an appropriate sentence in a given case, and that benchmark

17   needs to be kept in mind throughout the analysis of the

18   3553(a) factors.

19             However, the guideline sentence is not mandatory;

20   it is advisory.  It's an important element of my sentencing

21   calculus.  But what I need to do after determining the

22   guideline score is to look at the other 3553(a) factors on an

23   individualized basis in an effort to determine an appropriate

24   sentence for this particular case.

25             The first thing I need to do is consider the nature

1    and circumstances of the offense, and I cannot quarrel with

2    Ms. Hawkins' description of that.  The conduct here was

3    horrific.  The victims were numerous and perhaps the most

4    vulnerable of the world's society.  So I don't think there's

5    any question but we're dealing with here with an offense that

6    rises to the very top in terms of its seriousness and its

7    effect on other human beings.

8            These young children were victims who may never,

9    never overcome their abuse.  I recognize, of course, that Mr.

10   Irey and his family and friends are also victims here; and

11   society at large is a victim because, as Dr. Shaw indicated,

12   with every new development in human history, there seems to

13   come good and bad with it; and with all the good of the

14   Internet, perhaps one of the bad features of it is that it

15   has made possible what Dr. Shaw describes as an epidemic of

16   child pornography.  And, unfortunately, we here in the court

17   system witness that and have to deal with it; and our

18   government, in an effort to deal with it, has imposed -- has

19   criminal penalties, very harsh sentences for conduct like

20   this.

21           So in terms of the characteristics of the offense,

22   the seriousness of it itself, the long-standing, long-term

23   engagement in it certainly does not mitigate in favor of any

24   leniency.

25           But next I need to look at the history and

1   characteristics of the defendant.  By all accounts, Mr. Irey

2   has been a good husband and father for his wife and children

3   and a good friend to his friends and a good person to his

4   community.  The lies and thefts, I think, referred to by Ms.

5   Hawkins were essentially part of his effort to cover up his

6   illness, because I think other than the acts of Mr. Irey,

7   there's no indication that he has engaged in any other sort

8   of criminal conduct or conduct representing poor character.

9           Also, in terms of the characteristics of the

10  defendant, I think we're just beginning to learn what

11  pedophilia is and how to deal with it.  I think if you look

12  at the reports of the mental health people here and into the

13  literature, which I have done, Mr. Irey's acts that bring him

14  here today, I think it's safe to say, were not purely

15  volitional.  I think they were due in substantial part to a

16  recognized illness.  And while it does not excuse his conduct

17  and he will still be held accountable for it, I think it

18  would be inappropriate to ignore that fact.

19          I also think it's appropriate to credit the opinion

20  of the mental health professionals who indicate that Mr. Irey

21  is pursuing treatment and is doing so apparently successfully

22  and, in the view of the mental health professionals, is

23  treatable and has a low risk of recidivism.

24          Of course, all of that is somewhat academic because

25  by the time he gets out of prison, he'll be most likely at an

1   age where recidivism would be unlikely, just from a

2   physiological standpoint.

3          Mr. Irey obviously has a very loving family, and I

4   know he's proud of his family and deserves whatever credit he

5   should take for having produced these people who have come

6   here today to speak for him.  And I know it was difficult for

7   the family, but I think that your support is important and

8   says a lot, not only about your family, but about Mr. Irey

9   himself.

10          Another aspect of the defendant's character, as I

11   have alluded to, of course, not his character but his

12   individual characteristics, is his age.  As I indicated, even

13   the minimum sentence here, he's going to be an old man.  I

14   guess that makes me an old man, but he will certainly be an

15   older man when he gets out of prison; and that's, I think, a

16   factor to take into account.

17          There are other aspects of the statute that

18   essentially are subjective in nature.  Of course, adequate

19   deterrence to criminal conduct.  I mean, a serious sentence

20   is hopefully going to deter others from conducting similar

21   affairs, although when we're dealing with an illness like

22   this, I'm not sure that that rationally follows.  But,

23   nevertheless, deterrence is an appropriate consideration, and

24   a stiff sentence is in keeping with the seriousness of this

25   offense.

1          As far as protecting the public from further

2     conduct of this defendant, for the reasons I've indicated, I

3     think that militates against a 30-year sentence, given his

4     age, given the fact that he apparently recognizes now, from

5     everything I've seen, he recognizes the condition that has

6     led him to commit these acts and to put himself and his life

7     and his family's life in the order that it is.  He's taken

8     the first step toward rehabilitation and appears to be

9     amenable to treatment and also, according to the mental

10    health professionals, is of low risk of recidivism.  So I

11    don't think society needs further protection from him, at

12    least beyond the statutory minimum sentence.

13         As often happens in these cases, my judgment -- and

14    I am a fallible human being.  So what I do is not necessarily

15    right.  I just do the best I can under the circumstances.  It

16    comes down to my view of what promotes respect for the law

17    and provides just punishment.  And here, as indicated, I

18    think that a 30-year sentence, given the personal factors

19    that I have touched upon, is greater than necessary to

20    accomplish the statutory objectives.

21         On the other hand, in light of the seriousness of

22    the crimes, I think a sentence above the mandatory minimum is

23    called for.

