# United States Court of Appeals

## For the Eleventh Circuit

No. 08-10997

District Court Docket No.
06-00237-CR-ORL-31-DAB

```
FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jul 29, 2010

JOHN LEY
CLERK
```

UNITED STATES OF AMERICA,

　　　　　　　　Plaintiff-Appellant,

versus

WILLIAM IREY,

　　　　　　　　Defendant-Appellee.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
　　　　Deputy Clerk
　　Atlanta, Georgia

------------------------------------------------------------
Appeal from the United States District Court
for the Middle District of Florida
------------------------------------------------------------

## J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:　　July 29, 2010
For the Court:　John Ley, Clerk
By:　　Gilman, Nancy

ISSUED AS MANDATE

SEP 0 8 2010

U.S. COURT OF APPEALS
ATLANTA GA



ISSUED AS MANDATE
SEP 0 8 2010
U.S. COURT OF APPEALS
ATLANTA, GA

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 29, 2010
JOHN LEY
CLERK

No. 08-10997

D. C. Docket No. 06-00237-CR-ORL-31-DAB

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

WILLIAM IREY,

Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of Florida

(July 29, 2010)

Before DUBINA, Chief Judge, and TJOFLAT, EDMONDSON, BIRCH, BLACK,
CARNES, BARKETT, HULL, MARCUS, WILSON, PRYOR, MARTIN and
HILL,* Circuit Judges.

---

* Senior United States Circuit Judge James C. Hill elected to participate in this matter
pursuant to 28 U.S.C. § 46(c).

CARNES, Circuit Judge:

"The federal courts of appeals review federal sentences and set aside those they find 'unreasonable.'" Rita v. United States, 551 U.S. 338, 341, 127 S. Ct. 2456, 2459 (2007) (citing United States v. Booker, 543 U.S. 220, 261–63, 125 S. Ct. 738 (2005)).  With that statement the Supreme Court opened its opinion in the Rita case.  Later in the opinion the Court was more specific and emphatic:

> In sentencing, as in other areas, district judges at times make mistakes that are substantive.  At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur.  Our decision in Booker recognized as much.

Rita, 551 U.S. at 354, 127 S. Ct. at 2466–67.  We believe that the Supreme Court meant what it said in the Rita opinion and elsewhere about our duty to correct sentencing mistakes.  At the same time, we recognize that our substantive review of sentences is deferential and that we only look to see if the district court abused its discretion by committing a clear error in judgment.  Even so, the sentence in this case can withstand review only if deference amounts to abdication, if sentencing discretion is unbridled, and if "unreasonable" is a hollow term.  The sentence that the district court imposed is a clear error in judgment, a mistake, and it is our responsibility to "correct such mistakes when they occur."

The sentence is substantively unreasonable primarily, but not solely, because of the nature and extent of William Irey's criminal conduct.  The steady stream of

2

criminal cases flowing through this Court brings us many examples of man's inhumanity to man, and we see a depressingly large number of crimes against children.  But the sexual crimes that Irey committed against some of the most vulnerable children in the world set him apart.  He raped, sodomized, and sexually tortured fifty or more little girls, some as young as four years of age, on many occasions over a four- or five-year period.  He also scripted, cast, starred in, produced, and distributed worldwide some of the most graphic and disturbing child pornography that has ever turned up on the internet.

The horrific nature of Irey's crimes resulted in an adjusted offense level that would have led to an advisory guidelines range of life imprisonment.  Because the government had charged all of Irey's crimes in just one count, the statutory maximum was 30 years and that had the effect of reducing the guidelines range to 30 years as well.  The district court, however, did not impose that sentence. Instead, after deciding that pedophilia was an "illness" that had impaired Irey's volition, and pronouncing that Irey himself was a victim, like all of the little children he had sexually violated for so long, the district court deviated downward from the 30-year guidelines range and imposed a sentence of only 17 ½ years.  Our duty to set aside unreasonable sentences requires that we set aside this one.

3

## I. The Criminal Conduct

William Irey had a seemingly insatiable sexual appetite. Or as a psychiatrist he later retained would phrase it, Irey was "highly sexualized." While in Orlando, where he lived and had his business, Irey indulged his sexual appetite by consorting with prostitutes on a weekly basis. As the psychiatrist put it, Irey "engaged in other forms of sexually disordered behavior with prostitutes (e.g., sadomasochistic acts)." That went on for 15 years, despite the fact that he was married the entire time.

Starting in 2001 Irey began spending two weeks out of every month in China on business. On the weekends when he was there he would indulge himself in more "sexually disordered behavior" by traveling to brothels in different Asian countries. Early on he went to a brothel in Cambodia that featured underage girls and discovered that he enjoyed having sex with children. Over a period of four or five years, he "visited numerous brothels where they had underage children." Irey, who is 5'10" and weighs 200 pounds, was in his forties at the time. All of the children he sexually abused were underage girls; none of them was older than sixteen, and some of them were only four, five, or six years old.

Irey went to those brothels and had sex with the children "many many times," as he recounted it, during his numerous trips to that part of the world, and

4

as time went on he became "more and more obsessed and was returning to Asia more and more often" to sexually abuse children. He paid the Cambodian brothels up to $1,500 for the use of each child, and he would typically buy two or three of the children at a time. When he was too busy in China on business to get away for weekend visits to Cambodia, Irey would sometimes pay to have some of the young girls flown to him so that he could sexually abuse them when he found the time. Irey's sexual violation of the children did not end until August of 2006 when law enforcement in this country finally caught up with him.

The little Cambodian children whom Irey victimized were "abjectly impoverished" and, as the district court noted, "perhaps the most vulnerable of the world's society." We know some of the details of what Irey did to them because law enforcement agents seized his computers and found that he had memorialized at least part of what he had done in photographs and videos for his later viewing pleasure. On one of his computer hard drives there were more than 1,200 images of Irey sexually abusing the children, and that number does not include the obscene images Irey produced of the children that do not show him in the picture. Differentiating the children in so many images taken over a period of years is difficult, but we know that Irey sexually victimized at least fifty different underage

5

girls.[1]

The photographs and videos Irey produced reveal some details of how he violated and debased the children.[2]  There are images showing "Irey on a bed with several prepubescent female Asian children performing oral sex on him while he performs oral sex on them."  Other images depict "Irey engaged in anal and vaginal intercourse with a prepubescent Asian female with the words '9 Yo Fuck' marked on her body," and "an arrow is painted on her body which points to her vaginal area."  Some of them show "the writing 'Front,' 'Back,' 'Brown,' 'Back

_____

[1] The number of little children who were Irey's victims is literally countless.  Irey himself apparently did not keep count, although he did recall that he bought children to sexually abuse "many many times," usually two or three at a time, over a four- or five-year period.  Some of the more than 1,200 obscene images Irey produced to preserve his perverse exploits show the faces of many children, but the images were not framed and focused to aid a head count, and with the passage of years the appearances of the children undoubtedly changed as they grew older while being sexually abused.

The Presentence Report states that "[t]here were over forty victims," and Irey did not object to that statement but instead admitted it was true.  During the sentencing hearing Assistant United States Attorney Cynthia Hawkins, who prosecuted the case, described Irey's criminal conduct.  In doing so she represented to the court that the number of his child victims was "over 50."  She also showed the court photographs of the faces of "about 50" of the child victims taken from the more than 1,200 images of Irey abusing them.  Irey did not object to those photographs or to the representation that they showed about 50 of his victims or that there were "over 50" victims.  In setting out its sentence findings, the district court stated about the circumstances of the crime:  "I cannot quarrel with Ms. Hawkins' description of that."  Based on that finding, and considering the AUSA's undisputed representations at the sentence hearing, as well as the probability of an undercount, we will use 50 or "at least 50" as the number of victims.

[2] All of the descriptions of Irey's conduct contained in this and the next paragraph in the text are quoted from the Presentence Report.  Irey did not contest the accuracy of these descriptions.  Instead, he wrote to the district court that:  "I have read the presentence investigation report dated 11-26-07.  I have done the things which are graphically spelled out in it."  The district court adopted all of the factual statements contained in the report as the findings of the court.

door,' '9 Yo Fuck' on prepubescent girls' bodies.  The writing has arrows pointing to the vaginal and anal areas."  Other images are of Irey "engaged in vaginal and anal intercourse with prepubescent Asian girls" who are "tied up and bound with black and grey duct tape."  There are also images "of Irey with nude prepubescent children posing as trophies."

Irey's defilement of the little children did not stop at rape, sodomy, and humiliation.  He also tortured them.  There are images of "Irey inserting a plastic green/yellow glow stick, dildos, cockroaches and candy in the vaginal cavity of prepubescent Asian females."  Some images show "Irey inserting a plastic tube into the vagina of a prepubescent Asian female.  Several of the images show the plastic tube containing cockroaches crawling into the vagina of these children."  One image shows him "performing vaginal intercourse on a prepubescent girl" and "[i]mbedded on the image [in all capitals] is the phrase: 'Big Cock Push Bug Deep Into 9 Yo Girl, She Hurt in Pane.'"

If Irey felt any guilt about purchasing helpless little girls and subjecting them to pain and degradation, the images he recorded do not show it.  In some of them he can actually be seen smiling as he inflicts the sexual abuse.

Irey did not use the massive amount of child pornography he produced only for his own prurient perusal; he did not keep it to himself.  He used copies of the

7

images he made to gain access to the collections of other purveyors of child pornography. Irey gave them copies of the pictures and videos he had produced showing his sexual violation and humiliation of the little Cambodian children in return for their waiver of the access fee to the collections they already had on their websites. Through that type of trade the operators of those websites were able to add Irey's graphic images to their collections, which led to those images being spread around the world. Irey in turn was able to save some money while expanding his collection of child pornography, and he was also able to minimize the use of his credit card, which made it easier for him to hide what he was doing from his wife.

## II.  The Capture and Conviction

Irey's use of the internet led to his capture. Federal agents intercepted and traced to Irey email messages that he had sent to an illegal website offering child pornography. In one of those emails, which Irey sent in mid-January 2006, he asked the website operator: "do you remember me from before. could I trade you some of my latest pics for 30 days on your site. Let me know a good address to send you some samples." About a month later, agents intercepted another email from Irey, which stated: "do you want trade some new pics never saw before. I trade this for site access."

8

The agents searched Irey's house on August 13, 2006, and seized six computers. On a hard drive they found a collection of more than 1,200 images of Irey sexually violating young girls. The agents sent those 1,200 plus images to the National Center for Missing and Exploited Children, which in turn provided an extensive report about where the images had been seen before. More than 100 separate law enforcement agencies reported to the National Center that they had previously turned up some of those images of Irey's sexual abuse of underage girls in their investigations of child pornography. The graphic images Irey had produced and distributed were already widely known as the infamous "pink wall series," so named because of the pink walls that could be seen in the background of some of the photos and videos. The series included images of some of the worst child sexual abuse the agents had ever seen. And, as the Assistant United States Attorney pointed out at the sentence hearing: the pictures of these children, some of whom are "four or five, six years old . . . will forever be out there online." As the record of their abuse continues to circulate, "[t]hey will be victimized over and over again."

In a one-count indictment filed on December 13, 2006, Irey was charged with violating 18 U.S.C. § 2251(c). The indictment alleged that he "did knowingly employ, use, persuade, induce, entice, and coerce minors to engage in sexually

9

explicit conduct outside the United States, for the purpose of producing visual depictions of such conduct, and transporting such visual depictions to the United States by any means, including by computer and mail."

Irey was taken into custody on December 14, 2006. He was released on an unsecured bond conditioned on his being housed in a psychiatric facility "for treatment of mental health issues related to the current charges." He remained at that facility near his home for at least thirteen months.

At a change of plea hearing on July 2, 2007, Irey pleaded guilty to one count of violating 18 U.S.C. § 2251(c). When asked to tell the court what he had done, Irey replied: "Went to—overseas, visited numerous brothels where they had underage children and photographed them, had sex with them, and had them on my laptop when I entered the United States." He added that it happened over a period of four years,[3] the last time being in 2006. Irey agreed with the government's statement at the hearing that he had admitted to the agents that while overseas he had sex with children he knew were minors, had produced pornographic images of that, and had then transported those images back into this country.

---

[3] Although Irey stated at the change of plea hearing that his sexual abuse of the children occurred over a period of four years, he told Dr. Ted Shaw that it occurred over a period of five years.

10

### III.  The Sentencing Proceedings and Sentence

A. <u>The Calculation of the Guidelines Range</u>

The Presentence Report began the calculation of Irey's guidelines sentencing range with a base offense level of 32 under U.S.S.G. § 2G2.1(a), because the offense was one involving the sexual exploitation of minors by production of sexually explicit visual or printed matter.  Added to that base offense level were four levels under § 2G2.1(b)(1) because the offense involved children under the age of 12; two levels under § 2G2.1(b)(2)(A) because the offense involved the actual commission of sexual acts; two levels under § 2G2.1(b)(3) for distribution of child pornography; and four levels under § 2G2.1(b)(4) because it involved material portraying sadistic conduct, producing an adjusted offense level "subtotal" of 44.  Then two levels were added under § 3D1.4 as a result of grouping because of multiple victims.[4]  Those additions produced a combined adjusted offense level of 46.[5]  From that were deducted two levels under § 3E1.1(a) for acceptance of

---

[4] Although only one count was charged in the indictment, the guidelines consider each separate victim as a separate "group" for purposes of offense-level calculation.  U.S.S.G. § 2G2.1(d)(1).  In this case, the PSR did not proceed beyond two groups because two were enough to put the defendant's combined adjusted offense level at 46 and his final offense level at 43, which is the maximum level available under the guidelines.  Had the PSR considered all fifty children, five levels would have been added rather than two (the grouping ceiling is fixed at 5 levels regardless of the number of offenses), which would have given Irey a combined adjusted offense level of 49 and a final offense level of 46.

