a high likelihood of apprehension.  Rather, they act with stealth, deception, and premeditation in an effort to avoid detection.  This is purposeful, planned, and goal-directed conduct, not spontaneous and uncontrollable action or action that is substantially beyond the individual's ability to avoid."); id. at 523–24 ("There is nothing in the diagnostic criteria for pedophilia or any of the other paraphilias that suggests that individuals diagnosed with these disorders suffer from any cognitive impairment that affects their ability to understand the wrongfulness of their conduct or that renders them irrational in any respect or unable to control their actions. . . .  Moreover, there is nothing in the clinical literature that suggests that sex offenders are unable to exercise self-control.").

The district court refused to acknowledge the line that both of the defense experts drew between pedophilia and child molestation—a line, as the AUSA argued, that is similar to the one between alcoholism and driving under the influence.  Dr. Shaw attempted to explain to the court metaphorically the difference between having the urge and acting on the urge: "Pedophiles are capable of not re-offending, even if they have an urge, in the same way that compulsive dessert eaters can choose to not eat dessert."  The district court did not heed the metaphor or the experts' reports or the testimony of Dr. Shaw, but instead reasoned that because pedophiles have the urge they have diminished

volition when it comes to resisting the urge.

We would recognize this finding as clear error if the government had argued the point to us. Since it did not, we will accept as a fact, for this case only, the erroneous finding that when pedophiles molest children they are not acting in a "purely volitional" way but instead their crimes are "due in substantial part" to their pedophilia.[28]

That finding, which we assume correct for this case, is relevant to the § 3553(a)(1) factor concerning "the nature and circumstances of the offense and the history and characteristics of the defendant." But the assumed fact cannot reasonably carry much weight. Not "purely volitional" does not mean not volitional, and "due in substantial part" does not mean due, period. The district court did not find that Irey could not help committing the crimes, which he committed "many many times" over a period of four or five years. Perhaps the reason the court stopped short of finding Irey could not help it at all is that Irey

---

[28] Judge Tjoflat's separate opinion accuses us of using the reports we have cited to hold that the district court clearly erred in finding that pedophiles are not acting in a "purely volitional" way when they sexually abuse children. Separate Op. of Tjoflat, J., at 221 & n.89. In doing so that opinion ignores the fact that Dr. Shaw, whom the opinion describes as Irey's "'star' witness," id. at 204, was himself careful to distinguish between pedophilia and child molestation, a distinction that the district court insisted on blurring. More fundamentally, Judge Tjoflat's separate opinion also disregards our clear statement, to which this footnote is attached, that because the government has not contested the point, we are accepting as a fact for purposes of this case the finding that when pedophiles molest children they are not acting in a "purely volitional" way but instead their crimes are "due in substantial part" to their pedophilia.

obviously did help it when doing so suited his purpose of not getting caught.

While in this country Irey refrained from committing any crimes against children,

never once touching an American child in an inappropriate way, and instead

consorted with adult prostitutes.  It was while in Cambodia, where he could get

away with sexually violating children, that he did it so "many many times."  And

he acted with cunning.  As Judge Hill put it:

> I also disagree with the apparent weighty consideration that the
> sentencing judge gave to the notion that this defendant acted on
> account of some type of "sickness."  The defendant acted
> deliberately, cunningly and with obvious delight.  He ruined the lives
> of at least forty-three children (that we know of) and then published
> his triumphs on the internet for all the world to see, complete with
> scurrilous black marker writings tattooed on the nine-year-old girls'
> skin.

Irey, 563 F.3d at 1227 (Hill, J., concurring).

Moreover, the "history and characteristics of the defendant" component of

the § 3553(a)(1) factor is aimed at distinguishing among defendants who commit a

particular offense or type of offense.  The theory of the district court's finding,

however, is one of non-distinction because it applies to virtually everyone who

commits this type of crime.  According to the district court's theory,

pedophiles—not Irey in particular but pedophiles in general—share the

characteristic of having impaired volition when it comes to sexually abusing

children.  They all have what the district court insisted on calling the "illness" of

pedophilia. If the sexual molestation of children by pedophiles is not "entirely volitional," as the district court found and as we are assuming, then most sexual abuse of children is not "entirely volitional," because most of it is done by pedophiles. See Ryan C.W. Hall & Richard C.W. Hall, A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues, 82 Mayo Clinic Proc. 457, 458 (2007) ("An estimated 88% of child molesters and 95% of molestations (one person, multiple acts) are committed by individuals who now or in the future will also meet criteria for pedophilia. Pedophilic child molesters on average commit 10 times more sexual acts against children than nonpedophilic child molesters." (footnotes omitted)).

This point is important because it matters whether the reason for the variance is a fact that takes the present case outside the heartland of cases covered by the individual guideline. The Supreme Court instructed us in Kimbrough that decisions to vary "may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply." Kimbrough, 552 U.S. at 109, 128 S. Ct. at 574–75 (quotation marks omitted); see also Rita, 551 U.S. at 351, 127 S. Ct. at 2465 (the guidelines themselves foresee that they are not to apply to cases outside the heartland of cases). The Court stated that, by contrast, "closer review may be in

order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case." Kimbrough, 552 U.S. at 109, 128 S. Ct. at 575; see also Spears, 129 S. Ct. at 843 ("[Kimbrough's] implication was that an 'inside the heartland' departure (which is necessarily based on a policy disagreement with the Guidelines and necessarily disagrees on a 'categorical basis') may be entitled to less respect.").

The district court's reliance on the theory that pedophiles have reduced volition, applying as it does to virtually all crimes involving sexual abuse of children, does not take this case outside the heartland to which the Commission intended the guidelines relating to sexual offenses against children to apply. Instead, the pedophiles-are-ill variance is more properly seen as a variance based on the judge's view that the guidelines range for crimes involving the sexual abuse of children does not properly reflect § 3553(a) factors even in mine-run cases, i.e., in the vast majority of cases. For that reason, as Kimbrough teaches, the decision is not entitled to the "greatest respect" but instead should be subject to "closer review." Exercising that closer review, we reject as unreasonable and a clear error in judgment the district court's view that the guidelines involving sex crimes against children are too harsh in a mine-run case because pedophiles have

impaired volition. The reasons should be apparent but, if not, we refer the reader

to our upcoming discussion about the devastating and permanent harm that this

type of crime inflicts on its young victims. See infra at 98–102; see also Garcia v.

Quarterman, 456 F.3d 463, 471–72 (5th Cir. 2006) (capital case) ("The second

error in Garcia's argument is the suggestion that pedophilia may be considered

'mitigating' of a defendant's moral culpability. No case has so held. . . . There is

no sense in which reasonable people could view Garcia's pedophilia as morally

mitigating of guilt, any more than reasonable people would find a defendant's

uncontrollable compulsion to commit incest or eat human flesh 'mitigating.'"),

vacated on other grounds, 257 Fed. App'x 717 (5th Cir. 2007).

### c. Husband, Father, and Member of the Community

While considering the "the history and characteristics of the defendant"

component of § 3553(a)(1), the district court also weighed in Irey's favor his

status as a family man and member of the community:

> By all accounts, Mr. Irey has been a good husband and father
> for his wife and children and a good friend to his friends and a good
> person to his community. The lies and thefts, I think, referred to by
> Ms. Hawkins were essentially part of his effort to cover up his
> illness, because I think other than the acts of Mr. Irey, there's no
> indication that he has engaged in any other sort of criminal conduct
> or conduct representing poor character.

That is unreasonable and a clear error in judgment on several different levels.

To begin with, the judge's reasoning is like saying that other than the fact he had an "illness" that made him want to kill young women, Ted Bundy was a pretty nice guy and a valuable member of his community. That not only could have been said about Bundy, but something like it actually was said. See Ann Rule, The Stranger Beside Me 33–34 (2000) (describing how the author worked beside Bundy at a crisis clinic with a suicide prevention line, where Bundy served the community well: "If, as many people believe today, Ted Bundy took lives, he also saved lives. I know he did, because I was there when he did."). The district court's reasoning is also like saying that but for his taste for human flesh and how he satisfied it, Jeffrey Dahmer was not so bad. See Lionel Dahmer, A Father's Story 47 (1994) (describing how Jeffrey Dahmer had helped rescue a baby bird that had fallen from the nest and had nursed it back to health).

By the simple expedient of assuming away or putting out of mind all the criminal acts that they have committed, one may describe many, if not most, criminals as good people without "any other sort of criminal conduct or conduct representing poor character." Irey did not merely slip up and commit one criminal act. He persistently flew halfway around the world on a regular basis for four or five years and "many many times" raped, sodomized, and sexually tortured helpless children. And he recorded his sexual abuse and debasement of the little

90

children in photographs and videos for his own personal enjoyment and to share with others.  No one who commits such heinous crimes has good character regardless of whether the criminal, while he was not raping, sodomizing, and torturing helpless children, was a good father, or husband, or member of his local community (as distinguished from the world community).  It was unreasonable and a clear error in judgment to vary downward for Irey on the theory that he has good character.  See Martin, 455 F.3d at 1239–40 (disapproving the sentencing court's emphasis on the defendant's lack of a criminal record and the aberrational nature of his crimes, which the guidelines had already taken into account, and pointing out that his criminal conduct spanned a period of years and caused much harm).

The Fourth Circuit had a somewhat similar situation before it in United States v. Abu Ali, 528 F.3d 210, 258–59 (4th Cir. 2008), where the sentencing court in a case involving attempted terrorism had varied downward from a guidelines range sentence of life to a sentence of 30 years after considering, among other things, the many letters it had received "describing Abu Ali's 'general decent reputation as a young man' and his overall 'good character.'" Id. at 268.  Vacating the 30-year sentence as unreasonably lenient, the Fourth Circuit was "unmoved" by those letters, explaining:

> What person of "decent reputation" seeks to assassinate leaders of
> countries?  What person of "good character" aims to destroy
> thousands of fellow human beings who are innocent of any
> transgressions against him?  This is not good character as we
> understand it, and to allow letters of this sort to provide the basis for
> such a substantial variance would be to deprive "good character" of
> all its content.

Id.  Likewise here.  What person of good character commits the horrific crimes

that Irey did against at least fifty different children and on "many many"

occasions over a four- or five-year period, stopping only when he is finally

caught?  What the Fourth Circuit said applies as well to this case and what Irey

did: "This is not good character as we understand it."  If Irey is a person of good

character, the term has no meaning worth mentioning.

The facts about Irey as a husband, father, and member of the community

are not disputed, the question is how to weigh them for sentencing purposes.  The

uncontroverted facts are that as a husband Irey had been cheating on his wife with

prostitutes for the past 15 years, which was three-fifths of the 25 years they had

been married.  See Pugh, 515 F.3d at 1192–93 (considering beyond the sentence

findings "these additional salient facts that were elicited, and uncontroverted, at

the sentencing hearings"); see also Gall, 552 U.S. at 51, 128 S. Ct. at 597 (the

appellate court "will, of course, take into account the totality of the

circumstances").  He did it on a weekly basis while he was in Orlando, his

hometown.  Because of Irey's immoral conduct, he contracted a venereal disease and passed it on to his wife.  He lied to his wife.  As a result of Irey's depraved criminal misconduct his family lost their expensive house, their savings, and their second-generation family business.  Irey admitted that because he had spent so much time over the years pursuing sex outside marriage, he spent less time with his children than he should have:  "I was cheating my children out of things like taking them to the parks or a basketball game, because I had to go pick up a prostitute."  In view of those uncontroverted facts, no significant weight can be given to Irey's having been "a good husband and father for his wife and children."

Irey lied not just to his wife but to others as well.  As he put it, "I would lie to people even when I did not need to."  He stole from the family business, which his father had started a half century before.  His criminal conduct put the long-established company out of business, costing fifty members of the community their jobs.  No number of civic club memberships can outweigh the harm that Irey caused his wife and family and the community.

It was, however, appropriate for the district court to find and consider that "Irey obviously has a very loving family" and "deserves whatever credit he should take for having produced these people" who spoke on his behalf at the sentence hearing.  That is true even though the extremes Irey's family members went to in

expressing their affection for and devotion to him seem detached from the reality

of the circumstances in which they were called upon to do it.  It is incongruous at

best to describe the man who had sexually tortured so many little children as

"loving," a "hero," a "star," and as one who taught others "so much about life and

love," and who "had a way of touching people's lives."  Still, we are sympathetic,

as the district court was, to the terrible emotional plight that Irey's family was in

because of his crimes.  It is admirable that they chose to stand by him, but in

deciding how that weighs in the sentencing calculus their statements have to be

considered in context.

It may well be, as the government suggests, that some of the good things

Irey's family members had to say about him are a testament to his ability to lead a

double life and to evade detection even by those closest to him.  Their praise of

Irey may prove that he knew how to keep his family and friends in the dark about

his "terrible dark side," as he described it to the district court.[29]  Still, it was not

unreasonable for the district court to conclude that Irey has a "very loving family"

and "deserves whatever credit he should take for having produced these people."

We would find grossly unreasonable, however, any suggestion that the credit Irey

---

[29] We know from Dr. Shaw's report that, at least at the time of one of Irey's
psychological evaluations, his wife was unaware of the severity of his crimes.  Dr. Shaw also
testified that "I assume that people are going to minimize and leave some of the worst things
out."

may be due for his family's feelings for him could even remotely approach the heavy weight stacked against him for the criminal acts he committed.

