the district court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)."  18 U.S.C. § 3553(a). Thus, although all of the sentencing factors identified in § 3553(a) must be considered, the heart of the inquiry is the district court's assessment of the four traditional purposes of sentencing § 3553(a)(2) has codified.

The first purpose, § 3553(a)(2)(A), requires the sentence be "sufficient, but not greater than necessary" to satisfy the need for punishment.  Section 3553(a)(2)(A) actually involves three inquiries that exist in a dynamic relationship: the sentence must "reflect the seriousness of the offense, []promote respect for the law, and [] provide just punishment for the offense."[35]  Section

---

(regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

[35] Seriousness of the offense is easily understood.  Promoting respect for the rule of law turns on perception of the punishment; respect for the rule of the law may be compromised if the offender or community believes that an offender's punishment was too harsh or lenient based on the facts of the case or if it leads to unwarranted sentencing disparity.  Just punishment takes into account the offender's culpability.
    Evidence will be relevant to the (a)(2)(A) inquiry to the extent that it is relevant to any of these inquiries.  Importantly, the first and third inquiries are specific to "the offense." Moreover, the "offense" is the offense of conviction; therefore on these inquiries, the district court cannot consider conduct that does not bear on the offense of conviction, such as uncharged or unproven conduct.
    Sometimes, all three factors militate in favor of a strong need for punishment: for example, severe punishment may be just for a serious offense, and any failure to impose such

3553(a)(2)(B) focuses on the need for general deterrence—"the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." The need for general deterrence involves an assessment of the seriousness of the offense and its relative incidence in the community. Section 3553(a)(2)(C) asks what sentence is needed to "protect the public from further crimes of the defendant." The basic task is to predict the likelihood that the offender will commit further offenses, assess the potential seriousness of those offenses, and determine the need to incapacitate the offender as a prophylactic measure. Finally, § 3553(a)(2)(D) focuses on the need for the sentence to rehabilitate the offender—"to provide . . . needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Ordinarily, rehabilitation will play no role in determining the sentence. See 18 U.S.C. § 3582(a).[36]

---

punishment could engender disrespect for the rule of law.  Sometimes, the factors will be in tension: although a serious offense was committed, circumstances (such as the offender's motivation) may call for less punishment, and imposing a sentence without taking account of those circumstances may engender disrespect for the rule of law.

[36] "[I]mprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a); see also United States v. Shortt, 485 F.3d 243, 249 (4th Cir. 2007) ("Although still relevant, the fourth purpose, rehabilitation, was recognized by Congress and the Sentencing Commission to be insufficient, standing on its own, to justify a particular sentence."). Rehabilitation is clearly relevant, however, when sentencing an offender to a term of probation or supervised release. See, e.g., S. Rep. No. 98-225, at 76 ("Rehabilitation is a particularly important consideration in formulating conditions for persons placed on probation."). All of the (a)(2) factors are relevant to determining the conditions of probation or supervised release—probation and supervised release can certainly have punitive and deterrent

At first blush, it seems odd that Congress required consideration of seven factors but ultimately directed the district courts to impose sentences sufficient but not greater than necessary to comply with just one: § 3553(a)(2).  On further examination, however, it is apparent that all of the other factors inform the analysis of the four purposes of sentencing.  Section 3553(a)(1) requires consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant."  These considerations are directly relevant to all four purposes.  Section 3553(a)(3) requires consideration of the "kinds of sentences available," which is crucial to any determination of what sentence would be no harsher than necessary to punish or deter.  Sections 3553(a)(4), (5) and (6) require consideration of the Guidelines sentencing range, the Commission's policy statements, and the need to avoid unwarranted disparity, respectively.  Unwarranted sentencing disparity breeds disrespect for the rule of law in contravention of § 3553(a)(2)(A) (whose purpose is, in part, to "promote respect for the law"), and a correctly calculated Guidelines sentencing range (which is calculated in part by considering the Commission's policy statements) is one tool for avoiding such disparity.  Finally, § 3553(a)(7)'s command that the court consider the need to provide restitution to victims is directly relevant to just

---

aspects, for example.  For simplicity, though, I limit my discussion in this opinion to the imprisonment component of sentences.

punishment.

My take on what transpires after the district court considers the seven §

3553(a) factors is that the district court should impose a sentence that satisfies the

four traditional sentencing purposes of § 3553(a)(2).  In most, if not all cases, one

of the purposes will drive the sentence.  If, for example, the punishment that

should be meted out is more than sufficient to meet the needs of general and

specific deterrence, then the need for punishment will "drive" the sentence.  If the

need for general deterrence is at the forefront (say in a tax evasion case) and the

defendant is a first-time offender, the sentence will be imposed to satisfy the need

for general deterrence—that is, the term of imprisonment for that purpose is

greater than the period of incarceration required for punishment or specific

deterrence.  Alternatively, consider the case of a repeat offender with a string of

convictions that harmed scores of victims.  The period of incarceration required to

protect the public from his future criminal behavior may exceed the term of

imprisonment needed for punishment and general deterrence, and specific

deterrence will drive the sentence.[37]

---

[37] I say that a sentence is often driven by one of the (a)(2) purposes because of my
reading of the plain statutory language of § 3553.  Given the direction that a sentence must be
sufficient but not greater than necessary to comply with the 3553(a)(2) purposes, it logically
follows that a sentence should not be greater than is necessary to satisfy the (a)(2) purpose that
demands the longest sentence.  On the other hand, weighing the (a)(2) purposes against each
other does not follow logically from the statute—even if there is no need for specific deterrence,
for example, the sentence must still be sufficient to satisfy the driving (a)(2) purpose.  If the

## C. Preparing For the Sentencing Hearing

As I explain in part I.B, <u>supra</u>, a district judge might not find the answer to what would constitute a parsimonious sentence by consulting the Guidelines because the Commission was not instructed to take the parsimony principle into account when fashioning the Guidelines.  When the parties disagree about what would be a parsimonious sentence, the PSI is of limited use to the district court.  As the Supreme Court anticipated in <u>Gall</u>, the PSI does not answer the question of which of the four § 3553(a)(2) purposes the Guidelines sentencing range primarily accommodates; nor does it recommend a sentence that would be sufficient, but not greater than necessary to achieve those purposes.[38]  552 U.S. at 49–50, 128 S. Ct. at 596.  The PSI simply informs the district court of the range of sentences that, in the Commission's view, should be considered in cases with offense and offender characteristics similar to the case before the court.

The district court needs the parties' input to fashion a parsimonious

driving purpose is punishment, a district court cannot play the lack of a need for specific deterrence off of punishment—otherwise, the sentence would not be sufficiently long to satisfy the need for punishment.

In handing down the sentence, the district judge must explain why the driving purpose subsumes the other purposes—that is, the sentence necessary to satisfy the driving purpose is also sufficient to satisfy all of the other (a)(2) purposes.  All of the (a)(2) purposes, therefore, are properly considered, and the court's characterization of the "driving purpose" as "speed[ing] ahead and flatten[ing] the other three" is inaccurate. <u>Ante</u> at 76 n.24.  This explanation also enhances meaningful appellate review and the public perception that justice has been done.

[38]  The current PSI format is the same one used by the district courts' probation offices pre-<u>Booker</u>.

sentence.  The sentencing hearing is an adversary proceeding[39] in which the

parties frame the controversy by requesting sentences that they believe will meet §

3553(a)'s parsimony requirement.[40]  After the court has entertained the parties'

evidence and arguments in support of their requests, the district court determines

whether either sentence request is supported by the § 3553(a) factors.  Id.

    The obligations <u>Gall</u> has placed on the prosecutor and defense counsel to

present sentence requests to the district court is consistent with their adversarial

roles in the case.[41]  The prosecutor must urge the court to impose a sentence that is

---

[39] <u>Rita v. United States</u>, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007) ("[T]he
sentencing court subjects the defendant's sentence to the thorough adversarial testing
contemplated by federal sentencing procedure.").

[40] This assumes that the prosecutor and defense counsel are properly representing their
respective clients, as indicated in the following text.  Although they may at times agree, the
prosecutor will generally argue for a harsher sentence, and defense counsel for a more lenient
sentence.  If the prosecutor and defense counsel are not prepared to advance their positions, the
district court ought to continue the sentencing hearing and reconvene it when the parties are
prepared.

[41] They assumed these obligations early in the case.  The prosecutor's obligations are
expressed in the Principles of Federal Prosecution ("Principles"), <u>United States Attorneys'
Manual</u>, § 9-27.000 (1997), <u>available at</u>
http://www.justice.gov/usao/eousa/foia_reading_room/usam/index.html, the defense counsel's in
the Sixth Amendment.
    The Principles were originally promulgated by the Attorney General on July 28, 1980
and were updated to describe the prosecutor's role in the sentencing process under the
Guidelines.  The Principles have not been updated to reflect the changes <u>Booker</u> and <u>Gall</u> have
made to the prosecutor's obligations.  As the Principles indicate, the prosecutor considers
sentencing when presenting the case to the grand jury for indictment.  Presumably acting on the
prosecutor's recommendation, the grand jury indicts the defendant for the "the most serious
offense that is consistent with the nature of the defendant's conduct, and that is likely to result in
a sustainable conviction."  Id. § 9-27.300 ("Selecting Charges—Charging Most Serious
Offenses").  The "'most serious' offense" is "that which yields the highest range under the
sentencing guidelines."  Id.

"appropriate . . . under all the circumstances of the case." U.S. Dep't of Justice,

United States Attorneys' Manual, § 9-27.320 (1997), available at

http://www.justice.gov/usao/eousa/foia_reading_room/usam/index.html. To this

end, the prosecutor must endeavor to "ensure that the relevant facts are brought to

the court's attention fully and accurately." Id. § 9-27.710 ("Participation in

Sentencing—Generally"). This includes "mak[ing] a factual presentation to the

court when . . . [i]t is necessary to supplement or correct the [PSI]; [i]t is

necessary in light of the defense presentation to the court; or [i]t is requested by

the court." Id. § 9-27.720 ("Establishing Factual Basis for Sentence"). Finally,

the prosecutor must "[b]e prepared to substantiate significant factual allegations

disputed by the defense." Id. Defense counsel also has an obligation to prepare

for the sentencing hearing; in fact, the Sixth Amendment requires that defense

counsel provide the defendant with effective assistance in all phases of the case.

---

If the offense initially presented to the grand jury does not fully embrace the nature and
extent of the criminal conduct involved, the prosecutor should recommend that the grand jury's
indictment include charges that would do so. The prosecutor should seek additional charges
when they

    1. Are necessary to ensure that the . . . indictment:
        a. Adequately reflects the nature and extent of the criminal conduct
        involved; and
        b. Provides the basis for an appropriate sentence under all the
        circumstances of the case; or
    2. Will significantly enhance the strength of the government's case against the
    defendant or a codefendant.

Id. § 9-27.320 ("Additional Charges").

This would include providing the district court with evidence favorable to the defendant as the court considers § 3553(a)(2)'s sentencing objectives.

The parties should present their sentence requests to the district court after the PSI, and any addendums to the PSI, are in final form and ready for submission to the court.  Ideally, the requests should be presented well in advance of the sentencing hearing in sentencing memoranda akin to the pretrial briefs parties routinely present to the district court in advance of a civil bench trial.  In their sentencing memoranda, the parties should consider presenting the district court with findings of fact and conclusions of law similar to the findings of fact and conclusions of law parties in a civil case present the court prior to or following a bench trial.  The memoranda would indicate the Guidelines sentencing range,[42] the sentence the party requests, the primary § 3553(a)(2) purpose the sentence is to serve, and why the sentence would be sufficient, but not greater than necessary to comply with the § 3553(a)(2) purposes.[43]

---

[42]  This is the sentencing range set out in the PSI or, if the party objects to the PSI Guidelines calculation, the Guidelines calculation and sentencing range the party will ask the district court to reach at the sentencing hearing.

[43]  The Northern District of California Federal Public Defender provides a sample sentencing memorandum that explains that it is important to include this information because post-Booker, the court may no longer uncritically apply the Guidelines—it is counsel's responsibility to explain how all of the § 3553(a) factors are implicated in a given case, with an emphasis on (a)(2).  N. Dist. Cal. Fed. Pub. Defender, Model Sentencing Memorandum, http://www.ndcalfpd.org/Briefbank/Booker/David%20McColgin%20Model%20Sentencing%20Memo%204.25.05.htm (last visited June 30, 2010).

In formulating their sentence requests, the parties should first evaluate how well the guidelines listed in the PSI serve as proxies for § 3553(a)(2)'s purposes. As explained, the Guidelines offense level for the offense of conviction is made up of the base offense level, specific offense characteristics, and adjustments. Some of the specific offense characteristics and adjustments may describe acts committed by the defendant in perpetrating the offense of conviction; the Commission treats such acts as part of the "real" offense conduct and properly includes them in the offense level as proxies for the § 3553(a)(2)(A)–(B) needs for punishment and general deterrence. Other specific offense characteristics and adjustments, however, may not fairly be said to have any bearing on the defendant's commission of the offense of conviction and thus on the (A) and (B) needs. Therefore, although the Commission treats them as proxies for (A) and (B) purposes, they may be irrelevant to whether the sentence a party proposes is sufficient, but not greater than necessary to satisfy the (A) and (B) needs in the case.[44] Accordingly, in determining the proxies for (A) and (B), the defendant

---

[44] For example, there is a 2-point upward adjustment for lying to the probation officer who is compiling the PSI, U.S.S.G. §3C1.1 & cmt. n.4(h), but that conduct usually has nothing to do with the charged offense. The Guidelines manual is littered with adjustments and specific offense characteristics that may or may not be relevant to § 3553(a)(2) in a given case, even if the offender performed the conduct in question. U.S.S.G. § 3B1.5, for example, adjusts the offense level upward if the offender used body armor during a drug offense, but the use of body armor during a simple drug transaction in which the offender does not anticipate any violence might have no bearing on the § 3553(a)(2) purposes. Other examples of potentially irrelevant adjustments include: U.S.S.G. § 3A1.1 (hate crime motivation); § 3A1.2 (whether the victim was

may urge the court to remove from the PSI's offense level the specific offense characteristics and adjustments that reflect conduct unrelated to the offense of conviction.[45]

The offense level may not fit the circumstances of the case even after irrelevant considerations are removed. As indicated, the Guidelines offense level applies to all cases involving the offense of conviction; that is, it does not speak to the unique circumstances of a particular case. Consequently, in its sentencing memorandum, a party may urge the court to deviate from the prescribed offense level to take into account one or more of the offense characteristics listed in 28 U.S.C. § 994(c) (which the Commission considered in determining the categories of offenses)[46] that render the instant case atypical. In doing so, the party would be

---

a government official); § 3A1.3 (whether the victim was restrained during the offense); § 3B1.3 (whether the offender abused a position of trust or used a special skill); § 3B1.4 (whether the offender used a minor to commit the crime); § 3C1.2 (whether the offender recklessly endangered people during flight); § 3C1.3 (whether the offender was on release when the crime was committed).

[45] The government will oppose the defendant's request if it believes that the specific offense characteristics and adjustment do bear on the offense of conviction.

[46] In 28 U.S.C. § 994(c), Congress specified the following offense factors:

(1) the grade of the offense;
(2) the circumstances under which the offense was committed which mitigate or aggravate the seriousness of the offense;
(3) the nature and degree of the harm caused by the offense, including whether it involved property, irreplaceable property, a person, a number of persons, or a breach of public trust;
(4) the community view of the gravity of the offense;
(5) the public concern generated by the offense;

179

positing a substitute offense level and using it to support the sentence it will be asking the court to impose.

The parties' sentencing memoranda will also address the prescribed criminal history category, which, coupled with the offense level, would inform the district court's sentencing discretion. If the criminal history category is I, and the government does not contend that the category should be increased on the ground that it "substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," U.S.S.G.§ 4A1.3(a)(1), the defendant's sentence will be driven solely by the offense level for the offense of conviction—that is, the sentence necessary to satisfy the need for punishment or general deterrence will be more than enough to satisfy any need for specific deterrence.

