# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**-vs-**                                                    **Case No.  6:06-cr-237-Orl-31DAB**

**WILLIAM IREY**

_____

## MEMORANDUM OPINION
## AND ORDER

This matter comes before the Court on the Unopposed Motion for Continuance of
Resentencing Hearing Pending Review in United States Supreme Court (Doc. 80).  As the
motion's title suggests, the parties seek to have this Court delay its resentencing of the Defendant,
William Irey ("Irey"), on the chance that the Supreme Court will grant his petition for writ of
certiorari, due to be filed on October 27, 2010.  As things now stand, this Court is obligated by the
July 29, 2010 decision of the United States Court of Appeals for the Eleventh Circuit (henceforth,
the "July 29 Order") to impose a 30-year sentence on Irey.  Given that Irey is in the early stages of
serving the 17-and-a-half-year sentence originally imposed by this court, there is no pressing need
to impose the longer sentence – a fact apparently recognized by the Government, which does not
oppose the motion.  For these reasons, the motion will be granted, and the resentencing will be
continued.

* * *

Under normal circumstances, that would be the end of the matter.  But these are not normal
circumstances.  The July 29 Order raises a host of important issues, a fact recognized both by the

Defendant in the instant motion and by the appellate court in the order itself.  The pendency of the petition for a writ of certiorari provides the Court with a rare opportunity to respond to certain aspects of the appellate decision, prior to its possible review by the Supreme Court, with information that only the undersigned possesses.  In addition, the July 29 Order has certain implications that affect the courts that are tasked with the imposition of criminal sentences – implications that might not be apparent to the parties themselves.  The Court believes that a discussion of these points may assist the Supreme Court in determining whether the petition ought to be granted.

It is for these reasons, and not out of any disrespect for the Circuit Court's authority to reverse the sentence I imposed, that I will take this opportunity to respond to certain portions of the July 29 Order.

* * *

**Background**

On December 13, 2006, a grand jury returned an indictment charging Irey with one count of violating 18 U.S.C. § 2251, which proscribes sexual exploitation of children.  (Doc. 1 at 1).  In particular, Irey was charged with violating subsection (c) of that section, which provides that

(1) Any person who, in a circumstance described in paragraph (2), employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, any sexually explicit conduct outside of the United States, its territories or possessions, for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (e).

(2) The circumstance referred to in paragraph (1) is that —

(A) the person intends such visual depiction to be transported to the United States, its territories or possessions, by any means, including by using any means or facility of interstate or foreign commerce or mail; or

> (B) the person transports such visual depiction to the United States, its
> territories or possessions, by any means, including by using any means or
> facility of interstate or foreign commerce or mail.

18 U.S.C. § 2251(c).  With certain exceptions not applicable in this case, the penalty for a first-time offender under this section is a prison term of not less than 15 years nor more than 30 years.  18 U.S.C. § 2251(e).  On July 10, 2007, Irey pled guilty to the single count with which he had been charged.  (Doc. 49).

On January 29, 2008, Irey, then 50 years old, appeared before this Court for sentencing.  As set forth in the Presentence Investigation Report ("PSR") prepared by the United States Probation Office, a straight application of the United States Sentencing Guidelines ("USSG") would have resulted in a guideline sentence of life imprisonment.  Because the statute provided for a maximum sentence of only 30 years, the guideline sentence was automatically reduced to that amount.

The Court conducted a lengthy hearing, which included evidence of psychological evaluations conducted by two mental health professionals (and live testimony from one of them), plus live testimony and recorded statements from Irey's wife and three sons, as well as other members of Irey's family and friends, plus argument from the prosecutor and defense counsel.[1]  Afterward, I sentenced Irey to 210 months – 17 and a half years – in prison, plus a lifetime of supervised release and other restrictions.

The Government appealed.  Initially, a three-judge panel unanimously affirmed the decision, finding that the Government had failed to establish that the sentence was unreasonable.  *See United States v. Irey*, 563 F.3d 1223 (11th Cir. 2009) (henceforth, "Irey I").  Four months

---

[1]The Court also considered sentencing memoranda submitted by the parties.

later, the Circuit Court *sua sponte* decided to rehear the case and vacated the panel's opinion.  *See United States v. Irey*, 579 F.3d 1207 (11th Cir. 2009) (*en banc*) (henceforth, "Irey II").  After additional briefing and oral argument, a sharply divided court reversed and remanded with instructions to impose the maximum sentence permitted by the statute – 30 years.  *See United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010) (*en banc*) (henceforth, "Irey III").