24         So having said all that, it's the judgment of the

25    Court that the defendant, William Irey, is committed to the

 1    custody of the Bureau of Prisons to be imprisoned for a term

 2    of 210 months.

 3           Upon release from imprisonment, Mr. Irey, you'll be

 4    placed on supervised release for a term of life.  The

 5    mandatory drug testing requirements of the Violent Crime

 6    Control Act are imposed.  While on supervised release, you

 7    must comply with the standard conditions adopted by this

 8    court.

 9           In addition, I'm going to require you to

10    participate in a substance abuse program and to follow your

11    probation officer's instructions in that regard.  You must

12    also participate in a mental health program specializing in

13    sex offender treatment and follow your probation officer's

14    instructions in that regard as well.

15           You must register, as appropriate, with any state

16    offender registration agency and cooperate with your

17    probation officer with respect to complying with that

18    directive.

19           I'll impose the standard terms concerning risk

20    control, that is, no direct contact with minors under 18

21    without the written approval of your probation officer,

22    prohibition for possessing, subscribing to, viewing any video

23    or magazines, literature otherwise depicting children in the

24    nude or sexually explicit positions.  You shall not possess

25    or use a computer with access to any online service without

1   written approval of your probation officer.

2            Also, I'm going to impose a search requirement,

3   that you submit to a search of your person, residence, place

4   of business or any other area under your control at a

5   reasonable time and in a reasonable manner based on any

6   reasonable suspicion by your probation officer of contraband

7   or evidence violating these terms of supervised release.

8            You must cooperate with the collection of DNA.

9            I'm not going to impose a fine.  You are ordered,

10  however, to pay a special assessment of $100, which shall be

11  due immediately.

12           It's ordered that you shall forfeit to the United

13  States those assets identified in your Plea Agreement that

14  are subject to forfeiture.

15           As indicated, the Court has imposed a sentence

16  below the applicable guideline sentence for the reasons

17  indicated.

18           The Court accepts the Plea Agreement.

19           You are remanded to the Marshal to await

20  designation by the Bureau of Prisons.

21           In the meantime, he's in this program, right?  Is

22  he going to stay in this program until he's shipped off?

23           MR. KIRKCONNELL:  Your Honor, we had agreed with

24  the government to allow him to remain in the program and

25  voluntarily report at his own expense to the designated

1    institution.

2              MS. HAWKINS:   Your Honor, the understanding is that

3    he will remain in complete lockdown with no access or egress

4    in or out of the facility, and that his reporting to the

5    Bureau of Prisons would likewise be in a lockdown mode, that

6    is, the understanding is that he will not be free or at

7    liberty at any time.

8              THE COURT:   Right.   So that was my concern, this

9    volunteer stuff.   I mean, I want him to continue in this

10   program, which is the best place for him and for the

11   government right now; but when it's time for him to report --

12             MR. KIRKCONNELL:   Your Honor, we have Mr. Mike

13   Andrews here today, who has been the transportation for him,

14   and he understands his obligations.   He will be the one

15   taking him to the designated institution.

16             THE COURT:   Okay.   So I don't want any

17   misunderstanding about that.   We don't need the Marshals to

18   do it, in other words.

19             MS. HAWKINS:   He's been bringing him to and from

20   court, Your Honor, with at least two people, is my

21   understanding, and that he is fully secured.   As long as

22   that's a condition and he's paying for it, then we wouldn't

23   object.

24             THE COURT:   Okay.   Well, we'll continue with that

25   condition, then, up through and until he's in the possession

1   of the Bureau of Prisons or in the custody of the Bureau of

2   Prisons.

3           Is there any objection to the sentence or the

4   manner in which the Court has pronounced sentence?

5           MS. HAWKINS:  Your Honor, the United States does

6   object to -- specifically to the extent of the variance,

7   which is almost half, and based on the factors adduced in

8   this record, particularly the seriousness and long-term

9   nature of the offense, that the extent of the variance would

10  be unreasonable.

11          MR. KIRKCONNELL:  No objection from the defense,

12  Your Honor.

13          THE COURT:  Well, the sentence is more like 60

14  percent of the guideline, not half.  But, anyway -- well, Mr.

15  Irey, to the extent permitted by your Plea Agreement, you're

16  now advised that you have the right to appeal this sentence

17  within ten days from today or the date the judgment is

18  recorded, whichever is later.  Failure to appeal within the

19  ten-day period will be a waiver your right to appeal.

20          The government can also appeal this sentence.

21          You have the right to the assistance of counsel in

22  taking an appeal.  If you cannot afford a lawyer, one will be

23  provided for you.

24          Are there any questions, anything else we need to

25  consider before we adjourn?

1          MS. HAWKINS:  No, Your Honor.

2          MR. KIRKCONNELL:  No, Your Honor.

3          THE COURT:  All right.  Well, thank y'all.  We'll

4     be in recess.

5          (Proceedings were terminated at 3:20 p.m.)

6                    - - - - - - - -

7                 Reporter's Certification

8     I certify that the foregoing is a correct transcript from the

9     record of proceedings in the above-entitled matter.

Diane Peede, RMR, CRR
Official Court Reporter
United States District Court
Date: Feb 14, 2008     Middle District of Florida