[5] The Presentence Report pointed out that under § 2G2.1 cmt. n.6, "[a]n upward departure may be warranted because the offense involved more than ten minors."  No upward departure was requested by the government or applied by the district court, probably because it

11

responsibility and an additional level under § 3E1.1(b) for timely notification of
intent to plead guilty.  Subtracting those three levels from the 46 produced a final
offense level of 43.

Because Irey had no prior convictions his criminal history category was I.
Even with that category an offense level of 43 produces an advisory guidelines
imprisonment range of life.  The statute under which he was convicted, however,
carries a statutory maximum of 30 years.  See 18 U.S.C. § 2251(c).  As a result, the
guidelines "range" became 360 months (30 years); there was no spread—the top
and bottom of the range were the same.  See U.S.S.G. § 5G1.1(a) ("Where the
statutorily authorized maximum sentence is less than the minimum of the
applicable guideline range, the statutorily authorized maximum sentence shall be
the guideline sentence.").

Neither party objected to the calculation of the guidelines range.  In his
sentencing memorandum, Irey's counsel stated:  "Mr. Irey does not object to the
Probation Officer's advisory guideline calculations and does not seek a downward
departure from the guideline range described in the PSR."  Irey did, however, ask
for a sentence below the guidelines range of 30 years.  The statute requires a
minimum sentence of 15 years.  See 18 U.S.C. § 2251(c).  Irey's sentencing

---

would not have made any difference since the adjusted offense level and criminal history score
worked out to a guidelines imprisonment range of life even without an upward departure.

memorandum argued that "[a] sentence of 15–20 years in prison, followed by a substantial term of supervised release" should be imposed.

The government filed a sentencing memorandum arguing that "[i]f this case is atypical, it is because of aggravating, not mitigating, factors," and it urged the court to impose a sentence equal to the guidelines range and statutory maximum of 30 years. The government told the court that it "should give great weight to the findings of Congress . . . that departures should be extremely rare in child sex crime cases" because of the seriousness of those crimes. It specifically argued that any variance based on Irey's "diminished capacity, aberrant behavior, or family ties and responsibilities" would result in an unreasonable sentence. The government also pointed to precedent establishing that a guidelines sentence may be appropriate even where, in the government's words, the defendant's "psychological evaluation [had] found that he was not a significant risk to children or likely to molest children in the future." See United States v. Scott, 426 F.3d 1324, 1327, 1330 (11th Cir. 2005).

In anticipation of the argument that Irey's actions were "not purely volitional," the government argued that Irey "has not shown that his mental condition is outside the heartland of similar cases" and cited two of our decisions in support of that proposition. See United States v. Caro, 309 F.3d 1348, 1353

13

(11th Cir. 2002) ("[M]ost people who collect a sizeable amount of child pornography are in someway addicted to collecting it."); United States v. Miller, 146 F.3d 1281, 1285 (11th Cir. 1998) ("Nor would poor impulse control be unusual [for a collector or purveyor of child pornography], regardless of whether it stemmed from an impulse control disorder. . . . An impulse control disorder is not so atypical or unusual that it separates this defendant from other defendants."). Acknowledging that Irey may have "rationalized his crimes against children by failing to perceive the harm he was inflicting," it argued that "is not so uncommon as to take this case out of the heartland." In regard to the possibility that Irey, as a pedophile, may have "experience[d] self-deceptive thought processes," the government emphasized that he "has horribly sexually abused numerous children over a period of years." The government's sentencing memorandum concluded by arguing that "any variance under 18 U.S.C. § 3553(a) would be unreasonable because there is nothing unusual about the nature or circumstances of this offense or the defendant's personal characteristics."

## B. The Reports of the Psychiatrist and Psychologist

In connection with sentencing defense counsel hired two experts in the field of psychology and psychiatry, and he furnished their reports to the court. One of the reports was from Dr. Fred Berlin, who is board-certified in both general and

14

forensic psychiatry.  Although he did not testify at the sentence hearing, his report is mentioned in the Presentence Report, a copy of it was attached to defense counsel's objections to the Presentence Report, and it was discussed by Dr. Shaw, who did testify at the hearing.

Dr. Berlin reported that Irey "has a psychiatric disorder known as heterosexual pedophilia," which means "he experiences a strong sexual attraction to prepubescent girls; girls who ordinarily are less than thirteen-years-of-age." Dr. Berlin stated that Irey was capable of relating intimately to an adult woman, but he found that Irey "experienced intense sexual cravings for female children as well." Irey was "highly sexualized" and admitted to having "engaged in other forms of sexually disordered behavior with prostitutes (e.g. sadomasochistic acts), and . . . having viewed images involving bestiality on the Internet." Nonetheless, Dr. Berlin asserted that "to the best of my knowledge and belief, he has never coerced an unwilling person against their will."[6]

Dr. Berlin gave his opinion that "a sexual disorder such as pedophilia does

---

[6] In view of the undisputed facts, that statement is astounding. We find it inconceivable that Dr. Berlin believes impoverished Cambodian children, who are among the most vulnerable people in the world, willingly submitted to being bound by duct tape and sexually penetrated orally, vaginally, and anally by a 200-pound adult male, as well as to having various objects, including glow sticks, dildos, and cockroaches pushed into their vaginas, while they, in Irey's words, "Hurt in Pane." The only plausible explanation is that Irey was less than forthcoming with Dr. Berlin about the details of what he had done to those children "many many times" over at least a four-year period.

not develop as a consequence of a volitional decision." He also stated, however, that "[a]lthough it is not [Irey's] fault that he has the disorder, it is his responsibility to do something about it." Dr. Berlin thought that Irey needed professional treatment but he also pointed out that "[e]ven without treatment, in the past, he had been able to refrain from any sexual contact with children within the United States."

Dr. Berlin's report stated that he had found no evidence to suggest that Irey was "characterlog[icall]y flawed," and concluded that he was "not generally anti-social or psychopathic in his psychological makeup," nor was he "a man who has generally lacked a sense of conscience." Instead, he thought that Irey had often simply been unable to "readily appreciate the extent of his improprieties" with the children. Dr. Berlin denied that Irey had "a malicious disregard for the well-being of the girls in question." Instead, in his professional opinion, "Mr. Irey did have a genuine affection and concern for those youngsters at that time" and actually thought he was helping the little girls he was sexually abusing.[7] Dr. Berlin's view

---

[7] Irey himself probably would disagree with Dr. Berlin's opinion that he had not fully appreciated the wrongfulness of his conduct. In a letter he wrote to the district court a week before sentencing, Irey admitted to having visited the child brothels in Cambodia "many many times," even though he knew the girls were minors and that it was wrong, adding "but it was to[o] late, my sex addiction was now in full control of me." Later in the letter, Irey said: "I [had] wanted to stop this insanity for at least 15 years, but I could not. I was sneaking out to pick up prostitutes, I was leading a double life. I had developed this terrible dark side."

Dr. Berlin's theory that Irey had not fully appreciated the wrongfulness of what he was

is that, except for the fact that he had spent four or five years raping, sodomizing, and sexually torturing some of the most vulnerable children in the world, Irey is "an otherwise decent man."

Dr. Ted Shaw, a psychologist, was also retained by the defense, and he submitted a "psychosexual evaluation report" on behalf of Irey.  When Dr. Shaw evaluated Irey on August 23, 2007, Irey was at the Lifestream Behavioral Center in Leesburg, Florida, "on conditional release from jail."  He was undergoing treatment for alcohol abuse problems and sexual addiction.  According to Dr. Shaw, a review in May 2007 indicated that Irey "was making appropriate progress," although his wife and children "refused to attend personal counseling" as part of the family sessions.

Irey admitted to Dr. Shaw that he had used prostitutes in this country and in doing so had contracted a venereal disease, which he passed along to his wife. Irey had also "experimented with bisexuality" and had "enjoyed consensual bondage" with adult females.  Irey "described a lack of interest in well-endowed

---

doing to the little children in Cambodia apparently was too much of a stretch for Irey's defense counsel. Counsel did argue in his sentencing memorandum that "Irey has been diagnosed as a pedophile, and had a limited ability to control the behavior supporting the offense of conviction." He never argued, however, that Irey had not realized what he was doing was wrong or failed to appreciate fully the wrongfulness of his criminal conduct. Not in his sentencing memorandum, or at the hearing, or in his panel brief, or in his en banc brief. More importantly, the district court never found that Irey had not fully appreciated the wrongfulness of his conduct, but only that the conduct was not purely volitional and instead was in substantial part due to his pedophilia.

women," telling Dr. Shaw that "when he married his wife she was thin and had small breasts," but "[h]er physique has changed over the years." Irey admitted that he had visited child brothels in Cambodia "for the past five years." He did, however, lie to Dr. Shaw about some of the details of his sexual abuse of children.[8] Irey acknowledged, though, that the children "suffer the most and are victims."

Dr. Shaw's report noted Irey's escalating sexual interest over the preceding ten years, which "could be described as a 'sexual addiction,' with many behaviors and an obsessive fixation which included frequent masturbation, anonymous sex with prostitutes and the eventual use of brothels in Cambodia." He described Irey as "sexually obsessed for at least the last ten years," and stated his opinion that "Irey's paraphilias clearly drove his behaviors, in spite of being an otherwise moral and responsible individual, upon whom many people, including family, clients and employees, depended."

Under one of the risk assessments that Dr. Shaw applied, Irey's score "places him in the Medium-Low risk category for sexually re-offending."

---

[8] Irey told Dr. Shaw that some of the girls he had sex with "were in their early teens, with the youngest being about twelve." In fact, as Irey knew and would later acknowledge, the photographs he made showed that many of the girls were younger than twelve and some were as young as four years of age. Irey also told Dr. Shaw that he would only have oral sex with the girls who appeared younger than twelve years of age. However, a photograph Irey made shows him having vaginal intercourse with a young girl, and "[i]mbedded on the image [in all capitals] is the phrase: 'Big Cock Push Bug Deep Into 9 Yo Girl, She Hurt in Pane.'"

Another one, the Minnesota Sex Offender Screening Tool-Revised, resulted in a score that placed Irey in the "Moderate Risk Range." More specifically, Dr. Shaw said, "the five-year, ten-year, and fifteen-year recidivism rates for individuals in the development research study with Mr. Irey's score are 12%, 14%, and 19%." Overall, he reported, "the dynamic and static factors, suggest a moderate to low moderate risk of a new charge," which "can be reduced through continued treatment and informed supervision upon his release."

## C. The Sentence Hearing

The court began the sentence hearing, which was held on January 29, 2008, by noting that it had reviewed the sentencing memoranda, the presentence report, and Dr. Shaw's report. The first witness was Dr. Shaw. He gave his opinion that Irey has "a long-standing problem with sexual obsession," and "something like sexual addiction," and in American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (DSM-IV TR) terms, "obsessive-compulsive type disorder, not the full-blown disorder, but with the sexual behavior being the most prominent feature." So far as he could tell, there was not enough evidence to diagnose Irey with any personality disorder. Dr. Shaw said that Irey is "very low in psychopathy" and explained that "he has this encapsulated area where he was cheating, where he was lying, where he was

19

violating laws; but outside of that, he was—appears to be—to have been a law-abiding citizen."

As for Irey's risk of sexually abusing children again, Dr. Shaw testified that: "He's essentially in the medium low to medium or moderate risk categories, which is—which is below a threshold of likely." The risk might be further reduced with the use of certain drugs, but he was hesitant to recommend that the court require them given all of their side effects and the fact "that they're not always useful." He also noted that Irey is going to be older "when and if he's released, and he's going to have experienced a reduction naturally in testosterone and a reduction in sex drive." Dr. Shaw summed up the risk situation:

> So overall, I find him to be, as I said, a moderate risk, a low-moderate risk, low in psychopathy. He does have—has deviant interests. Those interests, he himself has been working on reducing and are likely somewhat reduced already. They are fueled by obsessive thinking and masturbating and by the sex acts themselves.

The court questioned Dr. Shaw about pedophilia, asking him: "I mean, is it an illness? I mean, how would you describe that as a mental health professional?" After noting that Dr. Berlin was on the committee that defined it for purposes of the DSM–IV TR, Dr. Shaw testified:

> I'll take my shot at it. It is a disorder of sexual interest and behavior, and you can have the diagnosis with only the interest. So you could be fascinated, sexually attracted to children and never act on it, and—but if it troubled you or caused any problems for you, you

would still be diagnosable with that disorder, and that is being
attracted to or engaging in behaviors, sexual behaviors, with
prepubescent children.

So it is clearly a well-recognized disorder, and I thought that
Dr. Berlin did a good job of saying that it's not a disorder that
someone chooses. It's something that is within you and you have
some tendency towards it.

And frankly and quite sadly, I think the availability of child
images, particularly on the Internet, has fueled an epidemic of
pedophilia that was kind of probably in the background, people might
not have even known that they suffered from it, and then come across
these images. But nonetheless, it is a treatable disorder. So it's a
disorder that has different origins.

And Mr. Irey talks about how the disorder manifested itself for
him in his being provided with a very young—or very young
prostitutes without asking for them initially; but then he found
himself first repelled but then attracted to them, and that's that sort of
natural biological disorder part of it that's different from the moral
and ethical issues.

So for another person, if they had been in the same situation,
they may have been repulsed and stayed repulsed by it and, you
know, not—just said, "Don't ever do that again and I'm not
interested;" but that led him into a spiral of interest in children
sexually. So that's the way that it's manifested itself here.