### d. Age

The district court also considered "[a]nother aspect of defendant's character" to be Irey's age and weighed in his favor the fact that with "even the minimum sentence here he's going to be an old man . . . when he gets out of prison." Irey was 43 or 44 years old when he started sexually abusing children, and he was 50 when he was sentenced. With the sentence the district court imposed, minus time off for good behavior under § 3624, Irey would be 65 years old when released. With the maximum sentence of 30 years, minus time off for good behavior, Irey would be 76 years old when released. 18 U.S.C. § 3624; 28 C.F.R. §§ 523.20, 541.13 (2005); see also Barber v. Thomas, 130 S.Ct. 2499 (2010).[30]

We fail to see how those facts show that Irey is different from any other person who commits horrendous crimes in middle age and faces a long prison sentence. Cf. United States v. Seljan, 547 F.3d 993, 997–98 (9th Cir. 2008) (en

_____

[30] Judge Tjoflat's separate opinion takes the position that in performing our sentencing review we should not consider any statute, such as 18 U.S.C. § 3624, unless it was cited by or in the district court. See Separate Op. of Tjoflat, J., at 223 n.93, 224–25, 227. That is an odd position for that opinion to take since the opinion itself cites and discusses § 3624 in connection with sentencing "honesty." Id. at 153 n.13. We will not blind ourselves to the law, give a less than honest accounting of it, and ignore a relevant statute merely because it was not discussed in the district court.

banc) (87-year-old defendant sentenced to 20 years for sexually abusing children); United States v. Zastrow, 534 F.3d 854, 855 (8th Cir. 2008) (73-year-old man sentenced to 20 years for enticing or coercing an 8-year-old girl into sexually explicit conduct which he photographed). Besides, if Irey had not successfully evaded detection for four or five years he would be that much younger when he gets out of prison. In these circumstances rewarding Irey for being older rewards him for evading detection and it is unreasonable to do that.

### 2. Section 3553(a)(2)(A)

The second factor that a district court must consider in sentencing, and that a court of appeals must consider in reviewing the sentence for substantive reasonableness, is "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). This requirement extends beyond, but also overlaps to some extent with, the "nature and circumstances of the offense" component of §3553(a)(1).

The § 3553(a)(2)(A) consideration is the "just deserts" concept, which carries the need for retribution, the need to make the punishment fit the crime, and the need not just to punish but to punish justly. In Pugh we quoted from the Senate Report regarding this provision:

96

> This purpose—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

515 F.3d at 1195 (quoting S. Rep. No. 98-225, at 75–76, 1984 U.S.C.CA.N.

3258–59); see also United States v. Lychock, 578 F.3d 214, 220 (3d Cir. 2009);

United States v. White Face, 383 F.3d 733, 740 (8th Cir. 2004); United States v.

Beasley, 12 F.3d 280, 283 (1st Cir. 1993).

     Because the punishment should fit the crime, the more serious the criminal

conduct is the greater the need for retribution and the longer the sentence should

be. The seriousness of a crime varies directly with the harm it causes or threatens.

It follows that the greater the harm the more serious the crime, and the longer the

sentence should be for the punishment to fit the crime. As we have stated before,

"[c]hild sex crimes are among the most egregious and despicable of societal and

criminal offenses." United States v. Sarras, 575 F.3d 1191, 1220 (11th Cir. 2009)

(affirming as reasonable a 100-year sentence for a first offender who sexually

abused a single 13-year-old girl and took photos of it). And Irey's criminal

conduct, as we stated at the beginning, is virtually unparalleled in a "most egregious and despicable" field of crime. This circuit has seen few, if any, other criminals who have over such a long time span raped, sodomized, and tortured so many children, some of whom were very young, and all of whom were among the most helpless people in the world. Irey, a 200-pound man, subjected his helpless young victims not just to sexual intercourse but also to anal and oral sodomy and to sexual torture that went far beyond the heartland of depravity even for child molesters. Irey treated his child victims as objects, as his toys, which he bought and then did with as he pleased. He smiled as they cried out in pain. As if that were not enough, Irey also photographed and video recorded his debauchery and distributed it on the internet, thereby guaranteeing that the record of it would outlast him and all of us, inspiring other child molesters to commit crimes against children.

Much has been said to describe and emphasize the grave harm that sexual abuse of children inflicts on its victims. Some of the best and most recent descriptions of that harm can be found in <u>Kennedy v. Louisiana</u>, — U.S. —, 128 S. Ct. 2641 (2008). Although the Court by a 5 to 4 margin decided that capital punishment could not constitutionally be imposed for the rape of a child, all nine justices agreed that sexual abuse of children inflicts enormous harm on the

victims.  The majority acknowledged that:

> Here the victim's fright, the sense of betrayal, and the nature of her
> injuries caused more prolonged physical and mental suffering than,
> say, a sudden killing by an unseen assassin.  The attack was not just
> on her but on her childhood. . . .  Rape has a permanent
> psychological, emotional, and sometimes physical impact on the
> child. We cannot dismiss the years of long anguish that must be
> endured by the victim of child rape.

Id. at 2658 (citations omitted).

The four dissenting justices in Kennedy believed that child rape was such a

serious crime that death could be imposed as punishment for it.  Id. at 2677–78

(Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting).  They

stressed the devastating, long-term effect that rape has on children.  See id. at

2677 ("The immaturity and vulnerability of a child, both physically and

psychologically, adds a devastating dimension to rape that is not present when an

adult is raped.  Long-term studies show that sexual abuse is grossly intrusive in

the lives of children and is harmful to their normal psychological, emotional and

sexual development in ways which no just or humane society can tolerate."

(quotation marks and citations omitted)).  All nine justices agreed about that, and

so do we.

Even before the Kennedy opinions, the Supreme Court had long recognized

that childhood sexual abuse has devastating and long-lasting effects on its victims.

99

See New York v. Ferber, 458 U.S. 747, 758 n.9, 102 S. Ct. 3348, 3355 n.9 (1982)

("It has been found that sexually exploited children are unable to develop healthy

affectionate relationships in later life, have sexual dysfunctions, and have a

tendency to become sexual abusers as adults." (citing Schoettle, Child

Exploitation: A Study of Child Pornography, 19 J. Am. Acad. Child Psychiatry

289, 296 (1980))).  The damage to children who are the victims of sexual abuse is

not limited to psychological and emotional injury; serious physical injuries often

result as well.  See, e.g., Kennedy, 128 S. Ct. at 2646; State v. Goodwin, 679 P.2d

231, 232 (Mont. 1984) (seven-year-old victim suffered "a severe laceration in the

vaginal area extending all the way to the cervix.  Major surgery was required to

repair the vaginal laceration."); id. at 234 (doctor testified that "[i]t was also too

early to know whether normal sexual intercourse or childbearing would be

possible" for the victim later in life); see also United States v. Eagle, 515 F.3d

794, 799 (8th Cir. 2008) ("After the assaults, [the 8-year-old victim] experienced

mental, emotional, and physical problems.  For instance, he began feeling sad and

unhappy and also experienced encopresis, or involuntary defecation." (footnote

omitted)).  In this regard, it is worth remembering that Irey proudly imbedded in

all capitals on one of the images he produced that:  "Big Cock Push Bug Deep

Into 9 Yo Girl, She Hurt in Pane."

When child pornography is produced in conjunction with the sexual abuse of children, as it was here, the harm to the child victims is magnified and perpetuated. See Ferber, 458 U.S. at 759, 102 S. Ct. at 3355 (stating that "the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation"); Pugh, 515 F.3d at 1197–98 & n.12 (citing extensive congressional findings about the harm caused by child pornography and recognizing that "[i]n light of these detailed legislative findings and numerous legislative enactments, we cannot help but underscore the seriousness of this crime"); see also Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note) ("Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse.").

There is another aspect of the compounding harm that the production and distribution of child pornography inflicts. It may incite or encourage others to sexually abuse children. Indeed, the district court found in this case that child pornography did have that effect on at least some pedophiles, causing them to sexually abuse children who otherwise would not have been abused. See supra at 31. The district court, however, seems to have ignored what its own finding

101

means to the calculus of harm that Irey caused.  He is, after all, the producer and distributor of one of the most graphic, depraved, and widely distributed series of child pornography on the internet, the infamous "pink wall series."  So widely distributed is it that over a hundred law enforcement agencies had turned up child pornography from the series in their investigations.  If child pornography is a cause of child sexual abuse, as Dr. Shaw testified and the district court found, then Irey not only sexually abused fifty or more little girls in Cambodia but he also multiplied the harm he did by inciting others to sexually abuse countless more children all over the world.  The district court did not even mention that harm-multiplier aspect of Irey's crime in its findings.

To be sure, the district court did describe the crime as "horrific," the victims as "numerous," and "perhaps the most vulnerable of the world's society," and it did state that it was "an offense that rises to the very top in terms of its seriousness and its effect on other human beings" who "may never, never overcome their abuse."  The court also, in an incredible understatement, said that "the characteristics of the offense, the seriousness of it itself, the long-standing, long-term engagement in it certainly <u>does not mitigate in favor of any leniency</u>" (emphasis added).  But the court then proceeded to show leniency anyway, in this worst of the worst crimes, by varying downward from the guidelines range by 12

½ years to a sentence of 17 ½ years, which is only 2 ½ years above the statutory minimum.  See Irey, 563 F.3d at 1227 (Hill, J., concurring) (noting how far the sentence was from the maximum and how close to the minimum).

The 17 ½-year sentence, if all of it were to be served, would amount to only 4 months and a week for each of the 50 distinguishable victims that Irey raped, sodomized, or sexually tortured.  In light of 18 U.S.C. § 3624, Irey will likely serve only 15 years and 3 months of his sentence, which works out to less than four months for each of those 50 victims who can be distinguished from each other in the images that show some of Irey's crimes.  And that calculation does not include any time for Irey's additional criminal behavior of producing and distributing the massive amount of extremely graphic child pornography.  Four months per child raped, sodomized, and tortured is grossly unreasonable.  In sentencing there should be no quantity discount for the sexual abuse of children. Cf. Crisp, 454 F.3d at 1291 ("The court gave Crisp five hours for a crime that caused $484,137.38 in harm.  That equates to $96,827.48 per hour or $1,613.79 per minute served in custody.  The sentence does not reflect the seriousness of the crime, promote respect for the law, and provide just punishment for the offense, as § 3553(a)(2)(A) requires, nor does it afford adequate deterrence to criminal conduct, as § 3553(a)(2)(B) requires.").

There is another way to gauge the reasonableness of Irey's sentence: by comparing what he did and the time he received above the statutory minimum to the minimum conduct required to violate the statute and receive the minimum sentence. This is an aspect of the "just deserts" concept. The less it takes to have the statutory minimum sentence imposed, the higher the sentence should be for someone who does much, much worse than the minimum amount of criminal behavior that would violate the statute. Irey was convicted of violating 18 U.S.C. § 2251(c), which prohibits using or enticing "any minor" to engage in, or assist any other person to engage in, "any sexually explicit conduct" outside the United States for the purpose of producing any visual depiction of that conduct. "Minor" is defined as any person under 18 years of age. 18 U.S.C. § 2256(1). A person who traveled to another country and took a single photograph of a 17-year-old engaging in an obscene pose by herself would be guilty of violating the same statute and be subject to a mandatory minimum sentence of 15 years in prison. See id. § 2256(2)(A)(v) ("sexually explicit conduct" defined to include "lascivious exhibition of the genitals or pubic area of any person"). That means Irey, for all of his years of sexual violation, torture, and humiliation of at least 50 children, received only 30 months more than if all he had done was on a single occasion snap a single photo of a single, teenage child in an obscene pose by herself. That

cannot be reasonable.[31]

We realize that 17 ½ years, even when reduced to 15 ¼ years to serve is, as the panel stated, "a substantial portion of a human life—and no serious person should regard it as a trifle." Irey, 563 F.3d at 1226. We do not regard it as a trifle, but we are required to review all challenged sentences for substantive reasonableness. See Gall, 552 U.S. at 41, 128 S. Ct. at 591 ("[C]ourts of appeal must review all sentences—whether inside, just outside, or significantly outside the Guidelines range."). And sentences even longer than 17 ½ years have been held to be unreasonably short in view of all the facts and circumstances including, of course, the crime. See Ressam, 593 F.3d at 1130–31 (a 22-year sentence); Abu Ali, 528 F.3d at 262 (a 30-year sentence). Irey, after all, sentenced the children he raped, sodomized, and sexually tortured to a lifetime of harm, and the egregious child pornography he created and distributed will, because he uploaded it to the internet, continue causing harm for far longer than 17 ½ years. Irey's pink wall series will last longer than his own lifetime or ours, inciting and encouraging the sexual abuse of multitudes of children yet unborn.

The district court did impose a lifetime of supervised release on Irey once

---

[31] It is also worth noting that if Irey had sexually abused a single one of his 50 victims in this country, he would have received a mandatory minimum 30-year sentence. See 18 U.S.C. § 2241(c).

he leaves prison, as the guidelines recommend for every offender who sexually abused children.  See U.S.S.G. § 5D1.2(b).  While it is true that someone on supervised release is not entirely free, it is equally true that he is not confined in a prison either.  As the Supreme Court has held, "[s]upervised release, in contrast to probation, is not a punishment in lieu of incarceration."  United States v. Granderson, 511 U.S. 39, 50, 114 S. Ct. 1259, 1266 (1994).  And "a term of supervised release does not replace a portion of the sentence of imprisonment, but rather is an order of supervision in addition to any term of imprisonment imposed by the court."  United States v. Goad, 44 F.3d 580, 585 n.13 (7th Cir. 1995).  If being on supervised release were the punitive equivalent of being in prison, if it served the just deserts function as well, there would be no need to put most criminals in prison; we could put them on supervised release instead.  If the punitive impact of the two were the same, convicted criminals would not ask for a longer term of supervised release in hopes of getting a shorter term of imprisonment.  Yet they do.  Irey's attorney, for example, pleaded with the district court not to impose the 30-year guidelines range sentence but instead to set the sentence at "between 15 and 20 years with up to [a] lifetime of supervised release."  Irey clearly views supervised release as being significantly less punitive than imprisonment.  And it is.

106

The same is true of the other restrictions the district court imposed, all of which are required or strongly recommended for all convicted sex offenders, such as participation in a substance abuse program and a mental health program specializing in sex offender treatment, compliance with any state sex offender registration law, being subject to search based upon reasonable suspicion, and "the standard terms concerning risk control." Those release terms may be inconvenient, annoying, and burdensome, but they are not the equivalent of being behind bars. If they were, no convicted sex offender would care whether he remained in prison or was released subject to those conditions.