If the defendant's criminal history category is greater than I, the parties may dispute whether the defendant's punishment for the offense of conviction should be greater on account of his past criminal behavior, see § 3553(a)(2)(A), or, if not, whether such behavior predicts future criminality and thus warrants an additional period of incarceration to protect the public, see § 3553(a)(2)(C). Regarding the

_____

(6) the deterrent effect a particular sentence may have on the commission of the offense by others; and
(7) the current incidence of the offense in the community and in the Nation as a whole.

latter, the parties may point to factors that bear on the defendant's likelihood to recidivate but that the Commission did not take into account for policy reasons, such as age and drug abuse.[47]  In the end, each party will arrive at a criminal history category, which, coupled with the offense level it proposes, will presumably support the sentence it is requesting the district court to impose.

## D. The District Court Proceeding

The sentencing hearing is framed by the competing positions of the parties, as expressed in their sentencing memoranda.  The government seeks the most severe sentence the facts and circumstances of the case will allow.  The defendant seeks leniency.  The manner in which the district court conducts the sentencing hearing is relevant to the parties' and the public's perception of whether the

---

[47]  Although the Commission settled on criminal history as the only measure of offender characteristics in the Guidelines, Congress listed in 28 U.S.C. § 994(d) a number of other offender characteristics the Commission could consider in devising the Guidelines:

> (1) age;
> (2) education;
> (3) vocational skills;
> (4) mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant;
> (5) physical condition, including drug dependence;
> (6) previous employment record;
> (7) family ties and responsibilities;
> (8) community ties;
> (9) role in the offense;
> (10) criminal history; and
> (11) degree of dependence upon criminal activity for a livelihood.

sentence imposed is fair or not. Gall, 552 U.S. at 50, 128 S. Ct. at 597. To ensure

that it is fair, and thus perceived as such, the sentence must be subjected to the

"thorough adversarial testing contemplated by the federal sentencing procedure,"

Rita v. United States, 551 U.S. 338, 352, 127 S. Ct. 2456, 2468 (2007), and the

reasons for its imposition must be explained, id. at 356, 127 S. Ct. at 2468

("Confidence in a judge's use of reason underlies the public's trust in the judicial

institution. A public statement of [the judges's] reasons [for the particular

sentence imposed] helps provide the public with the assurance that creates that

trust."). Moreover, the judge's statement of reasons "allow[s] for meaningful

appellate review." Gall, 552 U.S. at 39, 128 S. Ct. at 590.

　　　　The adversarial process the Supreme Court mandates involves five steps.

After listing them in order, I address them in some detail to indicate what might

take place in a typical case in which the parties cannot agree that the Guidelines

sentencing range correctly approximates the § 3553(a)(2) purposes. First, the

district court determines the Guidelines sentencing range. Id. at 49, 128 S. Ct. at

597; 18 U.S.C. § 3553(a); Fed. R. Crim. P. 32.[48] Second, turning to the prosecutor

then to defense counsel, the court asks the parties for their sentence requests and

affords them an opportunity to present evidence relevant to each of the four §

───────────────

[48] "As a matter of administration and to secure nationwide consistency, the Guidelines
should be the starting point." Gall, 552 U.S. at 49, 128 S. Ct. at 596.

3553(a)(2) purposes. Gall, 552 U.S. at 49–50, 128 S. Ct. at 596–97.[49]  Third, the court entertains the parties' arguments in support of their sentence requests.  Id. Fourth, the court determines whether the sentence either party proposes satisfies each of § 3553(a)(2)'s purposes and the parsimony principle.  Id.  Fifth, the court fashions a sentence that is sufficient, but not greater than necessary to meet those purposes, explains how the sentence does this, and if the sentence deviates from the Guidelines range or the parties' requests, gives the reasons for the deviation. Id.

The first step of the sentencing hearing is to determine whether the Guidelines sentencing range fixed by the PSI is correctly calculated.[50]  By "correctly calculated," I mean calculated per the instructions in the Guidelines manual.  At this stage, the court will resolve any disputes regarding whether the manual's instructions were properly followed.

In the second step, the district court will entertain the parties' sentencing requests.  The government and then the defense will present evidence to support their requested sentences, and this evidence will often show why the Guidelines

---

[49]  The record would already contain the evidence adduced at trial or the facts the defendant admitted in pleading guilty.  But the parties may wish to present additional evidence relating to, for example, the circumstances of the offense listed in 28 U.S.C. § 994(c), or relating to the offender characteristics in § 994(d) (and specifically his potential for recidivism).

[50]  In doing this, the court will have to resolve any Guideline issues the addendum to the PSI may disclose.

recommendation is or is not appropriate in the given case.[51]  A party might challenge the offense level the court has set by contending that the Commission's generalized treatment of the offense—for example, the weights accorded to characteristics in the base offense level or specific offense characteristics—is inappropriate in the present case.[52]  Aside from relying on the circumstances that "mitigate or aggravate the seriousness of the offense," the party might proffer evidence concerning the "community view of the gravity of the offense," or "the current incidence of the offense in the community."  This evidence, the party would contend, is relevant to the § 3553(a)(2)(A)–(B) inquiry regarding the needs for punishment and general deterrence.  Or, a party might challenge the criminal history category the court has set by proffering evidence on characteristics such as gender, race and ethnicity, employment status, educational attainment, and marital status that the Commission did not consider in establishing the categories of

---

[51] Because the Guidelines "reflect a <u>rough</u> approximation of sentences that <u>might</u> achieve § 3553(a)'s objectives," a party may argue that "the Guidelines sentence should not apply." <u>Rita</u>, 551 U.S. at 350–51, 127 S. Ct. at 2465 (emphasis added).  Perhaps the PSI's Guidelines calculation "fails properly to reflect § 3553(a) considerations, or perhaps . . . the case warrants a different sentence regardless." <u>Id.</u> at 351, 127 S. Ct. at 2465 (citing Fed. R. Crim. Pro. 32(f)).

[52] When the Guidelines were mandatory, "a party seeking a departure generally accepted his base offense level as a starting point and then attempted to show that the case was atypical." <u>United States v. Rodriguez</u>, 406 F.3d 1261, 1287 (11th Cir. 2005) (Tjoflat, J., dissenting from the denial of rehearing en banc).  "[U]nder the new model the defendant can also simply concede that his case is typical and challenge the wisdom of the Commission's judgment regarding the appropriate punishment in heartland cases." <u>Id.</u>

offenders.[53]

In the third step, the court entertains the parties' arguments in support of their sentence requests.

The court then turns to the fourth step of determining whether either party's proposal meets the four sentencing purposes of § 3553(a)(2) and is the sentence "sufficient, but not greater than necessary to comply with" those purposes. Gall, 552 U.S. at 50, 128 S. Ct. at 597 ("[T]he district judge should . . . consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.").

Finally, the court moves to the fifth step and fashions a sentence which, depending on its fourth-step determination, may mirror a party's request. If neither side prevailed in the fourth step, the sentence the court imposes may be less than the government requested or more than the defendant requested.[54] The

---

[53] A report issued by the Sentencing Commission found that these factors correlated with recidivism. U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines 11–13 (2004). The SRA instructed the Commission to "assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." 28 U.S.C. § 994(d). A question I do not purport to answer is whether this provision limits the ability of the district court to consider these offender characteristics in determining a defendant's potential for recidivism under § 3553(a)(2)(C).

[54] I omit from this discussion the possibilities that the record supported a more punitive sentence than the one the government requested or a less punitive sentence than the one defense counsel requested.

court supports the sentence by making factfindings regarding the (a)(2) purposes[55]

and explaining how the sentence is parsimonious to the driving § 3553(a)(2)

purpose.[56]  In the process, the court must also explain the reasons for any

deviation from a party's request or the PSI sentencing range as established in step

one.

After pronouncing a sentence, the court elicits the parties' objections in

accordance with United States v. Jones, 899 F.2d 1097 (11th Cir. 1996).  The

objections are important for appellate review.  They also give the court an

opportunity to correct any errors it may have made, which if corrected to the

objecting party's satisfaction will render an appeal unlikely.

---

[55] These facts may come from the PSI, the trial transcript or guilty plea, or evidence
presented by the parties at the sentencing hearing.  To the extent that the court intends to take
judicial notice of facts, it should notify the parties in advance.

[56] Requiring that district court judges make factfindings on each of the (a)(2) purposes,
identify the driving purpose, and explain how the sentence is parsimonious to the driving
purpose is more than is currently required of district court judges.  As the court's opinion points
out, I have authored opinions in which I stated that the district court need not discuss each of the
(a)(2) purposes in detail.  I did so in adherence to circuit precedent.  As we are now sitting en
banc, I would overturn that precedent, and, despite the court's concern, see ante at 71, doing so
would be entirely consistent with the Supreme Court's statements in Rita.

In Rita, the Supreme Court opined that "we cannot read [§ 3553(c)] (or our precedent) as
insisting upon a full opinion in every case.  The appropriateness of brevity or length, conciseness
or detail, when to write, what to say, depends upon circumstances."  Rita, 551 U.S. at 356, 127
S. Ct. at 2468.  I agree.  Sometimes—perhaps when the parties disagree over only minor points
or when both parties seek a sentence within the range recommended by the Guidelines—a
relatively brief explanation by the district court will suffice to support its finding and to allow
appellate review.  Other times—perhaps if the parties seek vastly different sentences or fiercely
contest the evidence—the district court will necessarily have to provide a more detailed
explanation to respond to the parties' arguments, to support its sentence, and to allow
meaningful appellate review.

### E. Appellate Review

### 1. Abuse of Discretion Explained

It is axiomatic that the appellate review of a sentence is conducted under the abuse of discretion standard. Rita, 551 U.S. at 351, 127 S. Ct. at 2465 ("'[R]easonableness' review merely asks whether the trial court abused its discretion."); Gall, 552 U.S. at 46, 128 S. Ct. at 594 ( "Our explanation of 'reasonableness' review in the Booker opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions."). Under this "familiar" standard, Gall, 552 U.S. at 26, 128 S. Ct. at 594, a district court abuses its discretion when it follows improper procedures, bases its decision on an incorrect interpretation of law or clearly erroneous factfindings, or when the reviewing court is left with the definite and firm conviction that the court committed a clear error of judgment in making the ultimate decision entitled to deference. Klay v. Humana, Inc., 382 F.3d 1241, 1251 (11th Cir. 2004). When conducting this review, the court of appeals may only consider evidence, arguments, and objections presented to the district court. See United States v. Weir, 51 F.3d 1031, 1032 (11th Cir. 1995).

The abuse of discretion standard governs a broad array of appellate inquiries; although the same basic framework applies to all these inquiries, how

that framework works in practice depends very much on the nature of the decision being reviewed.[57] See Am. Hosp. Supply Corp. v. Hosp. Products, Inc., 780 F.2d 589, 594 (7th Cir. 1985) (Posner, J.) ("[T]his phrase [abuse of discretion] covers a family of review standards rather than a single standard, and a family whose members differ greatly in the actual stringency of review."). The Supreme Court has said that "[w]hether discretion has been abused depends, of course, on the bounds of that discretion and the principles that guide its exercise." United States v. Taylor, 487 U.S. 326, 336, 108 S. Ct. 2413, 2419 (1988). In other words, examining what the district court inquiry looks like reveals how and to what the court of appeals defers. As I explained in part II, the sentencing inquiry is primarily a factual inquiry—the district court derives the ultimate sentence from a series of factfindings based on circumstantial evidence, credibility determinations, and sometimes conflicting evidence. In light of the nature of the district court's sentencing inquiry, I deconstruct the abuse of discretion standard and identify how its component parts apply to the district court's sentencing determination. Once simplified this way, the appellate court's task in reviewing sentences for abuse of discretion becomes clear.

I begin with the statement that a district court can abuse its discretion by

---

[57] The court in this case fails to grapple with the abuse of discretion standard in any meaningful way.

188

making a clearly erroneous factfinding.  It is well established that a finding of fact is clearly erroneous when "although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 573–74, 105 S. Ct. 1504, 1511 (1985) (quotation omitted).  The sentencing inquiry is driven in large part by factfindings: the underlying facts regarding the § 3553(a)(2) factors,[58] the weight given to each piece of evidence, the district court's determinations regarding each § 3553(a)(2) purpose,[59] and the sentence necessary to satisfy each § 3353(a)(2) purpose are all factfindings.  As such, the appellate court accepts these findings unless they are clearly erroneous.

A district court can also abuse its discretion by misinterpreting the law, although the fact-intensive nature of sentencing means that there will be fewer instances in which the district court abuses its discretion in this way.  Nonetheless, the district court might misinterpret the law in two key ways.[60]  First, it would be a

---

[58] For example, the defendant's conduct in committing the offense, circumstances about the defendant's background that bear on the offense, evidence about the defendant's mental or psychological condition, or evidence about the defendant's likelihood to recidivate.

[59] For example, how serious the offense was or how great of a need there is for general deterrence.

[60] I do not mean that there only two ways in which the district court can make a mistake of law, but I expect these two ways to be the most common.

misinterpretation of the law for the district court to fail to follow the adversarial

procedure required by Gall, which in part requires the court to elicit and consider

sentencing requests from the parties and to explain the reasons for its sentence in a

way that allows for the parties to object to any perceived errors and for the court

of appeals to meaningfully review the sentence.  Second, the district court would

misinterpret the law if it follows the correct procedural steps but its explanation

reveals that it misunderstood the nature of the sentencing inquiry.  This would

occur, for example, if the district court weighs the § 3553(a)(2) purposes against

each other instead of determining the sentence parsimonious to the driving

purpose or if the district court erroneously believes that it cannot consider relevant

evidence.[61]

---

[61]  As this explanation shows, abuse of discretion through a misinterpretation of the law generally refers to errors in procedure or in the way the district court conducts its inquiry.  This is so because most of the district court's determinations during the sentencing process are factual determinations—how important each (a)(2) factor is, for example.  Because the other § 3553(a) factors roll into the (a)(2) inquiry, there are relatively few issues of law for the court of appeals to consider.

For example, the need for a sentence to satisfy the § 3553(a)(2)(A) purpose is a factfinding based on three subsidiary factfindings—the need for the sentence "to reflect the seriousness of the offense, to promote respect for the rule of law, and to provide just punishment for the offense"—which in turn are based on underlying factfindings regarding the offense and the offender (facts such as the offender's criminal history, his ties to the community, his conduct during the offense, and so on).  All of these factfindings are reviewed for clear error, and a clearly erroneous factfinding at any point in the process could render the subsequent factfindings that are based on it clearly erroneous as well.  Likewise, a factfinding regarding the need to satisfy an (a)(2) purpose could be clearly erroneous if the underlying circumstantial facts on which it is based do not support the finding.

By contrast, if the district court considers these facts in an impermissible way—for example, by believing that the seriousness of the offense must always be given more weight than the need for just punishment or the need to respect the rule of law in determining the need for a

Lastly, the court of appeals will reverse the sentence if the district court committed a clear error of judgment. This term must be applied carefully when reviewing a sentence, which necessarily turns very heavily on the district court's assessment of the facts. It seems that when courts use the phrase "clear error of judgment" in this context, they are frequently saying that the court improperly weighed the § 3553(a) factors. See, e.g., United States v. Westry, 524 F.3d 1198, 1222 (11th Cir. 2008) ("A remand for resentencing due to the unreasonableness of a sentence occurs only 'if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case.'"). As I have explained, however, the § 3553(a) factors fold into the (a)(2) purposes, and the (a)(2) purposes should not be weighed against each other; rather, the court should identify the (a)(2) purpose that drives the sentence and fashion a sentence parsimonious to that purpose. Moreover, the need to satisfy each (a)(2) purpose and which purpose will drive the

---

sentence to satisfy (a)(2)(A)—the court will have misinterpreted the law. Similarly, the district court would commit a legal error if it considers patently irrelevant evidence.

The difference is important: by proceeding this way, the court of appeals defers to the district court's factfindings so long as the district court properly understood the inquiry it was performing. The court of appeals thereby ensures that it reviews the facts as found by the district court instead of substituting its own findings regarding the (a)(2) purposes. This makes sense given that Congress designated the district court as the forum for the "main event" in sentencing. See infra part IV.

sentence are both factfindings, the review of which I have already described.