**The Sentencing Factors**

In vacating the sentence I had imposed, the Circuit Court found no procedural irregularities, and noted that my factual findings and explanations were among the most specific and detailed that they had encountered in reviewing a sentence.  *Irey III* at 1195.  Instead, the decision to vacate the sentence was based on substantive grounds.  Accordingly, the discussion that follows will address the sentencing factors of 18 U.S.C. § 3553(a) in the context of substantive reasonableness.[2]

*18 U.S.C. § 3553(a)(1) – the Nature and the Characteristics of the Offense* and *18 U.S.C. § 3553(a)(2)(A) – the Seriousness of the Offense*

Section 3553(a)(1) and § 3553(a)(2)(A) contain similar requirements that the sentencing court begin its determination of an appropriate sentence by considering the nature and seriousness of the offense.  As charged by the Government, the offense committed by Irey was the production of child pornography outside the United States for transportation into this country, in violation of 18 U.S.C. § 2251(c).  The offense conduct is set forth in paragraphs four through 18 of the PSR.

---

[2]As noted by the Circuit Court, no one has suggested that the factors set forth in § 3353(a)(2)(D) (the need to provide training, medical care, or other treatment), § 3553(a)(3) (the kind of sentences available), or § 3553(a)(7) (the need to provide restitution) are relevant in this case.  *Irey III* at 1217 n.36.  Accordingly, they will not be addressed in this opinion.

Paragraphs four through 17 discuss the investigation of internet child pornography that led agents to Irey, and the execution of the search warrant that revealed the images depicting Irey engaging in sex acts with children.  Those images are described in paragraph 18 of the PSR.

I recognized that Irey's offense was serious  – indeed "horrific" – in that the victims were numerous and vulnerable, and the conduct occurred over an extended period of time.  (Tr. at 58).[3] Accordingly, I concluded that the seriousness of the offense did not mitigate in favor of any leniency.  (Tr. at 58).   However, in the opinion of a majority of the Circuit Court, the 17-and-a-half-year sentence was substantively unreasonable, primarily because of the nature and extent of Irey's criminal conduct.  *Irey III* at 1166.  In other words, the Circuit Court concluded that I gave insufficient weight to the seriousness of the offense.

Perhaps the disconnect between my judgment and that of the Circuit Court is a matter of perspective.  The offense, as I viewed it, was the production and transportation of child pornography, as charged.  The circumstances surrounding that offense were certainly relevant, and I considered them.  As I said during the sentencing hearing, "These young children were victims who may never, never overcome their abuse."  (Tr. at 58).  Conversely, the primary focus of the majority in *Irey III* was on Irey's sexual conduct – the rape, sodomy and torture of children – with the child pornography production almost an afterthought.  *See Irey III* at 1166 (graphically detailing Irey's sexual conduct, then adding that he "also . . . starred in [and] produced . . . child pornography").  *See also Irey III* at 1209-10 (describing Irey's production and distribution of child pornography as "additional criminal behavior").   Such a difference in perspective can certainly

---

[3]References to the transcript of the sentencing hearing will be given in the format  "(Tr. at [page number])".  A copy of the transcript was filed in the instant case at docket number 65.

lead to a different conclusion as to the seriousness and weight to be accorded Irey's criminal conduct.

There are a number of things in the *Irey III* decision with which I take issue.  However, I have no disagreement with the fundamental proposition underlying the majority opinion: that Irey's conduct, his filming (and subsequent distribution) of himself having sex with dozens of children, under the most revolting of circumstances, was utterly vile.  The bottom line for the majority appears to be that Irey raped and tortured fifty or more children, and that this fact so outweighs every other sentencing consideration that only a maximum sentence could be reasonable.  But Irey was not charged with 50-plus counts of rape and torture; he was charged with, and pled guilty to, a single count of violating 18 U.S.C. § 2251(c), which prohibits foreign production of child pornography for distribution in the United States.  The horrifying circumstances surrounding the production of this child pornography were certainly relevant, and I tried to take those circumstances into consideration when crafting Irey's sentence.  But the implicit holding of the majority opinion is that I was obligated to sentence Irey for the surrounding conduct, rather than the particular crime with which he was charged.

In any event, in the majority's view, the heavy weight to be accorded to the seriousness of Irey's offense trumps any mitigating factors that could support a below-guideline sentence.  That said, I will turn to the other statutory factors.

*18 U.S.C. §3553(a)(1) – The History and Characteristics of the Defendant*

The PSR describes Irey as a good husband and supportive father of four children, who remain supportive of him.[4] He has no prior criminal record. The PSR also notes that Irey was residing at a psychiatric hospital and receiving intensive treatment for his "sexual addiction." (PSR, ¶ 63). A psychological evaluation performed by Dr. Fred Berlin was attached to the PSR. In it, Dr. Berlin concluded that Irey had a psychiatric disorder known as "heterosexual pedophilia" and was in need of "appropriate professional treatment." (PSR, ¶ 63).

Dr. Ted Shaw, who also performed a psychological evaluation, testified at the hearing. Dr. Shaw stated that Irey had a "long-standing problem with sexual obsession," which in lay terms could be described as "sexual addiction." (Tr. at 11). Dr. Shaw testified that he had found Irey to be "amenable to treatment" and that he had made "observable progress." (Tr. at 12).