The district court then remarked that "people accuse me of not knowing

what I'm talking about when I say it's an illness, and maybe I don't. That's why

I'm asking you." The court continued:

And I guess the question is, from a standpoint of criminology,
is a person who acts out as a result of this condition acting totally of
rational free will or is that person acting out as a result of something

21

that is in essence an illness that he at that point has no control over?
Do you understand what I'm saying?

Dr. Shaw answered:

>   I do, Your Honor.  I think that the fact that pedophilia is not an
> underlying element for competency or sanity – it is an Axis I,
> treatable disorder.  Those of us who have been in the field – I've been
> in the sex offender field actually since 1976; and there were pioneers
> in the field before me, long before me.  We have been treating
> pedophilia for decades.

>   It is—I think that the problem that a lot of lay people have is in
> distinguishing between people who are disordered, seriously
> disordered, and curability versus treatability.  Pedophilia is very
> treatable, and there are many pedophiles in the community who are
> doing just fine and managing their behavior.

>   As I'm sure you know, probationers, U.S. probationers, are
> now subjected to an annual polygraph about whether they are
> following the rules of their probationer or whether they are re-
> offending.  Pedophiles are capable of not re-offending, even if they
> have an urge, in the same way that compulsive dessert eaters can
> choose to not eat dessert.

>   They have different levels of struggling, and there are aids to
> that: Good supervision, good treatment, replacing those needs with
> healthy needs.  A lot of treatment is helping people understand the
> origin of their disorder and then teaching them to, first of all, be
> aware of the danger signs, the risks to relapsing, but at the same time
> replacing the way that they were meeting the needs met with the
> disordered behavior, meet them in healthy ways; and that's
> something people can be taught.  People like Mr. Irey, who's bright,
> who has been successful in business, he can certainly learn the
> techniques that we teach to prevent—be responsible himself for
> preventing a reoffense.

>   It's—I think because we like to say, "You can't be cured"—in

22

other words, the best long-term treatment is to be alert to the problem and to—that's not a cure. Cures, you can forget about it. Just go be around kids again and don't worry about it. That, we can't do.

But there are, you know, thousands of pedophiles and child molesters, different, out there, in my belief, who aren't re-offending, who are in recovery and doing just fine. The new treatments that we use are, I think, very effective.

On cross-examination, Dr. Shaw confirmed for the record that Irey was "a pedophile with a sexual interest in children younger than 13, prepubescent children." As for Irey's risk assessment, he conceded the study it relied on was not confined to pedophiles but also included other sex offenders. Dr. Shaw also acknowledged that he had not looked at any of the photographs of Irey's victims and did not know how many victims there were. When asked if it would surprise him to know that Irey had sexually molested "over 50 children," he responded that it wouldn't because Irey "did admit that he had become more and more obsessed and was returning to Asia more and more often."

Other than Dr. Shaw the only people who submitted statements for, or testified at, the sentence hearing did so as character witnesses for Irey. Although they had not been willing to fully participate in family therapy with him, all of Irey's immediate family did make statements on his behalf either by video (wife, daughter, and a son) or in person (two other sons) at the sentence hearing. In his short video statement, Irey's youngest son told about his father building a

clubhouse and dirt bike track.  In her short video statement, Irey's daughter (age

16) described her father as "loving" and said that he "has taught me how to be

strong, respectful, honorable, loyal, and the list can go on and on."

   In her video statement Irey's wife of 25 years described him as "a loving

and wonderful husband and father" who is "mindful of other people's feelings."

She said that he was a member of the Rotary Club, the Masons, the United Way,

the YMCA, the local theater, the Shriners, and a charity called "Give Kids the

World."  He was so good and kind that he had even rescued and taken in a stray

dog.  Indeed, she proclaimed that she had been "very blessed to have been part of

Bill's life for so many years.  He's taught me so many things."  After watching her

video statement, the district court stated: "I understand that Mr. Irey has been a

good family man and has family support."

   Irey's oldest son (age 24) testified that his father had taught him "so much

about life and love" and called him "my hero, my star, our father."  His middle

son (age 20) testified that Irey had taught him "to stick up for the little guy

because a lot of times nobody else will," and that Irey did things "to make this

world what we all envision it could be."  A friend of Irey's testified that Irey had

used his contacts in China to help out the family of that man's wife in China.  He

also added that during his 32 years of law enforcement in New York City he had

24

seen "a lot of bad people and Billy Irey is not one of those people."  Irey's brother

testified about how Irey, when a senior in high school in 1976, had loaned his coat

to an accident victim, which was typical of his "random acts of kindness," and

how if someone was in need, you could count on him.

No one was more effusive in his praise of Irey than his nephew.  He

recounted how his uncle had helped get him a computer for college, had listened

to him talk about his aspirations, and had helped others over the years.  He

proclaimed that Irey "had a way of touching people's lives in a way that I've

never seen before," and "bring[ing] out the best in every single person that he

meets."  Irey is, in his view, "the most spirited and the most giving person" and

"overall is just one of a kind."  He even said that: "I like to think that when God

created Uncle Bill, He took a step back and He said, 'I'm really going to like this

one.'"

At the conclusion of the evidence, defense counsel argued that a sentence to

the statutory maximum of 30 years would be "greater than necessary for Mr. Irey

in light of the mitigation that's been presented."  He assured the court that he was

not trying to minimize "the gravity of the acts with which Mr. Irey is charged,"

but argued that they were "a compartmentalized area of his whole being that is a

result of his pedophilia."  He argued that Dr. Shaw's testimony and Dr. Berlin's

report established that "the behavior of a pedophile is not totally volitional, that is, it is dictated in some degree by the disease itself." He also argued that Irey had "lived, other than this disease and this addiction, an exemplary life." Counsel cited three decisions, two from this Court and one from the Eighth Circuit, which affirmed sentences below the guidelines range in cases involving defendants convicted of distributing child pornography over the internet.[9]

Counsel told the court that if Irey were sentenced to the 30-year guidelines range sentence he would be 81 years old when he got out.[10] Instead of that sentence, counsel asked the court to impose one of "between 15 and 20 years here with up to lifetime supervised release." Counsel asserted that a 15- or 20-year sentence "would make him 66 or 71 when he got out, if he served the entire

---

[9] The decisions cited were United States v. McBride, 511 F.3d 1293 (11th Cir. 2007), United States v. Gray, 453 F.3d 1323 (11th Cir. 2006), and United States v. White, 506 F.3d 635 (8th Cir. 2007). In none of those cases did the defendant actually produce the child pornography he distributed. And there is no indication that the acts depicted in the pornography involved in those three cases even came close to the depraved nature of the acts graphically depicted in Irey's pink wall series.

[10] That statement is not entirely accurate. Under 18 U.S.C. § 3624 federal inmates routinely receive 54 additional days credit toward the service of their sentence at the end of each year that they have served with good behavior (with the credit for the last year or part thereof being prorated and credited within the last six weeks of the imprisonment). Because of § 3624 Irey could complete a 30-year sentence in 26 years and 2 months, and he would be 76 years old when released, not 81. See 18 U.S.C. § 3624; 28 C.F.R. §§ 523.20, 541.13 (2005); see also Barber v. Thomas, 130 S.Ct. 2499 (2010).

sentence."[11]

After defense counsel made his argument, the court asked if Irey wanted to say anything. In brief remarks, Irey apologized to "the government agents that have had to get involved in my horrible deeds," to "the federal attorney's office," to the court, "to the children that I have harmed over the last several years of going to Cambodia," to his family, and to "my employees, that I've pretty much hurt them." He also said: "I've hurt a lot of people and I can't undo that, but I can learn from that and I'm willing to learn."

The AUSA then argued in favor of the advisory guidelines range sentence of 30 years. She reminded the court that Irey "is not being prosecuted for being a pedophile; he's being prosecuted for the acts that he committed." She argued that: "As an alcoholic does not have to drive a car, a pedophile doesn't have to put themselves in a brothel in Cambodia, which this defendant did for years and years and years, Your Honor."

The AUSA reminded the district court that the description of Irey's conduct in the Presentence Report included: "writing filth on children's bodies, inserting

---

[11] The "if he served the entire sentence" condition is important, because Irey would not have to serve his entire sentence unless he behaved so badly in prison that he did not qualify for the § 3624 additional credit for good behavior. See supra note 10. Assuming good behavior, Irey would complete a 15-year sentence in 13 years and 1 month, and be released at age 63; he would complete a 20-year sentence in 17 years and 5 months, and be released at age 68. See 18 U.S.C. § 3624; 28 C.F.R. §§ 523.20, 541.13 (2005); see also Barber, 130 S.Ct. 2499.

objects into them, binding them up and tying them up, treating them—posing

them as trophies, and having several of them engaging in acts with him and with

other children at the same time, [and] this is not run-of-the-mill child pornography

. . . if there is such a thing."  She stressed that this is a production case, and "the

defendant clearly had two different parts of his life going on; but in this one, he

was the star, the writer, the director, and, at the end, a person who ruined, just

absolutely and forever ruined over 50 children's lives."

     During her argument, the AUSA showed the court photographs of about

fifty of the children taken from Irey's pink wall series; none of those particular

photos showed any obscene acts or revealed private parts; they did show some of

the children's faces.  She pleaded with the court to "look at these babies' faces,"

pointing out that "some of these children are four or five, six years old.  They're

babies, Your Honor."  Referring to the child pornography that Irey produced

involving these same children, she pointed out that "[t]heir pictures will forever be

out there online.  They will be victimized over and over again . . . .  Their lives

can never be the same."

     The AUSA also informed the court that when Irey was caught and the cache

of child pornography he had produced was found on his computer, the National

Center for Missing and Exploited Children contacted law enforcement agencies,

which expressed astonishment that "you've found the person who produced the 'pink wall' series." The series "was infamous on the Internet, and is turning up even in cases now, that we're finding more and more of the pink wall series of these young children."

The AUSA also pointed out that "in some of the photographs, the defendant is smiling as he perpetrates this abuse." She asked: "How can we square this with the stories we've heard today? How can you treat a dog better than you treat a human being, a defenseless baby?" Answering her own question, she argued that "[i]t makes no sense other than there's something really, really bad about the defendant." She also asked the court to consider the offense and victimization, and argued that "[t]he message we send to people who would do this has to be considered." She pointed out that the defendant's conduct, according to his own admissions, was "not even just child rape and child molestation, but dealing with prostitutes, lying when he doesn't have to," and stealing. She characterized him as a person "who lies and steals and hurts other people."

Focusing on the 1,200 images in the collection of child pornography that Irey produced, the AUSA argued that there is no better word for it than "torture." She pointed out that what Irey did to the small children produced "some of the most egregious images that the agents have ever seen," and Irey had been doing it

29

for years and on many occasions and paying up to $1,500 for the rights to use

particular children in any way he wanted.

The AUSA concluded her remarks by asking the court to impose a 30-year

sentence, the maximum the law allowed, in order to do "justice for these children

who cannot plead on their own behalf."

### D.  The Sentence Findings and Sentence

The court began its sentencing remarks by stating that sentencing was the

hardest thing it had to do and was "particularly difficult in cases like this."  The

court noted the statutory minimum or floor was 15 years and the ceiling was 30

years, which was also what the court called "the guideline score."  The court

observed that while it was to take into account the guidelines score and consider

that score as a benchmark throughout the analysis of the 18 U.S.C. § 3553(a)

factors, the guidelines are not mandatory; while an important element of the

sentencing calculus, the result of the guidelines calculation is only advisory.  The

court then stated that it needed to look at the other § 3553(a) factors on an

individualized basis in order to determine an appropriate sentence for the case.

Because of the importance of the court's sentence findings and explanation,

we set them out in full:

> The first thing I need to do is consider the nature and
> circumstances of the offense, and I cannot quarrel with Ms. Hawkins'

30

description of that.  The conduct here was horrific.  The victims were numerous and perhaps the most vulnerable of the world's society.  So I don't think there's any question but we're dealing with here with an offense that rises to the very top in terms of its seriousness and its effect on other human beings.

These young children were victims who may never, never overcome their abuse.  I recognize, of course, that Mr. Irey and his family and friends are also victims here; and society at large is a victim because, as Dr. Shaw indicated, with every new development in human history, there seems to come good and bad with it; and with all the good of the Internet, perhaps one of the bad features of it is that it has made possible what Dr. Shaw describes as an epidemic of child pornography.  And, unfortunately, we here in the court system witness that and have to deal with it; and our government, in an effort to deal with it, has imposed—has criminal penalties, very harsh sentences for conduct like this.

So in terms of the characteristics of the offense, the seriousness of it itself, the long-standing, long-term engagement in it certainly does not mitigate in favor of any leniency.

But next I need to look at the history and characteristics of the defendant.  By all accounts, Mr. Irey has been a good husband and father for his wife and children and a good friend to his friends and a good person to his community.  The lies and thefts, I think, referred to by Ms. Hawkins were essentially part of his effort to cover up his illness, because I think other than the acts of Mr. Irey, there's no indication that he has engaged in any other sort of criminal conduct or conduct representing poor character.

Also, in terms of the characteristics of the defendant, I think we're just beginning to learn what pedophilia is and how to deal with it.  I think if you look at the reports of the mental health people here and into the literature, which I have done, Mr. Irey's acts that bring him here today, I think it's safe to say, were not purely volitional.  I think they were due in substantial part to a recognized illness.  And while it does not excuse his conduct and he will still be held

31

accountable for it, I think it would be inappropriate to ignore that fact.

I also think it's appropriate to credit the opinion of the mental health professionals who indicate that Mr. Irey is pursuing treatment and is doing so apparently successfully and, in the view of the mental health professionals, is treatable and has a low risk of recidivism.

Of course, all of that is somewhat academic because by the time he gets out of prison, he'll be most likely at an age where recidivism would be unlikely, just from a physiological standpoint.