In imposing a sentence below the advisory guidelines range, the district court unreasonably failed to give enough weight to "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and to the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," id. § 3553(a)(2)(A).

### 3. Section 3553(a)(2)(B)

The third factor that a district court must consider in sentencing, and that a court of appeals must consider in reviewing the sentence for substantive reasonableness, is "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." Id. § 3553(a)(2)(B). The sentencing judge in this

107

case referred to this important sentencing purpose as one of the § 3553(a) factors that "essentially are subjective in nature." He did say that "a serious sentence is hopefully going to deter others from conducting similar affairs," but then expressed his view that "when we're dealing with an illness like this, I'm not sure that that rationally follows." Even though the judge said that "nevertheless, deterrence is an appropriate consideration," it is apparent that his idiosyncratic doubts about whether pedophiles could be deterred from committing crimes involving the sexual abuse of children and child pornography affected the weight he gave to this important § 3553(a) factor.

The sentencing judge's skepticism about deterring these types of crimes is not shared by Congress, the Sentencing Commission, the Supreme Court, this Court, or other courts of appeals. See, e.g., Ferber, 458 U.S. at 760, 102 S. Ct. at 3356 ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product."); Osborne v. Ohio, 495 U.S. 103, 109–10, 110 S. Ct. 1691, 1696 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand.").

Far from questioning the value of deterrence, in <u>Pugh</u> we held that the deterrence objective of sentencing is "particularly compelling in the child pornography context." 515 F.3d at 1194. We explained that imposing a lighter sentence on one convicted of a child pornography offense "tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market." <u>Id.</u> The problem of a missed opportunity for deterrence, we observed, is compounded when the crime involves not just possession but also distribution of child pornography. <u>Id.</u> Other circuits agree. <u>E.g.</u>, <u>United States v. Goff</u>, 501 F.3d 250, 261 (3d Cir. 2007) ("[D]eterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing . . . ."); <u>United States v. Barevich</u>, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").

<u>United States v. Lychock</u>, 578 F.3d 214 (3d Cir. 2009), involved a defendant who had been convicted of possessing child pornography. The guidelines range was 30 to 37 months but the district court varied down to a

sentence of probation and a fine. Id. at 216. That district court, like the one in

this case, acknowledged that the crime "is a serious offense," but characterized the

defendant as otherwise "law abiding" and was impressed with his "supportive

family," and the fact that he had sought psychological help (after he was caught)

and was benefitting from it. Id. (quotation marks omitted). The district court in

Lychock, like the one in this case, was skeptical about whether pedophiles could

be deterred. The court there remarked:

> The only benefit I could see [to imprisonment would be] as a
> deterrent to others, and that is a factor. . . . So other people would
> recognize that they cannot subscribe to these images with impunity. I
> am not persuaded that a jail term for this defendant warrants, or is to
> be equated with that value. The kind of psychological problem in
> persons who are drawn to this kind of material it seems to me is not
> going to be deterred by a jail term for an internet porno observer.

Id. at 217. The Third Circuit rejected that reasoning and held the sentence

substantively unreasonable. Id. at 220–21.

As the Third Circuit noted, the district court's downplaying of deterrence

where pedophiles are concerned reflects "a policy disagreement with the

Guidelines recommendations, [and] such a disagreement is permissible only if a

District Court provides 'sufficiently compelling' reasons to justify it." Id. at

219–20 (citing Gall, 552 U.S. at 50, 128 S. Ct. at 597, and Kimbrough, 552 U.S. at

109, 128 S. Ct. at 575). And "[t]he conclusory statement of personal belief

110

provided in this case does not suffice." Lychock, 578 F.3d at 220. The same is true here.[32]

The defendant in United States v. Goldberg, 491 F.3d 668 (7th Cir. 2007), had been convicted of possessing child pornography and the guidelines range was 63 to 78 months. Id. at 669. The district court varied downward to impose only a nominal prison sentence to be followed by a decade of supervised release. Id. at 669–70. The Seventh Circuit reversed the sentence as substantively unreasonable because the district judge, among other things, had based the sentence on her "idiosyncratic penological views," id. at 673, and had "neglected considerations of deterrence and desert," id. at 674. The court explained why deterrence was so important in crimes involving the sexual abuse of children, including child pornography crimes:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be

---

[32] In Pugh, we rejected the notion that Kimbrough-style policy disagreement could justify the district court's decision to impose a probation-only sentence in a child pornography case where the minimum guidelines sentence was 97 months. 515 F.3d at 1201 n.15. We concluded that the guidelines sentences for child pornography crimes, which reflect judgments by both Congress and the Sentencing Commission as to the seriousness of the offense and the risk of recidivism, "do not exhibit the deficiencies the Supreme Court identified [in the crack cocaine guidelines] in Kimbrough." Id. We do not rule out the possibility that a sentencing court could ever make a reasoned case for disagreeing with the policy judgments behind the child pornography guidelines. We hold simply that in this case (involving production of child pornography), as in Pugh (involving possession of child pornography), the district court did not come close to doing so.

111

> produced. Sentences influence behavior, or so at least Congress
> thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory
> sentencing factor. The logic of deterrence suggests that the lighter
> the punishment for downloading and uploading child pornography,
> the greater the customer demand for it and so the more will be
> produced.

Id. at 672. We would add that in this case not only were young children raped in the course of producing child pornography, but Irey is the one who actually did the raping.

The more serious the crime and the greater the defendant's role in it, the more important it is to send a strong and clear message that will deter others. In sentencing Irey the district court should not have under-weighed the § 3553(a)(2)(B) adequate deterrence factor based on a conclusory statement of its personal subjective views (what the Seventh Circuit would call "idiosyncratic penological views") questioning the value of deterrence in crimes involving the sexual abuse of children. Kimbrough allows a district court to vary from the guidelines based solely on its judgment that the policies behind the guidelines are wrong. See 552 U.S. at 109, 128 S. Ct. at 575. When a district court does so, however, "closer review" of its reasoning is warranted. Id. Exercising that review, we conclude that the district court made a clear error of judgment in downplaying the importance of deterring this type of crime.

### 4. Section 3553(a)(2)(C)

112

The fourth factor that a district court must consider in sentencing, and that a court of appeals must consider in reviewing the sentence for substantive reasonableness, is "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). This is the specific deterrence or incapacitation factor.

Dr. Berlin, the defense psychiatrist, did not rate the risk of Irey committing more crimes against children as low or high, but instead gave his opinion that if Irey was "shown mercy and given the opportunity, he will be able to re-enter society as a safe and productive citizen." Dr. Shaw's report was more descriptive of the risk. It revealed that under one method of assessing risk, the Static-99 method, Irey's score placed him in "the Medium-Low risk category for sexually re-offending." According to Dr. Shaw, the research study he relied on indicated that people with Irey's score had recidivism rates of 12%, 14%, and 19% after five, ten, and fifteen years. The Shaw report did add that: "[t]he authors of the instrument, in reviewing development samples, found that few individuals recidivated beyond the age of sixty. Though this finding has mixed research support, in general as males age their sexual interest wanes." Irey's score on another instrument used to assess the risk of recidivism, the Minnesota Sex Offender Screening Tool-Revised, placed him in "the Moderate Risk Range." The

Shaw report concluded that all of the risk assessment factors "suggest a moderate to low moderate risk of a new charge," which could "be reduced through continued treatment and informed supervision upon his release."

At one point during the sentence hearing Dr. Shaw testified that Irey was "essentially in the medium low to medium or moderate risk categories, which is— which is below a threshold of likely." At a later point, he testified that "overall, I find him to be, as I said, a moderate risk, a low-moderate risk, low in psychopathy." He immediately added that Irey "does have—has deviant interests." In discussing whether the risk that Irey would sexually abuse children in the future could be reduced by using testosterone-reducing drugs, Dr. Shaw testified that they "come with a number of side-effects," that "they're not always useful," and that when and if Irey is released "he's going to have experienced a reduction naturally in testosterone and a reduction in sex drive." Dr. Shaw did not say that through any combination of factors and circumstances Irey would have a negligible risk of committing more crimes against children.

The district court credited the opinions of the two experts, which it re-characterized as Irey having "a low risk of recidivism." But then the court added: "Of course, all of that is somewhat academic because by the time he gets out of prison, he'll be most likely at an age where recidivism would be unlikely, just

from a physiological standpoint."

At the completion of the sentence that the district court imposed on him, with the § 3624 reductions considered, Irey would be 65 years old.  There is no support in the record for a finding that a 65-year-old male with what Dr. Shaw called "deviant interests," who has a record of not just raping and abusing children but also of sexually torturing them, is too old to do it again, thereby rendering concern about recidivism "academic."  That is not what Dr. Shaw said about the aging process.  He said, when talking about whether he would advise drug therapy for Irey when he was released, that as they age men are "going to have experienced a reduction naturally in testosterone and a reduction in sex drive."  That is different from saying that pedophiles in their sixties lose interest in sexually abusing children or are physically incapable of doing so.  No one testified that the risk of recidivism is "academic" for a pedophile in his sixties  or seventies, probably because that simply is not true.

One need look no further than the facts in published opinions to see that.  For example, United States v. Seljan, 547 F.3d 993 (9th Cir. 2008) (en banc), involved a man in his mid-80s who was arrested on his way to the Philippines to "sexually educate" some children by engaging in sexual relations with them.  Id. at 997–98.  He had been to the Philippines 43 times during the previous 11 years,

when he was between the ages of approximately 74 and 85, in order to have sex with children there.  See id.  He told agents after he was arrested that he had been "sexually educating" children ages 8 to 13 for about 20 years, which means that he started when he was around 65 years old.  See id. at 998.  He had bragged about doing it and had a scrapbook and video collection of child pornography.  Id. at 997.  Even though he was 87 years old at the time of sentencing the district court imposed a 20-year sentence on him.  Id.  The Ninth Circuit rejected his attack on the sentence as unreasonable even though it was tantamount to a life sentence.  Id. at 1007; see also Zastrow, 534 F.3d at 855–57 (affirming conviction and 20-year sentence of a 73-year-old man who enticed or coerced an 8-year-old girl into sexually explicit conduct which he photographed); United States v. MacEwan, 445 F.3d 237, 240 (3d Cir. 2006) (defendant had repeatedly violated federal laws prohibiting the possession, distribution, and receipt of child pornography when he was between the ages of approximately 66 and 70); Weiler v. Purkett, 104 F.3d 149, 152 (8th Cir. 1997) (plaintiff, a state prison inmate, had sodomized and sexually abused a female child for 3 years, beginning when the girl was 7 and the defendant was approximately 70).  The facts of those cases show that the risk of a male sex offender sexually abusing children after he reaches the age of 65 is anything but "academic."

Studies and reports in this field are consistent with what judicial decisions show: pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat. <u>See</u> Mark Motivans & Tracey Kyckelhahn, <u>Federal Prosecution of Child Sex Exploitation Offenders 2006,</u> Bureau Just. Stat. Bull., Dec. 2007, at 1, 5 tbl.6 (reporting that 7.3% of offenders arrested for sexual exploitation of children, including sex abuse, child pornography, and sex transportation, are over the age of 60); <u>see also</u> Hall & Hall, <u>supra</u>, at 457–58 ("The course of pedophilia is usually long term. In a study that examined the relationship between age and types of sexual crimes, Dickey et al found that up to 44% of pedophiles in their sample of 168 sex offenders were in the older adult age range (age 40-70 years). When compared with rapists and sexual sadists, pedophiles comprise 60% of all older offenders, indicating that pedophiles offend in their later years at a greater rate than other sexual offenders." (footnotes omitted)). Moreover, as the government points out, the photos and videos show that some of the worst of Irey's acts do not require sexual potency. All of this is consistent with Dr. Shaw's testimony that: "You can't be cured" of pedophilia, and "Cures, you can forget about it."

This Court has stated that the threat of recidivism by a pedophile who has sexually abused a child is "appalling." <u>Pugh</u>, 515 F.3d at 1201 ("As Congress has

117

found and as we have discussed, child sex offenders have appalling rates of recidivism and their crimes are under-reported."); see also United States v. Allison, 447 F.3d 402, 405–06 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). The Supreme Court has also noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class," and has found that "[t]he risk of recidivism posed by sex offenders is frightening and high." Smith v. Doe, 538 U.S. 84, 103, 123 S. Ct. 1140, 1153 (2003) (quotation marks omitted). The Supreme Court has gone even further, finding that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." McKune v. Lile, 536 U.S. 24, 33, 122 S. Ct. 2017, 2024 (2002).[33]

Nor does the fact that when Irey gets out of prison he will be subject to restrictions and supervised release, offer any guarantee that he will not commit any crimes. In 2003 alone, for example, 12.8% of all federal offenders on

---

[33] Judge Tjoflat's separate opinion argues that we should not consider any of the decisions of the Supreme Court and this Court about the high recidivism rate of pedophiles and the special need for deterrence when punishing sexual crimes against children. Separate Op. of Tjoflat, J., at 225. The reason it gives for wanting us to pretend that those decisions do not exist is that they were not cited in the district court. Id. No member of this Court, certainly not the author of that opinion, has ever before suggested that in determining the law we ought to confine ourselves to the decisions that were cited in the district court. We, like all courts, have a duty to find and apply the correct law.

supervised release committed new crimes.  Bureau of Justice Statistics, Dep't of Justice, Federal Criminal Justice Trends, 2003, at 37 tbl.29 (2006).  Sex offenders often fail to complete their treatment programs.  See Loretta J. Stalans, Adult Sex Offenders on Community Supervision: A Review of Recent Assessment Strategies and Treatment, 31 Crim. Just. & Behav. 564, 573 (2004) ("Sex offenders have high rates of either dropping out or being expelled from treatment.  Termination rates in the United States outpatient treatment programs have ranged from one quarter to more than one half of adult sex offenders . . . .").  Supervised release is revoked for 37.7% of the sex offenders who, like Irey, have a high school diploma but not a college degree.  James L. Johnson, Sex Offenders on Federal Community Supervision: Factors that Influence Revocation, Fed. Probation, June 2006, at 18, 19.  And the experience of states which have had sex offenders on supervised release, such as probation or parole, shows that it often fails to prevent sex offender recidivism.  See Patrick A. Langan et al., Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in 1994, at 14 (2003) ("Of the 4,163 sex offenders rearrested for a new [state] crime, nearly 9 in 10 (87%) were on parole when taken into custody . . . .").