Therefore, for "clear error of judgment" to do any work in appellate review of a sentence, it must refer to the situation in which the court has imposed a sentence that is more or less than necessary to satisfy the driving purpose. But importantly, the appellate court is not to substitute its own judgment for that of the district court; rather, it must determine whether the district court committed a clear error of judgment by imposing a sentence that cannot be reconciled with its correctly interpreted law and not-clearly-erroneous facts. In some regards, this inquiry is akin to the inquiry an appellate court performs when determining whether the evidence submitted to a jury is sufficient to support the jury's verdict. Cf. United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004) (noting that we "will not overturn a conviction on the grounds of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). In the sentencing context, though, the appellate court is limited to the facts set forth in the district court's sentencing explanation, which shows what evidence the court deemed relevant and probative and how that evidence informed the court's decision.[62]  Thus, focusing on the district court's

---

[62] The court of appeals must limit its inquiry to the facts set out in the district court's sentencing explanation for the abuse of discretion standard to have any force. Otherwise, the court would be free to search the entire record and make its own factual findings. This, of course, would be inconsistent with the notion that the court of appeals must defer to the district court's proper exercise of discretion. If the district court wholly ignores relevant evidence or a

192

sentencing explanation, the appellate court asks whether—in light of the district court's factfindings, its explanation for the sentence, and any deviation from the Guidelines sentencing range and the parties' requests—any rational judge could have concluded that the sentence was "sufficient but not greater than necessary" to achieve the § 3553(a)(2) purposes. If the sentence imposed cannot be reconciled with the § 3553(a)(2) factfindings, the sentence must be vacated.

Deconstructing the abuse of discretion standard shows that appellate review of a sentence should be a clearly delineated, straightforward process. If the district court followed the proper procedures, the court of appeals will have a sentencing explanation that clearly explains the facts found by the district court, how they relate to the (a)(2) purposes, the driving (a)(2) purpose, and how the sentence is parsimonious to that purpose. From the record (which will include the parties' objections and the court's responses), the court will be able to determine whether any factfindings were clearly erroneous in light of the evidence presented. It will also be readily evident whether the district court properly understood the nature of the sentencing inquiry. From there, the court asks whether there are sufficient facts in the record to support the sentence—that is, it must determine

---

party's argument (and the party objects), the court will have erred by misinterpreting the law, which requires that it respond to evidence presented and arguments made by the parties. Fed. R. Crim. P. 32(i)(3)(B).

whether any reasonable judge could find, based on the facts clearly found in the record, that the sentence imposed is parsimonious to the driving purpose.[63]  With this framework in mind, I now explain how the court of appeals should review

_____

[63] Consistent with the Supreme Court's explanation of sentencing review in <u>Gall</u>, many of our cases incorporate a boilerplate statement of the standard of review as consisting of two steps: procedural and substantive reasonableness.  Our cases routinely include a statement like this:

> "We review sentencing decisions only for abuse of discretion, and we use a two-step process." <u>United States v. Shaw</u>, 560 F.3d 1230, 1237 (11th Cir. 2009). First, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range." <u>Id.</u> (quoting <u>Gall v. United States</u>, 552 U.S. 38, 51, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007)).  If we conclude that the sentence is procedurally sound, the second step is to review the "substantive reasonableness" of the sentence, taking into account the totality of the circumstances, "including the extent of any variance from the Guidelines range." <u>Gall</u>, 552 U.S. at 51, 128 S. Ct. at 597.

<u>United States v. Alfaro-Moncada</u>, __ F.3d __, 2010 WL 2103442 (11th Cir. 2010).  Nothing I say here is inconsistent with this language.  My goal is simply to peel back the boilerplate language and explain how the abuse of discretion standard addresses the procedural and substantive unreasonableness concerns described in <u>Gall</u> and in our cases.

When a district court hands down a procedurally unreasonable sentence, it has abused it discretion by either making a clearly erroneous factfinding or by misinterpreting the law.  All of the errors labeled as procedural in <u>Gall</u>—"failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence," 552 U.S. at 51, 128 S. Ct. at 597—are instances in which a district court has abused its discretion by making a clearly erroneous factfinding or by misinterpreting the law.  If the sentence is procedurally reasonable (that is, no clearly erroneous factfindings and proper interpretation of the law), <u>Gall</u> instructs the courts of appeals to turn to the substantive reasonableness of the sentence.  <u>Id.</u>  Because the appellate court is not to substitute its own judgment for the district court's, <u>id.</u>, substantive review means ensuring that the record supports the district court's determination that the sentence imposed is the one sufficient but not greater than necessary to satisfy the driving sentencing purpose, which is the clear error of judgment inquiry.

194

each step of the sentencing hearing I set out in the previous section.

## 2. Reviewing the Sentencing Hearing

Having carefully examined the abuse of discretion standard in the sentencing context, I now show how appellate review under that standard identifies abuses of discretion at each step of the sentencing hearing.[64] I posit a case in which a party contends that the district court failed to follow the five-step process.[65] The party also contends, alternatively, that, if the court followed that process, its rulings in at least one of the steps were erroneous.[66] The court of appeals considers each challenge seriatim, under the abuse of discretion standard; that is, it examines for clear error the facts on which the district court based its ruling and the district court's application of the law de novo. If the district court abused its discretion at any step, the inquiry ends there. The sentence must be

---

[64] As the Supreme Court has emphasized in Rita and Gall, the process the district court employs to reach its sentencing decision is vitally important to the perception that the sentence handed down is fair. If the process is tainted, it matters not whether the sentence might appear to be fair; the sentence is perceived as tainted as well. What Gall and our cases routinely refer to as "procedural" review encompasses what appears in my discussion as steps one through four and the district court's explanation of the sentence at step five. What Gall and our cases refer to as "substantive" review involves only the final inquiry at step five—whether the record supports the district court's decision.

[65] It is well settled that a district court's failure to follow the prescribed process constitutes an abuse of discretion. Klay, 382 F.3d at 1251. In the case I posit in the text, the appellant challenges the district court's ruling in all five steps of the sentencing process. Because these steps reflect the process required by the law, failing to follow them demonstrates that the district court abused its discretion by misunderstanding the law.

[66] I am assuming that these challenges were presented to the district court in the form of objections and were preserved for appeal in accordance with United States v. Jones.

vacated, and the case remanded for resentencing.[67]  If there is no abuse of

discretion in a step, the court proceeds to the next.

Step one required the district court to determine the Guidelines sentencing

range for the case.  This determination is vulnerable to attack on two fronts: the

district court's factual findings and its application of the Guidelines to the facts.  If

the factfindings are clearly erroneous, the district court abused its discretion.  If

the factfindings survive clear error review, the question becomes whether the

court erred in applying the Guidelines to the facts.  If in doing so the court made

an "identifiable legal mistake" in interpreting the Guidelines or if it "clear[ly]

err[ed]" in applying them, the court abused its discretion and the sentence must be

vacated and the case remanded.  See United States v. White, 335 F.3d 1314,

1317–19 (11th Cir. 2003).

At step two, the district court was required to give the government, and

then defendant, the opportunity to present their sentence requests and to provide a

factual basis in support of their proposals.[68]  If the court failed to afford the parties

the opportunity to present their case, it abused its discretion (by misinterpreting

---

[67]  The step-by-step appellate review I describe includes application of the harmless error
doctrine.  In most cases—especially the mine run cases where the dispute centers on where
within the Guidelines sentencing range the sentence should have been imposed—the review will
focus on fewer than the five steps the district court took in fashioning the sentence.

[68]  Because the government initiated the criminal proceeding, it has the burden of first
going forward with its sentencing proposal.

the law requiring it to provide such an opportunity) and the defendant's sentence must be vacated.

At step three, the court must have given the parties the opportunity to argue—in light of all of the evidence presented at step two—that the sentences they have requested are supported by the § 3553(a) factors and are "sufficient but not greater than necessary" to achieve § 3553(a)(2)'s purposes. If the court failed to do this, it abused its discretion (by misinterpreting the law), and the sentence must be vacated.

Step four asked the district court to determine whether either party's sentence proposal fulfilled § 3553(a)(2)'s sentencing purposes, was not inconsistent with the remaining § 3553(a) factors, and satisfied the statute's parsimony requirement. If the court failed to engage in this process, it abused its discretion (by misinterpreting the law) and the sentence must be vacated.

Step five required the district court to select and explain a sentence supported by § 3553(a)'s factors and, moreover, a sentence "sufficient, but not greater than necessary" to meet § 3553(a)(2)'s objectives. If the sentence deviated from the Guidelines sentencing range for the case, the court had to set forth the reasons for the deviation. The first question the court of appeals must answer is whether the district court's explanation for the sentence is sufficient to permit

197

meaningful appellate review. Rita, 551 U.S. at 357, 127 S. Ct. at 2469.  If not, the sentence should be vacated and the case remanded for further proceedings on the ground that the district court misinterpreted the law requiring it to provide such an explanation.  The court of appeals also determines whether any facts relied on in the sentencing explanation were clearly erroneous.  If the explanation is sufficient and the facts not clearly erroneous, the question becomes whether the record reasonably supports the district court's explanation and therefore the sentence.  If it does, the district court did not commit a clear error of judgment and did not abuse its discretion.

In sum, appellate scrutiny of a sentence is performed through the classic abuse of discretion lens.  This is consistent with Gall's command that a district court's sentence is reviewed for abuse of discretion whether inside or outside the Guidelines sentencing range.  Gall, 552 U.S. at 51, 128 S. Ct. at 597.  It is also consistent with the district court's sentencing expertise.  The district court is unquestionably the best judicial actor to apply the fact-heavy and open-ended inquiry demanded by § 3553(a) and to fashion a sentence in accordance with the parsimony principle.  See id. ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.") (quotation omitted).

### III. Applying the Sentencing Model

Irey's sentence must be vacated and the case remanded because the court

failed to explain its deviation from the Guidelines sentencing range and its denial

of the Government's request and because it failed to make intelligible findings on

two of the four § 3553(a)(2) purposes.

### A. Irey's Sentence

The Government charged William Irey with one count of sexual

exploitation of children under 18 U.S.C. § 2251(c).  In relevant part, § 2251

proscribes "employ[ing] . . . any minor to engage in . . . any sexually explicit

conduct outside of the United States . . . for the purpose of producing any visual

depiction of such conduct," and "transport[ing] such visual depiction to the United

States."  <u>Id.</u>[69]  The statute carries a mandatory minimum of 15 years'

imprisonment and a maximum of 30 years' imprisonment.  Irey pled guilty and

was sentenced to 17.5 years' imprisonment.[70]

---

[69] As stated in the text, § 2251(c) makes it a crime to employ a single minor in committing the offense.  Irey's indictment, however, alleged that he employed "minors" in committing the offense.

[70] Irey was sentenced not only for committing the offense alleged in the indictment, but for committing several uncharged offenses as well.  In imposing sentence, the district court adopted the following provision:

> Pursuant to U.S.S.G. § 2G2.1(d)(1), if the offense involved the exploitation of more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the exploitation of each minor had been contained in a separate count of conviction.  There were at least forty minors exploited.  The highest offense level

1. Guidelines Calculation

Irey's sentencing process began with the presentence investigation. The PSI set out Irey's conduct in eighteen paragraphs. Because the court has already detailed that conduct, I will not replicate it here. Suffice it to say that Irey flew to Cambodia on numerous occasions, hired child prostitutes, photographed and videotaped himself having sex with them, brought the images back to the United States, and traded them on child pornography websites. The PSI found that Irey had abused over forty children.

Section 2G2.1 of the Guidelines applied, which carried a base offense level of 32.[71] The PSI found four specific offense characteristics, which increased the

---

allowable by the guidelines is a level 43. If the exploitation of each of the forty minors is scored as if it were contained in a separate count, the offense level would be well over the available maximum level of 43. Therefore, only two groups were utilized in determining the offense level.

As the court's opinion correctly states, the Guidelines sentencing range (according to the PSI, which the district court adopted) called for life imprisonment, see ante at 12, whereas the statutory maximum penalty for Irey's one-count conviction was 30 years' imprisonment. The Principles of Federal Prosecution instructs that prosecutors, in advising the grand jury, recommend that the grand jury indict the putative defendant "with the commission of additional offenses when additional charges . . . are necessary to ensure that the . . . indictment . . . provides the basis for an appropriate sentence under all the circumstances of the case." § 9-27.320. See supra note 41. I assume that the prosecutor knew that Irey would have to be charged with additional § 2252(c) violations in order to "provide[ ] the additional basis for an appropriate sentence under all the circumstances of the case," i.e., a sentence that would be commensurate with the Commission's Guidelines determination of what would be appropriate. The prosecutor either presented the grand jury with additional charges but it refused to indict, or did not present them at all.

[71] Section 2G2.1 covers three crimes: 18 U.S.C. §§ 1591 (sex trafficking of children), 2251 (sexual exploitation of children), and 2260 (production of child pornography for

offense level by 12: 4 levels because the offense involved minors under age twelve; 2 levels because the offense involved sexual contact; 2 levels because the offense involved distribution of child pornography; and 4 levels because the offense portrayed sadistic or masochistic conduct.  Two more levels were added under the Guidelines' "multiple counts" rules because, under § 2G2.1(d), "whether specifically cited in the count of conviction or not, each such minor shall be treated as if contained in a separate count of conviction."[72]  U.S.S.G. § 2G2.1 cmt. n.5.  Finally, the PSI reduced the offense level by 3 levels based on its finding that two adjustments applied: 2 levels because Irey accepted responsibility for the crime, and 1 level because he provided timely notification of the intent to plead guilty.  All told, Irey's total offense level was 43.

Because Irey had no criminal convictions, he fell into criminal history category I.  An offense level of 43 and a criminal history category I yielded a Guidelines sentencing range of life imprisonment, which well exceeded the statutory maximum.  The Government did not object to this calculation.  Irey objected to the use of the 2006 Guidelines, the PSI's representation of his ability

---

importation to the United States).

[72] The probation officer applied the multiple counts rules for only two counts of conviction because "[i]f the exploitation of each of the forty minors is scored as if it were contained in a separate count, the offense level would be well over the available maximum level of 43." See supra note 70.

201

to pay restitution, and the PSI's statement that there were no grounds for departing

from the Guidelines on the grounds that "Irey's psychiatric condition and his lack

of a criminal record support a sentence below the advisory guideline range."  In

support, Irey attached a report of Dr. Fred Berlin, which explained Irey's

psychiatric condition.  (Def.'s Objection to Presentence Investigation Report 2.)

## 2. Sentencing Memoranda

The parties filed sentencing memoranda in advance of the sentencing

hearing.  The Government filed its memorandum first, which totaled five pages.

After a two-paragraph recitation of the facts, the Government asked for a

Guidelines sentence.  Anticipating Irey's case for an outside-Guidelines sentence,

the Government argued that U.S.S.G. § 5K2.0(b) governs departures in child sex

abuse cases; § 5K2.0(b) only permits departures on grounds authorized by the

Commission; and the Commission had not authorized departures on the basis of

diminished capacity, aberrant behavior, or family ties and responsibilities.

Although the Government recognized that Booker invalidated § 5K2.0(b), it urged

the court to defer to Congress's policy preferences and pointed out that doing so

would be consistent with § 3553(a)(5)'s instruction to take into account the

Commission's policy statements.  Finally, the Government argued that if the "case

is atypical, it is because of aggravating, not mitigating, factors," and that Irey's

conduct and characteristics clearly fell within the heartland of the Guidelines. Accordingly, the Government asked for a Guidelines sentence.[73]

Irey's eleven-page sentencing memorandum was more substantial. Irey argued that in light of his acceptance of responsibility, pedophilia, history as a positive contributor to society, lack of criminal history, and low risk of recidivism, a sentence below 30 years' imprisonment was reasonable. (See Def.'s Sentencing Mem. 1.) That said, Irey "acknowledged" the "serious nature" of his conduct and "conceded" that a substantial term of imprisonment was appropriate. (Id.) Accordingly, Irey asked for a sentence of 15 to 20 years' imprisonment followed by a substantial term of supervised release. (Id. at 11.)