According to the majority opinion, my biggest error in judgment with regard to this factor resulted from a vastly mistaken, too-sympathetic view of Irey's character. In reaching this conclusion, the majority focuses on an extemporaneous remark I made while imposing the sentence, in which I referred to Dr. Shaw's testimony that the Internet has fueled an epidemic of child pornography. *Irey III* at 1198. Had I prepared a written sentencing opinion, I would not have described Irey as one of the "victim[s]" of this phenomenon.[5] However, in speaking from the

---

[4]A number of Irey's friends and family members testified at the hearing and corroborated this point.

[5]I was attempting to point out that society at large (including Irey and his family) had suffered harm resulting from the easy availability of this type of material. I concede, in retrospect, that my effort was clumsy. However, in 2009, I sentenced 51 individuals. I could not possibly write an opinion for every sentence I impose – though, in hindsight, I should have done so in this case.

bench, I made an ill-advised word choice.  Relying on that single word, the majority states that I made an "implicit finding" that the internet caused Irey to sexually abuse children, that I (also apparently implicitly) recast Irey from "criminal" to "victim," and that somehow I found that he was on the same "moral plane" as his young victims.  *Id.* at 1198-99.  I made no such findings, implicitly or explicitly.  And to suggest that I viewed Irey as not responsible for his conduct is absurd.  Yet, based on findings I did not make and views I do not hold, the Circuit Court concludes that I saw Irey as a victim and that this perception "permeated [my] reasoning and tainted [my] weighing of the 3553(a) factors."  *Id.* at 1199.  That simply is not true.[6]

I engaged Dr. Shaw in a colloquy in an effort to understand the nature of pedophilia from the standpoint of a mental health professional.  He described it as a treatable disorder, stating that it is "something that is within you and you have some tendency towards it."  (Tr. at 17).  He went on to say that the Internet has fueled an "epidemic of pedophilia."  (Tr. at 18).  Later in the proceeding, I carried this notion forward by noting the Internet's effect on the increase (epidemic) of child pornography.  Reflecting on the report and testimony of Dr. Berlin and Dr. Shaw, I also

---

[6]Common sense should suffice to establish that I could not and did not find any sort of equivalence between Irey and his victims.  But if not, a review of the transcript should do so.  Such a review shows that I made that remark while discussing the effects of the internet in the context of an assessment of the nature and circumstances of the *offense*, not the history and characteristics of the *defendant*.  (Tr. at 58).  And after doing so, and after mentioning the severity of the penalties we impose for conduct such as Irey's, I explicitly found that nothing in this offense mitigated in favor of any leniency.  (Tr. at 58).  Thus, two sentences after I clumsily referred to Irey as a victim, I made a no-leniency finding.  (Tr. at 58).  This simply does not square with the majority's analysis of what motivated my choice of sentence.

To the same end, if I truly considered Irey to be a victim rather than a criminal, one would expect that I would have at least mentioned this point during my analysis of the history and characteristics of the defendant (Tr. at 58-60).  But that analysis is devoid of any reference to victimhood – because I did not consider Irey to be a victim in any sense that could influence my sentencing decision.

said that Mr. Irey's acts were not *purely* volitional in that they were the product of a recognized "illness."[7]  I concluded that thought by saying, "And while it does not excuse his conduct and he will still be held accountable for it, I think it would be inappropriate to ignore that fact."  (Tr. at 59).[8]

Irey did possess some characteristics and history that I thought were relevant to sentencing, and I noted them in my remarks.  But the majority brusquely dismisses any evidence of Irey's positive qualities as a husband, father and friend, asserting that "[n]o one who committed such heinous crimes has good character."  *Irey III* at 1203.  The majority even cites Ted Bundy, who apparently spent some time working at a suicide prevention line, as an example.  *Id*.  By this logic, once a defendant's criminal conduct reaches a certain point, nothing else can be considered in imposing a sentence.  Among other things, such an approach would render meaningless the statutory obligation to consider the characteristics and history of the defendant.

In addition, contrary to the majority's assertions, I did not find that Irey "had good character."  Rather, I recognized that, by all accounts, he had been a good husband, father and friend, and except for the offense conduct (and its cover-up) he had not engaged in any other sort

---

[7]In retrospect, I should have used the term "psychiatric disorder known as heterosexual pedophilia."