Mr. Irey obviously has a very loving family, and I know he's proud of his family and deserves whatever credit he should take for having produced these people who have come here today to speak for him. And I know it was difficult for the family, but I think that your support is important and says a lot, not only about your family, but about Mr. Irey himself.

Another aspect of the defendant's character, as I have alluded to, of course, not his character but his individual characteristics, is his age. As I indicated, even the minimum sentence here, he's going to be an old man. I guess that makes me an old man, but he will certainly be an older man when he gets out of prison; and that's, I think, a factor to take into account.

There are other aspects of the statute that essentially are subjective in nature. Of course, adequate deterrence to criminal conduct. I mean, a serious sentence is hopefully going to deter others from conducting similar affairs, although when we're dealing with an illness like this, I'm not sure that that rationally follows. But, nevertheless, deterrence is an appropriate consideration, and a stiff sentence is in keeping with the seriousness of this offense.

As far as protecting the public from further conduct of this defendant, for the reasons I've indicated, I think that militates against a 30-year sentence, given his age, given the fact that he apparently recognizes now, from everything I've seen, he recognizes the

32

condition that has led him to commit these acts and to put himself and his life and his family's life in the order that it is. He's taken the first step toward rehabilitation and appears to be amenable to treatment and also, according to the mental health professionals, is of low risk of recidivism. So I don't think society needs further protection from him, at least beyond the statutory minimum sentence.

As often happens in these cases, my judgment—and I am a fallible human being. So what I do is not necessarily right. I just do the best I can under the circumstances. It comes down to my view of what promotes respect for the law and provides just punishment. And here, as indicated, I think that a 30-year sentence, given the personal factors that I have touched upon, is greater than necessary to accomplish the statutory objectives.

On the other hand, in light of the seriousness of the crimes, I think a sentence above the mandatory minimum is called for.

So having said all that, it's the judgment of the Court that the defendant, William Irey, is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 210 months.

Upon release from imprisonment, Mr. Irey, you'll be placed on supervised release for a term of life. The mandatory drug testing requirements of the Violent Crime Control Act are imposed. While on supervised release, you must comply with the standard conditions adopted by this court.

In addition, I'm going to require you to participate in a substance abuse program and to follow your probation officer's instructions in that regard. You must also participate in a mental health program specializing in sex offender treatment and follow your probation officer's instructions in that regard as well.

You must register, as appropriate, with any state offender registration agency and cooperate with your probation officer with respect to complying with that directive.

I'll impose the standard terms concerning risk control, that is, no direct contact with minors under 18 without the written approval of your probation officer, prohibition for possessing, subscribing to, viewing any video or magazines, literature otherwise depicting children in the nude or sexually explicit positions. You shall not possess or use a computer with access to any online service without written approval of your probation officer.

Also, I'm going to impose a search requirement, that you submit to a search of your person, residence, place of business or any other area under your control at a reasonable time and in a reasonable manner based on any reasonable suspicion by your probation officer of contraband or evidence violating these terms of supervised release.

You must cooperate with the collection of DNA.

I'm not going to impose a fine. You are ordered, however, to pay a special assessment of $100, which shall be due immediately.

It's ordered that you shall forfeit to the United States those assets identified in your Plea Agreement that are subject to forfeiture.

As indicated, the Court has imposed a sentence below the applicable guideline sentence for the reasons indicated.

The defendant had no objection to any aspect of the sentence, including the 210-month (17 ½-year) term of imprisonment. On behalf of the United States, the AUSA objected to the downward variance of 150 months (12 ½ years) as unreasonable "based on the factors adduced in this record, particularly the seriousness and long-term nature of the offense." She characterized the variance as being "almost half." The court responded that the sentence was "more like 60 percent of the guideline, not half."

34

Actually, the sentence of 210 months amounts to 58 percent of the advisory guidelines sentence of 360 months, or a downward variance of 42 percent from the guidelines sentence. But, of course, the court could not sentence below the statutory minimum of 15 years in any event. In light of that, it is also accurate to say that within the statutorily prescribed range of 15 to 30 years (a spread of 15 years or 180 months), the court imposed a sentence that was 83 percent from the maximum and only 17 percent above the minimum. As Judge Hill put it, the district court had "move[d] so far downward from the maximum upper sentencing limit that he nearly reache[d] the minimum limit." United States v. Irey, 563 F.3d 1223, 1227 (11th Cir. 2009) (Hill, J., concurring), vacated, 579 F.3d 1207 (11th Cir. 2009) (en banc).

## IV. Our Review of the Reasonableness of the Sentence

The United States appealed, contending that in view of the facts and circumstances the sentence was unreasonably light, amounting to an abuse of discretion. A panel of this Court disagreed and affirmed the sentence. Id. After voting to rehear the case en banc, we directed the parties to brief and argue this issue: "Is the sentence imposed in this case unreasonable and thereby an abuse of the district court's sentencing discretion?"

### A. The Scope, Standard, and Importance of Appellate Review

35

## 1. The Pre-Booker Era

Our review of a sentence that is challenged on substantive grounds is deferential but still important, as the history of substantive review of federal sentences indicates. Before the Sentencing Reform Act was enacted in 1984, there was practically no appellate review of federal sentences, except to ensure that they did not stray outside of the statutory minimum and maximum. So long as sentencing judges stayed within the statutory boundaries, they had unbridled discretion to arrive at any sentence they pleased. See Dorszynski v. United States, 418 U.S. 424, 431–32, 94 S. Ct. 3042, 3047 (1974) ("[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end."); United States v. Tucker, 404 U.S. 443, 447, 92 S. Ct. 589, 591 (1972) ("[A] sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review."). The result, predictably, was widespread disparity in sentences, a problem that gave rise to a lot of criticism. See, e.g., S. Rep. No. 98-225, at 38–39 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3221–22 (complaining of the "unjustifiably wide range of sentences" different judges imposed on similarly situated defendants).

One of the leading champions of change was Marvin Frankel, who was himself a district judge. Frankel described federal sentencing as it then existed as

"a non-system in which every judge is a law unto himself or herself and the sentence a defendant gets depends on the judge he or she gets." Marvin E. Frankel, Jail Sentence Reform, N.Y. Times, Jan. 15, 1978, at E21. He proposed a number of reforms, some of which were similar to what would become the sentencing guidelines system. See Marvin Frankel, Criminal Sentences: Law Without Order 113–14 (1972). One of Judge Frankel's key proposals was that federal sentences be subject to at least a limited degree of appellate review. See id. at 75–85. The standard he recommended was abuse of discretion, see id. at 82–84, which he described in these terms:

> Correctly understood, the "discretion" of judicial officers in our system is not a blank check for arbitrary fiat. It is an authority, within the law, to weigh and appraise diverse factors (lawfully knowable factors) and make a responsible judgment, undoubtedly with a measure of latitude and finality varying according to the nature and scope of the discretion conferred. But "discretionary" does not mean "unappealable." Discretion may be abused, and discretionary decisions may be reversed for abuse.

Id. at 84. The goal of the new system, Frankel explained, was "[s]entencing [that] would be more just. Like cases would tend to be treated alike," because "[t]he most fundamental of our legal principles—'equal justice under law'—demands that this be so." Frankel, Jail Sentence Reform, at E21; see also Martin v. Franklin Capital Corp., 546 U.S. 132, 139, 126 S. Ct. 704, 710 (2005) ("Discretion is not whim, and limiting discretion according to legal standards

helps promote the basic principle of justice that like cases should be decided alike."). Frankel and other reformers won the debate, although it took a number of years to enact the necessary legislation and put the new sentencing system in place.

The legislation was the Sentencing Reform Act of 1984, whose primary purpose was to channel district courts' sentencing discretion and reduce disparity in sentencing. See Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended at 18 U.S.C. §§ 3551–3586 (1988) and 28 U.S.C. §§ 991–998 (1988)); Mistretta v. United States, 488 U.S. 361, 364–69, 109 S. Ct. 647, 651–53 (1989) (discussing background to the Sentencing Reform Act and the guidelines). The Act, which became effective on November 1, 1987, created the Sentencing Commission and gave it the responsibility to develop a system of sentencing guidelines.

The sentencing guidelines were binding, and district courts were required to state reasons for imposing a particular sentence. 18 U.S.C. § 3553(b)–(c). A court could impose a sentence outside the applicable guidelines range only if it found the existence of an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." Id. § 3553(b)(1). In making such a finding, a

sentencing court could consider only the guidelines themselves and the policy

statements and official commentaries of the Sentencing Commission.  Id.  As the

Supreme Court later noted, departures on this basis were rarely available because

"[i]n most cases, as a matter of law, the Commission will have adequately taken

all relevant factors into account, and no departure will be legally permissible."

United States v. Booker, 543 U.S. 220, 234, 125 S. Ct. 738, 750 (2005).

Restraints on the exercise of discretion by district courts are enforced

through appellate review, and the Sentencing Reform Act of 1984 provided for it.

18 U.S.C. § 3742.  Under the Act, a sentence could be appealed on the ground

that:  (1) it was imposed in violation of the law; (2) it was imposed as a result of

an incorrect application of the guidelines; (3) the term of imprisonment, fine, or

supervised release was greater than the maximum or less than the minimum

established in the guidelines range; or (4) it was imposed for an offense for which

there is no sentencing guideline and was "plainly unreasonable."  Id. §

3742(a)–(b).

Departures from the guidelines range were reviewed under the third of the

statutorily listed grounds for appeal, see id. at § 3742(a)(3), (b)(3), and the

resulting sentence was vacated if the appellate court determined that it was

"unreasonable" in light of the factors to be considered in imposing a sentence

39

under § 3553(a) and the district court's stated reasons for the sentence.  See

Booker, 543 U.S. at 261, 125 S. Ct. at 765 (quoting the pre-2003 version of 18

U.S.C. § 3742(e)(3) (1994 ed.)).  In conducting its review, the court of appeals

accepted the district court's findings of fact unless they were clearly erroneous,

which was decided only after giving due regard to that court's opportunity to

judge the credibility of witnesses.  18 U.S.C. § 3742(e) (1994 ed.).  The reviewing

court also gave "due deference" to the district court's application of the guidelines

to the facts.  Id.

The district court's decision to depart from the guidelines was reviewed for

abuse of discretion in a three-step process.  See Koon v. United States, 518 U.S.

81, 98–100, 116 S. Ct. 2035, 2047–48 (1996).  First, the court of appeals

deferentially reviewed the district court's determination of whether the facts of the

case took it outside the "heartland" of the applicable guideline.  United States v.

Hoffer, 129 F.3d 1196, 1201 (11th Cir. 1997).  A case was outside the heartland

only if there was something unusual, either about the defendant or the

circumstances surrounding the crime, that warranted a different sentence.  See

United States v. Miller, 146 F.3d 1281, 1284 (11th Cir. 1998).  That determination

was made by comparing the facts of the case to the facts of other cases falling

within the heartland of the guidelines.  Id.  As the second step in reviewing

40

departure decisions the court of appeals determined for itself whether the departure factor used by the district court "has been categorically proscribed, is encouraged, encouraged but taken into consideration within the applicable guideline, discouraged, or not addressed by the [Sentencing] Commission." Hoffer, 129 F.3d at 1201. In the third step the appeals court reviewed with deference the district court's finding that the factor on which the departure was based did exist. Id.

In 2003 Congress amended the sentencing statute to provide for closer review of sentences that were outside the guidelines. Under the amendments a sentence could be vacated if the departure from the guidelines range was based on a factor that: (1) did not advance the objectives of sentencing set forth in § 3553(a)(2); (2) was not authorized under § 3552(b); or (3) was not "justified by the facts of the case." 18 U.S.C. § 3742(e)(3)(B); Pub. L. 108-21, § 401(d)(1), 117 Stat. 670. The court of appeals made each of those determinations de novo. Id. § 3742(e); see also United States v. Pressley, 345 F.3d 1205, 1209 n.1 (11th Cir. 2003). The 2003 amendments also specified that a sentence must be vacated if it departed "to an unreasonable degree" from the guidelines range, in light of the § 3553(a) factors and of the district court's stated reasons for imposing the particular sentence. Id. § 3742(e)(3)(C). The result was that an outside-the-

guidelines sentence could be vacated if it either was based on an impermissible factor or the degree of departure was unreasonable. A sentence within a correctly calculated guidelines range, however, was essentially unreviewable as long as the district court considered the § 3553(a) factors and explained its reasoning. See id. § 3553(c).

The 2003 amendments restricted even further the ability of a district court to depart downward from the guidelines in cases involving sex crimes against children. In that type of case a court could depart downward only if it found two things: (1) the existence of a mitigating circumstance that had been "affirmatively and specifically identified as a permissible ground of downward departure" by the sentencing guidelines or policy statements, taking into account any amendments by Congress; and (2) that mitigating circumstance had not been taken into consideration by the Sentencing Commission in formulating the guidelines range for that offense. Id. § 3553(b)(2).

The guidelines themselves also sharply limit the permissible grounds for downward departure in cases of sexual abuse of children, specifically disallowing departures based on diminished capacity (U.S.S.G. § 5K2.13), aberrant behavior (id. § 5K2.20), substance abuse (id. § 5K2.22), or family responsibilities and community ties (id. § 5H1.6). They provide that generally an offender's age and

42

health are not relevant, except in rare cases where the offender is so elderly and infirm that home confinement would be an effective alternative to prison. Id. §§ 5H1.1, 5H1.4. The guidelines also provide that charitable contributions and a defendant's mental and emotional condition generally are not appropriate grounds for departure. Id. §§ 5H1.11, 5H1.3.