Those studies are informative, but even without them we know that supervised release is no guarantee that a criminal will not commit more crimes

when he gets out of prison.  Courts of appeals regularly see cases in which serious crimes were committed by those on supervised release.  See, e.g., United States v. Wilk, 572 F.3d 1229, 1232 (11th Cir. 2009) (possession of child pornography); United States v. Williams, 322 Fed. App'x 846, 846 (11th Cir. 2009) (unpublished) (aggravated child molestation and enticing a child for indecent purposes);[34] United States v. Horsfall, 552 F.3d 1275, 1278 (11th Cir. 2008) (viewing child pornography); United States v. Trobee, 551 F.3d 835, 836 (8th Cir. 2009) (possession of child pornography); United States v. Azure, 539 F.3d 904, 905–06 (8th Cir. 2008) (robbery); United States v. Defoor, 535 F.3d 763, 763–64 (8th Cir. 2008) (aggravated assault); United States v. Eirby, 515 F.3d 31, 34 (1st Cir. 2008) (sexual abuse of a minor); United States v. Ralph, 480 F.3d 888, 888–89 (8th Cir. 2007) (child molestation); United States v. Spraglin, 418 F.3d 479, 480 (5th Cir. 2005) (murder); United States v. Martin, 382 F.3d 840, 841 (8th Cir. 2004) (rape); United States v. Marshall, 371 F.3d 42, 44 (2d Cir. 2004)

---

[34] Unpublished opinions are not precedential, see 11th Cir. R. 36-2, and we do not cite Williams for any legal holding or point of law discussed in that opinion.  Instead, we cite it solely as a source of facts about the crime committed while the defendant was on supervised release.  See 11th Cir. R. 36-2, IOP 7 ("The court may cite to them . . . to establish the . . . facts of the case.").

By contrast, Judge Tjoflat's separate opinion cites as "precedent" on a point of law two unpublished opinions, Separate Op. of Tjoflat, J., at 219, which under our rules and our precedent cannot be precedent.  See 11th Cir. R. 36-2; see also United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1358 n.15 (11th Cir. 2006) (Tjoflat, J.).

(robbery); see also McNaught v. United States, 646 F. Supp. 2d 372, 380

(S.D.N.Y. 2009) (arson).

Part of the problem may be understaffing and the resulting high case loads

of those who have the responsibility of doing the supervising. For example, as of

September 30, 2009, there were 14,987 people under post-conviction supervision

in the federal probation system in this circuit alone, with 12,216 of them on

supervised release. Admin. Office of the United States Courts, 2009 Annual

Report of the Director: Judicial Business of the United States Courts, tbl. E-2

(forthcoming spring 2010). And that does not count all of those on pre-trial

supervision or the thousands of presentence investigation reports that the federal

officers in this circuit have to complete each year. The nationwide situation was

summed up by Dr. Berlin (the same one who evaluated Irey for purposes of this

case), when he testified before Congress that: "Many of these parole and

probation people are stretched very thin. I think we want to be able to have them

have smaller case loads." Protecting Our Nation's Children from Sexual

Predators and Violent Criminals: What Needs to Be Done?, Hearing Before the

Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the

Judiciary, 109th Cong. 30 (2005) (statement of Fred S. Berlin, M.D., Associate

Professor, Johns Hopkins University).

Regardless of why so many convicted criminals on supervised release, including sex offenders, commit new crimes, the fact is that they do. Supervised release is better than unsupervised release, but it does not offer society the level of protection from a convicted criminal that incarceration does. Despite that undeniable fact, the district court found that Irey, one of the worst sex offenders ever prosecuted in this circuit, had a low risk of recidivism, or would pose a low risk when released at the end of the reduced sentence it imposed on him.

The government, however, has never attacked that factfinding as clearly erroneous. Instead, it has insisted throughout this appeal that it is not challenging any of the factfindings. As a result, for purposes of this appeal we will assume that at the end of a 17 ½-year sentence—15 years and 3 months after it was imposed—Irey would present a low risk of recidivism.[35]

That does not mean, however, that the sentence the district court imposed will adequately "protect the public from further crimes of the defendant," as § 3553(a)(2)(C) requires. A low risk is not the same as no risk. Adequate

---

[35] This is another part of our opinion that Judge Tjoflat in his separate opinion has misread. His opinion operates under the erroneous assumption that we have rejected the district court's finding that when Irey is released from the sentence it imposed on him and goes on supervised release he will pose a low risk of recidivism. See Separate Op. of Tjoflat, J., at 225–27. Although we have pointed out for the benefit of sentencing courts in the future the reasons and decisions indicating that the district court's finding is wrong, because the government has not challenged the factfinding we have expressly accepted the low risk of recidivism finding for purposes of reviewing this sentence.

protection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur. See United States v. Boyd, 475 F.3d 875, 877–78 (7th Cir. 2007) (upholding a sentencing determination that the defendant's acts created a substantial risk of bodily injury to another person in part because "[d]angerousness is a function of the magnitude of the harm that will occur if danger materializes and the probability that it will materialize"). With child sexual abuse of the kind that we know Irey is capable of and has committed, the harm is enormous and permanent. It can literally destroy lives. Accordingly, even with an assumed low risk of recidivism following release in 15 years and 3 months, imprisonment for that length of time does not afford adequate protection from further crimes by him. The district court imposed not one extra month over the statutory minimum for the purpose of protecting society and its children from further crimes by Irey, stating: "I don't think society needs further protection from him, at least beyond the statutory minimum sentence." Given the magnitude of the harm that will occur if Irey does commit more sexual crimes against children, that was a clear error in judgment.

### 5. Section 3553(a)(4) & (5)

District courts in sentencing, and courts of appeals in reviewing sentences, must also consider the guidelines range and any pertinent policy statements in the

123

guidelines.  18 U.S.C. § 3553(a)(4)–(5).[36]  Of course, since Booker the guidelines

have been advisory, but they are still to be given respectful consideration.  We

have not attempted to specify any particular weight that should be given to the

guidelines range and will not do so now.  Our best discussion of the subject came

in United States v. Hunt, 459 F.3d 1180 (11th Cir. 2006), where we rejected "any

across-the-board prescription regarding the appropriate deference to give the

Guidelines." Id. at 1184.  We decided instead that, subject to review for

reasonableness, sentencing courts may "determine, on a case-by-case basis, the

weight to give the Guidelines, so long as that determination is made with

reference to the remaining section 3553(a) factors that the court must also

consider in calculating the defendant's sentence." Id. at 1185.  In doing so, we

recognized that "Booker restored to district courts a measure of discretion that the

mandatory Guidelines had removed," id. at 1184, but we added this important

caveat: "This discretion is bounded, of course, by Congress's mandate to consider

the factors in section 3553(a), one of which, subsection four, is the Sentencing

Guidelines." Id.

---

[36] Section 3553(a)(2)(D) requires consideration of the need "to provide the defendant
with needed educational or vocational training, medical care, or other correctional treatment in
the most effective manner," and § 3553(a)(3) requires consideration of "the kinds of sentences
available."  No one suggests that either of those two considerations is relevant to this appeal.
Nor has anyone mentioned the § 3553(a)(7) factor, "the need to provide restitution to any
victims of the offense."

We stressed in Hunt that consideration of the advisory guidelines range is important, because the guidelines "are an indispensable tool in helping courts achieve Congress's mandate to consider 'the need to avoid unwarranted sentence disparities' among similarly situated defendants," id., which is required by 18 U.S.C. § 3553(a)(6).  Even though not bound by the guidelines, a sentencing court may not give them so little consideration that it amounts to "not giv[ing] any real weight to the Guidelines range in imposing the sentence."  Pugh, 515 F.3d at 1200; see also Booker, 543 U.S. at 264, 125 S. Ct. at 767 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").  See generally Kimbrough, 552 U.S. at 107, 128 S. Ct. at 573–74 ("[I]t is unquestioned that uniformity remains an important goal of sentencing.  As we explained in Booker, however, advisory Guidelines combined with appellate review for reasonableness and ongoing revision of the Guidelines in response to sentencing practices will help 'to avoid excessive sentencing disparities.'"); Rita, 551 U.S. at 348, 127 S. Ct. at 2463 ("The upshot is that the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale.").  In this case, the advisory guidelines range calculated out at life imprisonment and was lowered to thirty years only because

125

that is the statutory maximum based on the way the crime was charged. See supra at 12. In view of all of the facts and circumstances of this case, and given the weakness of the district court's explanation for deviating from the guidelines range, it effectively gave the guidelines range no real weight in imposing the sentence.

In addition to requiring consideration of the guidelines range, the Sentencing Reform Act also requires that district courts consider any pertinent policy statement issued by the Sentencing Commission. 18 U.S.C. § 3553(a)(5). The policy statements in the guidelines that are relevant to this case address when departures are appropriate in calculating the sentencing range. We are not dealing with a guidelines departure decision here, but a § 3553(a) variance decision. Still, even though the policy statements are in no way binding, § 3553(a)(5) requires that they be considered in making decisions about variances. All of the policy statements point in one direction in this case and that is away from a below-the-guidelines sentence.

The guidelines state as a matter of policy that age "is not ordinarily relevant in determining whether a departure is warranted," at least not unless "the defendant is elderly and infirm." U.S.S.G. § 5H1.1. In the present case the district court expressly considered Irey's age at sentencing (50 years) in his favor,

126

even though he was not elderly or infirm.

The guidelines state as a matter of policy that "civic, charitable, or public service . . . and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." Id. § 5H1.11.  Yet one of the reasons the district court gave for varying downward was Irey's civic work—that he had been "a good person to his community."  The guidelines also advise, as a matter of policy, that aberrant behavior may be used to support a downward departure only if, among other things, "the defendant committed a single criminal occurrence or single criminal transaction" that was "without significant planning" and "was of limited duration." Id. § 5K2.20(b).  This case does not fit any of those requirements, yet the district court used what amounted to an aberrant behavior theory as part of the justification for its downward variance, stating:  "I think other than the acts of Mr. Irey, there's no indication that he has engaged in any other sort of criminal conduct or conduct representing poor character."[37]

The guidelines state as a matter of policy that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a departure is warranted," except in circumstances not present here. Id. § 5H1.3.  Yet in

---

[37] The district court either overlooked the fact that Irey, a married man, had patronized prostitutes on a weekly basis for 15 years, or it thought that doing so does not "represent[ ] poor character."

deciding to vary downward, the district court placed significant weight on Irey having what it characterized as the "illness" of pedophilia.  To the extent that the district court relied on its belief that because he was a pedophile Irey had diminished capacity to resist raping children, or that his criminal behavior was due in substantial part to pedophilia, another policy statement is relevant.  The guidelines state that a court should not depart downward based on diminished capacity where "the offense involved actual violence or a serious threat of violence," or where the defendant has been convicted of an offense under Chapter 110 of Title 18, which Irey was.  Id. § 5K2.13.

There are also guideline policy statements advising that an upward departure would be appropriate in this case.  While Irey's criminal conduct was so extreme that the guideline calculations maxed out at life even without any upward departures, § 3553(a)(2)(5) still expressly requires that those policy statements be considered.  As the Presentence Report in this case noted, the comment to § 2G2.1 advises that "[a]n upward departure may be warranted if the offense involved more than 10 minors."  Id. § 2G2.1 cmt. n.6.[38]  Irey's criminal conduct involved at

---

[38] The cited comment to § 2G2.1 of the guidelines is technically not a policy statement, but the guidelines provide that it is to be treated as one.  See U.S.S.G. § 1B1.7 ("Such commentary is to be treated as the legal equivalent of a policy statement."); see also United States v. Smith, 568 F.3d 923, 927 n.1 (11th Cir. 2009) ("The commentary and application notes of the Sentencing Guidelines are authoritative, unless they are plainly erroneous, inconsistent with the regulation they interpret, or contrary to the Constitution or federal law.").

least five times more than 10 minors, yet the district court varied downward.  The guideline policy statements also call for an upward departure "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim."  Id. § 5K2.8.  Everyone agrees that what Irey did fits within that description, yet the district court varied downward.

While not binding on the district court, the policy statements in the guidelines, which it was required by the Sentencing Reform Act to consider, all advise against a sentence below the guidelines range.  The district court effectively ignored them all.[39]

### 6.  Section 3553(a)(6)

Section 3553(a) requires that district courts in sentencing, and courts of appeals in reviewing sentences, "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  This factor is a particularly important one when reviewing the substantive reasonableness of a sentence because one of the primary purposes of appellate review of sentences is to iron out differences in order to avoid undue disparity.  Booker, 543 U.S. at 264, 125 S. Ct.

---

[39] With one exception.  The district court did impose a lifetime term of supervised release, as the policy statement in U.S.S.G. § 5D1.2(b) advises for all cases where the defendant was convicted of a sex offense against a minor.

at 767.