In arguing for a below-Guidelines sentence, Irey cited three child pornography cases where a district court's downward variance was affirmed on appeal. Irey then focused on the § 3553(a) factors and the parsimony principle and argued that less than 30 years' imprisonment would be appropriate because: (1) at 50 years old, Irey would be an old man when released from prison even if he served just the 15 year minimum sentence; (2) Irey's expert psychological reports

---

[73] The Government's memorandum did not address how the Guidelines calculation fit the particular facts of the case in light of § 3553(a). The Government did not propose any § 3553(a) findings or identify how its proposed sentence fulfilled the § 3553(a)(2) purposes. Its only reference to any § 3553(a) factor was to (a)(5), which requires consideration of the Commission's policy statements. The Government did not cite any evidence beyond what was in the record and the PSI; it focused its arguments on the Guidelines.

demonstrated that he is a pedophile who had a "limited ability to control the behavior supporting the offense of conviction" and presented a "low risk of recidivism"; and (3) that Irey still had the support of his family.  (Id. at 9.)  Irey also briefly criticized the Guidelines in light of § 3553(a), arguing that some of the specific offense characteristics were cumulative.  (Id. at 10.)  In terms of evidence, Irey submitted two expert witness reports and numerous character letters from his family and friends.

### 3. Sentencing Hearing

The district court did not follow the sentencing hearing procedure I have outlined.[74]  The sentencing hearing began with the district court adopting the PSI's findings of fact and Guidelines applications.  But rather than hear argument on how well the Guidelines approximated the § 3553(a) factors, the court turned to Irey and his plea for mitigation.

Irey put on nine witnesses, including himself.  His "star" witness, however, was a psychiatrist, Dr. Shaw.  On direct examination, Dr. Shaw essentially testified that Irey was a pedophile who presented a "moderate to low risk of recidivism" based on "empirically validated actuarials."  Before permitting cross-examination, the court asked Dr. Shaw whether pedophilia is an illness and

---

[74]  This is not entirely surprising given the courts of appeals' confusion regarding the proper way to review sentences.  See infra note 84.

whether a pedophile who acts out does so out of "rational free will." This resulted in the exchange that the court details and criticizes at length. See ante at 83–87. On cross-examination, the Government did not impeach Dr. Shaw in any meaningful way.[75] After Dr. Shaw, Irey put on eight character witnesses. Finally, Irey briefly testified to apologize for his crimes. After entering this evidence, Irey's counsel made his argument, which rehashed with some embellishment the argument contained in his sentencing memorandum.[76] At the end of the day, Irey

---

[75] The Government simply had Dr. Shaw admit: (1) Irey was a pedophile with interest in children younger than 13; (2) the actuarials used had control groups that included rapists and pedophiles who were interested in children above the age of 13; (3) that depression and alcoholism do not cause pedophilia; and asked a series of questions designed to elicit the depth of the expert's knowledge of Irey's crime. (Sentencing Hr'g Tr. 21–24.)

[76] Among other points, Irey's counsel argued:

> [W]e submit, Your Honor, that a 360-month sentence here is greater than necessary for Mr. Irey in light of the mitigation that's been presented.

> There is no way to minimize . . . the gravity of the acts with which Mr. Irey is charged. You've heard the mental health professionals tell you that this is a compartmentalized area of his whole being that is a result of his pedophilia, which is a diagnostic criteria for psychiatric care.

> What I gathered from Dr. Shaw's testimony and the best I could from Dr. Berlin's report is that the behavior of a pedophile is not totally volitional, that is, it is dictated in some degree by the disease itself. . . .

> . . . .

> [Irey] understands that he needs to be punished. . . . But he asks the Court to give him some consideration for the rest of his life, separate and apart from the crime he has committed.

> . . . .

argued that a sentence of between 15 and 20 years' imprisonment with up to a lifetime of supervised release would be sufficient but not greater than necessary to comply with § 3553(a).

Then came the Government's case. The prosecutor put on no witnesses and offered no evidence with the limited exception of a few sample images it showed the court during the course of the argument. The prosecutor began her argument with the observation that "the defendant is not being prosecuted for being a pedophile . . . . As an alcoholic doesn't have to drive a car, a pedophile doesn't have to put themselves in a brothel in Cambodia, which this defendant did for years and years . . . ." (Sentencing Hr'g Tr. 53–54.) She then emphasized that this was not a child pornography possession case, but a production case and that Irey "ruined, just absolutely and forever ruined over 50 children's lives," sometimes smiling while he did it. (Id. at 54–55.) Asking the court to look at the sample images, the prosecutor explained that the children were between 4 and 6 years old and that Irey's distribution of the images over the Internet had made the pictures infamous. She encouraged the court to consider the offense, the

─────────────────────

You've heard that he's treatable. You've heard that he's a low risk of recidivism. That would make him 66 or 71 when he got out, if he served the entire sentence. He would be an old man. We ask you to consider a sentence less than the guideline's recommended sentence.

(Sentencing Hr'g Tr. 49–52.)

206

victimization, and the "message we send to people who would do this." (Id. at 55–56)  In the end, the prosecutor focused on the "viciousness" of Irey's crime—over 1200 images of "torture" and some of the worst child pornography the agents had ever seen—and asked the court to impose a 30 year sentence.  (Id. at 56–57.)

### 4. District Court's Findings

After hearing from both parties, the court made its findings on the record. The court first explained its task:

> I take into account the guideline score and consider that as a benchmark in terms of imposing an appropriate sentence in a given case, and that benchmark needs to be kept in mind throughout the analysis . . . . But what I need to do after determining the guideline score is to look at the other 3553(a) factors on an individualized basis in an effort to determine an appropriate sentence for this particular case.

(Id. at 57.)

Without saying anything more about the Guidelines, the court launched into an analysis of the § 3553(a) factors, beginning with § 3553(a)(1)—the nature and circumstances of the offense and the history and characteristics of the offender. The court characterized the offense as "horrific": "The victims were numerous and perhaps the most vulnerable of the world's society.  So I don't think that there's any question but we're dealing with here with an offense that rises to the very top

in terms of <u>seriousness</u> and its effect on other human beings." (<u>Id.</u> at 58.

(emphasis added.))  Summarizing, the court found that "the seriousness" of the

offense "certainly does not mitigate in favor of any leniency." (<u>Id.</u>)  Turning to

Irey's history and characteristics, the court found that Irey had been a good family

man and community member, the acts that brought him before the court were "not

purely volitional" and "due in substantial part to a recognized illness," and he had

a "low" risk of recidivism.  The recidivism finding turned on two points: (1) the

court credited the expert testimony, and (2) Irey's age—as the court put it, "by the

time he gets out of prison he'll most likely be at an age where recidivism would be

unlikely, just from a physiological standpoint." (<u>Id.</u> at 59–60).

    The court then skipped § 3553(a)(2)(A), jumping to § 3553(a)(2)(B) and

(C).  Regarding general deterrence, the court found that a serious sentence would

"hopefully" deter others, but that conclusion might not "rationally follow[]"

because of the illness of pedophilia. (<u>Id.</u> at 60.)  Turning to specific deterrence,

the court referred to its findings on § 3553(a)(1), reiterated that the mental health

professionals categorized Irey as presenting a low risk of recidivism, and therefore

found that society did not need "further protection from him, at least beyond the

statutory minimum sentence." (<u>Id.</u> at 61.)

    Finally, the court seemed to return to § 3553(a)(2)(A), stating "[i]t comes

down to my view of what promotes respect for the law and provides just punishment." (Id.)  Here is the entirety of its discussion: "as indicated, I think that a 30-year sentence, given the personal factors that I have touched upon, is greater than necessary to accomplish the statutory objectives.  On the other hand, in light of the seriousness of the crimes, I think a sentence above the mandatory minimum is called for." (Id.)

### 5. Final Sentence and Objections

The court immediately—without hearing any argument on the application of the parsimony principle to its findings—announced the sentence.  The court settled on 210 months' imprisonment (or 17.5 years), a special assessment of $100, forfeiture, and a lifetime term of supervised release (which included a mandatory substance abuse and mental health program specializing in sex offender treatment).  (Id. at 61–62.)

In accordance with Jones, the court then asked whether there was any objection to the sentence or the manner in which it had been pronounced.  The prosecutor objected to "the extent of the variance, which is almost half, and based on the factors adduced in this record, particularly the seriousness and long-term nature of the offense, [that] the extent of that variance would be unreasonable."  The court merely responded that the sentence was "more like 60 percent of the

guideline, not half."  (Sentencing Hr'g Tr. 65.)

### B. Why the Sentence Must be Vacated and Remanded

Irey's sentence must be vacated and the case remanded for resentencing.

As I explained in part II.E, supra, a district court abuses its discretion in imposing

a sentence when it follows improper procedures, bases its decision on an incorrect

interpretation of law or clearly erroneous factfindings, or when the reviewing

court is left with the definite and firm conviction that the court committed a clear

error of judgment in making its sentencing decision.  The Government objected to

Irey's sentence on substantive reasonableness grounds, and I would vacate Irey's

sentence on those grounds: the sentence imposed cannot be reconciled with the

district judge's factfindings on § 3553(a)(2)(A).[77]

When making his findings on § 3553(a)(1), the judge remarked that when

---

[77] I would also find that the district court followed improper procedures and committed legal errors by not following the model that I set forth, had the Government objected on those grounds.  This is the case for at least two reasons.  First, the district court failed to follow the requisite adversarial procedure.  Importantly, it did not adequately address either the Guidelines recommendation or the Government's request for a 30 year sentence—that is, it neglected to articulate the reasons why such a sentence was greater than necessary to satisfy the § 3553(a)(2) purposes.  Gall clearly indicates that the failure to explain a deviation from the Guidelines range constitutes error.  Gall, 552 U.S. at 51, 128 S. Ct. at 597 (explaining that the court must "adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range").  Here, the court made no effort to explain why it sentenced Irey to 17.5 years' imprisonment when the Guidelines called for 30 years' imprisonment.  Second, it is impossible for this court to determine which § 3553(a)(2) purpose drove the sentence.

This is not to be overly critical of the district court.  In this circuit, the law governing sentencing has been at sea.  This circuit's precedent has not made clear the steps a district court must follow, nor has it clarified the importance of making findings regarding the (a)(2) purposes.  The district judge followed the procedural and substantive law as best he could discern it.

considering the "nature and circumstances" of the offense, the crime "r[ose] to the

top" in terms of seriousness and that the "seriousness of the offense . . . did not

mitigate in favor of any leniency." On (a)(2), after explaining why the need for

specific deterrence counseled a sentence of no more than 15 years' imprisonment

based on Irey's pedophilia, age, and family ties, the court turned to the sentencing

purpose of punishment, (a)(2)(A). The entirety of the court's discussion on (A)

was as follows:

> It comes down to my view of what promotes respect for the law and
> what provides just punishment. I think that a 30-year sentence, given
> the personal factors that I have touched upon is greater than
> necessary to accomplish the statutory objectives. On the other hand,
> in light of the seriousness of the crimes, I think a sentence above the
> mandatory minimum is called for.

(Id. at 61.)[78]

---

[78] Given the context and content of this finding, it is unclear that the court understood the
proper § 3553(a)(2)(A) inquiry. The court did not explain what it meant by "personal factors."
It may have been referring to Irey's low risk of recidivism, which it had just found. If so, the
court erred because a finding on specific deterrence has no bearing on (a)(2)(A). As I note in
part II.B, supra, culpability does bear on the (a)(2)(A) need. For this reason, criminal history can
be relevant to (a)(2)(A). U.S.S.G. Ch.4, Pt.A, intr. comment. Even though criminal history
might be relevant to both (a)(2)(A) and (a)(2)(C), that does not mean that the court's finding
regarding specific deterrence (which will be based on a number of factors, including criminal
history) has any bearing on the (a)(2)(A) need.

Of course, the court may have simply been referring to the same personal factors it had
drawn on for the § 3553(a)(2)(C) analysis to set up an independent § 3553(a)(2)(A) analysis.
Generally, considering an offender's personal characteristics for their impact on the need for just
punishment for the offense and the need to promote respect for the law is permissible. For
example, it stands to reason that someone who acts under duress is less culpable and therefore
should receive less punishment than an ordinary offender. It also stands to reason that the
court's failure to take account of that difference would promote disrespect for the law. In such
cases, however, the court must explain its reasoning.

The inquiry a court should conduct on (a)(2)(A) involves three steps: (1) making findings regarding the seriousness of the offense, the need to promote respect for the rule of law, and the need for just punishment; (2) weighing the three considerations against each other; and (3) making findings on the sentence needed to meet the § 3553(a)(2)(A) purpose.[79]  The district court, in making its (a)(2)(A) findings, failed to follow these three steps.  While it mentioned the need to "promote[] respect for the law" and "provide[] just punishment," it made <u>no</u> intelligible findings on these inquiries and gave <u>no</u> indication that it had considered facts crucial to any determination of the need for "just punishment" and the need "to promote respect for the law" (for example, the sentences other offenders received).[80]  Similarly, although the court stated here that the seriousness of the offense "called for" "a sentence above the mandatory minimum," it made no specific findings on the seriousness of the offense when conducting the (a)(2)(A) inquiry.  I do know, however, what the court would find on the seriousness of offense from what it said during the (a)(1) inquiry.  There, it found that the offense was "horrific," "rises to the very top in terms of

_____

[79]  The court's narrow focus on Irey's personal characteristics belies that it was conducting this analysis.

[80]  It is unclear why the court omitted the "seriousness of the offense" when it said "it comes down to my view of what promotes respect for the law and what provides just punishment."  It may have been because the court thought it had settled the issue of the seriousness of the offense during the § 3553(a)(1) inquiry.

seriousness," and that "in terms of the . . . seriousness of [the offense], the long-standing, long-term engagement in it certainly does not mitigate [sic] in favor of any leniency."

Therefore, all I know about the district court's findings on (a)(2)(A) is that it found the offense to be very serious. It is inconceivable that the judge's finding on seriousness of the offense alone would translate into a sentence at the bottom half of the statutory sentencing range of 15 to 30 years, let alone a sentence only two and a half years above the statutory minimum. The court, in conducting its (a)(2)(A) inquiry, may have concluded that the three relevant considerations were in tension—with the seriousness of the offense counseling a sentence at or near the top of the statutory range, but, for example, with Irey's impaired volition and advanced age decreasing the need for just punishment and respect for the law. If this were the case, the evidence in the record could support a sentence of 17.5 years,[81] but it is not our province to make this explanation for the judge. Without making intelligible findings on just punishment and respect for law, and without explicitly weighing the three inquiries and reaching a conclusion on how they bore

---

[81] On the other hand, if the district court's findings on just punishment and respect for the law were consistent with his finding on the seriousness of the offense, (a)(2)(A) would drive Irey's sentence, and a sentence of 17.5 years could not be reasonable. Because the judge's findings on (a)(2)(A)—unlike the three subsidiary inquiries under (a)(2)(A)—cannot be weighed against the other (a)(2) factors, the sentence imposed would have to be harsh enough to satisfy the strong (a)(2)(A) need.

on the (a)(2)(A) need, I simply cannot say on appellate review that the sentence imposed was supported by the district court's factfindings. All I have is the district court's finding on the seriousness of the offense, and I know that it cannot be reconciled with the sentence imposed. No rational judge could have sentenced Irey to 17.5 years based on the only intelligible finding—that seriousness rose to the top for this "horrific" crime.[82] I would therefore vacate Irey's sentence on the ground that it is not supported by the district court's findings, as I am able to understand them.[83]

---

[82] Contrary to the court's characterization of my opinion, I would not vacate Irey's sentence on the ground that the district court's findings are insufficiently "detailed" or "lacking in specificity or effort." <u>Ante</u> at 68, 72. My point is not, as the court implies, that a district court's findings need be of a certain length or belabor unnecessary points.