[8]The Circuit Court concluded that I made an implicit finding that it was the Internet that caused Irey to sexually abuse children.  *Irey III* at 1198.  I made no such finding, express or implied.

of criminal conduct or conduct representing poor character.[9]  These facts were uncontroverted and I gave them some weight, as I believe the statute requires me to do.[10]

I also considered Irey's age.  He was fifty when he was sentenced, and I noted that he would be an old man – 67 years old, to be precise – when he was released from prison.  (Tr. at 60). The Circuit Court held that it was unreasonable to consider this fact.  *Irey III* at 1205.  The age of the defendant is clearly one of the personal characteristics that may be considered under § 3553(a). The real issue is how much weight should be given to it.  I chose to give some weight to Irey's age, so that he and his family might have some hope of life together after his prison term.  The majority finds it was unreasonable for me to do so.  In its view, Irey's age is not relevant, and if a guideline sentence is effectively a life sentence, this makes no difference  The majority's pronouncement on this point – that "[w]e fail to see how those facts show that Irey is any different from any other person who commits horrendous crimes in middle age and faces a long prison sentence" is difficult to square with any notion of deferential review.

---

[9]The majority makes much of the fact that Irey cheated on his wife with prostitutes, including doing so on a weekly basis in his hometown.  *Id.* at 1204.  Though unsavory, this behavior is not a federal crime, and his wife and family were apparently willing to forgive him for it.  While certainly not evidence of good character, it may be viewed as a manifestation of what Dr. Shaw referred to as Irey's "sexual addiction."

[10]The majority also concludes that "no significant weight can be given" to Irey's positive qualities as a husband and father, because he cheated on and lied to his wife, and because his family suffered financially and emotionally as a result of his "depraved criminal misconduct."  *Id.*  I understood this suffering because I heard the testimony and I saw the emotion.  Yet Irey's family members testified that they remain supportive of him, and there is no evidence to the contrary. Despite this, the Circuit Court would have me discredit this fact because, in its view, his family was detached from reality, and because any credit due Irey was outweighed by his criminal conduct.  *Id.* at 1205.  Simply put, I gave some weight to this evidence, while the Circuit Court would give it none.

The majority attempts to undermine my finding as to Irey's age upon release by deducting the two and a half years of "gain time" he might earn in prison pursuant to 18 U.S.C. § 3624(b). *Id*. The United States Sentencing Commission does not use this calculation in the data that it compiles, nor am I aware of any sentencing case law that does so. Introducing this factor distorts comparisons between different defendants' sentences, likely rendering them meaningless. Despite this, the majority appears to have concluded that this modified figure is more relevant to a sentencing determination than the actual sentence imposed.

Such a conclusion has significant implications at the district court level. Are sentencing judges now supposed to calculate the possible "net" sentence to determine whether it falls within the guideline range, or to carry out any of the remainder of the § 3553(a) analysis? And how would we do so? Are we to assume that everyone we sentence will earn gain time, and adjust our sentences to take this into account? Stated differently, should judges impose longer sentences because of the "threat" that the defendant will behave himself in prison? Will an otherwise unreasonable, above-guideline sentence be deemed reasonable if the defendant may earn enough gain time to bring the "actual" sentence within the guideline range?

*18 U.S.C. §3553(a)(2)(B) – Deterrence*

This subsection deals with the need for the sentence to afford adequate deterrence to criminal conduct, and should be considered in the context of the parsimony principle.[11] As the

---

[11]The majority opinion takes issue with any use of "parsimony principle" to describe § 3553(a)'s requirement that one impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of that subsection. *Id.* at 1196-97. The majority asserts that the term is inaccurate in that it ignores § 3553(a)'s command that the sentence be "sufficient" in favor of the command that it not be "greater than necessary," and accuses those who employ it of doing so because they hope "to slant the discussion toward shorter sentences by

majority noted, the more serious the crime and the greater the defendant's role in it, the more important it is to send a strong and clear message that will deter others.  *Id.* at 1212.  In this case, I believed that a 17 and a half-year sentence sent a strong message.  As described in the panel opinion, "no serious person should regard it as a trifle."  *Irey I* at 1226.

Nonetheless, the majority concluded that I failed to give enough weight to this factor – a conclusion that follows, almost by necessity, from the premise that I failed to give enough weight to the seriousness of the offense.  But the opinion goes on to suggest that the weight I gave this factor was affected by my "idiosyncratic doubts about whether pedophiles could be deterred".  *Irey III* at 1211.  According to the majority, my skepticism as to the deterrent effect amounted to a "policy disagreement with the guideline recommendations," a disagreement that was only permitted if I provided "sufficiently compelling" reasons to justify it.  *Id.*

A fair reading of the sentencing transcript, however, does not support this notion.  In discussing the deterrence factor, I did question the vitality of deterrence for this type of crime,[12] but in doing so I was not mounting an attack on the guideline policy.[13]  Expressing some misgivings as

---

emphasizing only that part of the twin requirements."  *Id.* at 1197.