## 2. The Booker Era

Then came the Booker decision in 2005. In it the Supreme Court held the sentencing statute unconstitutional insofar as the guidelines were mandatory and to the extent that they allowed the upper limits of the sentence to depend on facts that had not been established by a plea of guilty or proven to a jury beyond a reasonable doubt. Booker, 543 U.S. at 244, 125 S. Ct. at 756. Instead of striking down the entire guidelines system, the Court salvaged much of it by making the guidelines advisory rather than mandatory. Id. at 245, 125 S. Ct. at 756–57. The salvage work required the Court to sever and excise two provisions of the Act: (1) § 3553(b)(1), which had required the district court to impose a sentence within the guidelines range; and (2) § 3742(e), which had set forth the scope and standard of review of sentences. Id. at 259, 125 S. Ct. at 764. The excision of § 3742(e) left a gap: § 3742 still created appellate jurisdiction for sentencing review, but with subsection (e) gone it no longer specified the standard of review.

43

The Supreme Court filled that gap by inferring a standard of review from "related statutory language, the structure of the statute, and the sound administration of justice." Id. at 260–61, 125 S. Ct. at 765 (quotation marks omitted). Those considerations, as well as "the past two decades of appellate practice in cases involving departures," implied "a practical standard of review already familiar to appellate courts: review for unreasonableness." Id. (brackets omitted); see 18 U.S.C. § 3472(e)(3) (1994 ed.).[12] The Court reasoned that appellate courts had ample experience applying the "reasonableness" standard to sentences outside the guidelines range before the 2003 amendments and to sentences for offenses not addressed by the guidelines. Booker, 543 U.S. at 262, 125 S. Ct. at 766. The Booker Court saw appellate review of sentences as important to the new system, because it "would tend to iron out sentencing differences," avoiding undue disparity. Id. at 263, 125 S. Ct. at 767.

Section 3553(a) plays a critical role in appellate review of sentences, just as it does in the initial sentencing decision. Booker instructs us that not only must district courts apply the § 3553(a) factors in making their sentencing decisions,

---

[12] The "related statutory language" and "the two decades of appellate practice" the Supreme Court drew from did not include provisions added by the 2003 amendments or experience under them. Because the purpose and effect of those amendments had been "to make Guidelines sentencing even more mandatory than it had been," the amendments were tossed onto the legislation scrap pile with the comment that "the reasons for [them] have ceased to be relevant." Booker, 543 U.S. at 261, 125 S. Ct. at 765.

but courts of appeals also must apply those same factors in determining whether a

sentence is reasonable.  Id. at 261, 125 S. Ct. at 766 ("Those factors in turn will

guide appellate courts, as they have in the past, in determining whether a sentence

is unreasonable."); accord United States v. Pugh, 515 F.3d 1179, 1188 (11th Cir.

2008) ("Booker further held that in performing this review, we must measure

'reasonableness' against the factors outlined by Congress in 18 U.S.C. §

3553(a)."); United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per

curiam) ("We must evaluate whether the sentence imposed by the district court

fails to achieve the purposes of sentencing as stated in section 3553(a).").[13]

---

[13] Section 3553(a) reads in its entirety:

   (a) Factors to be considered in imposing a sentence.--The court shall impose a sentence
sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)
of this subsection. The court, in determining the particular sentence to be imposed, shall
consider—

      (1) the nature and circumstances of the offense and the history and characteristics of the
      defendant;

      (2) the need for the sentence imposed—

            (A) to reflect the seriousness of the offense, to promote respect for the law, and to
            provide just punishment for the offense;

            (B) to afford adequate deterrence to criminal conduct;

            (C) to protect the public from further crimes of the defendant; and

            (D) to provide the defendant with needed educational or vocational training,
            medical care, or other correctional treatment in the most effective manner;

      (3) the kinds of sentences available;

Read in light of earlier decisions, the "reasonableness" standard <u>Booker</u>

adopted entails review for abuse of discretion that accords "substantial deference"

to the district court's sentencing decisions.  <u>Koon</u>, 518 U.S. at 97–99, 116 S. Ct. at

---

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

    (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

    (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement—

    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

2046–47. Pre-<u>Booker</u> decisional law, of course, only applied the reasonableness standard to sentences that departed from the guidelines range or to sentences for offenses not addressed in the guidelines. <u>See</u> <u>id.</u> at 98–99, 116 S. Ct. at 2046–47. After <u>Booker</u>, the abuse of discretion standard outlined in <u>Koon</u> applies more broadly to the district judge's sentence decision, whether the sentence is within or without the guidelines range. <u>See</u> <u>Rita</u>, 551 U.S. at 364, 127 S. Ct. at 2472 (Stevens, J., concurring).

Two years after <u>Booker</u>, the Supreme Court addressed in greater detail the sentence review function of a court of appeals, leaving no doubt about the importance of that function. <u>See</u> <u>Rita</u>, 551 U.S. 338, 127 S. Ct. 2456. As we pointed out at the beginning of this opinion, the opening line of the <u>Rita</u> opinion categorically states that courts of appeals are to "review federal sentences and set aside those they find 'unreasonable.'" <u>Id.</u> at 341, 127 S. Ct. at 2459. And later in the <u>Rita</u> opinion the Supreme Court explains that, in the world according to <u>Booker</u>, courts of appeals exist to correct substantively unreasonable sentences imposed by the district courts. <u>Id.</u> at 354, 127 S. Ct. at 2466–67.

The specific holding of <u>Rita</u> is that a court of appeals may presume that a sentence within the guidelines range is reasonable. <u>Id.</u> at 347, 127 S. Ct. at 2462. The Supreme Court believed that such a presumption simply reflects the fact that

47

when both the sentencing judge and the Sentencing Commission have reached the same conclusion as to the proper sentence, it "significantly increases" the likelihood that the sentence is reasonable.  Id., 127 S. Ct. at 2463.  After all, the Court explained, Congress directed both the Sentencing Commission and the sentencing judge to carry out the same basic § 3553(a) objectives; the guidelines themselves reflect application of the § 3553(a) factors, and so should the district court's sentencing decision.  Id. at 347–48, 127 S. Ct. at 2463.  It follows that when a particular sentence is consistent with the guidelines' application of the § 3553(a) factors in the "mine run" of cases, it is "probable" that the sentence is reasonable.  Id. at 351, 127 S. Ct. at 2465.  If the sentence is not consistent with the guidelines that same probability does not exist, although the reviewing court may not presume a sentence that is outside the guidelines is unreasonable, id. at 354–55, 127 S. Ct. at 2467.

The decision in Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), illustrates the importance of all the facts and circumstances to the reasonableness of the sentence.  As a sophomore in college Gall had participated in a conspiracy to distribute ecstasy.  Id. at 41, 128 S. Ct. at 591–92.  His role was limited to delivering drugs between conspirators.  Id., 128 S. Ct. at 592.  Later Gall voluntarily stopped using drugs himself, and seven months after joining the

48

conspiracy he withdrew from it and told the others he was quitting. Id. Drug free,

Gall graduated from college and became a master carpenter. Id. at 41–42, 128 S.

Ct. at 592. Two years after withdrawing from the conspiracy, Gall was questioned

by federal agents and admitted his participation. Id. Three and a half years after

he had withdrawn from the conspiracy and turned his life around, Gall was

indicted for conspiracy to distribute illegal drugs. Id. He pleaded guilty. Id. His

co-conspirators, who had not withdrawn from the conspiracy, received sentences

ranging from 30 to 36 months. Id. at 54–55, 128 S. Ct. at 599–600.

Gall's guidelines range was 30 to 37 months. Id. at 43, 128 S. Ct. at 593.

The district court varied downward from that range to a sentence of probation,

largely because Gall had been young and immature when he committed the crime,

he had withdrawn from the conspiracy years before the charges were filed, and he

had made something of himself. Id. at 43–44, 128 S. Ct. at 593. When the

government argued for a guidelines range sentence on the ground that the three

co-conspirators had received sentences in that range, the district court noted that,

unlike Gall, the other conspirators had continued with the conspiracy. Id. at

54–55, 128 S. Ct. at 599–600.

The court of appeals vacated the probationary sentence as unreasonable,

concluding that the district court had erred by giving too much weight to Gall's

voluntary withdrawal, his age at the time of the offense, and his post-offense rehabilitation, and too little consideration to the need to avoid unwarranted sentence disparities. Id. at 45, 128 S. Ct. at 594. The Supreme Court reversed that decision after discussing at some length "the unique facts of Gall's situation." Id. at 54, 128 S. Ct. at 599.

In doing so, the Court reiterated that all sentences, whether within or without the guidelines, are to be reviewed only for reasonableness under an abuse of discretion standard. Id. at 46, 128 S. Ct. at 594. It rejected any requirement that an outside-the-guidelines sentence must be justified by "extraordinary" circumstances, and rejected any "rigid mathematical formula" that uses the percentage of departure as the standard for determining the strength of justification required for a specific sentence. Id. at 47, 128 S. Ct. at 595. At the same time, however, the Court said that the sentencing court must give "serious consideration" to the extent of any departure from the guidelines, and must offer "sufficient justifications" for its conclusion that an unusually harsh or light sentence is appropriate. Id. at 46, 128 S. Ct. at 594. That means, the Court explained, that the justification for the deviation from the guidelines range must be "sufficiently compelling to support the degree of the variance." Id. at 50, 128 S. Ct. at 597.

50

About appellate review, the Supreme Court held in <u>Gall</u> that "[i]n reviewing the reasonableness of a sentence outside the Guidelines range, appellate courts may therefore take the degree of variance into account and consider the extent of a deviation from the Guidelines," in addition to the sentencing court's justifications. <u>Id.</u> at 47, 128 S. Ct. at 594–95. While rigid mathematical formulas and proportionality tests cannot be used, the Court concluded that "the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant," <u>id.</u> at 41, 128 S. Ct. at 591, and that "a major departure should be supported by a more significant justification than a minor one." <u>Id.</u> at 50, 128 S. Ct. at 597.[14] In other words, the justification for the variance must be "sufficiently compelling to support the degree of the variance." <u>Id.</u> Checking to see that the justification is sufficiently compelling remains the duty of the court of appeals. At the same time, the appellate court may not presume that a sentence outside the guidelines is unreasonable and must give "due deference to the district

---

[14] The difficulty of the distinction that the Supreme Court drew in this regard has not gone unnoticed. <u>See, e.g.</u>, <u>United States v. Levinson</u>, 543 F.3d 190, 197 n.6 (3d Cir. 2008) (noting "[a]s an example of the challenge" in post-<u>Booker</u> sentence review the "somewhat mixed messages that can be drawn" from <u>Gall</u>'s statement ruling out proportionality but embracing the requirement of a greater justification for major variances); <u>see also</u> <u>United States v. Feemster</u>, 572 F.3d 455, 467 (8th Cir. 2009) (Colloton, J., concurring) (after <u>Gall</u>, "one searches in vain for a principled basis on which to conduct a consistent and coherent appellate review for reasonableness"); <u>United States v. Evans</u>, 526 F.3d 155, 168 (4th Cir. 2008) (Gregory, J., concurring) ("I must conclude that the Court has left the specifics of how appellate courts are to conduct substantive reasonableness review, charitably speaking, unclear.").

court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id. at 51, 128 S. Ct. at 597. The fact that the court of appeals "might reasonably have concluded that a different sentence was appropriate" is not sufficient to justify reversal. Id.; see also Talley, 431 F.3d at 788 ("A district court may impose a sentence that is either more severe or lenient than the sentence we would have imposed, but that sentence must still be reasonable.").

In Gall's case the court of appeals erred by giving "virtually no deference" to the district court's decision that a significant variance from the guidelines was justified. Gall, 552 U.S. at 56, 128 S. Ct. at 600. The Supreme Court decided that it was entirely reasonable for the district court to give substantial weight to Gall's voluntary withdrawal. Unlike all his co-defendants and "the vast majority of defendants convicted of conspiracy in federal court," Gall's efforts at self-rehabilitation began long before he got caught, which gave the district court "greater justification for believing Gall's turnaround was genuine." Id. at 56–57, 128 S. Ct. at 600–01. It was also reasonable for the district court to conclude that a guidelines range sentence for Gall would have created unwarranted sentencing disparities, because his co-conspirators who were sentenced within the guidelines had not voluntarily withdrawn from the conspiracy and had not shown any comparable rehabilitation. Id. at 55–56, 128 S. Ct. at 600; see also Lyes v. City of

52

Riviera Beach, 166 F.3d 1332, 1342 (11th Cir. 1999) (en banc) ("[I]t is worth
noting that equal treatment consists not only of treating like things alike, but also
of treating unlike things differently according to their differences."). The district
court reasonably concluded that under the unusual facts of that case the § 3553(a)
factors "on the whole" justified the below-the-guidelines sentence it imposed on
Gall. Gall, 552 U.S. at 59–60, 128 S. Ct. at 602.

The same day that Gall was released the Supreme Court also issued its
decision in Kimbrough v. United States, 552 U.S. 85, 128 S. Ct. 558 (2007),
which involved sentencing for an "unremarkable drug-trafficking offense" and an
unremarkable firearm possession offense, id. at 110, 128 S. Ct. at 575. Thanks in
large part to the much-criticized 100 to 1 crack/powder cocaine disparity in the
guidelines, the bottom of the advisory range for the combined charges was 19
years. Id. at 92, 128 S. Ct. at 565. After considering all of the § 3553(a) factors
and the strong upward influence of the crack/powder disparity on the guidelines
range, the district court concluded that a 19-year sentence would have been greater
than necessary to accomplish the purposes of sentencing set forth in § 3553(a). Id.
at 92–93, 128 S. Ct. at 565. For that reason, it varied downward to a sentence of
15 years. Id. at 93, 128 S. Ct. at 565.