It is difficult to find a case involving sexual abuse of children that compares

to this one.  The number of Irey's victims (at least 50), the very young age (four,

five, and six years old) of some of them, the extreme nature of the abuse and

torture that he inflicted on them, the number of years it went on (four or five), and

the massive amount of graphic child pornography that he single-handedly

produced and distributed (at least 1,200 photographs or videos showing Irey

himself sexually abusing the children) combine to make his criminal behavior the

worst of the worst.  Yet, the district court gave Irey a major downward variance,

resulting in a sentence just above the statutory minimum and more than a decade

below the guidelines range.  That sentence is seriously out of line with sentences

imposed on other defendants whose criminal behavior, while atrocious in some

cases, was not as extreme as Irey's or did not involve as many victims.  See, e.g.,

United States v. Frank, 599 F.3d 1221 (11th Cir. 2010) (40-year sentence for

defendant who had twice traveled to Cambodia, where he paid three girls who

were between the ages of approximately 11 and 15 to engage in sexual acts with

him and to take sexually explicit pictures of those acts); United States v. Culver,

598 F.3d 740 (11th Cir. 2010) (60-year sentence for defendant who fell within

criminal history category II, had used tranquilizers and a stun gun to render his

13-year-old stepdaughter unconscious, and had produced a pornographic videotape and four pictures depicting the unconscious girl); United States v. Huskey, 349 Fed. App'x 495 (11th Cir. 2009) (70-year sentence for defendant, who (like Irey) fell within criminal history category I, who engaged in anal, oral, and vaginal sex with his daughter and penetrated her vagina with objects, while she was between the ages of six and nine, recorded the abuse in photographs and videotapes, and traded images of the abuse over the internet for other child pornography);[40] Sarras, 575 F.3d 1191 (100-year sentence for the defendant, who fell within criminal history category I, who engaged in oral and vaginal sex with his 13-year-old step-daughter approximately 23 times during a 4-month period and photographed it on three of those occasions);[41] United States v. Kapordelis, 569 F.3d 1291 (11th Cir. 2009) (35-year sentence for the defendant, who fell within criminal history category I, who over a span of at least 20 years: drugged two boys, aged 11 and 14, on three occasions before photographing their genitalia; traveled abroad, where he molested and took digital videos and pictures of three minors, some of whom he had drugged, and engaged in oral and anal sex with at

---

[40] We include a number of unpublished opinions in this list, citing each one not for any holding but solely for the facts about the crime and the sentence imposed by the district court. See supra at 120 n.34.

[41] The defendant in Sarras was sentenced in the same courthouse the same year as Irey but by a different district court judge.

131

least one 17-year-old; solicited sex from male prostitutes under the age of 18 while in foreign countries; drugged his 16-year-old second cousin and then videotaped himself having sex with the minor; and possessed approximately 10,580 images and 400 videos of child pornography, some of which featured victims he had personally molested); United States v. Wilcox, 324 Fed. App'x 805 (11th Cir. 2009) (45-year sentence for the defendant, a 50-year-old diabetic with no prior criminal history, who took and posted on the internet pornographic photographs of himself touching an 11-year-old girl, attempted to gain commercially from the photographs, and possessed approximately 120 child pornography images, including a sadistic picture of a 5-year-old girl wearing a dog collar while being vaginally penetrated by an unidentified male); United States v. Harris, 291 Fed. App'x 300 (11th Cir. 2008) (30-year sentence for a defendant, who fell within criminal history category I, who filmed and photographed seven 15- and 16-year-old boys, two of whom were his godchildren, engaging in sexual acts with each other in his bedroom, shared videos and photographs depicting those occurrences with others, and on one occasion invited his friend over to watch two underage males engage in sexual activities and then filmed as his friend had sex with one of them); United States v. Carter, 292 Fed. App'x 16 (11th Cir. 2008) (45-year sentence for the defendant, with no specified

criminal history, who possessed approximately 4,800 image, text, and movie files depicting or describing the sexual exploitation, including bondage, of at least eleven different young girls, ages 7 to 14; some of those files were produced and distributed by the defendant himself and depicted him touching the genitalia of two young girls); United States v. Oliver, 281 Fed. App'x 898 (11th Cir. 2008) (130-year sentence for the defendant, with no criminal record that was mentioned, who produced images of himself molesting a single victim, his 6-year-old granddaughter, and distributed those images over the internet); United States v. Hodnett, 210 Fed. App'x 949 (11th Cir. 2006) (30-year sentence for the defendant, who fell within criminal history category I, who possessed at least 600 images of child pornography, some of which depicted prepubescent minors engaged in sexual activity, traded images of child pornography over the internet, and had in the past engaged in the following sexual activities with minors: kidnaping and raping a 6-year-old Vietnamese girl in 1969 while serving in Vietnam; molesting and engaging in sexual intercourse with his two step-daughters in the 1970s; and engaging in oral sex with a 6-year-old girl in 2004); United States v. Foster, 209 Fed. App'x 942 (11th Cir. 2006) (life imprisonment for the defendant who fell within criminal history category I, and who during a 4-year period engaged in oral and vaginal sex with a single victim who was less than

12 years old when the abuse began); United States v. Johnson, 451 F.3d 1239

(11th Cir. 2006) (140-year sentence for the defendant, who had two prior

convictions for lewd acts in front of minors, who sexually abused and

photographed three boys between the ages of 8 and 16 over an approximately 6-

year period, produced at least 150 pornographic images of the victims, transmitted

an unknown number of those images over the internet, and either possessed or

transmitted at least 24 videos of children engaging in sexually explicit conduct);

United States v. Hersh, 297 F.3d 1233 (11th Cir. 2002) (105-year sentence for the

defendant, who fell within criminal history category I, and who traveled to third

world countries during a period of 20 years and enticed at least eight boys,

between 8 and 17 years old, to engage in sex with him, encouraged them to

engage in sex with a fellow pedophile, convinced one Honduran family to allow

their minor son to live with him illegally in the United States, and possessed at

least 120 images of child pornography).

     While the criminal conduct of all the defendants in the cited cases ranges

from serious to truly depraved, none of it is worse than Irey's criminal conduct,

yet he received a sentence far more lenient than they did. The lesser sentence the

district court imposed on Irey by means of a major downward variance creates a

substantial disparity. The disparity arises not because the defendants in the cited

cases were denied a downward variance they should have received and were sentenced too harshly, but because Irey was given a downward variance he should not have received and was sentenced too leniently. The unreasonableness is not in the sentences imposed in the cited cases but in the sentence imposed in this case.[42]

### 7. What "It Comes Down To"

The district court suggested that these factors weighed in Irey's favor: he was 50 years old; his family still loved him; when he was not consorting with prostitutes in this country or raping, sodomizing, and torturing little girls in Cambodia, he was not such a bad guy; the "illness" of pedophilia rendered his criminal acts "not purely volitional"; and he was a victim of child pornography on the internet. The court discounted the value of general deterrence for sexual crimes against children. It thought that Irey would present a low risk of

---

[42] Judge Barkett's dissenting opinion argues that we cannot assess whether Irey is similarly situated to any defendant convicted of sexually abusing children "without the benefit of the entirety of the sentencing records of all [those] defendants." Dissenting Op. of Barkett, J., at 254–55 n.1. The statutory command is to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). That information can be discerned from the appellate opinion in most cases, including those that we have cited. See also Kimbrough, 552 U.S. at 108, 128 S. Ct. at 574 (holding that the statute requires consideration of sentences of other courts in order to comply with § 3553(a)(6)'s instruction that the need to avoid unwarranted sentencing disparities be taken into account). Any requirement that the record in other cases be scoured before the sentences in those cases can be considered would render it impossible to comply with the statute, and we will not interpret the statute in a way that effectively renders it a nullity, see, e.g., Hibbs v. Winn, 542 U.S. 88, 101, 124 S. Ct. 2276, 2286 (2004), and ignores what the Supreme Court has said about it.

recidivism once released and, as a result, no time above the statutory minimum was needed to protect society from him. The result the court reached created an unwarranted sentence disparity among defendants who have committed comparable or less egregious offenses involving the sexual abuse of children. Along the way to its final sentencing decision the district court, as we have explained, committed a number of subsidiary errors in judgment, but even if we disregard all of them there remains one overriding clear error in judgment that renders the downward variance sentence substantively unreasonable.

After discussing the other factors, the district court said: "It comes down to my view of what promotes respect for the law and provides just punishment." The district court was right about the importance of the § 3553(a)(2)(A) factor, which requires consideration of the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." But the court was wrong, it committed a clear error in judgment, in deciding that those purposes could be served by a major downward variance to a point closer to the statutory minimum sentence than it is to the guidelines range. The district court's leap from the advisory guidelines sentence of 30 years down to a just-above-minimum sentence of 17 ½ years does not reflect the seriousness of and provide just punishment for Irey's rape, sodomy,

136

and sexual torture of at least fifty children, acts that he committed "many many times" over a four- or five-year period, and his production and distribution of one of the worst series of child pornography on the internet.  Nor does it promote respect for the law.

For all of the reasons we have explained, no downward variance from the guidelines range is reasonable in this case.  Nothing less than the advisory guidelines sentence of 30 years, which is the maximum available, will serve the sentencing purposes set out in § 3553(a).  We are left with the definite and firm conviction that it was substantively unreasonable, a clear error in judgment, an abuse of discretion, for the district court to conclude to the contrary.  Were we to hold otherwise, "we would come perilously close to holding that appellate review is limited to procedural irregularity," and that the Supreme Court has "eviscerated appellate review at the same time that it has mandated the appellate courts to continue to review sentences for reasonableness."  Pugh, 515 F.3d at 1203–04.  That paradoxical holding would throw us back a quarter of a century into the pre-Sentencing Reform Act era, with its "non-system in which every judge is a law unto himself or herself," Frankel, Jail Sentence Reform, at E21, an era that is gone for good.

In reaching this conclusion, we are not, as Judge Tjoflat asserts, usurping

137

the district court's sentencing role.[43]   Separate Op. of Tjoflat, J., at 215–17.

Instead, we are performing our sentence review role.   Again, the Supreme Court

has instructed us that "district judges at times make mistakes that are substantive"

and "impose sentences that are unreasonable," and we "exist to correct such

mistakes when they occur."   Rita, 551 U.S. at 354, 127 S. Ct. at 2466–67.   In the

course of reviewing this sentence, we have determined that, given the extreme

facts in the case, a downward deviation from the guidelines range is not

substantively reasonable.   We have made that decision after studying the record of

the sentence proceedings, which is complete; considering the district court's

findings and explanation, which are adequate for the purpose; granting the district

court's decision the full measure of deference that it is due; and considering all of

the arguments of the parties for and against the reasonableness of the sentence.

That is what appellate courts are supposed to do.[44]

---

[43] Nor are we, as Judge Tjoflat's opinion charges, taking a step toward creating, through judicial decisions, a system of mandatory sentencing ranges "that is identical in all relevant respects to [the pre-Booker] mandatory-Guidelines sentencing range[s]."   Separate Op. of Tjoflat, J., at 229 n.98.   We are simply doing our duty, as prescribed in Rita, to review the substantive reasonableness of the sentence imposed in this case.

[44] Judge Tjoflat's separate opinion goes to great lengths to accuse us of addressing arguments that were not raised and preserved in the district court.   See Separate Op. of Tjoflat, J., at 215–16, 221–27.   Much of that opinion's analysis is based on the faulty premise that the government made only a "simple objection" that Irey's sentence is "unreasonable."   Id. at 216.   As we have already explained, however, the government has been arguing for a 30-year sentence ever since it filed the sentencing memorandum in the district court.   See supra at 13–14.   That memorandum emphasized the sheer magnitude and utter depravity of Irey's criminal conduct and urged the court to respect Congress' findings that "departures should be extremely rare in

138

———————————

child sex crime cases" because of the seriousness of those crimes. The government specifically argued that a variance would not be justified even if Irey's risk of recidivism was low, his capacity was diminished, his behavior was aberrant, his family ties and responsibilities were significant, and his decisions were clouded by his pedophilia. Indeed, the government said that "any variance under 18 U.S.C. § 3553(a) would be unreasonable because there is nothing unusual about the nature or circumstances of this offense or the defendant's personal characteristics." The government argued in its sentencing memorandum that "[i]f this case is atypical, it is because of aggravating, not mitigating, factors." And it took the same position at the sentence hearing. See supra at 27–30.

The government's objection that Irey's sentence was substantively unreasonable was sufficient to preserve the specific grounds for the objection that it had already raised in its sentencing memorandum and in its arguments during the sentence proceeding. Especially given the context of the sentence proceedings, the government did not need to regurgitate its arguments in favor of a 30-year sentence after the court had pronounced the sentence; it is enough that the government objected to the downward variance sentence as unreasonable. See United States v. Maurice, 69 F.3d 1553, 1557 (11th Cir. 1995) (holding that a general objection after the sentence was announced is sufficient to preserve supporting arguments made before it was announced where the reasons for the objection are clear); see also United States v. Candelario, 240 F.3d 1300, 1304–05 (11th Cir. 2001) (Tjoflat, J.) (citing, with approval, a circuit court decision "reviewing the defendant's sentence under preserved error review where the defendant argued in his sentencing memorandum that the amount of drugs for which he was to be sentenced had to be pleaded in the indictment and found by the jury beyond a reasonable doubt" (emphasis added) (quotation marks omitted)); see also United States v. Bartlett, 567 F.3d 901, 910 (7th Cir. 2009); United States v. Guthrie, 557 F.3d 243, 255 (6th Cir. 2009); United States v. Curry, 461 F.3d 452, 459 (4th Cir. 2006) (concluding that the government, "by vigorously arguing for a sentence within the Guidelines range throughout the sentencing hearing," had preserved its objection to the sentence even though it did not object at the end of the sentencing colloquy); United States v. Shumard, 120 F.3d 339, 340 (2d Cir. 1997).