My point on substantive reasonableness is that a district court's findings must be reconcilable with the sentence imposed. Had the district court imposed a sentence that was reconcilable with the (a)(2)(A) findings it made, I would not vacate Irey's sentence on <u>substantive</u> reasonableness grounds, even if the district court had failed to make proper (a)(2)(A) findings on respect for the law and just punishment. In this instance, I would vacate the sentence because the findings the district court made on the seriousness of the offense cannot be reconciled with the sentence imposed, and given the district court's failure to properly address the other (a)(2)(A) considerations, I cannot assume that they balanced the court's finding on seriousness of the offense.

[83] It is also unclear what the district judge's findings on general deterrence were and whether they supported the sentence, though I need not address this question because it is clear that the sentence imposed was not supported by the judge's findings on (a)(2)(A). Here is the entirety of the court's discussion of § 3553(a)(2)(B):

There are other aspects of the statute that essentially are subjective in nature. Of course, adequate deterrence to criminal conduct. I mean a serious sentence is hopefully going to deter others from conducting similar affairs, although when we're dealing with an illness like this, I'm not sure that that rationally follows. But, nevertheless, deterrence is an appropriate consideration, and a stiff sentence is in keeping with the seriousness of this offense.

I would remand Irey's sentence to the district court so that the district court can make (a)(2) findings and resentence Irey accordingly—rather than making our own (a)(2) findings to determine whether the sentence is reasonable. To do so, we would have to step out of our role as a reviewing court and assume the role of resentencer. As I now explain, this is precisely the error the court makes today.

## IV. The Court's Approach

Today, the court needlessly assumes the role of resentencer. In so doing, it cements this circuit's answer to a question that continues to vex the nation's courts of appeals: after <u>Booker</u>, what does appellate review of sentences for substantive "reasonableness" under an abuse of discretion standard mean?[84] The

---

(<u>Id.</u> at 60.)

    The court's statement that general deterrence is "essentially subjective in nature" indicates that the court did not understand the § 3553(a)(2)(B) inquiry. The inquiry includes the incidence of the crime in the community and the community view of the offense. The court should have taken into account its earlier finding that child pornography is an "epidemic," driven by its ready availability on the Internet. Regardless, it is unclear what the court found at the end of the day regarding the need for general deterrence—whether it reasoned that the need for general deterrence should be discounted because of the illness of pedophilia or whether the need for general deterrence was great and counseled a harsh sentence. If it were the latter, the sentence imposed may not be sufficient to satisfy the need for general deterrence as found by the district judge.

    [84] The federal courts of appeals, including this court, approach substantive reasonableness review inconsistently. This is not surprising since, as the Supreme Court itself has recognized, "<u>Apprendi</u>, <u>Booker</u>, <u>Rita</u>, <u>Gall</u>, and <u>Kimbrough</u> have given the lower courts a good deal to digest over a relatively short period." <u>Spears v. United States</u>, 129 S. Ct. 840, 845 (2009) (per curiam) (quotation omitted). Specifically, the courts and their judges differ in the amount of deference they purport to afford the district court's weighing of the § 3553(a) factors. <u>Compare</u> <u>United States v. Pugh</u>, 515 F.3d 1179, 1191 (11th Cir. 2008) ("[W]e may find that a district court has abused its considerable discretion if it has weighed the factors in a manner that demonstrably yields an unreasonable sentence. We are therefore still required to make the

correct answer, as I demonstrate in parts III and IV, supra, is to apply classic

abuse of discretion review.  The court's answer is shocking: a simple objection

that a sentence is "unreasonable" grants a disappointed party the functional

equivalent of a new sentencing hearing before the court of appeals.  The court

considers evidence and arguments never offered to the district court, makes new

findings, reweighs the § 3553(a) factors, and concludes as a matter of law that

William Irey must be sentenced to 30 years' imprisonment.  In the process, the

---

calculus ourselves . . . .") and United States v. Tomko, 562 F.3d 558, 585-86 (3d Cir. 2009)
(Fisher, J., dissenting) ("As the remainder of our analysis reveals, the District Court's over-
reliance on § 3553(a)(1) as justification for the significant qualitative and quantitative variance it
granted pales in comparison to the numerous § 3553(a) factors which suggest that a term of
imprisonment is warranted . . . . [W]e conclude that the relevant § 3553(a) factors advocate in
the strongest possible terms for a sentence including a term of imprisonment.") with Tomko, 562
F.3d at 574 (majority opinion) ("Accordingly, the substantive reasonableness of each sentence
must be evaluated on its own terms, based on the reasons that the district court provided, in light
of the particular facts and circumstances of that case.") (emphasis added) and United States v.
Smart, 518 F.3d 800, 808 (10th Cir. 2008) ("We may not examine the weight a district court
assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as
a legal conclusion to be reviewed de novo.").

Moreover, appellate courts and circuit judges across the country have openly expressed
confusion about the appropriate role of appellate courts.  See, e.g., United States v. Feemster,
572 F.3d 455, 467 (8th Cir. 2009) (Colloton, J., concurring) ("[O]ne searches in vain for a
principled basis on which to conduct a consistent and coherent appellate review for
reasonableness."); United States v. Funk, 534 F.3d 522, 530 (6th Cir. 2008) (Boggs, C.J.,
dissenting) ("This case represents essentially a judgment call under the rather unclear standard of
'reasonableness' that we have been given by the Supreme Court in the wake of Rita, Kimbrough,
and Gall.").  Likewise, commentators have noted the Supreme Court's seemingly contradictory
imperatives.  E.g., Frank O. Bowman, III, Debacle: How the Supreme Court has Mangled
American Sentencing Law and How It Might Yet Be Mended, 77 U. Chi. L. Rev. 367, 459–60
(2010) (claiming that the Supreme Court's entire line of Sixth Amendment sentencing cases
presents a "tangle of rules and exceptions" that "is obviously neither simple nor, as illustrated at
length above, logical"); Lindsay C. Harrison, Appellate Discretion and Sentencing after Booker,
62 U. Miami L. Rev. 1115, 1115–16 (2008) ("What has resulted is primarily confusion about the
role of the appellate courts in reviewing sentences.  Several often seemingly conflicting
imperatives are at play after Booker . . . .").

court does immense and immeasurable institutional damage.  Part A sets out the

court's approach; Part B explains the harm that it causes.

### A. Appellate Resentencing

According to the court, the question presented is whether Irey's sentence is

"reasonable."  Ante at 35.  In determining whether the sentence is "reasonable,"

the court unabashedly explains that its job is to take the facts found by the district

court and any others it finds in the record, and then make its own findings for each

§ 3553(a) factor.  Id. at 58–59.  After making its own findings, the court reweighs

the § 3553(a) factors and determines for itself what range of sentences is

reasonable.  Id. at 58 ("In order to determine whether that has occurred, we are

'required to make the [sentencing] calculus ourselves' and to review each step the

district court took in making it.") (quoting United States v. Pugh, 515 F.3d 1179,

1191 (11th Cir. 2008)).  By "reasonable," the court means the sentencing range

that it thinks is objectively correct to satisfy the sentencing purposes of § 3553(a).

The court even goes so far as to declare, incorrectly and without any

support, that the weight of facts under § 3553(a) presents a question of law.  Id. at

59 ("[T]he importance of facts in light of the § 3553(a) factors is not itself a

question of fact but instead is an issue of law.") (emphasis added); id. at 118, n.33

(justifying the court's new finding on the need for specific deterrence in sex crime

cases because "[n]o member of this Court . . . has ever before suggested that <u>in</u> <u>determining the law</u> we ought to confine ourselves to the decisions that were cited in the district court") (emphasis added).[85]

In reaching this conclusion, the court disregards the Supreme Court's analysis in <u>Gall</u>. <u>See, e.g.</u>, <u>Gall</u>, 552 U.S. at 56–57, 128 S. Ct. at 600–602, (reversing the Eighth Circuit because "[a]lthough [it] correctly state[ed] that the appropriate standard of review was abuse of discretion, it engaged in an analysis that more closely resembled de novo review of the facts presented" by, for example, concluding that the district court "gave too much weight to Gall's withdrawal from the conspiracy") (quotations omitted); <u>United States v. Smart</u>, 518 F.3d 800, 808 (10th Cir. 2008) (reversing precedent as inconsistent with <u>Gall</u> that had reviewed "<u>de novo</u> the weight assigned to various § 3553(a) sentencing factors because we considered this weighing process to be a question of law."). It also ignores this circuit's precedent—we have repeatedly held that "[t]he weight given to any § 3553(a) factor is within the sound discretion of the district court and we will not substitute our judgment in weighing the relevant factors." <u>E.g.</u>,

---

[85]  The court does not seem to be claiming that whether a fact is relevant, in the evidentiary sense, presents a question of law.  Rather, the court says that a given fact's "importance," that is, weight, in deciding a § 3553(a) issue presents a question of law.  <u>See</u> <u>ante</u> at 60 (explaining that the district court cannot write facts out of the record by ignoring them, even if it reflects the court's judgment that "those facts are not important" to the § 3553(a) inquiry).

United States v. Amedeo, 487 F.3d 823, 832 (11th Cir. 2007); United States v.
Gardner, 363 Fed. App'x 688, 690 (11th Cir. 2010) (unpublished); United States
v. Pertil, 344 Fed. App'x 569, 573 (11th Cir. 2009) (unpublished).[86]

Whatever the case, because questions of law are reviewed de novo even
under the abuse of discretion standard,[87] the court does not give—or even think it
owes—deference to the district court's § 3553(a) analysis. See ante at 44–45
("Section 3553(a) plays a critical role in appellate review of sentences, just as it
does in the initial sentencing decision" and the court of appeals must "apply those
same factors in determining whether a sentence is reasonable.") (emphasis added).

The court purports to apply abuse of discretion because it will give some

---

[86] Though the court is convinced that it is not committing the same mistake as the Eighth
Circuit in Gall—conducting an inquiry of the § 3553(a) factors akin to de novo review—there
are striking similarities between the two analyses. Compare United States v. Gall, 446 F.3d 884,
889 (8th Cir. 2006) ("First, the district court gave too much weight to Gall's withdrawal from the
conspiracy because the court failed to acknowledge the significant benefit Gall received from
being subject to the 1999 Guidelines."), rev'd 552 U.S. 38, 128 S. Ct. 586, and id. at 891 ("[T]he
district court did not properly weigh the seriousness of Gall's offense. While the district court
observed that Gall's offense level did not adequately reflect the offense conduct because it was
based 'solely on drug quantity,' the district court ignored the serious health risks ecstasy
poses."), with ante at 92–95 ("The facts about Irey as a husband, father, and member of the
community are not disputed, the question is how to weigh them for sentencing purposes. . . .
We would find grossly unreasonable, however, any suggestion that the credit Irey may be due
for his family's feelings for him could even remotely approach the heavy weight stacked against
him for the criminal acts he committed."), and ante at 123 ("With child sexual abuse of the kind
that we know Irey is capable of and has committed . . . . [E]ven with an assumed low risk of
recidivism following release in 15 years and 3 months, imprisonment for that length of time does
not afford adequate protection from further crimes by him.").

[87] See Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047 (1996)
("[W]hether a factor is a permissible basis for departure under any circumstances is a question of
law, and the court of appeals need not defer to the district court's resolution of the point.").

deference to a district court's <u>conclusion</u>. Specifically, the court notes that "[a] district court's sentence need not be the most appropriate one, it need only be a reasonable one" and because "we are to vacate the sentence if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors." <u>Id.</u> at 60, 62 (quotation omitted). But the line between "unreasonable" and "most appropriate" blurs. And it blurs quickly when the court conceives of its role as to conduct the § 3553(a) inquiry for itself and identify the range of sentences the district court could have reasonably imposed (as opposed to reviewing the district court's reasoning from its § 3553(a) factfindings to its conclusion). Once the court of appeals has independently identified what it believes is the range of permissible sentences (explicitly or implicitly), appellate review becomes an inquiry into whether the district court's sentence falls within the range of sentences it, the court of appeals, would have imposed. This approach amounts to <u>de novo</u> review in the guise of abuse of discretion. <u>See</u> <u>Curtiss-Wright Corp. v. Gen. Electric Co.</u>, 446 U.S. 1, 10, 100 S. Ct. 1460, 1466 (1980) (instructing that when conducting abuse of discretion review, the role of appellate courts is not to "reweigh the equities or reassess the facts but to make sure that the conclusions derived from [the district court's] weighings and assessments are judicially sound and supported by the

220

record.").[88]

What is worse, the court does not confine its new analysis of the § 3553(a)

factors to the evidence, arguments, and objections offered to the district court.[89]

_____

[88] The court relies on United States v. Taylor, 487 U.S. 326, 108 S. Ct. 2413 (1988), for the proposition that courts of appeals must scrutinize a sentencing decision more closely because a sentence is arrived at by considering a number of statutory factors. Ante at 59–60 & n.15. In Taylor, though—which addressed only the issue of whether a district court abused its discretion by dismissing charges with prejudice when the Government committed a Speedy Trial Act violation—the Supreme Court specifically limited its analysis to whether the factfindings supported the decision to dismiss the charges with prejudice. The Court started with the district court's order—dismissing the charges with prejudice—and then looked to see whether the record supported that conclusion. Ultimately, because the district court did not fully explain its reasoning, the Court held that "[t]he District Court failed to consider all the factors relevant to the choice of a remedy under the Act. What factors it did rely on were unsupported by factual findings or evidence in the record." Taylor, 487 U.S. at 344, 108 S. Ct. at 2423. Finding insufficient support in the record for the district court's decision and refusing to conjure its own explanations, the Court held that the district court abused its discretion. Tellingly, the court did not conduct the Speedy Trial Act remedy inquiry for itself: It did not reach its own conclusions on the way each Speedy Trial Act factor cut and it did not decide whether the case should be dismissed with or without prejudice. Rather, because the decision is left to the district court's discretion, the court simply returned the question to it for reconsideration.

[89] The court contends that "much" of my criticisms on this score stem from the "faulty premise that the government made only a 'simple objection' that Irey's sentence is 'unreasonable.'" Ante at 138 n.44. With this mischaracterization of my position in hand, the court purports to defeat it by citing a number of our cases reaching the uncontroversial conclusion that a party need not repeat in the Jones colloquy arguments it had already made to the district court. See, e.g., United States v. Weir, 51 F.3d 1031, 1032 (11th Cir. 1995) (declining to apply the waiver rule when the district court "clearly understood the [party's] position and specifically rejected it.").
My criticism is different. It is true that a general objection will preserve more specific arguments a litigant actually made to the district court, id., but a general objection does not preserve specific arguments that a litigant never made. Here, for example, the Government did argue in general terms that only a 30-year sentence would be reasonable due to the seriousness of Irey's crimes. But the Government did not contend—as the court does today—that the good behavior credit would reduce Irey's sentence, or that such a sentence would amount to " less than four months for each of [Irey's] 50 victims." Ante at 103. Had the Government made these arguments and the others the court considers for the first time here, the district court may have imposed a different sentence. Since the Government did not, we may not consider them for the first time on appeal.

In so doing, the court ignores well-established rules of appellate procedure and

implicitly overrules <u>United States v. Jones</u>, 899 F.2d 1097, 1102 (11th Cir. 1990)

<u>overruled on other grounds by</u> <u>United States v. Morrill</u>, 984 F.2d 1136 (11th Cir.

1993) (en banc).[90]  In <u>Jones</u>, this court explicitly ruled out considering new

arguments and evidence in sentencing appeals.  Thus, without explanation or

apology, the court works a revolution in the rules governing the scope of review.

The court's willingness to do so underscores that its conception of substantive

reasonableness review bears no resemblance to traditional abuse of discretion

review.[91]

---

[90]  Any conclusion that objecting to a sentence's "substantive unreasonableness" triggers the functional equivalent of a new sentencing hearing on appeal is tantamount to overruling <u>Jones</u>. <u>Jones</u> required that the district court have the first opportunity to correct its errors; an objection that a sentence is "substantively unreasonable" without explaining why does not give the court that opportunity.