Without purporting to speak for all of the judges who have used the term – which has been routinely employed without criticism by, among others, the courts of appeal in the First, Second, Third, Sixth, Seventh, Eighth, Ninth, Tenth, and, until *Irey III*, Eleventh Circuits – I can say I am not attempting to "slant the discussion" by doing so.  Rather, in my understanding, "parsimony principle" is simply a widely recognized label for both of the requirements of § 3553(a).  It is also more appropriate in the context of a criminal sentencing than alternative terms, such as the "Goldilocks principle."  *See id.*

[12]This, in my opinion, is a legitimate subject for rational discussion in connection with the imposition of sentence.

[13]I do have policy concerns regarding the child pornography guidelines (discussed *infra*), but they are not related to the issue of deterrence.

to the *likelihood* of deterrence is not at all the same thing as "questioning the *value* of deterrence" or "downplaying the importance of deterring this type of crime," as the majority puts it. *Id.* at 1212 (emphasis added).

In support of its conclusion that I did not reasonably consider the deterrence factor, the majority compares the sentence I imposed with those imposed in *United States v. Lychock*, 578 F. 3d 214 (3rd Cir. 2009) and *United States v. Goldberg*, 491 F. 3d 668 (7th Cir. 2007). Lychock, who was convicted of possessing child pornography, had a guideline sentencing range of 30-37 months. *Lychock* at 216. The district court judge imposed a probation-only sentence, stating that a person with this "kind of psychological problem . . . is not going to be deterred by a jail term." *Id.* at 217. Similarly, the defendant in *Goldberg* faced a guideline range of 63-78 months for possession of child pornography but received a single-day sentence from a district judge who stated that "the life that I'm concerned with here, the life I can affect, is Mr. Goldberg's life." *Goldberg* at 670.

The statements I made while sentencing Irey do not even remotely resemble these flat rejections of the possibility of a deterrent effect. To the contrary, I stated that deterrence was "an appropriate consideration in this case," adding that a stiff sentence would be "in keeping with the seriousness of this offense." (Tr. at 60). Moreover, it should be noted, I made these statements in the course of sentencing Irey to more than 17 years in prison – a far cry from the probation-only and single-day sentences imposed in *Lychock* and *Goldberg*. With these facts in mind, it should be clear that I did give significant weight to considerations of deterrence, and that I imposed a sentence that, by almost any measure, is harsh enough to have such an effect.

*18 U.S.C. §3553(a)(2)(C) – Protection of the Public*

This subsection addresses the need for the sentence to protect the public from further crimes of the defendant.  I viewed this as a mitigating factor for three basic reasons.  First, because of Irey's age and the length of the sentence, he would be relatively old when released and, as a consequence, somewhat less likely to reoffend.  In addition, the mental health professionals who evaluated him believed that Irey had a low risk of recidivism.  Finally, after his release, Irey would be subject to a lifetime of supervision.

Once again, it appears that I expressed my view in a manner that the majority finds objectionable.  After crediting the opinion of the experts, as noted above, I said, "of course, all that is *somewhat* academic because by the time he gets out of prison, he'll be most likely at an age where recidivism would be unlikely, just from a physiological standpoint."  (Tr. at 59-60) (emphasis added).  Obviously, this was just my inartful way of recognizing Dr. Shaw's testimony that, after spending 15 or more years in prison, Irey would naturally experience reductions in testosterone and in his sex drive, which could affect his urge to commit similar crimes.  (Tr. at 15). I did not say, nor would a reasonable reader infer that I suggested, that Irey would be "too old to do it again" or that any risk of recidivism in Irey's case was entirely "academic."  *Irey III* at 1213.

The majority then proceeds to refute these "conclusions," which were not made by me, by citing information which was not presented to me.  This information includes reported opinions of criminal cases involving older sex offenders, and studies suggesting older pedophiles generally have a high risk of recidivism.  *Id.* at 1213-15.  Next, the majority discusses cases and law review articles showing that some criminals commit additional crimes despite being on supervised release or other restrictions, and therefore such post-release conditions do not "guarantee" that Irey will

not commit more crimes when he gets out of prison.  *Id.* at 1215-16.  Summing up, the majority expresses disbelief that, in the face of all this contrary evidence (which, again, was not presented to me before sentencing), I could possibly find that Irey would pose a low risk of recidivism upon his release.  *Id.* at 1216.

Notwithstanding this lengthy, critical dissection, and an explicit statement that my finding on this point was "wrong," the majority then stated that my finding was unassailable, because the government had never challenged it (or any others) as clearly erroneous.  *Id.*  Thus, the majority was obligated to accept my finding that after serving his term, Irey would pose a low risk of reoffending.  *Id.*  And then, after doing so, the majority concluded that I erred by failing to *increase* his sentence in response to this risk.  Given the level of harm that would be inflicted, the majority asserted, any risk of recidivism was too great to bear:  "The district court imposed not one extra month . . . for the purpose of protecting society and its children from further crimes by Irey. . . .  Given the magnitude of the harm that will occur if Irey does commit more sexual crimes against children, that was a clear error in judgment."  *Id.* at 1217.