The government appealed the sentence and the Fourth Circuit reversed

53

solely because of its view that a variance based on disagreement with the crack/powder ratio in the guidelines was per se unreasonable. Id. After the Supreme Court granted review, the government argued against the variance on that same ground. Id. at 101–07, 128 S. Ct. at 570–74. It asserted that while the guidelines are usually only advisory, the 100 to 1 crack/powder ratio guidelines were an exception because Congress had directed sentencing courts to follow that ratio. Id. at 101–02, 128 S. Ct. at 570. The government's position, in essence, was that the crack/powder ratio in the offense level part of the guidelines was a little pocket of mandatoriness in an otherwise advisory system.

The Supreme Court rejected that position, disagreeing with all of the government's arguments that Congress had required the Sentencing Commission and sentencing courts to follow the 100 to 1 ratio in every case. Id. at 102–11, 128 S. Ct. at 570–76. The government did not contend that the below-the-guidelines sentence was unreasonable for any other reason, and the Court found that it was reasonable. Id. at 110–11, 128 S. Ct. at 575–76; see also Spears v. United States, — U.S. —, 129 S. Ct. 840, 843–44 (2009) (per curiam) (clarifying that Kimbrough means "district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines").

54

The <u>Kimbrough</u> decision involved a specific part of the guidelines, the one

involving the peculiar crack/powder disparity, which the Sentencing Commission

itself had consistently and emphatically criticized as at odds with the goals behind

§ 3553(a).  See <u>Kimbrough</u>, 552 U.S. at 111, 128 S. Ct. at 576; <u>see also</u> <u>Pugh</u>, 515

F.3d at 1189 n.7 ("<u>Kimbrough</u> primarily involved issues related to the guidelines

for crack cocaine offenses.").  The Supreme Court's opinion in that case, however,

also contains a number of observations of broader application.  For example, the

Court discussed "the discrete institutional strengths" of sentencing courts and the

Sentencing Commission, and how those different strengths affect the amount of

respect due a court's decision to vary from the guidelines range.  <u>Kimbrough,</u> 552

U.S. at 109, 128 S. Ct. at 574–75.  It said that decisions to vary "may attract

greatest respect when the sentencing judge finds a particular case outside the

heartland to which the Commission intends individual Guidelines to apply."  <u>Id.</u> at

109, 128 S. Ct. at 574–75 (quotation marks omitted).  By contrast, "closer review

may be in order when the sentencing judge varies from the Guidelines based

solely on the judge's view that the Guidelines range fails properly to reflect §

3553(a) considerations even in a mine-run case."  <u>Id.</u>, 128 S. Ct. at 575 (quotation

marks omitted).  The Court in <u>Kimbrough</u> also reiterated the importance of

appellate review of sentences for substantive reasonableness.  See <u>id.</u> at 107–08,

128 S. Ct. at 573–74 (explaining that appellate review along with the ongoing revision of the guidelines "will help to avoid excessive sentencing disparities" and variations among district courts).

### 3. The Abuse of Discretion Standard

Since the Supreme Court's <u>Booker</u> decision it has been "pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions." <u>Gall</u>, 552 U.S. at 46, 128 S. Ct. at 594; <u>see also</u> <u>Pugh</u>, 515 F.3d at 1191 (explaining that the Supreme Court's teachings "leave no doubt that an appellate court may still overturn a substantively unreasonable sentence, albeit only after examining it through the prism of abuse of discretion, and that appellate review has not been extinguished"). That familiar standard "allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." <u>United States v. Frazier</u>, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (quotation marks omitted) (quoting <u>Rasbury v. I.R.S.</u>, 24 F.3d 159, 168 (11th Cir. 1994)). As we have explained, "under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a <u>de novo</u> standard of review." <u>Id.</u> (quoting <u>Rasbury</u>, 24 F.3d at 168); <u>see also, e.g., Ledford v.</u>

Peeples, 605 F.3d 871, 922 (11th Cir. 2010) ("[T]he relevant question [when reviewing for abuse of discretion] is not whether we would have come to the same decision if deciding the issue in the first instance.  The relevant inquiry, rather, is whether the district court's decision was tenable, or, we might say, 'in the ballpark' of permissible outcomes.").

    "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." United States v. Campa, 459 F.3d 1121, 1174 (11th Cir. 2006) (en banc).  As for the third way that discretion can be abused, a district court commits a clear error of judgment when it considers the proper factors but balances them unreasonably.  See Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005) ("[A]n abuse of discretion can occur . . . when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." (emphasis added) (quotation marks omitted)).  The principle that discretion can be abused by unreasonably balancing proper factors is solidly established in Supreme Court precedent and our circuit law.  See, e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257, 102 S. Ct. 252, 266 (1981) ("The forum non conveniens determination

57

is committed to the sound discretion of the trial court.  It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." (emphasis added)); Ford v. Brown, 319 F.3d 1302, 1308 (11th Cir. 2003) ("We conclude that the district court overlooked some highly relevant factors, and that it ultimately struck a balance that was an abuse of discretion.").

In the context of sentencing, the proper factors are set out in 18 U.S.C. § 3553(a), and a district court commits a clear error in judgment when it weighs those factors unreasonably, arriving at a sentence that does not "achieve the purposes of sentencing as stated in § 3553(a)." Pugh, 515 F.3d at 1191 (quoting Talley, 431 F.3d at 788 (quotation marks omitted)).  In order to determine whether that has occurred, we are "required to make the [sentencing] calculus ourselves" and to review each step the district court took in making it.  Id.; see also Booker, 543 U.S. at 261, 125 S. Ct. at 766 ("Those [§ 3553(a)] factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."); Pugh, 515 F.3d at 1194 ("Indeed, we could not begin to review the reasonableness of a sentence without examining all of the relevant factors embodied in Section 3553(a).").

In reviewing the reasonableness of a sentence, we must, as the Supreme Court has instructed us, consider the totality of the facts and circumstances. Pugh, 515 F.3d at 1192 (unreasonableness of sentence depends "on an examination of the 'totality of the circumstances'" (quoting Gall, 552 U.S. at 51, 128 S. Ct. at 597)). To the extent that the district court has found facts, we accept them unless they are clearly erroneous. Id. At the same time we can and should consider "additional salient facts that were elicited, and uncontroverted." Id. The difference is between contradicting a factfinding, on the one hand, and ignoring uncontroverted facts that the district court failed to mention on the other. That difference is important because a district court cannot write out of the record undisputed facts by simply ignoring them. The failure to mention facts may well reflect the district court's judgment that those facts are not important, but the importance of facts in light of the § 3553(a) factors is not itself a question of fact but instead is an issue of law. See United States v. Taylor, 487 U.S. 326, 337, 108 S. Ct. 2413, 2419–20 (1988) ("Factual findings of a district court are, of course, entitled to substantial deference and will be reversed only for clear error. A judgment that must be arrived at by considering and applying statutory criteria, however, constitutes the application of law to fact and requires the reviewing court to undertake more substantive scrutiny to ensure that the judgment is

59

supported in terms of the factors identified in the statute." (citations omitted)).[15]

After performing the required analysis, we are to vacate the sentence if, but only if, we "are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Pugh, 515 F.3d at 1191 (quotation marks omitted); accord United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009); United States v. McBride, 511 F.3d 1293, 1297–98 (11th Cir. 2007); United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007).  We are not often "left with [that] definite and firm conviction" because, as we have explained, our examination of the sentence is made "through the prism of abuse of discretion." Pugh, 515 F.3d at 1191.  But

---

[15] Judge Tjoflat's separate opinion asserts that it is "deconstructing" the abuse of discretion standard.  Concurring and Dissenting Op. of Tjoflat, J. (hereafter "Separate Op. of Tjoflat, J."), at 193; see also id. at 188.  It is deconstruction with a wrecking ball.  According to that opinion, the weight given to each piece of evidence is a factfinding, id. at 189; the degree of seriousness of an offense is a factfinding, id. at 189 n.59; the importance given to each factor is a factfinding, id. at 190 n.61; the sentence necessary to satisfy each § 3553(a)(2) purpose is a factfinding, id. at 189; in other words, everything that goes into a sentence is a factfinding subject only to clearly erroneous review.  To the contrary, the Supreme Court has applied the abuse of discretion standard to the weight the sentencing court has given to the evidence and the importance it has given to the § 3553(a) factors.  See Gall, 552 U.S. at 57, 128 S. Ct. at 600.  Many of the "factfindings" Judge Tjoflat's separate opinion identifies are actually applications of statutory law to facts, resulting in a determination that we review for abuse of discretion when considering whether "the § 3553(a) factors, on the whole, justif[y] the sentence" a district court has imposed.  Id. at 60, 128 S. Ct. at 602.  A sentencing decision is a classic "judgment that must be arrived at by considering and applying statutory criteria," which "requires the reviewing court to undertake more substantive scrutiny to ensure that the judgment is supported in terms of the factors identified in the statute." Taylor, 487 U.S. at 337, 108 S. Ct. 2413, at 2419–20.  And, contrary to Judge Tjoflat's opinion, our recognition of the fact that statutory criteria are at play does not mean that we are reviewing de novo the district court's balancing of those criteria.

60

sometimes we are. <u>See</u> <u>United States v. Livesay</u>, 587 F.3d 1274, 1278–79 (11th Cir. 2009) (vacating as "patently unreasonable" a sentence of probation for participant in billion-dollar fraud scheme and holding that only a "meaningful period of incarceration" would fulfill the goals of sentencing under § 3553(a)); <u>Pugh</u>, 515 F.3d at 1188–94 (vacating as substantively unreasonable a sentence of probation for receiving and distributing child pornography); <u>United States v. Martin</u>, 455 F.3d 1227, 1238–39 (11th Cir. 2006) (vacating a seven-day sentence for billion-dollar securities fraud as "shockingly short" and "wildly disproportionate" to the seriousness of the offense, even though the defendant had rendered substantial assistance that was extraordinary); <u>United States v. Crisp</u>, 454 F.3d 1285, 1290 (11th Cir. 2006) (vacating as "outside the range of reasonableness" a sentence of five hours' imprisonment for bank fraud even though the defendant had provided substantial assistance that was crucial in the prosecution of his co-defendant). Out of the hundreds of sentences that we have reviewed up to this point in the five years since the <u>Booker</u> decision, those are the only four we have found to be substantively unreasonable.

Looking at sentencing decisions through the prism of discretion is not the same thing as turning a blind eye to unreasonable ones. And, as we said in <u>Pugh</u>, "the district court's choice of sentence is not unfettered." <u>Id.</u> The fetters on a

district court's sentencing discretion are the requirement of reasonableness and the existence of appellate review to enforce that requirement.  While those fetters are loosened by the substantial discretion we afford district courts in sentencing, at the boundaries of reasonableness the fetters do fetter.  See Frankel, <u>Criminal Sentences</u> 84 ("'[D]iscretionary' does not mean 'unappealable.'  Discretion may be abused, and discretionary decisions may be reversed for abuse."); <u>cf.</u> <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 416, 95 S. Ct. 2362, 2371 (1975) ("That the court's discretion is equitable in nature hardly means that it is unfettered by meaningful standards or shielded from thorough appellate review." (citation omitted)).[16]

We may not—it bears repeating—set aside a sentence merely because we would have decided that another one is more appropriate.  <u>Gall</u>, 552 U.S. at 51, 128 S. Ct. at 597.  <u>See generally</u> <u>Frazier</u>, 387 F.3d at 1259; <u>Ledford</u>, 605 F.3d at 922.  A district court's sentence need not be the most appropriate one, it need only be a reasonable one.  We may set aside a sentence only if we determine, after giving a full measure of deference to the sentencing judge, that the sentence

---

[16] Although the burden of persuasion may not be decisive in many cases, it is on the party attacking the sentence as unreasonable.  <u>Pugh</u>, 513 F.3d at 1189; <u>Martin</u>, 455 F.3d at 1237; <u>Talley</u>, 431 F.3d at 788.  The burden being there tends to reinforce the discretionary zone in which the district court acts when it decides on an appropriate sentence, but that zone is neither limitless nor impervious to review.

imposed truly is unreasonable.[17]

Judge Edmondson's dissenting opinion argues that in reviewing a sentence for substantive reasonableness we may not decide whether the district court placed unreasonable weight on any of the § 3553(a) factors. See Dissenting Op. of Edmondson, J., at 241 ("[T]o grant something in the record more or less value than the District Judge did and so to conclude that the record overall weighs more heavily for a higher sentence . . . oversteps [appellate] authority."). We disagree for several reasons.