We have specifically recognized that so long as the government raises "the crux of its objection to the district court's sentence," it is not required to articulate all the details of its position. United States v. Smith, 39 F.3d 1143, 1146 (11th Cir. 1994); see also United States v. Livesay, 484 F.3d 1324, 1327–29 & 1330 n.7 (11th Cir. 2007) (concluding that the government's objection to the extent of the downward departure also preserved an objection "to the reasonableness of the overall sentence"), vacated on other grounds, 552 U.S. 1092, 128 S. Ct. 872 (2008); United States v. Arevalo-Juarez, 464 F.3d 1246, 1249–50 (11th Cir. 2006) (stating that even though the district court did not grant a departure the government's argument that a departure was unwarranted was enough to preserve the issue of whether the sentence was otherwise unreasonable); see also United States v. Carlson, 498 F.3d 761, 763 & n.2 (8th Cir. 2007); United States v. Pineiro, 470 F.3d 200, 204–05 (5th Cir. 2006) ("We have never required a party to express its objection in minute detail or ultra-precise terms.").

139

This is one of those unusual cases where the top and bottom of the

guidelines range are the same; both are 30 years.  There can be no upward

variance because the statutory maximum is also 30 years.  As a result, our holding

that no downward variance is reasonable under the totality of the facts and

circumstances of this case means that on remand the sentence must be 30 years.[45]

There is no other sentence left.  When we vacate a district court's judgment and

remand, we routinely include in the bottom line of our decision that we are

---

On a similar point, Judge Tjoflat's opinion accuses us of implicitly overruling United States v. Jones, 899 F.2d 1097 (11th Cir. 1990), overruled on other grounds by United States v. Morrill, 984 F.2d 1136 (11th Cir. 1993) (en banc), by allowing an unexplained objection that a sentence is "substantively unreasonable" to trigger the equivalent of a new sentencing hearing on appeal.  See Separate Op. of Tjoflat, J., at 78 & n.86.  Our decision, however, is consistent with Jones and its progeny.  In United States v. Weir, 51 F.3d 1031 (11th Cir. 1995), we explained that "[i]f the relevant objection is raised after the presentation of the [pre-sentence investigation] report, . . . but before the actual imposition of the sentence, Jones is satisfied."  Id. at 1033.  Specifically, in Weir, we held that Jones was satisfied because "[t]he district court clearly understood the Government's position and specifically rejected it."  Id.  Similarly, we held in Maurice that the rationales behind Jones "are served so long as the objection to be preserved and the grounds for the objection are clear to the sentencing court at the conclusion of the hearing."  69 F.3d at 1557.  As a result, "a party is not required to reargue a general objection made after sentencing if the argument in support of that objection has previously been presented to the sentencing court and the reasons for the objection remain clear after the sentence is pronounced."  Id.  The government did enough to preserve all of the arguments in favor of a 30-year sentence here.

[45] Judge Tjoflat's separate opinion points out that in none of the other cases where we have vacated a sentence as unreasonable have we directed the district court to enter a particular sentence.  Separate Op. of Tjoflat, J., at 227–28 & n.96.  That is true, but in none of those four other cases did we have both extreme facts and circumstances rendering any downward variance unreasonable and a pinpoint guidelines range—one where the bottom and top were the same sentence.  Because this is an unprecedented situation, it adds nothing to label our decision an "unprecedented step."  Id. at 227.  Whatever we do in a situation that has never been before us is, by definition, an unprecedented step one way or the other.

sending the case back for "proceedings consistent with this opinion." Because we have determined that a downward deviation from the guidelines range in this case is unreasonable, it follows that the only action on remand that will be consistent with this opinion is resentencing within the guidelines range, which necessarily means a sentence of 30 years.[46]

## V. CONCLUSION

Because of the substantial deference district courts are due in sentencing, we give their decisions about what is reasonable wide berth and almost always let them pass. There is a difference, though, between recognizing that another usually has the right of way and abandoning one's post. We will not quit the post that we have been ordered to hold in sentencing review and the responsibility that goes with it. The Supreme Court has instructed us that "[i]n sentencing, as in other areas, district judges at times make mistakes that are substantive," and that it is our duty "to correct such mistakes when they occur." Rita, 551 U.S. at 354, 127

---

[46] Having determined that no downward variance is reasonable, it would be senseless to remand with instructions that permit the district court to downwardly vary and resentence below the guidelines range again. If the district court on remand resentenced Irey to 20 years, we would have to vacate that sentence and send the case back. If the court then tried out a sentence of 22.5 years, we would have to vacate that sentence and send the case back again. And so on, back and forth the case would go in a pointless ping pong game. To borrow Judge Tjoflat's hyperbolic language, such proceedings would "gobble[ ] up judicial resources" that could be better spent elsewhere. Separate Op. of Tjoflat, J., at 236. Doing as he suggests would prevent the first appeal from a sentence from being "the main event" for determining whether a sentence is substantively reasonable and would instead send "the unmistakable message that [the first appeal of a sentence] is nothing but a tryout on the road." Id. at 231. That would be, to use his term, "shocking." Id. at 216.

S. Ct. at 2466–67.

In this case the district court made a substantive mistake, a clear error in judgment, by unreasonably varying downward from the advisory guidelines sentence when no sentence less than it is sufficient to fulfill the purposes set forth in the Sentencing Reform Act.  To do our duty to correct that mistake, we vacate the sentence the district court imposed and remand with instructions that the defendant is to be resentenced within the guidelines range.

**VACATED AND REMANDED.**

HILL, Circuit Judge, concurring:

I concur in the opinion for the court and in the judgment reversing and remanding with instructions.

I do so in spite of the fact that I originally concurred in the now vacated panel opinion, United States v. Irey, 563 F.3d 1223(11th Cir.), vacated, 579 F.3d 1207 (11th Cir. 2009).

I should explain.

That original concurrence was based entirely on my perception of the extent of discretion due the trial judge.  The sentence was not the right one, in my opinion, but I stretched discretion to cover it.  I tend, properly I think, to be reluctant to limit the discretion of a trial judge who is closer to a case than its record can bring me.

Since our panel opinion was vacated, I have persisted in putting one question to counsel and colleagues:  "If this case does not demand the maximum sentence authorized by Congress for violation of 18 U.S.C. § 2251(c), what case would?"  No one has persuaded me that any is likely to be encountered.

That case, more aggravated than this, remained elusive.

After oral argument and the court's conference, I finally realized that I had been putting a question that has no answer because it is predicated upon the wrong

143

assumption.  It asks that this case be assumed <u>not</u> to demand the maximum sentence.  But I now realize that the elusive maximum sentence case, which I sought, was right here before me.

<u>This case is the case demanding the maximum sentence</u>.

Therefore, the sentence imposed, remarkably reduced from what the Congress authorized, does abuse discretion.  And if it does, then I would abdicate my duty should I vote to leave it intact.

So I vote to reverse.

TJOFLAT, Circuit Judge, specially concurring in part and dissenting in part:

I concur with the court's judgment that Irey's sentence must be vacated but dissent as to the instruction that the district court sentence Irey to 30 years' imprisonment. I write separately because in reaching this result, the court asks the wrong question and gives the wrong answer. Today's decision cements this circuit's approach to one of the most difficult questions posed by United States v. Booker, 543 U.S. 404, 125 S. Ct. 738 (2005): what is the proper role of the courts of appeals now that the once mandatory Guidelines are only advisory?

The court asks whether Irey's sentence achieves the purposes of 18 U.S.C. § 3553(a). After conducting its own § 3553(a) analysis, the court answers "no," then proceeds to decide what would be an appropriate sentence: 30 years' imprisonment. It orders the district court to impose this sentence on remand. It does so on the basis of new evidence and arguments that the Government never presented to the district court. In short, we have assumed the role of resentencer.

Resentencing defendants on appeal does immense harm to this court's institutional relationship with the district courts by transforming the district court's sentencing proceeding from the "main event" to a "tryout on the road." This, in turn, creates perverse incentives for the parties and the district court, misallocates judicial resources, and creates disrespect for the rule of law.

145

In my view, the right question for us to ask is whether the district court abused its discretion. The correct answer is "yes" because its factfindings as best I can understand them cannot be reconciled with the sentence it imposed. The correct disposition is to vacate and remand for resentencing. With this approach, we would preserve our traditional function as an appellate court and ensure that the district court is the forum for the main event, which is required by United States v. Booker, 543 U.S. 404, 125 S. Ct. 738 (2005).

To understand the roles Booker assigned to the district court, the Sentencing Commission, and the courts of appeals, it is necessary to see the evolution of these roles over time. This opinion is therefore organized as follows: part I describes the sentencing model before and under the Sentencing Reform Act (the "SRA")[1] before Booker, part II sets out the sentencing model after Booker, part III applies abuse of discretion review to the case at bar, and part IV surveys the court's approach and resulting institutional harm. Part V concludes.

### I. Pre-Booker

### A. Pre-SRA

Understanding the sentencing model I apply today requires understanding the deeply rooted purposes of sentencing and their evolution in American criminal

---

[1] Sentencing Reform Act of 1984, Pub. L. No. 88-473, 98 Stat. 1987 (codified, as amended, in scattered sections of 18 and 28 U.S.C.).

law.

> Prior to the American Revolution, colonial courts fashioned sentences with three basic purposes in mind: to punish the offender for his crime, thereby satisfying society's desire for retribution ("punishment"); to deter others from committing the same crime by demonstrating its disadvantageous consequences ("general deterrence"); and to incapacitate the wrongdoer, so as to protect society from further criminal activity ("specific deterrence" or "incapacitation").

United States v. Scroggins, 880 F.2d 1204, 1206 (11th Cir. 1989).  In the 1800s, penological experts became "dissatisfied with the failure of prisons to rehabilitate inmates," and rehabilitation became a fourth basic purpose of sentencing.  See Arthur W. Campbell, The Law of Sentencing § 1:2 (2009).  The American tradition thus embraced four purposes of sentencing—punishment, general deterrence, specific deterrence, and rehabilitation;[2] this tradition has continued to the present day.

An early model of sentencing that combined these four purposes was the "medical model," so named because penological experts believed that proper measures taken during imprisonment could "cure" offenders, allowing them to reenter society as productive members.  Accordingly, rehabilitation received more weight than the other three purposes of sentencing under the medical model.  Under the medical model, sentencing responsibilities were divided between the

---

[2] See United States v. Brown, 381 U.S. 437, 458, 85 S. Ct. 1707, 1720 (1965).

147

district court and the Parole Board.[3]  District courts imposed indeterminate

sentences that were monitored by a Parole Board, meaning that a judge would

impose a sentence that had a minimum term of confinement and a maximum term

of confinement, but "allow[ed for] the possibility of release sometime between the

expiration of those terms[, with] the date and conditions of release before the

maximum term" determined by the Parole Board.[4]  Campbell, supra, § 4:2.

District courts fashioned the minimum and maximum bounds of the

sentence in accordance with the four traditional purposes of sentencing.  They

could consider all facts they thought were relevant to these purposes,

"conduct[ing] an inquiry broad in scope, largely unlimited either as to the kind of

information . . . or the source from which it [could] come." United States v.

Tucker, 404 U.S. 443, 446, 92 S. Ct. 589, 591 (1972).[5]  Because they could

---

[3]  The system started with the U.S. Board of Parole.  It was redesignated the U.S. Parole Commission by the Parole Commission and Reorganization Act of 1976, Pub. L. No. 94-233, § 4202, 90 Stat. 219, 219 (1976).  For convenience, I refer to the Parole Commission as the Parole Board.

[4]  The Parole Board "monitor[ed] the offender's rehabilitative progress.  When it decide[d] that the offender [was] fully rehabilitated, the board release[d] the offender on parole.  Thus, rehabilitation [was] the dominant goal of the medical model; punishment, general deterrence, and incapacitation [were] achieved only incidentally to the offender's rehabilitative incarceration." United States v. Scroggins, 880 F.2d 1204, 1207 (11th Cir. 1989).  For more on the model, see id. at 1207 n.7 (detailing the variety of sentencing options available to the district court).

[5]  For example, a court could consider the manner in which the offender committed the crime, which included any circumstances that aggravated or mitigated the offender's criminal blameworthiness, because the manner was relevant to the purpose of punishment.  Likewise, it could consider aspects of the defendant's background because they were relevant to specific

148

consider a broad array of facts, they enjoyed "wide discretion in determining what sentence to impose." Id.[6]

Although the district court set the bounds of the sentence, the Parole Board was given

> discretion to determine when a prisoner ha[d] reached that point in his rehabilitation process at which he should be released under supervision to begin his readjustment to life in the community. By [the district court's] keeping the minimum low, the prisoner [was] encouraged "to earn favorable consideration for parole in accord with the public policy embodied in the parole statutes."[7]

Garafola v. Benson, 505 F.2d 1212, 1217 (7th Cir. 1974) (internal citations omitted). The Parole Board therefore determined how much of the sentence would be served beyond the minimum term. Thus, although the Parole Board could not review the parameters the district court set on the offender's sentence, it could re-sentence the offender within the parameters. Because the parameters were often wide—the district court could not accurately predict how long the offender would need for rehabilitation, the model's driving factor—the Parole

_____

deterrence and rehabilitation.

[6] See also Wasman v. United States, 468 U.S. 559, 563, 104 S. Ct. 3217, 3220 (1984) ("It is now well established that a judge or other sentencing authority is to be accorded very wide discretion in determining an appropriate sentence.").

[7] See also Morrissey v. Brewer, 408 U.S. 471, 477–478, 92 S. Ct. 2593, 2598 (1972) (explaining that the purpose of releasing offenders on parole was "to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed").

Board was a powerful actor in the medical model.

The courts of appeals, on the other hand, had virtually no role under the medical model. So long as the sentence was within statutory limits, it "was, for all practical purposes, not reviewable on appeal." <u>Koon v. United States</u>, 518 U.S. 81, 96, 116 S. Ct. 2035, 2045 (1996).[8] Because sentences were not subject to appellate review, judges rarely explained the reasoning behind the sentences imposed, and there is little direct evidence from the pre-SRA era of how judges made sentencing decisions. Marc Miller, <u>Purposes at Sentencing</u>, 66 S. Cal. L. Rev. 413, 451–52 (1992). So while a judge sentencing an offender to prison implied that imprisonment was needed for punishment, general and specific deterrence, and rehabilitation, there was little evidence of the relative weights the judge assigned to those purposes.