[91]  In <u>United States v. Brown</u>, 415 F.3d 1257 (11th Cir. 2005), this court discussed abuse of discretion review in another fact-heavy, individualistic context.  There, the issue was whether expert testimony could be admitted under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993).  This court explained in some detail the reasons for abuse of discretion review, most notably that the "rules relating to <u>Daubert</u> issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization" and that "we don't want to denigrate the importance of the trial."  <u>Brown</u>, 415 F.3d at 1266.  On appeal, this court did not reweigh the <u>Daubert</u> factors to determine whether the district court abused its discretion.  Instead, this court explained that even though the expert evidence met only one of the four <u>Daubert</u> factors, we could not say that in this "particular situation" the district court abused its discretion, especially "given the heavy thumb—really a thumb and a finger or two—that is put on the district court's side of the scale."  <u>Id.</u> at 1268.
   The same should be true with sentencing.  Sentencing decisions defy precise calibration and must be applied to the unique facts of specific cases.  District courts are uniquely suited to make the judgment demanded by § 3553(a) and the parsimony principle, and reopening the record on appeal certainly diminishes the importance of the sentencing hearing.

Instead, the court conducts a free-wheeling inquiry—conjuring new arguments and citing new evidence.  With respect to § 3553(a)(1), for example, the court creates for the first time an argument that the district court's view of Irey as a victim "permeated" and "tainted" the court's weighing of the § 3553(a) factors, although the prosecutor never objected to the characterization of Irey as a victim.  Ante at 80–81.[92]  The court also argues, for the first time, that the district court clearly erred when it found that Irey's misconduct was "not purely volitional," and that even accepting the district court's finding on volition, the case would still fall in the heartland because almost all pedophiles are child molesters.[93]  Id. at 84–87.  To prove both of these points, the court cites to expert

---

[92] When I say "for the first time," I mean that these arguments were not made to the district court.

[93] I recognize, of course, that after the court explains why the finding was clearly erroneous, it states that it accepts the finding because the Government did not challenge it on appeal.  But see ante at 84–85.  If the court is truly accepting the finding, however, I do not understand why the court takes the time to conjure new evidence and arguments.

It could be that though the court ostensibly accepts the district court's volitional finding, its explanation that it is clearly erroneous is very important to its analysis.  The court ultimately concludes that the finding "cannot reasonably carry much weight" because, at least in part, it is clearly erroneous.  Id.  If the court really accepted that Irey's misconduct was "due in substantial part" to diminished capacity, id. at 85, it could not conclude—as it ultimately does—that the district court would have abused its discretion as a matter of law if it had imposed a sentence of even one day less than the statutory maximum.  See id. at 137 ("Nothing less than the advisory guidelines sentence of 30 years, which is the maximum available, will serve the sentencing purposes set out in § 3553(a).").

In any event, my point is that when reviewing sentences, this court should not consider or conjure evidence and arguments that have never been offered to the district court.  That is inconsistent with classic principles of appellate review and will cause immense damage to the institutional relationship we have with the district courts of this circuit.

223

evidence never offered to the district court.[94] See id. at 83, 87 (citing Bruce J.

Winick, Sex Offender Law in the 1990s: A Therapeutic Jurisprudence Analysis, 4

Psychol. Pub. Pol'y & L. 505, 524 (1998), and Ryan C.W. Hall & Richard C.W.

Hall, A Profile of Pedophilia: Definition, Characteristics of Offenders,

Recidivism, Treatment Outcomes, and Forensic Issues, 82 Mayo Clinic Proc. 457,

458 (2007)).

Nor did the Government ever argue, as the court does, that the district court

clearly erred in finding that Irey had good character and had contributed positively

to his family and community. See id. at 89–95 (contending that, categorically,

anyone who commits the crime Irey committed and causes his family to lose its

business and home cannot be a good family man and have good character). Nor

did the Government argue to the district court that it should not have considered

Irey's old age in his favor because to do so would reward him "for evading

detection and it is unreasonable to do that." Id. at 96.

Similarly, in reweighing each of the § 3553(a)(2) purposes, the court

conjured new arguments and cited new evidence never heard by the district court.

Regarding the need for punishment, the Government never argued, as the court

_____

[94] Though I label this expert "evidence," it is not technically evidence because it was not entered into the record. A more apt term might be "extra-record information." Vining v. Sec'y, Dep't of Corr., No. 07-15681, slip op. at 4 (11th Cir. June 28, 2010). Nevertheless, because it performs the function of evidence in the court's analysis, I refer to it as such.

does, that the good behavior credit would reduce Irey's sentence to 15.5 years, which amounts to "less than four months for each of [his] 50 victims." Id. at 103. Nor did the Government argue that Irey's sentence does not reflect the seriousness of the offense because he received only 2.5 years longer than the 15 years he would have served had he taken one lewd picture of a 17-year-old girl. Id. at 104.

With respect to general deterrence, the court's entire analysis would be new to the district court. The Government never argued that the need for general deterrence is especially compelling in the child pornography context. But see id. at 108–12. The Government never pointed to Supreme Court cases underscoring that importance, or to appellate cases reversing district courts for questioning the logic of general deterrence when pedophilia was involved. But see id.

The Government completely ignored specific deterrence at the sentencing hearing.[95] The Government never questioned, as the court does today, the district court's finding that a 65-year-old male would be too old for sexual activity from a "physiological standpoint." But see id. at 114–15. Obviously then, the Government did not cite to published opinions involving sex offenders over age 60 to make this point. But see id. at 115–16. Nor did the Government enter

---

[95] In fact, the Government stipulated that Irey fell into criminal history category I, which in essence means the Government stipulated that no prison time beyond that called for by his offense level was needed for specific deterrence. Accordingly, the Government never argued, for example, that Irey's criminal history category under-represented his potential for recidivism.

expert evidence about the comparatively high recidivism rates of older sex offenders. But see id. at 117 (citing Mark Motivans & Tracey Kyckelhahn, Federal Prosecution of Child Sex Exploitation Offenders 2006, Bureau Just. Stat. Bull., Dec. 2007 for the proposition that 7.3% of all sex offenders are over 60, and Ryan C.W. Hall & Richard C.W. Hall, A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensics Issues, 82 Mayo Clinic Proc. 457 (2002), for the proposition that up to 44% of pedophiles were in the older adult range (age 40 to 70 years) and that pedophiles "offend in their later years at a greater rate than other sexual offenders").

Still on specific deterrence, the Government never argued that a lifetime of supervised release would be insufficient to protect the public by pointing to Bureau of Justice statistics, other expert evidence, and cases demonstrating that it is possible to recidivate when under supervision. But see id. at 118–21 (citing Bureau of Justice Statistics, Dep't of Justice, Federal Criminal Justice Trends, 2003, (2006); Loretta J. Stalans, Adult Sex Offenders on Community Supervision: A Review of Recent Assessment Strategies and Treatment, 31 Crim. Just. & Behav. 564 (2004); James L. Johnson, Sex Offenders on Federal Community Supervision: Factors that Influence Revocation, Fed. Probation, June 2006; Patrick A. Langan et al., Bureau of Justice Statistics, Recidivism of Sex Offenders

226

Released from Prison in 1994 (2003); 2009 Annual Report of the Director:
Judicial Business of the United States Courts (forthcoming spring 2010);
Protecting Our Nation's Children from Sexual Predators and Violent Criminals:
What Needs to Be Done?, Hearing Before the Subcomm. on Crime, Terrorism,
and Homeland Security of the H. Comm. on the Judiciary, 109th Cong. 30 (2005)
(statement of Fred S. Berlin, M.D., Associate Professor, Johns Hopkins
University)).

Finally, with respect to § 3553(a)(6), the Government never argued that
Irey's sentence would produce unwarranted disparity. Obviously, then, it never
cited twelve cases for the proposition that the defendants in those cases committed
a less serious crime than Irey but received a more serious sentence. Id. at 130–34.

If the court's analysis leaves any doubt that the court has assumed the role
of resentencer, its conclusion removes it. After conducting the functional
equivalent of a new sentencing hearing, the court concludes that "[n]othing less
than the advisory guidelines sentence of 30 years, which is the maximum
available, will serve the sentencing purposes set out in § 3553(a)." Id. at 137.
Accordingly it vacates Irey's sentence and remands the case with the instruction
that the district court impose a sentence of 30 years' confinement. Id. at 140–41.
With this unprecedented step, it is indisputable that the court has resentenced Mr.

227

Irey.[96]

\* \* \*

After today's opinion, it is the law of this circuit that a party who is

disappointed by the sentence the district court has imposed may apply to this court

for resentencing.[97] Except for live testimony, the disappointed party can brief

evidence never offered and arguments never articulated to the district court.  From

its new vantage point, this court will then second-guess the district court's

sentence.  We will determine the range of objectively correct sentences based on

the new facts and new arguments; if the sentence handed down by the district

court falls outside of that range, we will reverse.  Sometimes, that range could be a

single point.  Here, the court holds that any sentence other than 30 years'

imprisonment would constitute an abuse of discretion—if the district court had

sentenced Irey to 29 years, 11 months, and 29 days, it would have abused its

_____

[96] Though we have reversed sentences on substantive reasonableness grounds before, we have never ordered the district court to impose a particular sentence.  See, e.g., United States v. Livesay, 587 F.3d 1274, 1278–79 (11th Cir. 2009) (vacating a sentence and instructing that imprisonment was required but leaving the length of the term to the district court's discretion); Pugh, 515 F.3d at 1204 (remanding without stating what the sentence should be); United States v. Martin, 455 F.3d 1227, 1241–42 (11th Cir. 2006) (same); Crisp, 454 F.3d at 1291–92 (same).

[97] In this case, the Government is the disappointed party.  But suppose the defendant were the disappointed party, claiming that the sentence the district court imposed was so severe as to be "unreasonable."  If the defendant had sandbagged the district court by withholding evidence that mitigated the need for punishment and by failing to cite the sort of published authorities cited in the court's opinion, we would not consider the withheld evidence and published authorities (because we do not consider matters not presented to the district court) unless we invoked the plain error doctrine.

discretion as a matter of law.[98]  The court is not taking the abuse of

---

[98] Not only is the court's approach inconsistent with abuse of discretion review, it also risks reintroducing the constitutional infirmity cured by Booker.  In short, the court's approach turns the appellate court into the post-Booker Sentencing Commission: rather than the Commission's Guidelines, the court of appeals will determine the bounds of a district court's discretion by identifying the range of "reasonable sentences" for a given set of facts.

Pre-Booker, the mandatory Guidelines set the Apprendi statutory maximum because, based only on the facts reflected by a jury verdict, a defendant could be sentenced to no greater than the sentencing range identified for his base offense level and criminal history category score.  A defendant could receive a higher sentence if—but only if—the district court found facts to support specific offense characteristics or adjustments by preponderance of the evidence.  This was true even though district courts could disregard the Guidelines in extraordinary circumstances, because in "most cases, as a matter of law, the Commission will have adequately taken all relevant factors into account, and no departure will be legally permissible." United States v. Booker, 543 U.S. 220, 234, 125 S. Ct. 738, 750 (2005).  This was also true even though the district court had virtually unfettered discretion to sentence a defendant within the range identified by the mandatory Guidelines.

Transforming the Guidelines from mandatory to advisory cured the Sixth Amendment violation because the Court had "never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." United States v. Booker, 543 U.S. at 233, 125 S. Ct. at 740.  Thus, a defendant risked any sentence along the statutory range, so long as the district court did not abuse its discretion.  Because the district court's authority to exercise "broad discretion" to sentence offenders along the statutory range is what allows the Booker remedy to cure the Sixth Amendment violation of mandatory Guidelines, and because appellate review is the check on that authority, properly defining the scope of appellate review is essential.

Giving proper content to appellate review is the key to assuring that the advisory-Guideline remedy actually rights the Sixth Amendment wrong identified by Booker.  If appellate review is too stringent, it will carve up statutory sentencing ranges in exactly the same way the Sentencing Commission's mandatory Guidelines did.  For example, suppose the statutory range for a particular crime is 5 to 40 years' imprisonment.  Suppose that in one case, the appellate court decides that for any defendant who commits the crime under X facts, the district court would necessarily abuse its discretion unless it imposed a sentence of at least 10 years' imprisonment.  Suppose that in another case, a defendant commits the same crime, again under X facts, and the appellate court decides that the district court would necessarily abuse its discretion if it imposed a sentence above 20 years' imprisonment.  After those two decisions, the court has created a sentencing range that is identical in all relevant respects to a mandatory-Guidelines sentencing range: as a matter of law, a defendant who violates the crime under X set of facts must receive a sentence of somewhere between 10 and 20 years' imprisonment.  If the defendant did not admit all of the facts, then the district court would base that sentence on judge-found facts by a preponderance of the evidence.  The district judge would then have unfettered discretion to sentence a defendant who commits the crime under X facts from between 10 and 20 years, but would have no discretion to sentence beyond that range (just as the district judge had

discretion standard seriously.

## B. Institutional Harm

The court's willingness to resentence does immense and immeasurable

institutional damage. "'It has been uniform and constant in the federal judicial

tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes

---

unfettered discretion to sentence within the range of sentences identified by the mandatory Guidelines).

Today, the court takes a step in this direction. The court conceives of its role as to determine what range of sentences is "reasonable." In other words, the court is deciding as a matter of law the bounds of the district court's discretion within the statutory range on the particular set of facts contained in this record. The court concludes that under the facts of this case, Irey must be sentenced to no less than 30 years' imprisonment or the district court would necessarily abuse its discretion. If we follow the court's approach and declare what range of sentences is objectively "reasonable" based on our own assessment of the § 3553(a) factors in light of a particular set of facts, we will, over time, carve up statutory sentencing ranges to the point that it will be possible to identify the maximum sentence that can be imposed based solely on the facts embodied in the jury verdict. In fact, after today, I fail to see how a district court could impose a sentence of less than 30 years for a materially similar defendant. Once that occurs, this court will have reintroduced the Sixth Amendment violation supposedly cured by Booker.

The standard of review I set out in part II.E, supra, gives meaning to appellate review of sentences while avoiding this result as much as possible. Under my approach, this court is not in the business of reweighing all of the facts in the record, conducting a § 3553(a) inquiry de novo, and declaring a range of sentences that is objectively correct or "reasonable." Rather, under my approach, when we reverse a sentence on substantive grounds, we are simply holding that under the non-clearly erroneous facts found by the district judge and in light of the district judge's explanation, no rational judge could have imposed that sentence. We would not hold as a matter of law that on a given set of facts, only a sentence of at least so-many years' imprisonment is reasonable. Nor would we decide the import of particular facts to the § 3553(a) inquiry for all time; for example, we would not hold, as the court does, that pedophilia-as-diminished-capacity can never form the basis for a downward departure in a sex crimes case. Such a standard gives district judges maximum discretion to sentence a defendant anywhere along the statutory sentencing range and thus is more consistent with the remedy fashioned by the Supreme Court in Booker.

mitigate, sometimes magnify, the crime and the punishment to ensue.'" <u>Gall</u>, 552

U.S. at 52, 129 S. Ct. at 598 (quoting <u>Koon v. United States</u>, 518 U.S. 81, 113,

116 S. Ct. 2035, 2053 (1996)).  The district court is unquestionably the best

judicial actor to conduct this "unique study" and to undertake the open-ended and

fact-heavy § 3553(a) inquiry.  <u>See, e.g.</u>, <u>Gall</u>, 552 U.S. at 51–52, 129 S. Ct. at

597–98 (explaining that the district court is in a "superior position to find facts

and judge their import under § 3553(a) in the individual case" because it looks the

defendant and witnesses in the eye, gains insights not conveyed by the cold

record, and has extensive sentencing experience) (quotation omitted).  The district

court's effective use of its expertise, however, turns on the active participation of

the lawyers—the prosecutors and defense counsel—in the adversary proceeding

envisioned by <u>Rita</u> and <u>Gall</u> and fleshed out by my opinion today.  Their

professionalism is vital to the sentencing process.  Indeed, if sentences are to

inspire the confidence of the defendant and the public, the sentencing hearing in

the district court must be the "main event," rather than a "tryout on the road" for

the real forum that will determine the sentence.  <u>Wainright v. Sykes</u>, 433 U.S. 72,

96, 97 S. Ct. 2497, 2508 (1977).