In plain English, the majority found that a mitigating factor, supported by substantial evidence and unchallenged by the government, was trumped by its aversion to Irey's crime.  Stated in terms of sentencing law, the majority again imported a § 3353(a)(1) factor – specifically, the nature and circumstances of the offense – into the analysis of a separate factor – the need to deter others.  I see nothing in §3353(a) that permits such double-counting, much less any indication that, as the majority sees it, such double-counting is required.[14]

_____

[14]The majority cited a single case as supporting its "adequate protection" analysis: *United States v. Boyd*, 475 F.3d 875 (7th Cir. 2007).  *Boyd* was not a § 3353(a) case.  Rather, the question in

*18 U.S.C. §3553(a)(4) and (5) – The Sentencing Guidelines and Policy Statements*

The majority opined that I "effectively gave the guidelines range no real weight in imposing the sentence." *Irey III* at 1218.  In support of this opinion, the majority simply asserts that my explanation for deviating from the guidelines was so weak, that I effectively gave them no weight.  However, the appellate court has repeatedly held that a simple statement that the sentencing judge considered all of the § 3553(a) factors was enough.  *See*, *e.g.*, *United States v. Sanchez*, 586 F.3d 918, 935-36 (11th Cir. 2009).  Logically, even a weak explanation of the reasons for deviating from the guidelines is implicitly a statement that those guidelines were considered and ought to suffice under this Circuit's precedent.

The majority also states that I ran afoul of § 3553(a)(5) because I ignored Sentencing Commission policy statements relating to such matters as age, good works, aberrant behavior and mental health.  *Irey III* at 1218-19.  The majority concluded that, though these policy statements were not binding on me, they all advised against a below-guideline sentence.  But these policy statements, by their own terms, apply only to departure-related decisions.  For example, U.S.S.G. 5H1.1 states, "Age (including youth) is not ordinarily relevant in determining whether a *departure* is warranted."  (Emphasis added).  Yet the majority would have this policy statement that places limits on departures also apply where a sentencing court seeks to exercise its (post-*Booker*) discretion and impose a variance – a very different situation.  I am not aware of any authority or rationale for doing so.

─────────────────────

*Boyd* was whether someone who randomly fired off a pistol in a vacant lot created a "substantial risk of bodily injury," thereby committing a felony under Indiana law.  *Id.* at 876.

Under the pre-*Booker* mandatory guideline scheme, the only realistic way to ameliorate an unduly harsh guideline sentence was by way of a departure.  But because of limiting policy statements, departures (except for those sponsored by the prosecution) were hard to come by.  Personal factors such as age, physical and mental health, aberrant behavior, diminished capacity, employment and military service were deemed not ordinarily relevant in determining whether a departure was warranted.  *See generally*, U.S.S.G. Chap. 5H.  In the wake of *Booker*, however, departures have lost almost all of their significance, while these personal factors have gained significance.  They are inherent in the court's consideration of the nature and circumstances of the offense and the history and characteristics of the defendant and can, post-*Booker*, lead a judge to impose a sentence below the guideline range.  18 U.S.C. §3553(a)(1).  *See also United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006) (affirming downward variance in child pornography case, noting that district court took defendant's age, minimal prior criminal record, and medical condition into account in imposing sentence below guideline range, and stating that these were "all valid considerations because they relate to the 'history and characteristics of the defendant.'").  The anti-departure policy statements simply have no application to the issue of a below-guideline variance.  Thus, I did not consider them as a limitation on my sentencing discretion.

*18 U.S.C. §3553(a)(6) – Sentencing disparity*

As set forth in this subsection, the sentencing judge is required to consider "the need to avoid  unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  In the ordinary case, the Guidelines serve as a useful aid, providing the sentencing court with a "rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Rita v. United States*, 551 U.S. 338, 350, 127 S.Ct. 2456, 2465, 168 L.Ed.

2d 203 (2007).   But the Guidelines are advisory, and judges have discretion to reach a result outside their suggested range based on, among other things, policy considerations.   *Kimbrough v. United States*, 552 U.S. 85, 101-02, 128 S.Ct. 558, 570, 168 L.Ed.2d 481 (2007).

Describing Irey's criminal behavior as the "worst of the worst," the majority stated that it was "difficult to find a case involving sexual abuse of children that compares to this one."[15]   *Irey III* at 1219-20.   In the end, the majority cited thirteen Eleventh Circuit opinions where longer sentences were imposed on defendants whose criminal behavior was not as extreme as Irey's.   *Id.* at 1220-21.   On their face, however, all of these cases differed from Irey's in more areas than simply that of the defendant's behavior.   One of the cited cases[16] occurred under the mandatory sentencing scheme that was in place prior to *Booker*, and therefore is of little relevance to this analysis.   All of the others presented at least some differences that appear to weigh in favor of a longer sentence.[17]   Some involved crimes other than (or in addition to) the one Irey was convicted

---

[15]As noted previously, Irey was charged with and convicted of a single count of violating 18 U.S.C. § 2251(c),which prohibits "sexual exploitation of children," rather than, for example, 18 U.S.C. § 2243(a), which bars "sexual abuse of a minor."