First, the only authority the dissenting opinion cites for that proposition is Gall, which actually contradicts it. The Supreme Court decided that Gall's sentence was reasonable only after reviewing the weight the district court had assigned to various factors as well as its decision that the § 3553(a) factors, as a whole, justified the sentence. See Gall, 552 U.S. at 56–60, 128 S. Ct. at 600–02. It stated that the district court "quite reasonably attached great weight to the fact that Gall voluntarily withdrew from the conspiracy after deciding, on his own

---

[17] Some of our colleagues take the position that by finding the sentence in this case unreasonable we are simply disagreeing with the district judge's decision and substituting our own view of a proper sentence for his. See Dissenting Op. of Barkett, J., at 254; Dissenting Op. of Edmondson, J., at 241, 249; Separate Op. of Tjoflat, J., at 217–21. Of course, the fact that we find the district court's sentence unreasonable necessarily means that we disagree with it. That is true in every instance in which an appellate court finds a sentence substantively unreasonable. If the appellate court agreed with a sentence it would not find the sentence unreasonable, so it is illogical to suggest that disagreement with a sentence somehow means that an appellate court is not properly carrying out its duty to review the reasonableness of the sentence.

initiative, to change his life," which "len[t] strong support to the District Court's conclusion that Gall is not going to return to criminal behavior and is not a danger to society." Id. at 57, 128 S. Ct. at 601. The Court also stated that the district court "quite reasonably attached great weight to Gall's self-motivated rehabilitation, which . . . lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts." Id. at 59, 128 S. Ct. at 602.[18] If appellate review did not extend to the weight placed on a § 3553(a) factor—as Judge Edmondson's dissenting opinion contends—those statements in Gall would make no sense.[19]

---

[18] Judge Tjoflat's separate opinion argues that we are disregarding Gall, an argument that is based on his reading of that decision to mean that appellate review of the weight put on the various § 3553(a) factors by the sentencing court is necessarily akin to de novo review of sentencing, which we may not undertake. See Separate Op. of Tjoflat, J., at 218 (asserting that one reason for the Supreme Court's conclusion in Gall that the Eighth Circuit's analysis "more closely resembled de novo review" than abuse of discretion review was that the court of appeals decided that the sentencing court "gave too much weight to Gall's withdrawal from the conspiracy" (citation omitted)). That reading of Gall, however, is a misreading of the decision, which actually confirms that appellate courts, with the proper measure of deference, should review the reasonableness of the weight placed on a § 3553(a) factor by the sentencing court. See Gall, 552 U.S. 56–57, 128 S. Ct. at 600–01. The Eighth Circuit's mistake was not that it had reviewed the district court's weighing of the statutory factors, but that in doing so it had asked the wrong question—whether "in its view" the sentence was appropriate—instead of whether the district court's weighing and the resulting sentence were reasonable. Id. at 56, 128 S. Ct. at 600.

[19] If an appellate court could not review the reasonableness of the weight the district court placed on a factor—if all that mattered was correct factfindings and accurate recitation of the applicable law—many of the Supreme Court's other statements in its Booker-through-Kimbrough decisions also would have little or no purpose. See, e.g., Gall, 552 U.S. at 47, 128 S. Ct. at 594–95 ("In reviewing the reasonableness of a sentence outside the Guidelines range, appellate courts may therefore take the degree of variance into account and consider the extent of

Second, the position that Judge Edmondson's dissenting opinion takes is inconsistent with the familiar abuse of discretion standard that the Supreme Court has told us to apply. As we have already explained, a district court commits a clear error of judgment, abuses its discretion, when it considers the proper factors but balances them unreasonably. See Piper Aircraft Co., 454 U.S. at 257, 102 S. Ct. at 266; Campa, 459 F.3d at 1174; Ameritas Variable Life Ins., 411 F.3d at 1330; Ford, 319 F.3d at 1308. One purpose of reasonableness review is to correct those errors. If the weight given various factors could not be reviewed on appeal, there would be no way to serve that purpose. If appellate courts were limited to determining whether proper procedures were followed and whether factfindings are clearly erroneous, there would be no substantive review, only procedural review. See Gall, 552 U.S. at 51, 128 S. Ct. at 597 (defining procedural review to include a determination of whether the sentence was based on clearly erroneous facts). We would be back to "a non-system in which every judge is a law unto himself or herself." Frankel, Jail Sentence Reform, at E21.

Third, the position that the weight a sentencing court gives to the § 3553(a)

---

a deviation from the Guidelines."); Booker, 543 U.S. at 261, 125 S. Ct. at 766 ("Those [§ 3553(a)] factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."); Kimbrough, 552 U.S. at 107–08, 128 S. Ct. at 573–74 (explaining that appellate review for reasonableness will help avoid excessive sentencing disparities). And there would have been no point at all in the Rita decision, which held that we may presume a sentence within the guidelines is reasonable. 551 U.S. at 347, 127 S. Ct. at 2462.

factors may not be reviewed has been rejected not only by this Court but also by all of our sister circuits that have addressed the issue. See United States v. Russell, 600 F.3d 631, 633 (D.C. Cir. 2010) ("Substantive reasonableness is the catch-all criterion under which the reviewing court monitors (deferentially—for abuse of discretion) whether the district court has given reasonable weight to all the factors required to be considered."); United States v. Ressam, 593 F.3d 1095, 1031–32 (9th Cir. 2010) ("[I]t appears that the district court abused its discretion in weighing the relevant factors by giving too much weight to [the defendant's] cooperation and not enough weight to the other relevant § 3553(a) factors, including the need to protect the public."); United States v. Camiscione, 591 F.3d 823, 834 (6th Cir. 2010) ("General deterrence is one of the key purposes of sentencing, and the district court abused its discretion when it failed to give that matter its proper weight." (quotation and other marks omitted)); United States v. Sayad, 589 F.3d 1110, 1118 (10th Cir. 2009) ("Unlike procedural reasonableness review, which focuses on the permissibility of relying on a particular factor, substantive reasonableness review broadly looks to whether the district court abused its discretion in weighing permissible § 3553(a) factors in light of the 'totality of the circumstances.'" (quotation marks omitted)); United States v. Cooks, 589 F.3d 173, 186 (5th Cir. 2009) (stating that a sentence is substantively

66

unreasonable if it "does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors"); United States v. Moore, 565 F.3d 435, 438 (8th Cir. 2009) ("We may find an abuse of discretion where the sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only the appropriate factors but commits a clear error of judgment in weighing those factors." (quotation marks omitted)); United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) ("At the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it."); United States v. Goff, 501 F.3d 250, 261 (3d Cir. 2007) ("[D]eterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing . . . ."); United States v. Hampton, 441 F.3d 284, 288–89 (4th Cir. 2006) (vacating sentence as substantively unreasonable because the district court gave "excessive weight" to one statutory factor and failed to account for others); see also Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 335–36 (1st Cir. 2008) (stating that, in general, abuse of discretion may occur if the court "fails to consider a significant factor in

67

the decisional calculus, if it relies on an improper factor in working that calculus, or if it considers all the appropriate factors but makes a serious error in judgment as to their relative weight."). We join those circuits in reaffirming that substantive review exists, in substantial part, to correct sentences that are based on unreasonable weighing decisions. If we accepted the position set out in Judge Edmondson's dissenting opinion, we would be the only circuit to do so.[20]

### B. The Adequacy of the Sentence Findings and Explanation

Judge Tjoflat's separate opinion criticizes the district court for not making more detailed sentence findings and not offering a better explanation for the sentence it imposed. Separate Op. of Tjoflat, J., at 199, 212–14. Irey's sentence, according to that separate opinion, is unreasonable because the district court failed to make "intelligible" and "specific" findings on the § 3553(a)(2)(A) factors, and because it did not "explicitly" weigh those factors. Id. at 212–13. About that criticism, we have four things to say. First of all, the adequacy of a district court's findings and sentence explanation is a classic procedural issue, not a substantive

---

[20] Each of the circuits we have cited has determined, at least implicitly, that the weight given each § 3553(a) factor may be reviewed in a principled fashion, and we agree. Even though "the appropriate weight given to each of the [§ 3553(a)] factors cannot be calibrated with a slide rule," Pugh, 515 F.3d at 1203, that does not mean appellate review of that weight is impossible; it only reinforces the deferential nature of the review. As we have emphasized, there is "a difference between deference and abdication." Crisp, 454 F.3d at 1290. If there were no difference, if we did not have a meaningful role to play, we would never have set aside any sentences as substantively unreasonable, but we have.

one.  See Gall, 552 U.S. at 51, 128 S. Ct. at 597 (explaining that "failing to

consider the § 3553(a) factors, . . . or failing to adequately explain the chosen

sentence," constitutes procedural error); United States v. Ellisor, 522 F.3d 1255,

1273 (11th Cir. 2008) (Tjoflat, J.).  And in this case no one has ever argued that

the district court committed any procedural error in sentencing.  That possibility

was not mentioned by either party in the district court, or in their briefs to the

panel, or in the oral argument before the panel, or in the panel's opinion (which

Judge Tjoflat joined), or in the en banc briefing instructions, or by the parties in

their briefs to us, or at oral argument before us, or anywhere else at all until it

emerged in Judge Tjoflat's separate opinion.  The issue in this appeal has never

been procedural reasonableness, but instead substantive reasonableness.  Judge

Tjoflat's opinion, although purporting to recognize that Irey's sentence cannot be

vacated on procedural grounds, dresses up its own procedural objections to the

sentence as substantive ones.  No amount of rhetorical couture, however, can

cover up the fact that the opinion really is complaining about the procedural

unreasonableness of the sentence, an issue that is not before us.

Second, even if that issue were before us, the district court was not required

to make any more detailed findings or give a more thorough explanation than it

did.  In Rita the Supreme Court upheld the adequacy of a "sentencing judge's

69

statement of reasons [which] was brief but legally sufficient." 551 U.S. at 358, 127 S. Ct. at 2469. It did so because the record showed that the judge listened to the evidence and arguments and was aware of the various factors the defendant put forward for a lesser sentence. Id. In sentencing the defendant the judge did not say much, and the Court acknowledged that he "might have said more," but it surmised that "[h]e must have believed that there was not much more to say." Id. Although the judge did not even state that he had considered the evidence and argument or why he rejected the arguments for a variance, it was enough that "the context and record" indicated the reasoning behind his conclusion. Id. at 359, 127 S. Ct. at 2469. No member of this Court has ever before indicated that a sentencing judge is required to articulate his findings and reasoning with great detail or in any detail for that matter. See, e.g., United States v. Sanchez, 586 F.3d 918, 935–36 (11th Cir. 2009) (Tjoflat, J.) ("In general, the district court is not required to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors. It is sufficient that the district court considers the defendant's arguments at sentencing and states that it has taken the § 3553(a) factors into account." (citation and quotation marks omitted)); United States v. Brown, 526 F.3d 691, 713 (11th Cir. 2008); Ellisor, 522 F.3d at 1278.

Judge Tjoflat's separate opinion now asserts, however, that he would have this Court sitting en banc overturn our precedent on the amount of specificity required of a sentencing judge.  Separate Op. of Tjoflat, J., at 186 n.56.  While we as an en banc court can overturn our own precedent, <u>see, e.g., Main Drug, Inc. v. Aetna U.S. Healthcare, Inc.</u>, 475 F.3d 1228, 1230 (11th Cir. 2007), we cannot overturn Supreme Court precedent.  And the Supreme Court has already laid out the requirements for a sentencing court's recitation of its reasoning on each of the § 3553(a) factors:

> [W]e cannot read the statute (or our precedent) as insisting upon a
> full opinion in every case.  The appropriateness of brevity or length,
> conciseness or detail, when to write, what to say, depends upon
> circumstances.  Sometimes a judicial opinion responds to every
> argument; sometimes it does not; sometimes a judge simply writes
> the word "granted," or "denied" on the face of a motion while relying
> upon context and the parties' prior arguments to make the reasons
> clear.  The law leaves much, in this respect, to the judge's own
> professional judgment.

<u>Rita</u>, 551 U.S. at 356, 127 S. Ct. at 2468.  The depth of detail that Judge Tjoflat's separate opinion would require exceeds the requirements of that precedent.  <u>See</u> <u>id.</u>; <u>see also</u> <u>id.</u> at 359, 127 S. Ct. at 2469 ("Where a matter is as conceptually simple as in the case at hand and the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to write more extensively.").

71

Third, the district court's sentence findings and explanation, which we have set out in full, see supra at 30–34, are far more specific and detailed than we have seen in the vast majority of other cases where we have reviewed the substantive reasonableness of sentences.  In fact, we cannot recall seeing sentence findings and explanations that were more specific and detailed than those in this case, although the substantive reasonableness of the sentence is another matter.  We have never required or expected district judges to compose a doctoral thesis to explain why they have imposed a particular sentence.

Fourth, the problem with the district court's sentence findings and explanation is not that they are unintelligible or lacking in specificity or effort; instead, the problem is that the sentence is substantively unreasonable.  That unreasonableness is the underlying cause for the Tjoflat opinion's criticism of the findings and explanation as not "intelligible," for its pronouncement that they "cannot be reconciled" with the sentence, and for its conclusion that in light of them the sentence is "inconceivable."  Separate Op. of Tjoflat, J., at 210–13.  The reason that the sentence when viewed against the findings is inconceivable, irreconcilable, and unintelligible is not the fault of the findings but of the sentence itself.  The Tjoflat opinion confuses the unreasonableness of the sentence with an absence of stated reasons for it, and the impossibility of giving a reasoned basis

for the sentence with a lack of effort on the part of the sentencing judge to do so.

We turn now to the task of explaining why, even under the deferential standard of review that applies, viewing the facts and circumstances of this case in light of the § 3553(a) factors leads to the conclusion that the downward deviation sentence the district court imposed in this case is substantively unreasonable.

### C.  Substantive Unreasonableness

The statutory minimum sentence applicable to this case is 15 years and the maximum is 30 years.  The advisory guidelines range is 30 years, top and bottom. The district court deviated downward 12 ½ years to a sentence of 17 ½ years, which is only 2 ½ years above the statutory minimum.  The downward variance was 42 percent.[21]  Whether considered in absolute or percentage terms, it is a "major" variance in the legal parlance of sentencing law.  See United States v. Smith, 573 F.3d 639, 660–61 & n.5 (8th Cir. 2009) (requested variance downward from a 360-month guidelines sentence to one of 240 months, a reduction of 33 percent, would have been "a major variance"); United States v. Abu Ali, 528 F.3d 210, 261 (4th Cir. 2008) (noting that a downward variance of 40 percent to a sentence of 30 years is "major"); see also United States v. Burns, 577 F.3d 887,

---

[21] As we have already noted, when viewed in terms of the statutorily permissible range of 15 to 30 years, the district court chose a sentence within that range (a spread of 15 years or 180 months) that was 83 percent below the maximum and only 17 percent above the minimum.  See Irey, 563 F.3d at 1227 (Hill, J., concurring).