Therefore, prior to the SRA, district judges had wide discretion in imposing sentences, but the Parole Board ultimately had control over how much of the sentence would be served. The courts of appeals played a very limited role.

### B. SRA

---

[8] Prior to the SRA, Fed. R. Crim. P. 35(a) allowed the "court to correct an illegal sentence at any time." An illegal sentence was not "within the limitations set forth in the statute under which it [was] imposed." <u>Dorszynski v. United States</u>, 418 U.S. 424, 431, 94 S. Ct. 3042, 3047 (1974).

By the 1970s, the medical model was falling out of favor.[9]  Congress had

come to reject the medical model's core premise—that prison sentences could

rehabilitate offenders—as well as its unfair results.  Offenders who committed the

same crime served wildly different sentences because of the district courts'

unfettered discretion and because the Parole Board determined how much of a

sentence would actually be served.[10]  See S. Rep. No. 98-225, at 38 (1984),

reprinted in 1984 U.S.C.C.A.N. 3182, 3221.

To address the vices of the medical model—mainly unwarranted sentencing

disparity—Congress enacted the SRA, which codified the traditional purposes of

sentencing as the

> need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner.

18 U.S.C. § 3553(a)(2).[11]  These factors mapped onto punishment, general

---

[9] See Michael Vitiello, Reconsidering Rehabilitation, 65 Tul. L. Rev. 1011, 1018–26 (1991), for an explanation of some of the critiques of the medical model in the 1970s.

[10] This was especially unfair because the length of the sentences offenders served, based on the Parole Board's release decisions, did not correlate with their likelihood to recidivate.

[11] By codifying these purposes, Congress defined the factors relevant to the traditional purposes of sentencing in ways that sometimes differed from the common law.  Whereas

deterrence, specific deterrence, and rehabilitation, respectively.  Unlike under the

medical model, however, rehabilitation was no longer the dominant concern; in

fact, while rehabilitation could be a relevant factor in sentencing, it could not

drive a prison sentence.  18 U.S.C. § 3582(a) (directing that the court, when

considering a prison sentence, recognize that "imprisonment is not an appropriate

means of promoting correction and rehabilitation").  Congress feared that

allowing the district court to fashion a sentence based on these purposes in each

individual case would perpetuate the unwarranted sentencing disparity that

plagued the medical model.  Congress therefore created the United States

Sentencing Commission (the "Commission") and tasked it with devising

sentencing guidelines that would dictate offenders' sentences.

   The new model had three main goals: (1) honesty, (2) fairness, and (3)

proportionality.  See United States Sentencing Commission, Guidelines Manual, §

1A1.1(3) (Nov. 1, 2009) (hereinafter "U.S.S.G."); United States v. Booker, 543

U.S. 220, 264, 125 S. Ct. 738, 767 (2005).[12]  To achieve honesty, Congress

---

punishment historically was driven by retribution, see Scroggins, 880 F.2d at 1206, 18 U.S.C. § 3553(a)(2)(A) defined it as encompassing the above considerations.

   [12] Because, prior to the SRA, the sentence the judge imposed was not the sentence the offender served, neither the public nor the offender perceived the judge's sentence as "honest." See Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest, 17 Hofstra L. Rev. 1, 4 (1988); see also U.S.S.G. Ch.1, Pt.A, intr. comment. Furthermore, because of "the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders," sentences were not "fair." U.S.S.G. Ch.1, Pt.A, intr. comment. Lastly, because the system did not "impose[] appropriately different sentences for criminal

abolished parole and replaced indeterminate with determinate sentencing.  Judges

sentenced offenders to fixed terms and offenders served the full prison sentence

imposed.[13]  To achieve fairness, Congress severely curtailed the district court's

discretion to fashion a sentence by requiring that, in typical cases, the court

impose a sentence within the range identified by sentencing guidelines.  To

achieve proportionality, Congress replaced the theory that sentences should be

imposed primarily to rehabilitate offenders with the theory that sentences should

be no harsher than necessary to serve the four traditional purposes of sentencing.

The Sentencing Commission's Guidelines and the courts' role in sentencing were

to reflect these goals.

   The rest of this subpart explains how the SRA divided the roles in

sentencing between the Commission, the district courts, and the courts of appeals,

respectively.

---

conduct of differing severity," sentences were not "proportional."  Id.

   [13] An offender could still serve less than the full sentence, however, if awarded credit for
satisfactory behavior while incarcerated.  18 U.S.C. § 3624(b) provides:

> a prisoner who is serving a term of imprisonment of more than 1 year other than a
> term of imprisonment for the duration of the prisoner's life, may receive credit
> toward the service of the prisoner's sentence, beyond the time served, of up to 54
> days at the end of each year of the prisoner's term of imprisonment, beginning at
> the end of the first year of the term, subject to determination by the Bureau of
> Prisons that, during that year, the prisoner has displayed exemplary compliance
> with institutional disciplinary regulations.

Hence, offenders served the sentence imposed less good time.

### 1. The Sentencing Commission's Role

The SRA charged the Commission with designing guidelines that would direct the district courts how to fashion sentences to fulfill § 3553(a)(2)'s sentencing purposes in a way that ensured honesty, proportionality, and fairness. See 28 U.S.C. § 991(b)(1); id. § 994(f). Assembled in a Guidelines manual, the Guidelines resembled a computer program. To impose a sentence, all a district judge had to do was to input information requested by the manual and the manual would generate a sentencing range.

Every sentence had an offense- and an offender-based component. United States v. Mogel, 956 F.2d 1555, 1558 (11th Cir. 1992); see 28 U.S.C. § 994(b) (instructing that the Commission "establish a sentencing range" for "each category of offense involving each category of defendant"). The offense-based component correlated mostly to the sentencing purposes of punishment and general deterrence; the offender-based component correlated mostly to the purposes of specific deterrence and rehabilitation. See Mogel, 956 F.2d at 1559. The district court found the sentence it was to impose by consulting a table in the Guidelines manual: the table's Y axis specified offense levels; its X axis specified categories of offenders. See U.S.S.G. § 1B1.1; id. Ch.5, Pt.A ("Sentencing Table") The table listed an appropriate sentencing range for each combination of offense level

and category of offender.

### a. The Offense Level

Roughly speaking, the offense level was the Guidelines' proxy for the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(A)–(B).  See Scroggins, 880 F.2d at 1208.  As an initial matter, the Commission had to determine what type of conduct would factor into the offense level, namely

> whether to base sentences upon the actual conduct in which the defendant engaged regardless of the charges for which he was indicted or convicted ("real offense" sentencing), or upon the conduct that constitutes the elements of the offense for which the defendant was charged and of which he was convicted ("charge offense" sentencing).

U.S.S.G. § 1A1.1 (initial policy statement).[14]

It settled on a hybrid approach, devising an offense level with three components: (1) a "base offense level," (2) "specific offense characteristics," and

---

[14] The Commission explained the differences between a real offense and charged offense sentencing model:

> A bank robber, for example, might have used a gun, frightened bystanders, taken $50,000, injured a teller, refused to stop when ordered, and raced away damaging property during his escape.  A pure real offense system would sentence on the basis of all identifiable conduct.  A pure charge offense system would overlook some of the harms that did not constitute statutory elements of the offenses of which the defendant was convicted.

U.S.S.G. § 1A1.4(a).

(3) "adjustments." <u>Scroggins</u>, 880 F.2d at 1209–10.[15] The base offense level reflected the charged conduct. Rather than draft a guideline for each offense in the United States Code, the Guidelines grouped offenses and specified an offense level that reflected the average seriousness of the group.[16] <u>Id.</u> at 1209. The specific offense characteristics were tailored to each category of offense[17] and captured some of the offender's real conduct in committing the offense of conviction. The adjustments applied to all offenses regardless of their category. Some but not all of the adjustments related to the charged offense. <u>Id.</u> at 1209–10.[18]

---

[15] The jury found or the guilty plea established the charged offense conduct, and the district court found the facts relevant to the specific offense characteristics or the adjustments. <u>See</u> <u>infra</u> note 24.

[16] As instructed by 28 U.S.C. § 994(b), the Commission classified each federal crime according to its severity, then placed it together with the crimes similarly classified in a "category of offenses." Because all of the crimes in a category were of like severity, all had the same base offense level. For example, the base offense level for approximately 130 different theft offenses in the United States Code is the same, established by U.S.S.G. § 2B1.1 (Larceny, Embezzlement and Other Forms of Theft).

[17] The specific characteristics for robbery, for example, include whether property was taken from a financial institution or post office, whether and how a firearm was used, whether people were injured, whether a carjacking occurred, and the dollar value of the loss. U.S.S.G. § 2B3.1.

[18] The Commission rejected a pure charge offense system because it could have achieved only unfair uniformity: it would have treated unlike offenders alike given that the criminal code is not written to take account of the manner in which the offenses are committed. <u>See</u> Stephen Breyer, <u>supra</u> note 12 at 9–10. The Commission rejected a pure real offense system—a system that would have considered all possible real conduct, not only selected specific offense characteristics or adjustments—because it would have been administratively unwieldy: innumerable factual permutations might have a bearing on the need for punishment and general deterrence. <u>Id.</u> at 10–12. The hybrid model was a compromise to avoid the primary pitfalls of

## b. The Offender Characteristics

The category of offender was the Commission's proxy primarily of the need for the sentence "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C); see also Mogel, 956 F.2d at 1558–59. The Commission categorized offenders almost exclusively by criminal history as determined by prior convictions.[19] See U.S.S.G. § 4A1.1; see also Mogel 956 F.2d at 1560 (noting that the "offender-based component almost entirely relies on the offender's criminal history"). The Commission settled on criminal history because it was a workable way to achieve sentencing uniformity. See Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest, 17 Hofstra L. Rev. 1, 19–20 (1988). Criminal history based on convictions could be neatly categorized and taken into account by the Guidelines matrix. The myriad other factors that might help predict recidivism were difficult to categorize and even more difficult to quantify—age, for example, might cut differently in different cases—and including them would make the sentencing

both.

[19] The Guidelines did allow for a departure if "reliable information indicates that the defendant's criminal history category substantially [over- or] under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3.

table unworkable.[20]  See id.

## 2. The District Court's Role

### a. The Statutory Considerations

The SRA tasked the district courts with sentencing individual offenders in accordance with several statutory factors, but, at the same time, eliminated most of the district court's discretion in carrying out that task.  In nearly all cases, the court's job was ministerial, to follow the Commission's instructions.  The scheme played out this way.

The district courts were required to sentence pursuant to 18 U.S.C. § 3553. Section 3553(a) directed the courts to tailor their sentences to the particular circumstances of the offense and the offender consistent with what I refer to as the parsimony[21] principle: a sentence must be "sufficient, but not greater than necessary" to achieve the four traditional purposes of sentencing.  (emphasis

---

[20]  In so focusing, the Commission ignored a number of factors that Congress had suggested and the Commission had conceded were relevant to predicting recidivism.  See U.S.S.G. Ch.4, Pt.A, intr. comment (recognizing that "empirical research has shown that other factors are correlated highly with the likelihood of recidivism, e.g., age and drug abuse, [but] for policy reasons they were not included here at this time").  Other factors disregarded included education, vocational skills, employment record, and family ties and responsibilities.  See 28 U.S.C. § 994(d).

[21]  "Parsimony" is defined as "economy in the use of means to an end."  Merriam-Webster's Collegiate Dictionary 846 (10th ed. 1999).  In this context, parsimony translates to using the least harsh sentence (the means) needed to satisfy the traditional purposes of sentencing (the end).  Although the court quibbles with the label "parsimony principle," it does not disagree with the underlying concept.

158

added).[22]  Section 3353(b)(1), however, instructed that "the court shall impose a

sentence of the kind, and within the range" prescribed by the Guidelines, unless

"there exist[ed] an aggravating or mitigating circumstance of a kind, or to a

degree, not adequately taken into consideration by the Sentencing Commission in

formulating the guidelines" or there was no "applicable sentencing guideline."  18

U.S.C. § 3553(b)(1).  "In the absence of an applicable sentencing guideline, the

court [had to] impose an appropriate sentence, having due regard for the purposes

set forth in subsection (a)(2)"—the four traditional purposes of sentencing.  Id.

The court also had to consider "sentences prescribed by guidelines applicable to

similar offenses and offenders" and "the applicable policy statements of the

Sentencing Commission."  Id.

Because the district court was obligated to follow the Guidelines in all but

the rarest cases, the district court only followed the parsimony principle to the

extent that the Commission did in creating the Guidelines.  Congress instructed

the Commission to establish sentencing guidelines to meet the § 3553(a)(2)

purposes, but did not mention the parsimony principle that appears in § 3553(a).

---

[22]  In fashioning a sentence, the district courts were to take account of other factors,
including: (1) the nature and circumstances of the offense and the history and characteristics of
the offender, (2) the kinds of sentences available, (3) the Commission's guidelines and policy
statements, (4) the need to avoid unwarranted disparity, and (5) the need to provide restitution.
18 U.S.C. § 3553(a).

See 28 U.S.C. § 991(b)(1)(A).[23]  It is thus not clear that the Guidelines took into account the parsimony principle, and the way they operated frequently created tension with the parsimony principle.

In sum, while Congress instructed district judges to consider the § 3553(a)(2) purposes, district judges—to ensure uniformity—almost always had to impose Guidelines sentences.  They only conducted an independent analysis of the 3553(a)(2) purposes and parsimony principle in the rare event that aggravating or mitigating circumstances existed or no guideline applied.