Today's decision sends the unmistakable message that the district court is

nothing but a tryout on the road.  This diminishes the district courts' institutional

role in the eyes of the public and the legal profession because it <u>de facto</u> strips the district courts of their Congressionally given authority.[99]  If the district court procedure is merely a tryout, a busy district court may be inclined to pay mere lip service to its § 3553(a) duty and simply impose a Guidelines sentence;[100] after all, its sentence would only be tentative, subject to second-guessing on appeal.  And even if the district court wanted to do its duty, the prosecutor may not present the government's best case to the district court—better to wait and see what sentence the court imposes before expending the government's resources.[101]

---

[99]  In this case, the Government participated in the diminishment through the prosecutor's failure to present a robust sentencing argument to the district court and failure to adequately call attention to the mistakes she believed the district court made.  Defense counsel are required by the Sixth Amendment to perform at the highest professional level and to treat the sentencing hearing before the district court as the main event.  If defense counsel's performance is wanting, counsel may have to answer for it in a collateral proceeding alleging a violation of the defendant's Sixth Amendment right to the effective assistance of counsel.  The prosecutor, however, does not run the risk of having to answer to a district judge in a collateral proceeding on a charge of inept performance.

[100]  This would not only flout the Congressional command embodied in § 3553(a), it would also deny justice for either the United States or the defendant.  If the facts and circumstances of the case call for a sentence outside the Guidelines sentencing range to satisfy the § 3553(a)(2) purposes of a federal sentence—and they often will—the sentence will not be tailored to the unique facts before the court, will not serve the parsimony principle, and will work an injustice on one of the parties.

[101]  District courts' tendency to impose sentences within the Guidelines range worsens this already perverse incentive.  This circuit's district courts imposed Guidelines sentences in 65.6% of the cases from October 1, 2008 through September 30, 2009.  <u>See</u> United States Sentencing Commmission, <u>Sourcebook of Federal Sentencing Statistics</u>, tbl. 26 (2009).  The court's approach gives the government every incentive to rest on the Guidelines and put on no § 3553(a) evidence before the district court (as the government frequently does).  In the infrequent event that the district court imposes a below-Guidelines sentence, the government would lose nothing because it could make its § 3553(a) case for the first time before the court of appeals.

The court's willingness to ignore time-honored contemporaneous objection and procedural default rules diminishes the status of the district courts for another reason.[102]  These rules are designed to force the parties to give the district court everything it needs to make sound decisions and the first chance to fix any errors. This, in turn, leads to an enhanced quality of judicial decision making, preserves the sentence's finality, and may prevent unnecessary appeals.  The court's message to the prosecutors in this circuit is: don't bother, there is no need to try to put the district court in the best position to make decisions.

Sadly, our approach today diminishes the district court's role for no good reason.  It transfers sentencing authority from district judges to the courts of appeals, which lacks the district judges' experience and expertise in imposing criminal sentences.  As the length of today's opinion shows, even attempting to duplicate the district judge's § 3533(a) task requires a huge investment of this court's resources.  Despite the huge investment, there is no real return: due to our lack of experience and expertise, we are poorly suited to the job and will not infrequently reach a wrong result.  Moreover, our fact-intensive resentencing

---

[102] <u>Jones</u>, after all, is simply an application of the contemporaneous objection rule to the sentencing context.  Sentencing is unique because the <u>district court</u> is not bound by the evidence, the parties' proposed findings and conclusions, and the parties' arguments at the close of the hearing.  If the district court bases the sentence on findings or arguments not articulated at the sentencing hearing, the parties must have an opportunity to object to the court's findings and conclusions and obtain the correction of any error the district court may have made.

233

decisions will be incapable of generalization and will hinder our ability to establish clear guidance for the district courts of our circuit. See Koon v. United States, 518 U.S. at 98–99, 116 S. Ct. at 2046–47; see also Buford v. United States, 532 U.S. 59, 65–66 121 S. Ct. 1276, 1281 (2001) (explaining that if the question presented "grows out of, and is bounded by, case-specific detailed factual circumstances," then the "value of appellate court precedent" is limited). Lastly, as we fritter away our resources on sentencing appeals, other litigants in the appellate queue will suffer.

This court is not well-suited to sentence offenders for another and even more important reason. The Supreme Court has made abundantly clear the crucial role that process plays in sentencing. See Gall, 552 U.S. at 49–50, 128 S. Ct. at 596–97. The public's and the defendant's confidence in the justice of a sentence turn on how the sentencer arrived at it. Given the strictures of appellate review, it is impossible for us to accord a defendant the process that is due. See e.g., Fed. R. Crim P. 32(i). When this court resentences a defendant, it deprives him of a meaningful hearing in which he has the right to address a judge who can look him in the eye before deciding his fate. See Fed. R. Crim. P. 32(i)(4)(A)(2)(ii). Because the defendant's first notice of the reasons for the resentence and its

234

factual bases is provided by this court's opinion imposing the sentence,[103] he is deprived of the right to object to the reasons and factual bases.[104] And, crucially, it deprives him of a right to appeal. Such treatment of a litigant not only breeds disrespect for the rule of law, but also raises serious due process concerns. See Gardner v. Florida, 430 U.S. 349, 362, 97 S. Ct. 1197, 1207 (1977) (plurality opinion) (concluding that the due process clause was violated when "the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain").

In sum, when placed on a balance sheet, the grave institutional harm caused by the court's approach significantly outweighs any benefit the approach might yield.[105] Resentencing defendants on appeal diminishes the role of the district court in the eyes of the legal profession, and it diminishes the public's confidence in the district courts as an institution for administering criminal justice. It

---

[103] That the Government's brief cites evidence and advances arguments not presented to the district court in the first instance is of no moment. Defense counsel would assume that this court, adhering to its time-honored rule that matters not presented to the trial court will not be considered, Dupree v. Thomas, 946 F.2d 784, 793 (11th Cir. 1991), would refuse to entertain the evidence and arguments, and thus would not waste precious briefing space to respond.

[104] The defendant would have the right to petition the court for rehearing, but a rehearing petition does not perform the same service a post-sentence objection would provide in the district court.

[105] The only benefit that comes to mind is finality. In resentencing the defendant, we make his sentence final and bring his case to a close.

235

misallocates and gobbles up judicial resources.[106]  None of this is necessary.[107]  If

a sentence constitutes an abuse of discretion, we should simply say so and return

the case to the district court, the appropriate forum for the main event.

V.

For the foregoing reasons, I would vacate Irey's sentence and remand to the

district court for resentencing.

---

[106]  The court acknowledges that we have reviewed hundreds of cases for substantive reasonableness since Booker was decided, but minimizes the impact of its decision by pointing out that the Eleventh Circuit has only reversed sentences in four of these cases.  See ante at 61. After today's decision, however, we may see more sentence appeals because any dissatisfied party can ask this court to resentence the defendant based on information favorable to its position that the district court presumably ignored by neglecting to mention the information in stating its reasons for the sentence.  And with the precedent that we can consider evidence not in the record and make new arguments for or against a party on appeal, we may see more sentences vacated—or defendants resentenced.  The court's decision could affect many of the hundreds of sentencing appeals we will see in the years to come.

[107]  The court claims that if Irey's sentence is reasonable, then any sentence is reasonable and that would return us to the pre-SRA days where a district judge was a "law unto himself or herself."  See ante at 137 (quotation omitted).  These arguments do not justify the court's approach of resentencing Irey.  First, we can say that Irey's sentence is unreasonable and set it aside under classic abuse of discretion review—we need not resentence Irey to solve the reasonableness concern.  Second, we need not worry about a return to the pre-SRA days given the post-Booker requirements that district judges exercise their sentencing discretion only after conducting a formal process, applying statutory factors, and explaining their rationale—which is then subject to appellate review for abuse of discretion.

236

EDMONDSON, Circuit Judge, dissenting, in which BIRCH, BARKETT, and MARTIN, Circuit Judges, join:

The limit that the law places on the right use of appellate court power to interfere with the sentencing decisions of United States District Judges (who, of course, have -- under the law -- powers of their own) is, for me, what this appeal is about. The specific case before us involves a serious crime and ghastly conduct -- "horrific" in the District Judge's words -- on the part of Defendant. And, no party has contended that the District Judge, in imposing the sentence, made a significant procedural error.[1] The government prosecutors (who bear the burden of showing reversible error) contend that the sentence imposed in district court is too lenient and that no sentence would be lawful except the maximum sentence of imprisonment that the pertinent criminal statute will allow: 30 years.[2]

The issue is not whether federal appellate judges ought to do their duty. They must. And the issue is not whether appellate courts can review sentences and sometimes correctly set them aside, even when the sentence was imposed

---

[1] Only a case without a substantial procedural error is in my mind as I write this dissent.

[2] Because of the interplay of the Guidelines and the pertinent criminal statute, the Guidelines (which the District Judge recognized as a sentencing factor) called, in this case, for 30 years' imprisonment. But the Guidelines are not mandatory as everyone knows. See, e.g., Nelson v. United States, 129 S. Ct. 890 (2009) (reversing Fourth Circuit and stressing that "Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable" by sentencing courts.); Spears v. United States, 129 S. Ct. 840 (2009) (reversing Eighth Circuit and upholding a below-Guidelines sentence in crack cocaine case based entirely on sentencing District Judge's policy disagreement with Guidelines).

without procedural errors.  They can.  Appellate judges do have some legitimate

power to review the substance of sentences: that is, to determine whether a

District Judge has imposed a sentence that is either too lenient or too harsh as a

matter of law.  The general question presented here is what is the limit, under the

law, on the power of appellate judges in deciding such reviews.

The legal limit on the power of appellate judges to interfere with sentences

imposed by District Judges is staked out by the standard of review.  In Gall v.

United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court -- in the

course of reversing an appellate court judgment that had overturned a district

court's sentence as too light[3] -- set the standard of review: we only look to see if

the sentence is reasonable in the light of a "deferential abuse-of-discretion

standard."  Id. at 40, 128 S. Ct. at 591.

This standard of review promotes (among other things) finality in criminal

cases.  But the deferential abuse-of-discretion standard was selected mainly to

---

[3] In reversing the District Judge's far-below-the-Guidelines sentence, the Eighth Circuit
in Gall had studied the record and opined that the District Judge in sentencing had given "too
much weight" to X, "did not properly weigh" Y, given "too much emphasis" to Z, and so on.
The Supreme Court said, "Although the Court of Appeals correctly stated that the appropriate
standard of review was abuse of discretion, it engaged in an analysis that more closely resembled
de novo review of the facts presented and determined that, in its view, the degree of variance
[from the advisory guideline] was not warranted."  Gall, 552 U.S. at 56, 128 S. Ct. at 600.
    Although the Eighth Circuit vacated the sentence imposed by the district court and
remanded for resentencing, the Eighth Circuit did not set a precise sentence to be imposed on
Mr. Gall on remand.

recognize that the Sentencing Guidelines are advisory only and a District Judge must <u>not</u> presume that the sentence indicated by the Sentencing Guidelines is a reasonable sentence for the convicted person standing before the District Judge: the District Judge must make for each convicted person "an individualized assessment based on the facts presented." <u>Gall</u>, 552 U.S. at 50, 128 S. Ct. at 597. Thus, sentencing is a fact-bound determination.  When the Supreme Court laid down the law, the Court pointed out that a District Judge "is in a superior position [relative to an appellate court] <u>to find facts and judge their import under § 3553(a)</u> in the individual case.  The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." <u>Id.</u> at 51, 128 S. Ct. at 597 (internal quotation omitted and emphasis added).

In sentencing, a District Judge is to "impose a sentence <u>sufficient, but not greater than necessary,</u> to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2). (emphasis added).[4]

_____

[4] The sentence imposed needs

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

In my view of the law, a District Judge's decision on what sentence to impose is essentially a fact finding, especially as here where witnesses testified at the sentencing hearing: oral evidence particularly raises issues of credibility. Consider Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 401-02, 110 S. Ct. 2447, 2459 (1990) (discussing deferential standard of review for sanctions imposed under Fed. R. Civ. P. 11 as one to review a fact-intensive question). And "[w]hen an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable: . . ." Id. at 401, 110 S. Ct. at 2458.

The clearly erroneous/deferential abuse-of-discretion standards deprive the appellate court of the authority to reweigh conflicting evidence and to reconsider facts already weighed and considered by a district court. See Cooter & Gell, 496 U.S. at 400-04, 110 S. Ct. at 2458-60; see also Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 857-58, 102 S. Ct. 2182, 2190 (1982). As I grasp it, the deferential abuse-of-discretion standard (while certainly no "any evidence" rule or scintilla rule) calls for nothing more than some reasonable basis in the record for the District Judge's decision. Because the standard prohibits appellate judges

---

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

240

from making their own determination of where the weight of the evidence lies, the law greatly restrains the maneuvering room of appellate courts.  The restraint flows directly from the deferential abuse-of-discretion standard of review chosen for us by the Supreme Court.  I submit that an appellate court's reweighing of the evidence or giving the facts a different construction -- to grant something in the record more or less value than the District Judge did and so to conclude that the record overall weighs more heavily for a higher sentence -- smacks of a kind of <u>de novo</u> review à la the Eighth Circuit's approach in <u>Gall</u>: the appellate court oversteps its authority.

Appellate courts can set aside a sentence as too lenient to be reasonable as a matter of law.  But appellate courts first need to ask only one question: could an objectively reasonable District Judge looking at the record "on the whole" have found the ultimate sentence imposed to be a "sufficient" one, when the record (including all the evidence and reasonable inferences and credibility evaluations) is viewed in the light most favorable to the sentence.  If the answer is "Yes," the appellate courts can correctly do nothing but affirm the sentence.  This deferential standard limits severely the authority of appellate judges to interfere with sentences, even when the appellate judges -- giving more or less weight to one circumstance or another -- think the sentence, in an immediate case, is not "just"

241

or not the most "just."

On the other hand, this standard of review -- because it demands some objective, reasonable basis in the record -- guards against true arbitrariness and stops short of allowing District Judges the freedom to sentence simply as they please. The deferential abuse-of-discretion standard of review acknowledges that sentencing is about marshaling the facts and applying the fact-dependent legal criteria set out by 18 U.S.C. § 3553(a). The pertinent standard places the main responsibility and legal power for sentencing squarely on United States District Judges whose business is fact finding; this standard very greatly restricts the authority of appellate judges to interfere, although the appellate judges would have definitely imposed some other sentence. "[I]t is not for the Court of Appeals to decide de novo whether . . . the sentence [is] reasonable." Gall, 552 U.S. at 59, 128 S. Ct. at 602. "The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." Id. at 51, 128 S. Ct. at 597.

Turning to the facts of the particular case before us, I conclude that the experienced District Judge did not abuse his discretion in deciding that 17.5 years of imprisonment plus a lifetime of supervised release was a sufficient sentence given all the circumstances. That this serious crime deserves a substantial term of

imprisonment is beyond debate (and, in reality, has never been debated). I trust that most American judges (I hope all of them) would accept that 17.5 years of imprisonment is a substantial term of imprisonment.[5] And it is years beyond the statutory minimum sentence for the only crime with which Defendant was charged.[6]

The government says that nothing but 30 years of imprisonment would be a lawful sentence in the circumstances of this case. I cannot agree with that legal conclusion. First, I think the argument belittles the punishment involved in a lifetime of supervised release that follows a substantial term of imprisonment. The Supreme Court, in Gall, made it plain to me that supervised-release punishments count -- under the law -- as real punishments and must not be treated by appellate courts as nothing or, at least, nothing significant when sentences are being reviewed. See id. at 48-49, 128 S. Ct. at 595-96. Second, the record in this particular case contains many things that, I accept, would allow (that is, provide

---

[5] Defendant might actually serve something less than 17.5 years because the Executive Branch, over the years, "may" award him some limited credit toward service of his sentence if the prison administrators determine Defendant has "displayed exemplary compliance with institutional disciplinary regulations." See 18 U.S.C. § 3624(b)(1). How much credit Defendant will actually be awarded in the uncertain future is highly speculative. For review purposes, it seems best to me to treat a sentence imposed by a district court -- in this case, 17.5 years plus a lifetime of supervised release -- as a fixed sentence. I believe this approach has been our custom.