[16]*United States v. Hersh*, 297 F.3d 1233 (11th Cir. 2002).

[17]Stated differently, all of the other cited cases involved facts and circumstances that, had they been present in Irey's case, would likely have led me to impose a longer sentence.

of.[18]   Other cases involved defendants convicted of multiple counts,[19] rather than the single count to which Irey pled guilty, or who had a higher criminal history,[20] among other meaningful (or, at least, potentially meaningful) distinctions.[21]   And those are just the distinctions that appear in the Circuit Court opinions – as opposed to, for example, the sentencing court's opinion, or the PSR or the credibility determinations on which the sentence was based.

The Sentencing Commission maintains data that provides some basis for an empirical analysis of the disparity issue.[22]   Most of the data pertains to sentences imposed pursuant to U.S.S.G. § 2G2.2  for possession and distribution of child pornography.  For the three-year period of Fiscal Year 2007 through Fiscal Year 2009, 3,654 sentences were imposed nationwide pursuant

---

[18]For example, the defendant in *United States v. Frank*, 599 F.3d 1221 (11th Cir. 2010), was convicted of eight counts, including traveling in interstate and foreign commerce for the purpose of engaging in illicit sexual conduct with a minor (18 U.S.C. § 2423(b)) and obtaining custody or control of a minor with the intent to engage in sexually explicit conduct (18 U.S.C. § 2251A(b)(2)(A).  The statutory penalty range for each of these crimes was 30 years to life.  Frank was sentenced to 40 years on three of the counts and 30 years on the other five counts, to run concurrently.

[19]*See, e.g., United States v. Sarras*, 575 F.3d 1191 (11th Cir. 2009) (defendant sentenced to 100 years after being convicted at trial on three counts of violating 18 U.S.C. § 2251(a) and one count of violating 18 U.S.C. § 2252A(a)(5)(B)).

[20]*See e.g., United States v. Harris*, 291 Fed. App'x. 300, 302 (11th Cir. 2008) ("With a criminal history category of II and a statutory maximum term of imprisonment of 30 years for each charge, the report provided a sentencing range between 360 and 720 months of imprisonment.").

[21]It is also worth noting that in all of the cited cases, the applicable maximum statutory penalty exceeded 30 years.  One of these cases – *United States v. Foster*, 209 Fed.Appx. 942 (11th Cir. 2006) – resulted in a life sentence.  In the others, the defendants were sentenced to an average of 67 years, well above the 30-year maximum applicable to Irey.

[22]The Sentencing Commission data and explanatory material in regard to § 2G2.2 are attached to this opinion as Appendix A, while the data and explanatory material with regard to § 2G2.1 are attached as Appendix B.  The tables in Appendix B are limited to one that covers all districts and one that covers the Eleventh Circuit.  (Note that the "Re:" line in the cover letter in Appendix B mistakenly refers to § 2G2.2 rather than § 2G2.1.)

to § 2G2.2.  Of those sentences, 43.5 percent were below the minimum sentence recommended by the Guideline, and these below-minimum sentences were, on average, 36.4 percent less than the minimum recommended sentence.  Judges within the Eleventh Circuit  followed essentially the same pattern, imposing below-Guideline sentences 44.2 percent of the time, and varying downward by an average of 35.2 percent when they did so.  *See* Appendix A.  This downward variance trend has increased dramatically, presumably reflecting increased criticism of and policy concerns with this Guideline.  Nationwide in FY 2007, 30.8 percent of these sentences were below the low end of the Guideline range nationwide, while in FY 2009, 51.6 percent fell below that recommended minimum.  Within this Circuit, this figure increased from 42.2 percent in FY 2007 to 51.4 percent in FY 2009.[23]

Irey was sentenced under a related but different Guideline – § 2G2.1, which covers the crime of sexual exploitation of a minor by production of sexually explicit material.  During the three-year period tracked by the Sentencing Commission, only 436 sentences were imposed pursuant to § 2G2.1.  The Commission staff declined to draw conclusions based on this sample, saying it was too small to do so.  (*See* Appendix B).  With that caveat, it is worth noting that sentences imposed under this Guideline do reflect that a significant number of courts –15.6 percent, or about one in six – imposed a below-guideline sentence, with an average reduction from the recommended minimum of 26.4 percent.  This figure is consistent with the results of a recent

---

[23]The amount of downward variance of these sentences increased slightly during this period, going from about 35 percent to about 40 percent, both nationwide and within this Circuit.  *See* Appendix A.

survey of district judges, which found that 16 percent of the responding judges believed that guideline to be too high.[24]