73

888–90, 896 (8th Cir. 2009) (a variance downward by 60 percent from a 360-month guidelines sentence to one of 144 months imprisonment is "beyond dispute" a major one).

Although there is no proportionality principle in sentencing, a major variance does require a more significant justification than a minor one—the requirement is that the justification be "sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50, 128 S. Ct. at 597. The justifications the district court offered for its major variance downward in sentencing were not only insufficiently compelling to support the degree of the variance, but they were also insufficiently compelling to support any variance.

The district court's clear error in judgment becomes apparent when all of the facts and circumstances are considered in light of the § 3553(a) factors. What § 3553(a) requires is "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of that subsection. Throughout his separate opinion (nineteen times by our count), Judge Tjoflat refers to the § 3553(a) requirement that a sentence be adequate but not excessive for the purposes set out in § 3553(a)(2) as "the parsimony principle" or "the parsimony requirement." Separate Op. of Tjoflat, J., at 158 & n.21, 159–60, 164, 168, 174–75, 183, 197–98, 203, 209, 222 n.91, 232 n.100. It is a term that has

74

been used in a few other circuits. See, e.g., United States v. Carrasco-De-Jesus, 589 F.3d 22, 29 (1st Cir. 2009) (noting that the appellant "posits that the sentence violates the parsimony principle of 18 U.S.C. § 3553(a)"); United States v. Martinez-Barragan, 545 F.3d 894, 904 (10th Cir. 2008) ("[T]he district court must be guided by the 'parsimony principle'—that the sentence be 'sufficient, but not greater than necessary, to comply with the purposes' of criminal punishment, as expressed in § 3553(a)(2).").

The problem with the parsimony terminology is that the statutory command has two components of equal standing, and it ignores one of them. The requirement is not merely that a sentencing court when handing down a sentence be stingy enough to avoid one that is too long, but also that it be generous enough to avoid one that is too short. Calling the statutory requirement "the parsimony principle" is as incomplete and inaccurate as it would be to call the requirement "the severity principle." The reason that defense counsel and those who argue for shorter sentences, either generally or in specific cases, like the term "parsimony principle" is that it tends to slant the discussion toward shorter sentences by emphasizing only that part of the twin requirements. But terminology that is less than completely accurate should not be used to guide judicial decisions.[22] A more

---

[22] The term "parsimony principle" is an example of what Holmes once referred to as an "inadequate catch word[ ]," which could by its "very felicity, delay further analysis." Oliver

accurate term, if one is needed, might be "the Goldilocks principle," because the

goal is to lock in a sentence that is not too short and not too long, but just right to

serve the purposes of § 3553(a).[23]  In this opinion, however, we will avoid using a

catchword and simply apply the provision as Congress wrote it.  We turn now to

the sentencing factors set out in § 3553(a).[24]

_____

Wendell Holmes, Law in Science and Science in Law, 12 Harv. L. Rev. 443, 455 (1899).

   Judge Tjoflat's separate opinion says that "[a]lthough the court quibbles with the label 'parsimony principle,' it does not disagree with the underlying concept." Separate Op. of Tjoflat, J., at 158 n.21. To the contrary, we emphatically disagree with the "parsimony principle" terminology and the concept that underlies it, which is that one of the two § 3553(a) principles is to be given predominance over the other. The term "parsimony principle" is an "inadequate catch word" that stacks the deck and we would prefer to deal with result-neutral terms.

   [23] Research reveals that this thought has occurred to at least one other judge. See United States v. Pruitt, 502 F.3d 1154, 1175 (10th Cir. 2007) (McConnell, J., concurring) ("The § 3553(a) factors tell judges, like Goldilocks, not to sentence too high and not to sentence too low."), vacated, 552 U.S. 1306, 128 S. Ct. 1869 (2008).

   [24] Judge Tjoflat's opinion interprets the statutory language of § 3553(a) to require the sentencing judge to identify a single "driving purpose," and then "explain why the driving purpose subsumes the other purposes." Id. at 173 n.37; see also id. at 191 ("[T]he (a)(2) purposes should not be weighed against each other; rather, the [district] court should identify the (a)(2) purpose that drives the sentence and fashion a sentence parsimonious to that purpose."); id. at 190–94 & n.63. Under that novel approach, the driving purpose the sentencing judge chose would run over all of the other purposes listed in the statute.

   The statute directs courts to "impose a sentence . . . [that] compl[ies] with the purposes set forth" in § 3553(a)(2). 18 U.S.C. § 3553 (emphasis added). The direction is that the sentence comply with the "purposes" plural; four of them are listed in § 3553(a)(2), and they are joined by the conjunctive "and," not by the disjunctive "or." Id. at § 3553(a)(2)(A)–(D). The Tjoflat opinion cites no authority for the proposition that courts should pick one "driving purpose" to speed ahead and flatten the other three.

   Not only do we disagree with the approach in Judge Tjoflat's opinion, but so does the Supreme Court. In explaining how § 3553(a)(6) directs sentencing courts to consider the need to avoid unwarranted sentencing disparities, the Court instructed us that "these disparities must be weighed against the other § 3553(a) factors." Kimbrough, 552 U.S. at 108, 128 S.Ct. at 574

## 1. Section 3553(a)(1)

The first listed factor—it is actually two factors in one—that a district court must consider in sentencing, and that a court of appeals must consider in reviewing the sentence for substantive reasonableness, is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). To a large extent "the nature and circumstances of the offense" component of this factor overlaps with the next listed consideration, which is "the need for the sentence imposed—to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," id. § 3553(a)(2)(A). For that reason, we will postpone some of our discussion of the nature and circumstances of the offense component of (a)(1) until we take up the (a)(2)(A) offense-related factor in the next section.

### a. The "Victim"

Most of the district court's reasons for the major variance it imposed relate to the "history and characteristics of the defendant" component of the § 3553(a)(1) factor, and it is here where most of the court's errors in judgment leading to the unreasonable sentence can be found. To begin with, the district court viewed Irey,

---

(emphasis added). The Court did not say that the § 3553(a)(6) sentencing disparity factor folds into the § 3553(a)(2) purposes, and that one of those purposes then becomes the driving purpose behind the sentence, but instead that all of the § 3553(a) factors are to be weighed against each other in order to determine the proper sentence.

77

who had raped, sodomized, and tortured fifty underage girls, as himself a victim. The court said exactly that: "I recognize, of course, that Mr. Irey and his family and friends are also victims here; and society at large is a victim because, as Dr. Shaw indicated . . . the Internet . . . has made possible an epidemic of child pornography." Dr. Shaw never said that Irey was a victim of the availability of child pornography on the internet. Nor did Dr. Berlin. Nor did defense counsel. Nor did Irey himself. The only one who saw Irey as a victim was the district court.

There are two problems with the district court's re-casting of the predator as prey: its factual premise and its legal premise. The problem factually is not with the court's explicit finding that the internet "has made possible an epidemic of child pornography." No one disputes that. Nor is the problem with the court's implicit finding that the availability of child pornography on the internet has caused some children to be sexually abused by pedophiles who would otherwise have restrained themselves. In discussing pedophilia generally, Dr. Shaw testified that the availability of child pornography on the internet "has fueled an epidemic of pedophilia that was kind of probably in the background, people might not have even known that they suffered from it, and then come across these images." So there is a basis in the record for finding that some pedophiles are excited to action

by the child pornography on the internet. That is not the factual problem.

The factual problem is, instead, with the district court's implicit finding that child pornography on the internet caused Irey, the only defendant before the court, to sexually abuse children. We know that it did not, and we know that from no less of an authority than Irey himself. In a letter he wrote to the district court a week before sentencing, Irey stated that he did not start viewing child pornography on the internet until after he had begun having sex with the little girls in Cambodia.[25] The government has insisted throughout this appeal, however, that it is not challenging any of the district court's factfindings, only the court's characterizations, its application of law to fact, the weight it assigned to various factors, and the overall reasonableness of the sentence it imposed. For that reason, we will not disturb the district court's clearly erroneous finding that the existence of child pornography on the internet enticed Irey to sexually abuse children or was a contributing cause of his doing so, and we will instead accept that finding as a

---

[25] In his letter to the court, Irey stated: "I visited these brothels many many times after that. I knew that these girls were not 18. But it was to[o] late, my sex addiction was now in full control of me. After awhile I started to look for child porn on the internet" (emphasis added). And Dr. Berlin's report stated that: "Mr. Irey denied any sexual fantasies of children before he had the sexual experiences in the Cambodian brothels."

During oral argument before us, defense counsel conceded that Irey's own statements negated a finding that he saw child pornography on the internet that enticed him to travel to Cambodia and have sex with children. Counsel acknowledged it was "correct" that Irey "went to Cambodia and visited the child brothels first and then after a while he started looking for it on the internet."

79

given in our analysis.

The more fundamental problem with the district court's recasting of Irey-the-criminal as Irey-the-victim is the legal premise behind it, one that suggests the criminal is like his victims. Irey is the wrongdoer, the predator, the victimizer. The little girls in Cambodia are the wronged, the prey, the victims. The district court should have kept the two separate and not commingled them in its thinking. Child molesters and the children who are their victims do not occupy the same moral plane or position or anything resembling it. A man who sexually violates little children is no more entitled to be considered a victim of child pornography on the internet than a defendant who rapes an adult woman is entitled to be considered a victim of sexually provocative images on television. The victims in this case are the underage girls, some as young as four years old, whom Irey violated for his own perverse pleasure, filming that violation for distribution worldwide. Suggesting that Irey, like those little children, was a victim is absurd. Even defense counsel refused to defend it before us.[26]

––––––––––––––––––––––

[26] During oral argument, defense counsel was asked these questions and gave these answers:

    Q. What about his factfinding that Irey himself was a victim? What supports that?
    A. Judge, I think that his statement in that regard is unfortunate and I think it was in direct response to Dr. Sh—
    Q. You don't defend that statement do you?
    A. I do not.
The first quoted question in that exchange, above, labeled the district court's statement a factfinding, but it was not. Calling Irey a victim is a characterization, not a finding of fact.

The district court's view of Irey as a victim permeated its reasoning and tainted its weighing of the § 3553(a) factors, including (a)(1), which is "the nature and circumstances of the offense and the history and characteristics of the defendant." The nature of an offense would tend to seem less morally outrageous if the one who committed it were himself a victim. And if the characteristics of the defendant include being a victim, he is naturally more sympathetic than otherwise.

### b. The "Illness" of Pedophilia

Along these same lines, the district court insisted on describing Irey as suffering from the "illness" of pedophilia, while the two defense experts described it as a "treatable disorder."[27] The district court found that because he suffered from pedophilia: "Mr. Irey's acts that bring him here today, I think it's safe to say, were not purely volitional. I think they were due in substantial part to a recognized illness. And while it does not excuse his conduct and he will be held accountable for it, I think it would be inappropriate to ignore that fact."

The record does not support the district court's finding that because he is a pedophile Irey could not much help raping, sodomizing, and sexually torturing

---

[27] Under the DSM IV TR, pedophilia is a paraphilia and an Axis I disorder. Other examples of Axis I paraphilia disorders include voyeurism, exhibitionism, fetishism, frotteurism, transvestic fetishism, sexual masochism, and sexual sadism. DSM IV TR at 566–67.

little children, posing them as trophies, and smiling while he did it. The record actually contradicts that finding. Dr. Berlin reported: "Although it is not his fault that he has the disorder [of pedophilia], it is his responsibility to do something about it." It could not be Irey's responsibility to do something about his pedophilia if he lacked the volitional capacity to do something about it. One is responsible for doing something only if one has the ability to do something about it. Both experts agreed that pedophilia was treatable. What Irey could have done about his pedophilia is seek treatment for it. He never once sought treatment for his pedophilia, which was part of what he described as his "terrible dark side," during the four or five years he was sexually abusing little children "many many times." Like most criminals, Irey stopped only when he got caught.

Not only that, but as Dr. Berlin noted, "[e]ven without treatment, in the past, [Irey] had been able to refrain from any sexual contact with children within the United States." The undisputed fact is that Irey was perfectly capable of not sexually abusing children where the risk of detection and punishment was high, which is why he consciously chose to commit his crimes against children halfway around the globe in a third world country where there was little or no risk from law enforcement. Irey's self-restraint when it was in his own best interest not to indulge his lust for children proves that his volition was not impaired to any extent

82

worthy of weight in sentencing.

During the sentence hearing, the district court asked Dr. Shaw: "is a person who acts out as a result of this condition acting totally of rational free will or is that person acting out as a result of something that is in essence an illness that he at that point has no control over?" Dr. Shaw refused to endorse the court's pedophiles-can't-much-help-it theory. Instead, he gave his expert opinion that while pedophilia is not curable, it is treatable and pedophiles can and many do avoid molesting children. Dr. Shaw stressed that "Pedophilia is very treatable, and there are many pedophiles in the community who are doing just fine and managing their behavior." He later reiterated that there are "thousands of pedophiles and child molesters, different, out there, . . . who aren't re-offending, who are in recovery and are doing just fine." The "many pedophiles in the community" could not be doing "just fine" and the "thousands of pedophiles . . . out there" could not be avoiding commission of offenses if, as the district court believed, the "illness" of pedophilia rendered the criminal acts of those who molest children "not entirely volitional." See generally Bruce J. Winick, Sex Offender Law in the 1990s: A Therapeutic Jurisprudence Analysis, 4 Psychol. Pub. Pol'y & L. 505, 524 (1998) ("People diagnosed with pedophilia do not molest children in the presence of police officers or in other situations presenting

83