### b. The Sentencing Proceeding

Under the SRA, district courts fashioned sentences using an adversary process, in which "a confrontation between the parties [occurred] similar to that which occurs at a civil bench trial."  United States v. Scroggins, 880 F.2d 1204, 1209 (11th Cir. 1989).  The process began with a pretrial investigation conducted by the court's probation officer and the issuance of a presentence investigation report ("PSI").  Id. at 1209 n.11.  The PSI identified the guidelines applicable to the offense of conviction, recited the facts related to the base offense level, the

---

[23]  Compare 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.") with 28 U.S.C. § 991(b) ("The purposes of the United States Sentencing Commission are to (1) establish sentencing policies and practices for the Federal criminal justice system that (A) assure the meeting of the purposes of sentencing as set forth in section [18 U.S.C. §] 3553(a)(2).").

specific offense characteristics and adjustments, determined the offense level, and,

after reciting the defendant's criminal history, determined the defendant's criminal

history category.  The PSI then specified the sentencing range for the offense and

the kinds of sentences available.  See 18 U.S.C. § 3552; Fed. R. Crim. P.

32(c)–(d); Scroggins, 880 F.2d at 1209 & n.11.  After considering the parties'

objections to the PSI's factual recitations and Guidelines determinations, the

probation officer summarized any unresolved objections in an addendum to the

PSI.  Scroggins, 880 F.2d at 1209 & n.11.  The PSI thus "serve[d] the purpose of a

pretrial stipulation in a civil case."  Id.  The addendum framed the issues to be

litigated at the sentencing hearing.

    The sentencing hearing followed.  There, the district court resolved any

remaining factual and legal issues regarding the correct application of the

Guidelines.  See Scroggins, 880 F.2d at 1209, 1211 & n.18.  Determining the

circumstances of the offense and the offender's criminal history presented factual

questions; the correct application of the Guidelines to those facts[24] presented

---

[24] Because the jury conviction or the guilty plea established the charged offense conduct
(the base offense level) and the defendant's criminal history would have been established (in
most cases) as a matter of record, the district judge was responsible for making findings related
to specific offense characteristics and adjustments.  The government bore the burden of proving
by a preponderance of the evidence any specific offense characteristics and adjustments (not
established via jury verdict or guilty plea) that would enhance the defendant's offense level, and
any facts that would support an increase of the defendant's category of offender.  The defendant
bore the same burden regarding adjustments that would reduce the offense level or the category
of offender.  United States v. Wilson, 884 F.2d 1355, 1356 (11th Cir. 1989).

mixed questions. After hearing from the parties, the district court announced and

"state[d] in open court the reasons for its imposition of the particular sentence."

18 U.S.C. § 3553(c). If the court imposed a within-Guidelines sentence and the

Guidelines range exceeded 24 months, the court had to also state "the reasons for

imposing a sentence at a particular point within the range." Id. § 3553(c)(1). In

the rare event that the court imposed a sentence "not of the kind, or . . . outside the

[Guidelines] range," it had to state its reasons for doing so with specificity in a

written order. Id. § 3553(c)(2).

Following its imposition of the sentence, the district court had to give the

parties a chance to object to its findings of fact, its Guidelines applications or

other legal rulings, or the manner in which the sentence was imposed. United

States v. Jones, 899 F.2d 1097, 1102 (11th Cir. 1990), overruled on other grounds

by United States v. Morrill, 984 F.2d 1136 (11th Cir. 1993) (en banc).

Entertaining an objection at this stage of the proceeding gave the district court an

opportunity to address the objection and correct any error it may have made.[25]

---

[25] Allowing an objection to be made for the first time on appeal would give the objecting
party an opportunity to blind side the district court's sentencing decision. The Jones objection
rule precluded this and enabled the court of appeals to treat objections that could have been
made but were not as waived.
    The Jones "raise it or waive it" rule applied unless a party could demonstrate plain error,
Jones, 899 F.2d at 1103, or the record disclosed that the district court was clearly aware of the
objection in time to address it. See United States v. Weir, 51 F.3d 1031, 1033 (11th Cir. 1995)
(declining to apply the waiver rule when the district court "clearly understood the [party's]
position and specifically rejected it").

### 3. The Court of Appeal's Role

Lastly, Congress tasked the courts of appeals with policing the system by creating substantive grounds for appeal. In addition to the right to appeal an "illegal" sentence, which had existed under the medical model, Congress created three new grounds for appeal, see 18 U.S.C. § 3742, to assure that the district court correctly applied the Guidelines. The first of these grounds was that the sentence was the result of an "incorrect application" of the Guidelines. Id. § 3742(a)(2), (b)(2).[26] The second was that the sentence was "greater" or "less" than the Guidelines sentencing range. Id. § 3742(a)(3), (b)(3).[27] The third was that the sentence was imposed for an offense for which no guideline existed and was "plainly unreasonable." Id. § 3742(a)(4), (b)(4).[28]

\* \* \*

In sum, the SRA structurally divided responsibility for sentencing among

---

[26] A district judge's determination of where to sentence a defendant within a correctly calculated Guidelines range, however, could not be appealed. United States v. Medina, 90 F.3d 459, 465 n.8 (11th Cir. 1996) ("The district court has the discretion to impose any sentence within the guideline range.").

[27] If the district court rejected a party's request for a sentence greater or less than the Guidelines sentencing range, the sentence was unreviewable unless the court erroneously believed it lacked the authority to depart from the sentencing range. See, e.g., United States v. Rudisill, 187 F.3d 1260, 1265 (11th Cir. 1999); United States v. Fossett, 881 F.2d 976, 979–80 (11th Cir. 1989).

[28] When no guideline existed, the findings of fact underpinning the sentence were reviewed for clear error. See 18 U.S.C. § 3742(e). Guidelines applications were reviewed de novo. See, e.g., United States v. Auguste, 392 F.3d 1266, 1267 (11th Cir. 2004).

163

three entities: the Commission, the district courts, and the courts of appeals.  The Commission promulgated the mandatory Guidelines, which were the lynchpin of the SRA.  The Guidelines created sentences by considering offense and offender characteristics.  In addition to a base offense level reflecting the charged offense conduct, the offense characteristics incorporated specific offense characteristics and more general adjustments, meaning that offenders were sentenced partly on the basis of uncharged conduct.  The offender characteristic was based entirely on the offender's criminal history.

The district courts were statutorily charged with sentencing offenders consistent with the traditional purposes of sentencing and the parsimony principle. In nearly all cases, though, the district courts were required to impose a Guidelines sentence.  Therefore, the district court rarely had to conduct an independent analysis of the four purposes driving sentencing—the Sentencing Commission had already done this work for them in devising the mandatory Guidelines.  Likewise, the courts rarely had to grapple with the parsimony principle.  In all, the district courts exercised very little discretion other than determining where within the applicable Guidelines range to sentence the offender.  The courts of appeals' role was to ensure that the Guidelines were followed.

## II. The Post-SRA Model

### A. United States v. Booker

In <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738 (2005), a fractured

Supreme Court radically reformed and rearranged the roles the SRA had assigned

the district courts, the Commission, and the courts of appeals.  At issue in <u>Booker</u>

was whether the SRA's mandatory Guidelines violated the Sixth Amendment.

The Supreme Court held they did and reaffirmed that "[a]ny fact (other than a

prior conviction) which is necessary to support a sentence exceeding the

maximum authorized by the facts established by a plea of guilty or a jury verdict

must be admitted by the defendant or proved to a jury beyond a reasonable

doubt."[29]  <u>Id.</u> at 244, 125 S. Ct. at 756.  Because the Guidelines sentencing range

---

[29]  The court defined the statutory maximum as the "'maximum sentence a judge may
impose <u>solely on the basis of the facts reflected in the jury verdict or admitted by the
defendant.</u>'"  <u>United States v. Booker</u>, 543 U.S. 220, 232, 125 S. Ct. 738, 749 (2005) (quoting
<u>Blakely v. Washington</u>, 542 U.S. 296, 303, 124 S. Ct. 2531, 2537 (2004)).  "In other words, the
relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding
additional facts [beyond those found by the jury], but the maximum he may impose <u>without</u> any
additional findings."  <u>Blakely</u>, 542 U.S. at 303–04, 124 S. Ct. at 2537.
    Although the Guidelines range fell between the statutory minimum and maximum, the
requirement that the judge in most cases impose a Guidelines sentence posed a constitutional
problem.  Prior to the SRA, the jury found beyond a reasonable doubt that the offender had
committed the charged offense conduct.  This finding exposed the offender to any sentence
within the full statutory range.  Because the jury found the charged offense conduct beyond a
reasonable doubt, this sentencing model posed no constitutional problem.
    Under the SRA, the jury still made findings beyond a reasonable doubt as to the charged
offense conduct.  If the sentencing record contained only the jury's findings regarding the
charged offense conduct, the maximum sentence the offender could receive under the statute
would be the sentence called for by the base offense level plus only those specific offense
characteristics and adjustments supported by the jury's findings (plus any increase based on the
offender's criminal history).  But the SRA allowed the judge to make additional factual

165

was often determined by facts established by the district court by a mere preponderance of the evidence, the mandatory Guidelines violated the Sixth Amendment. Id. at 232–34, 244, 125 S. Ct. at 749–50, 756.

To solve this Sixth Amendment problem, the Court discussed two possible remedies: (1) transform the Guidelines from mandatory to advisory,[30] or (2) require that every fact that would determine the Guidelines range be admitted by the defendant or proved to a jury beyond a reasonable doubt. Citing administrative concerns, the Booker remedial majority[31] opted for the first choice.

Accordingly, the Supreme Court severed and excised two provisions of the SRA. First, the Court struck 18 U.S.C. § 3553(b)(1), which had mandated the

---

findings—to support specific offense characteristics and adjustments beyond those supported by the jury's findings—that would increase the offender's sentence beyond the maximum sentence he could receive based solely on the jury's findings. Thus, the SRA violated the Sixth Amendment because the judge's factual findings would permit a sentence beyond the maximum sentence that would be allowed by statute based on the facts found by the jury.

[30] The Supreme Court recognized that there would be no Sixth Amendment problem if the Guidelines "could be read as merely advisory provisions." Booker, 543 U.S. at 233, 125 S. Ct. at 750. The SRA allowed for departure from the Guidelines in rare circumstances, but that did not render the Guidelines advisory. Id. at 234, 125 S. Ct. at 750. The clear import of this reasoning is that the Booker problem could be cured (and ultimately was cured) by transforming the Guidelines into recommendations, but the Guidelines had to be genuinely advisory. See Gall v. United States, 552 U.S. 38, 47, 128 S. Ct. 586, 595 (2007) ("We reject, however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range.").

[31] Two different opinions in Booker garnered a five-vote majority. The first opinion, often called the "Constitutional opinion," held that portions of the SRA violated the Sixth Amendment. The second opinion, called the "remedial opinion," remedied the Constitutional problem by excising parts of the SRA.

166

imposition of a Guidelines sentence. 543 U.S. at 259, 125 S. Ct. at 764. Second, the Court struck 18 U.S.C. § 3742(e), which set out standards of appellate review, because it contained "critical cross-references" to § 3553(b). Id. at 260–61, 125 S. Ct. at 765. To fill the gap, the Court held that the statute "impli[ed]" that sentences should be "review[ed] for 'unreasonable[ness]'" Id. (citing 18 U.S.C. § 3742(e)(3)) (final alteration in original).[32] The Court later clarified that "review for unreasonableness" meant review for abuse of discretion. Gall, 552 U.S. at 46, 128 S. Ct. at 594. Aside from these changes, the Court left the remainder of the SRA intact, concluding that it functioned independently. Booker, 543 U.S. at 259, 125 S. Ct. at 764.

Booker redistributed the roles in sentencing offenders between the Commission, the district courts, and the courts of appeals. The Commission no longer framed the district courts' sentencing discretion with mandatory guidelines; instead, it would inform the district courts' sentencing discretion with advisory

---

[32] The Court explained:

[A]s we have previously held, a statute that does not explicitly set forth a standard of review may nonetheless do so implicitly. . . . [I]n this instance . . . the past two decades of appellate practice in cases involving departures[] imply a practical standard of review already familiar to appellate courts: review for "unreasonable[ness]."

Booker, 543 U.S. at 260–61, 125 S. Ct. at 765 (citing 18 U.S.C. § 3742(e)(3)) (final alteration in original).

guidelines.[33]  The district courts once again bore the responsibility of

independently crafting sentences.  See United States v. Rodriguez, 406 F.3d 1261,

1287–89 (11th Cir. 2005) (Tjoflat, J., dissenting from the denial of rehearing en

banc).  Thus, § 3553(a), which embodies the parsimony principle and the four

traditional purposes of sentencing, moved to the forefront,  providing the bases for

the construction of a sentence.  The courts of appeals bore the responsibility of

reviewing the district courts' sentences, but under the abuse of discretion standard

of review.  Such review, it was thought, would preserve some of the uniformity in

sentencing the SRA sought to achieve.

   Because the primary responsibility for sentencing post-Booker lies with the

district courts, I explain what fashioning a sentence in accordance with § 3553(a)

involves, how the sentencing hearing should be conducted, and the explanation

the district courts must give for the sentences they impose.  Only then can the

abuse of discretion standard of appellate review be meaningfully discussed.

<h3 style="text-align:center">B. The Key Inquiry—§ 3553(a)</h3>

---

   [33] Except for Booker's requirement that the district courts consider the Guidelines in
exercising their sentencing discretion, post-Booker sentencing resembles the sentencing the
district court performed pre-Booker in imposing a sentence for an offense for which no guideline
existed.  When no guideline existed, the court had to "hav[e] due regard" for "the purposes set
forth in [§ 3553](a)(2)[,] . . . sentences prescribed by guidelines applicable to similar offenses
and offenders, and [] the applicable policy statements of the Sentencing Commission." 18
U.S.C. § 3553(b)(1).  In that situation, the district court was in effect doing the Commission's
work; because the court was not constrained by an offense category, it had to make an
individualized sentencing determination.

168

Section 3553(a) sets out seven factors that a district court must "consider"

before imposing a sentence.[34]   At the end of the day, however, the statute requires

---

[34] 18 U.S.C. § 3553(a) provides:

(a) Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed—

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established for—

        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

            (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

            (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

        (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

    (5) any pertinent policy statement—

        (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress

169