[6] The government only charged Defendant with one count of production of child pornography per 18 U.S.C. § 2251(c). Other cases involving longer sentences in child pornography cases involved either prior criminal convictions or more counts or both.

an adequate evidentiary/factual basis for) an objectively reasonable judge to back off the absolute thirty-years-imprisonment maximum sentence.

It is undisputed that Defendant surrendered after being indicted, plead guilty, and expressed remorse. He accepted responsibility and relieved the Government of the trouble and expense of a trial.[7] After surrendering and posting bond, he entered into a residential treatment center: a step toward rehabilitation. It is also undisputed that Defendant has no prior criminal convictions. Furthermore, Defendant did not obstruct justice and, to the contrary, cooperated with the government providing information about the nature of his offense (time, places, identity of others with whom he dealt and so forth). These kinds of things have traditionally and commonly been reflected in a lessening of a sentence from what it would have otherwise been. In the context of the full record, these things provide a reasonable basis for the sentence in this case to be less than the maximum allowed by the statute.

Moreover, at the sentencing hearing in district court, the Defendant stood

---

[7] Contrast United States v. Kapordelis, 569 F.3d 1291 (11th Cir. 2009), where defendant -- a medical doctor charged, among other things, with producing pornographic images of underage boys (including one underage boy who was his near relative and another underage boy who had been the doctor's patient: defendant had seemingly drugged the boys first) -- insisted (despite powerful photographic evidence against him) on a trial by jury and, at his sentencing, never accepted responsibility, and called prosecutors "liars" and compared them to Hitler; and the district court found the defendant would not likely be rehabilitated given "his attitude and lack of remorse."

before and spoke to the judge who would impose the sentence upon him; and

Defendant presented witnesses on his behalf: this case is an oral-evidence case.

The government presented no witnesses.  Several friends and family members

testified to Defendant's characteristics generally and history of good works as an

employer, parent, and so on and to their own loyalty and support of Defendant, as

a human being who was in disgrace and in trouble.  I appreciate that this kind of

humanizing testimony raises a familiar debate about whether it is possible for

character to be compartmentalized so that a person who is weak (or wicked) in

one way can really be strong (or good) in some other ways or whether character

must be viewed holistically so that a person's weak or wicked character in one

context produces a reliable conclusion in every context.  This familiar debate has

been taken up by Aristotle and Kant and other Greats.  And I doubt the power of a

Court of Appeals to resolve it as a matter of law.  Whatever I personally might

think about this family-and-friend evidence, the District Judge in this case had the

legal right to determine the credibility of the witnesses before him and to give the

testimony the weight that he did.[8]  Given the entire record, this evidence was

reasonable evidence to support a sentence less than the maximum sentence

---

[8] I think it was Robert Frost who said that "there are tones of voice that mean more than words."  A District Judge hears those tones.  Furthermore, a District Judge sees the witness's demeanor as well as hears the testimony.  I submit these opportunities are big advantages when it comes to fact finding.

allowed by the pertinent statute.

In addition, at the sentencing hearing, Defendant presented an expert witness: Dr. Shaw. The government did not; and the government did not object to the expertise of the Defendant's expert witness. The expert never suggested (nor has anyone else) that Defendant was not guilty on account of some mental disorder. But the mental health expert did testify that this Defendant was afflicted with a recognized mental disorder: heterosexual pedophilia. The expert testified that this disorder was not something that Defendant had chosen to have, but was something that was "within" Defendant (something "natural biological") and caused Defendant to have a tendency toward being attracted to sexual behavior with prepubescent children. (This evidence, I submit, supports the District Judge's reference to Defendant as a "victim": in the sense of a victim of the circumstance of Defendant's own biology.) The expert also testified that the disorder was treatable, that this Defendant was amenable for treatment, that Defendant's aging[9] -- a reduction naturally in testosterone and a reduction

---

[9] Defendant was 50 at the time of sentencing. According to the Census Bureau, a white male of 50 would typically have a life expectancy of less than 30 years. See U.S. Census Dep't., 2010 Statistical Abstract, Table 103 (available at http://www.census.gov/compendia/statab/2010/tables/10s0103.pdf). A 30-year maximum sentence then had a realistic likelihood of being, in fact, life imprisonment for this Defendant. Congress, in 18 U.S.C. § 2251(c) -- the statute of Defendant's conviction -- does not call for life imprisonment as a statutory punishment. (Taking into account life's uncertainty, I understand that any term of imprisonment might turn out to be actually life imprisonment; but, in reality, some sentences of years are, for some defendants, more likely to be life sentences than other

naturally in sex drive -- would likely be helpful to his treatment, and that

Defendant was not likely to be a recidivist. The District Judge who saw and heard

this expert witness could credit the evidence. Given the entire record, this

evidence is reasonable evidence to support a sentence of less than the maximum

allowed by the statute.

Of course, a number of elements make up the total record. Still, while I

accept that other facts and evidence (some of it conflicting) are in the record, I

think what I have summarized is legally enough to justify -- I do not say compel --

an objectively reasonable judge to find that a sentence of less than the 30 years of

imprisonment would be sufficient.

However I might have judged the weight of the evidence and facts in my

own reckoning of the best sentence, I accept that the record as a whole was

sufficient to allow -- as a matter of law -- the imposition of something less than

the maximum sentence. Imponderables are involved, and a District Judge has

unique access to and familiarity with the individual defendant. Here, the

---

sentences for other defendants. This reality of human age seems all right to consider, although
never would I contend that persons aged 50 or older are, as a matter of law, exempt from a 30-
year term of imprisonment under the pertinent statute.) The District Judge thought that
Defendant's age was pertinent to sentencing, especially Defendant's advanced age upon his
release from imprisonment. I accept that the circumstance of Defendant's age was a permissible,
reasonable basis, in conjunction with everything else, for a sentencing court to impose a sentence
of less than the maximum on this Defendant.

sentencing District Judge thought out and selected a sentence for this case that involved a substantial period of imprisonment, including a period of years (not hours, weeks or months, but years of imprisonment) above the statutory minimum. Then, to follow the term of imprisonment, the sentencing judge imposed a lifetime of supervised release with many special conditions[10]: a "substantial restriction of freedom" as the Supreme Court put it in Gall. Gall, 552 U.S. at 48, 128 S. Ct. at 595.

The sentencing range under the one statute involved is not very wide: only 15 years from the minimum sentence (15 years) to the maximum sentence (30 years). Cf., e.g., 18 U.S.C. § 2422(b) (a sexual offense allowing for imprisonment of ten years to life); 21 U.S.C. § 841(b)(1)(A) (a drug offense allowing for imprisonment of ten years to life). So, the room for the exercise of sentencing discretion is markedly controlled from the start by the statutory range set by Congress; therefore, it seems to me that it is harder for a sentencing judge to go far off the rails. This observation seems even clearer to me where, as here, the District Judge did impose a lengthy sentence of imprisonment: not the maximum, but neither did he impose the minimum sentence (or something that was merely hours, weeks, months, or only one year beyond the minimum).

---

[10] The list of conditions of supervised release was long and tailored for someone like Defendant.

248

I think the record would support a variety of lawful sentences, including some sentences heavier than the one actually imposed. Nevertheless, the government's prosecutors have failed to demonstrate to me that there is no legitimate basis for the district court's actual sentencing decision. All things considered and applying the deferential abuse-of-discretion standard, I cannot conclude that the sentence imposed was beyond the outside borders of reasonable. For more background, see United States v. Irey, 563 F.3d 1223 (11th Cir. 2009) (vacated for rehearing en banc).

In the federal judicial system, I believe that the district courts have duties and powers -- mainly about fact finding and about weighing in the balance some facts against others -- that are theirs and not ours. I believe that one of the important duties of appellate judges is to allow District Judges room to carry out the duties of District Judges. I believe the deferential abuse-of-discretion standard set out and applied in Gall was intended to buttress the district courts' sentencing powers and to limit the appellate courts' powers to recast what is essentially a factual issue into a question of law. Given these principles, I believe it is jurisprudentially important to steer clear of de novo review, or something resembling it, in an appeal about the substantive-reasonableness of a sentence. Considering this record and all, I would defer to the District Judge's decision and

affirm the sentence in today's case.

I dissent with respect and not without regret.

BIRCH, Circuit Judge, dissenting:

The time-worn adage in jurisprudence that hard facts often lead to bad law is certainly applicable to this case. I have little doubt that had I been the sentencing judge I might well have fashioned a different and harsher sentence for this defendant. But the decision at play here is the respective roles of the appellate court and the sentencing court. Our appellate role is properly constrained by the standard of review to which we are required to adhere. As Judge Edmondson persuasively describes the application of that standard to the record, it compels an affirmance of the sentencing court's judgment in this case. Accordingly, I respectfully dissent and join in the dissenting opinions of Judge Edmondson and Judge Barkett.

BARKETT, Circuit Judge, dissenting, in which BIRCH and MARTIN, Circuit Judges, join:

I agree with just about everything in Judge Edmondson's dissent. If there is any point of departure, it is the addition (or clarification, in my view), that the district judge must articulate the reasons for the sentence imposed based on the evidence in the record. Because the record may support a number of reasonable sentences, this articulation is necessary so that the appellate court can be satisfied that the district judge actually considered how all of the § 3553 factors relate to the defendant's individual case.

I previously explained why it is important for district judge's to give reasons in my dissent in <u>United States v. Docampo</u>, 573 F.3d 1091 (11th Cir. 2009).

First, Congress explicitly mandated the articulation of reasons:

> Congress requires the district court to "state in open court the reasons for its imposition of the particular sentence," § 3553(c), and before doing so, the court must consider each of the factors delineated in § 3553(a) to arrive at the appropriate sentence.

<u>Docampo</u>, 573 F.3d at 1106. Second, not every case requires an elaborate explanation:

> What is "enough" or "adequate" depends upon the circumstances of the particular case at hand[] . . . . [L]ess may be required if a case is "simple" or "typical." The

252

logical corollary of this conclusion, however, is that more is required when a judge is faced with an <u>atypical</u> case or the defendant argues that a departure from the Guidelines is warranted.

. . . .

. . . Thus, while a mechanical discussion of each § 3553(a) factor may not be necessary in every case, a district court has a responsibility to analyze the relevant factors on the record.  These would include a particular § 3553(a) factor raised by a defendant, or one clearly implicated by the specific facts of that case . . . .

Moreover, the sentencing judge should be able to articulate the rationale that justifies the actual number of months or years that make up a defendant's sentence, whether that number is within or outside the Sentencing Guidelines.  A reasonable sentence is one for which there is an explanation of how the particular length of the imposed sentence corresponds to the individual sentencing needs of the particular defendant.  For example, how does a sentence of fifteen years, as opposed to a sentence of five or ten years, or twenty-two years for that matter, serve the needs of individual and general deterrence while also addressing the nature of the crime and the individual characteristics of the defendant in a given case?  The number of years cannot be determined simply by an individual judge's gut feeling.  As a society that values due process, we must have some rationalization for every step of our judicial system.  There should be a transparent, logical, and reasonable justification to support the amount of jail time prescribed for a particular defendant based on the § 3553 factors.

<u>Id.</u> at 1106-08, n.7.

Here, the district judge meticulously and conscientiously followed the

253

dictates of Congress.  Indeed, I do not see what more the district judge could reasonably have done to assure us that he considered and weighed all of the § 3553 factors as they applied to this case.  The district judge considered every piece of evidence in the extensive record before him, which is clearly sufficient to permit meaningful appellate review.  The problem, if there is one, is that, beyond the offense itself, the government failed to present any evidence whatsoever to rebut or challenge any of the defendant's witnesses at sentencing.  And, it was not the district judge's job, nor is it ours, to supply and rely on evidence that was not presented.

The bottom line is that the majority—based on its own finding of facts and credibility determinations—simply disagrees with the district judge's conclusion that seventeen years followed by a lifetime of supervised release is an appropriate sentence for Irey.  Notably, the majority really does not offer any explanation for mandating that the district judge impose a sentence of thirty years of imprisonment in lieu of Irey's current substantial sentence.[1]  Because the majority is not

_____

[1] The majority cites to numerous published and unpublished cases involving various different offenses against minors in which the defendants therein received sentences in excess of thirty years to suggest that Irey's sentence of seventeen and one-half years creates a "substantial disparity" that renders it unreasonable.  Majority Op. at 130-134.  Looking at only the length of the various sentences in the cited cases, Irey's sentence arguably presents a disparity.  However, Congress did not command sentencing courts to avoid mere "disparities" or even "substantial disparities."  What it did require is that sentencing courts consider the need to avoid <u>unwarranted</u> disparities among similarly situated defendants.  <u>See</u> 18 U.S.C. § 3553(a)(6).  Whether one defendant's sentence creates an <u>unwarranted</u> disparity from other defendants necessarily requires

"reviewing" the district judge's judgment but rather is substituting its own and is

assuming the role that the prosecutor failed to perform in presenting evidence that

could arguably support a longer sentence, I dissent.[2]

---

a sentencing court to undertake a fact-intensive inquiry in the first place to determine whether
the defendants are similarly situated. See United States v. Docampo, 573 F.3d 1091, 1101 (11th
Cir. 2009) ("A well-founded claim of disparity, however, assumes that apples are being
compared to apples.") (citation omitted). I believe a court cannot truly assert that one
defendant's sentence creates an unwarranted disparity from another or several defendants'
without the benefit of the entirety of the sentencing records of all the defendants. However, even
if this extremely fact-intensive analysis can be based on the information contained in appellate
opinions alone, consideration of any potential unwarranted sentencing disparity is not a task for
the appellate court to complete in the first instance as the majority does in this case.

Moreover, several of the majority's cited cases contain facts that could just as
legitimately support a finding that those defendants were not similarly situated to Irey and thus
do not support the conclusion that the sentence imposed on Irey created an unwarranted
disparity. For example, several of the cases concern defendants who, unlike Irey, proceeded to
trial. We have previously held that defendants who plead guilty and assist the government are
not similarly situated to those who proceed to trial. See e.g., Docampo, 573 F.3d at 1101
(holding that a defendant who proceeded to trial was not similarly situated to his co-conspirators
who plead guilty and assisted the government and thus there was no unwarranted disparity
between the defendant's lengthy 270 month sentence and his co-conspirator's substantially
shorter sentences).

[2] As I also noted in my dissent in Docampo:

> Appellate courts have had no difficulty finding unreasonableness
> when asking [whether a sentence is enough punishment]. See,
> e.g.,[United States v.]Pugh, 515 F.3d [ ]1179 [(11th Cir. 2008)]
> (finding that probation for a possessor of some child pornography
> was insufficient). We should likewise be willing to find that, in a
> case that warrants it, "a within-Guidelines sentence is 'greater than
> necessary' to serve the objectives of sentencing," Kimbrough [v.
> United States], [552 U.S. 85, 91], 128 S. Ct. [558], 564 (quoting §
> 3553(a)). Our appellate sentencing review should not develop into
> a one-way rachet upwards. Just as the district court has an
> obligation not to assume the Guidelines are automatically
> reasonable, we too—as a circuit that does not apply a
> reasonableness presumption—are obligated to ask whether a
> within-Guidelines sentence is reasonable without any thumb on the

255

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit
By: _____
Deputy Clerk
Atlanta, Georgia

---

scale.  Thus, reiterating what we have previously noted, there are
"many instances where the Guidelines range will not yield a
reasonable sentence. . . . In some cases it may be appropriate to
defer to the Guidelines; in others, not."  United States v. Hunt, 459
F.3d 1180, 1184 (11th Cir. 2006).

Docampo, 573 F.3d at 1110-11.

256

# United States Court of Appeals
## Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**John Ley**
Clerk of the Court

For rules and forms visit
www.ca11.uscourts.gov

September 08, 2010

Sheryl L. Loesch
Clerk, U.S. District Court
401 W CENTRAL BLVD STE 1-200
Orlando  FL  32801-0120

**Appeal Number: 08-10997-FF**
Case Style: USA v. William Irey
District Court Number:  06-00237 CR-ORL-31-DAB

The motion for stay of mandate has been denied.  The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

John Ley, Clerk of Court

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (06/2006)