These concerns are also reflected in the substantial number of reported opinions that find that the Guidelines for child pornography sentences are fundamentally flawed.  As stated by Judge Adelman in *United States v. Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wis. 2008), "Much like the crack guideline criticized by the Supreme Court in *Kimbrough*, guideline 2G2.2 is not representative of the Commission's typical role or of empirical study."   Judge Adelman also noted that, at least in some cases, the Guideline operated to suggest sentencing ranges that are "far greater than necessary to protect the public and deter defendant[s] from re-offending."  *Id.* at 1011. In addition, these Guidelines require enhancements for factors that are present in almost all child pornography cases, with the result that almost all defendants end up with a guideline sentence "range" of the statutory maximum.   The flawed nature of these particular guidelines has also been noted by at least one other Circuit Court.  *See United States v. Dorvee*, 616 F.3d 174 (2nd Cir. 2010)

I share these policy concerns, which I have expressed in numerous prior cases dealing with sentences for the possession and distribution of child pornography pursuant to § 2G2.2.  This was a production case, not a possession/distribution case, and as such the sentence was imposed under § 2G2.1 rather than § 2G2.2.  Although I did not express any policy concern in regard to § 2G2.1, it is possible that my reservations about § 2G2.2 colored my judgment as to the weight that this

---

[24]United States Sentencing Commission, *Results of Survey of United States District Judges, January 2010 to March 2010*, http://www.ussc.gov/Judge_Survey/2010/JudgeSurvey_201006.pdf.

Guideline merited.  Were I given the opportunity on remand, I would reconsider the extent to which § 2G2.1 might be subject to policy-related objections.

**Conclusion**

I normally conclude the sentencing process by coming back to a consideration of the need for the sentence imposed to promote respect for the law and to provide just punishment for the offense.  18 U.S.C. § 3553(a)(2)(A).  These are subjective factors that overlay the other statutory considerations.  As I said at the sentencing, "I just do the best I can under the circumstances.  It comes down to my view of what promotes respect for the law and provides just punishment.  And here, as indicated, I think that a thirty year sentence . . . is greater than necessary to accomplish the statutory objectives."  (Tr. at 61).

The Circuit Court acknowledged that I properly calculated the guideline score, committed no procedural error, and gave thorough and thoughtful consideration to the statutory sentencing factors.[25]  Nevertheless, after demonizing Irey with over 100 references to uncharged conduct (child abuse), the Circuit Court either misconstrued or exaggerated my comments, or took them out of context, considered numerous facts and arguments never presented to me, and concluded that there were no mitigating circumstances to justify any sentence other than the 30-year guideline sentence.

---

[25]As noted previously, the government did not contest any of my findings; thus, for purposes of this appeal, they were unassailable.

This is an extraordinary and unprecedented result.[26]  The Circuit Court has effectively

usurped my sentencing discretion and raised serious questions regarding Irey's right to due

process.  I concede that the majority opinion has raised valid concerns about the reasonableness of

the sentence I imposed.  Were this case remanded to me for re-sentencing, I would take these

concerns into account and exercise my discretion accordingly.   But as it now stands, I will not be

given that opportunity.  Nor, it appears, will Irey be given the opportunity to confront the facts and

arguments raised for the first time on appeal, which resulted in a 12 and a half year increase in his

sentence.

In his separate opinion, Judge Tjoflat states that the majority opinion's approach – *i.e.*,

resentencing defendants on appeal – does "immense and immeasurable institutional damage."

*Irey III* at 1267.  In my opinion, it also undermines the basic tenets of sentencing law developed

over the past five years, and opens a Pandora's box of new sentencing issues.  I regret that my

sentencing of this defendant – including any errors I made in doing so – appears to have led to this

result.

* * *

It is, therefore

---

[26]Since *Booker*, as the majority acknowledged, the Eleventh Circuit has reversed four sentences as being unreasonably lenient:   *U.S. v. Crisp*, 454 F.3d 1285 (11th Cir. 2006) (five hours imprisonment for bank fraud); *U.S. v. Martin*, 455 F.3d 1227 (11th Cir. 2006) (seven-day sentence for billion-dollar securities fraud); *U.S. v. Pugh*, 515 F.3d 1179 (11th Cir. 2008) (probation for receiving and distributing child pornography); and *U.S. v. Livesay*, 587 F.3d 1274 (11th Cir. 2009) (probation for participant in billion-dollar fraud scheme).  Needless to say, a 17 and a half year sentence is substantially greater than the sentences originally imposed in these cases.  Moreover, in none of these cases did the Circuit Court itself determine the sentence to be imposed on remand.

**ORDERED** that the Unopposed Motion for Continuance of Resentencing Hearing

Pending Review in United States Supreme Court (Doc. 80) is **GRANTED.**

**DONE** and **ORDERED** in Chambers in Orlando, Florida on October 22, 2010.

_____
**GREGORY A. PRESNELL**
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
William Irey